UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                    Chapter 11 Cases

GULFSTREAM INTERNATIONAL                                  Case No. 10-44131-JKO
GROUP, INC., *et al.,*[1]                                 Joint Administration Pending

          Debtors.
_____/

## DECLARATION IN SUPPORT OF FIRST DAY PLEADINGS

I, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I, David F. Hackett, President and Chief Executive Officer of Gulfstream International Group, Inc. (collectively, with its Chapter 11 affiliates, debtors and debtors in possession in the above-captioned Chapter 11 cases, the "Debtors") became President of the Debtors, or began my role as acting President, in March 2006. In my capacity as President of Gulfstream International, I have been actively engaged over the last four years in the Debtors' businesses and efforts to restructure their businesses and finances, as described herein.

2.     To minimize any adverse effects on their business as a result of the commencement of these Chapter 11 cases (the "Chapter 11 Cases"), the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief, among other things, to: (a) continue the Debtors' operations while in Chapter 11 with as little disruption as possible; (b) reorganize

_____

[1] The address of each of the Debtors is 3201 Griffin Road, 4th Floor, Fort Lauderdale, FL 33312; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis: (i) Gulfstream International Group, Inc. (3956); (ii) Gulfstream International Airlines, Inc. (1720); (iii) Gulfstream Training Academy, Inc. (5843); (iv) GIA Holdings Corp., Inc. (9548); and (v) Gulfstream Connection, Inc. (1208).

the Debtors and restructure their financial obligations; (c) maintain the confidence and support of key constituencies and employees, and (d) establish procedures for the smooth and efficient administration of these cases. The relief requested in these motions is crucial to the success of the Debtors' reorganization efforts.

3.      I submit this declaration (the "Declaration") in support of the Debtors' petitions and First Day Motions. In addition to the personal knowledge that I have acquired while working with the Debtors, I also have general knowledge of Debtors' books and records, and I am familiar with the Debtors' financial and operational affairs. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees or advisors, or my opinion based upon my experience with the Debtors' operations and financial condition. In making the statements herein based upon my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees to accurately record, prepare and collect any such documentation and other information.

4.      If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or my personal opinion.

5.      I am authorized to submit this Declaration on behalf of the Debtors.

6.      Part I of this Declaration describes the business of the Debtors and the developments which led to the Debtors' filing of the voluntary Chapter 11 petitions. Part II sets forth the relevant facts in support of the various emergency first-day motions and applications

filed by the Debtors concurrently herewith. Part III summarizes the Debtors' objectives in these Chapter 11 Cases.

## I. <u>BACKGROUND</u>

### A. The Chapter 11 Filings

7.     On the date hereof (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C §§ 101 <u>et. seq.</u>

8.     The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

9.     The Debtors commenced these Chapter 11 Cases to obtain the financial flexibility to restructure their finances. The Debtors will work diligently to file a Chapter 11 plan within the exclusive period in order to minimize fees, preserve the value of their assets and maximize the availability of recovery for their stakeholders.

### B. Overview of the Debtors

10.     Gulfstream Acquisition Group, Inc. was incorporated in Delaware in December 2005 and changed its name to Gulfstream International Group, Inc. ("GIG" or the "Company") in June 2007. Gulfstream International was formed for the purpose of acquiring Gulfstream Training Academy, Inc. ("GTA") and Gulfstream International Airlines, Inc. ("GIA"), a wholly-owned subsidiary of GIA Holdings Corp., Inc. ("GIA Holdings"). Today, GIA serves the public as a regional air carrier based in Fort Lauderdale, Florida. GIA operates a fleet of turboprop Beechcraft 1900D aircraft, and specializes in providing travelers with access to niche locations not typically covered by major carriers. Specifically, GIA operates more than 150 scheduled flights per day, serving nine destinations in Florida, ten destinations in the Bahamas, five destinations from Continental Airline's hub under the Department of Transportation's Essential

Air Service Program and supports charter service to Cuba through a services agreement with Gulfstream Air Charter, Inc., an entity otherwise unrelated to the Debtors (see discussion below). GIA operates as a Continental Connection carrier, as well as for United Airlines, Northwest Airlines and Copa Airlines, through respective code share agreements.

11.    As of the Petition Date, GIA employed approximately 619 employees; GCI employed approximately 6 employees; GIG had no employees; and GTA employed approximately 14 employees (collectively, the "Employees"), who, together provide a myriad of services to the Debtors throughout the country.  The Employees serve both national and international operations in the States of Florida, Ohio, West Virginia, Pennsylvania, New York, and in the countries of Cuba and the Bahamas.

12.    Approximately 537 of the Employees are full-time (the "Full-Time Employees"), while 102 of the Employees are part-time (the "Part- Time Employees").[2]  In addition, the Debtors utilize the services of a variety of independent contractors from time to time, all of whom are paid as vendors through the Debtors' normal accounts payable system and not through the normal payroll systems, as are discussed herein.  Approximately 60% of all Employees are hourly wage earners (the "Hourly Employees"), 21% are covered by collective bargaining agreements (the "CBAs")[3] (the "Represented Employees") while the remaining 19% are salaried personnel (the "Salaried Employees").

13.    Gulfstream Air Charter, Inc. ("GAC"), an unrelated related company now owned by GIA'S founder, Thomas L. Cooper, operates charter flights between Miami, Florida and Havana, Cuba. GAC is licensed by the Office of Foreign Assets Control of the U.S. Department

---

[2] "Part-Time Employees" are defined as those Employees who are normally scheduled to work less than 36 hours per week for an indefinite period.

[3] The Debtors have collective bargaining agreements with the following union: AIRLINE DIVISION of the INTERNATIONAL BROTHERHOOD OF TEAMSTERS.

of the Treasury as a carrier and travel service provider for charter air transportation between designated U.S. and Cuban airports. Pursuant to a services agreement between GIA and GAC dated August 8, 2003, as amended on March 14, 2006 (the "Amended Agreement"), GIA may provide use of its aircraft, flight crews, the Gulfstream name, insurance, and service personnel, including passenger, ground handling, security, and administrative functions. GIG also maintains the financial records for GAC. Pursuant to the Amended Agreement, GIA receives 75% of the operating profit generated by GAC, after paying operating expenses on behalf of GAC.

14.     GTA is in the business of flight training.  In furtherance of that business, GTA currently employs 6 teaching staff to service two currently enrolled students as well as providing recurrent 441 training for the GIA pilots.  GTA houses the flight training operations at Flight Safety Orlando, and maintains a simulator to aid and assist in the delivery of its training curriculum. The training program for enrolled students consists of approximately 522 hours of training including 318 hours of Turboprop training, and 250 hours of Flying Line as a Part-121 paid First Officer at GIA.

15.     Gulfstream Connections, Inc. ("GCI") is an FAA certified part 135 air carrier located at the Ft. Lauderdale, Hollywood International Airport (FLL).  GCI provides private charter service to the Islands of the Bahamas, the Caribbean, and Florida.  GCI employs 8 persons and operates four twin engine aircraft with seating for 9 passengers and an executive configuration for 6 passengers.

16.     GIA Holdings is a non-operating holding company which owns one hundred percent (100%) of the capital stock of GIA.

### C. Current Capital and Financing Structure[4]

17.     As of August 31, 2010, GIG was indebted to Shelter Island in the aggregate principal amount of $3,634,000 together with accrued and unpaid interest thereon as of that date hereof in the amount of $11,731.27 (the "Shelter Island Debt") pursuant to a Securities Purchase Agreement dated August 31, 2008, between Shelter Island and GIG (the "Shelter Island Securities Purchase Agreement"), and that certain $5,100,000 Secured Original Issue Discount Debenture entered into on September 19, 2008, and effective on August 31, 2008, as amended by that Forbearance Agreement and Amendment to Debenture dated February 26, 2010 (together with all other documents executed in connection with the Shelter Island Debt and in effect on the date hereof, collectively, the "Shelter Island Debt Documents").

18.     The obligations of GIG under the Shelter Island Debt Documents are secured by a lien and security interest (the "Shelter Island Lien") in and to all of the assets and properties of Gulfstream and its Subsidiaries and, all stock in the Subsidiaries, whether now owned or hereafter acquired and any and all additions and accessions to any of the foregoing, and any and all replacements, products, proceeds (including insurance proceeds) and substitutions of any of the foregoing wherever located (collectively, the "Collateral"), subject and subordinate only to (i) the first priority lien and security interest in favor of SVSP in the Cuba Business Collateral, and (ii) the first priority lien and security interest in favor of Taglich in the Accounts (other than Accounts arising from the Cuba Business Collateral).

19.     As of August 31, 2010, GIG was indebted to the Taglich Note Purchasers in the

---

[4] A chart summarizing the Debtors' Capital Structure is attached to the DIP Financing Motion (as hereinafter defined) as Exhibit C.  In addition to that which is outlined in the Capital Structure Summary, the Shelter Island Opportunity Fund, LLC ("Shelter Island"), Taglich Brothers, Inc. ("Taglich") as collateral agent on its own behalf and for the Purchasers listed on Exhibit A to the Taglich Debt Documents (together with Taglich, individually and collectively, the "Taglich Note Purchasers"), and SAH-VUL Strategic Partners I, LLC ("SVSP") are parties to that certain Waiver, Consent and Intercreditor Agreement (the "Intercreditor Agreement"), dated August 31, 2010.  A true and correct copy of the Intercreditor Agreement is attached to the DIP Financing Motion as Exhibit D.

aggregate principal amount of $1,050,000, together with accrued and unpaid interest thereon as of the date hereof in the amount of $67,148.92 (the "Taglich Debt") pursuant to a Purchase Agreement dated as of February 26, 2010 among GIG, Taglich and the Taglich Note Purchasers (the "Taglich Purchase Agreement"), which Taglich Debt is evidenced by Gulfstream's notes in the aggregate principal amount of $1,050,000 in favor of the Taglich Note Purchasers, and which are guaranteed by each Subsidiary of GIG (together with all other documents executed in connection with the Taglich Debt and in effect on the date hereof, collectively, the "Taglich Debt Documents").

20.     The obligations of GIG under the Taglich Debt Documents are secured by a lien and security interest (the "Taglich Lien") in the "Accounts" (as that term is defined in the Security Agreement dated as of February 26, 2010 among GIG, Taglich, as agent for the Taglich Note Purchasers, and certain subsidiaries of GIG) of GIG and its Subsidiaries, whether now owned or hereafter acquired and any and all additions and accessions to any of the foregoing, and any and all replacements, proceeds (including credit insurance proceeds of such Accounts) and substitutions of any of the foregoing wherever located (collectively, the "Taglich Collateral") subject and subordinate to the first priority lien and security interest in favor of SVSP in the Cuba Business Collateral in accordance with the terms hereof.

21.     On September 8, 2010, GIG completed a $1,500,000 debt financing, effective as of August 31, 2010 (the "SVSP Financing"), pursuant to a securities purchase agreement dated August 27, 2010 (the "SVSP Purchase Agreement") with SVSP. Under the terms of the SVSP Purchase Agreement, GIG issued to SVSP a maximum of $1,500,000 principal amount 8% Secured Convertible Promissory Note due August 31, 2011 (the "SVSP Note"), convertible into shares of the GIG's common stock, par value $0.01 per share, at a conversion price of $.70 per share, subject to certain adjustments as set forth therein, and warrants to purchase $750,000

shares of Common Stock at an exercise price of $0.70 per share, subject to certain adjustments as set forth therein, for a period beginning on the date of issuance through August 31, 2015.

22.     Cash advances pursuant to the SVSP Note were made by SVSP to GIG in accordance with the following schedule: (a) $500,000 was advanced on September 8, 2010 (the "Initial Closing Date"); (b) $500,000 advanced on September 10, 2010; and (c) $500,000 advanced on September 24, 2010.  In addition, SVSP and its designees were granted an option (the "SVSP Option"), exercisable during the 90 day period beginning on the Initial Closing Date through December 8, 2010 (the "Option Period"), to lend an additional $1,000,000 to GIG in exchange for an additional $1,000,000 Secured Convertible Promissory Note (the "Additional SVSP Note"), and an additional Warrant to purchase up to 500,000 shares of common stock at an exercise price of $0.70 per share.  As discussed below, SVSP did not exercise the SVSP Option.

23.     Payment of the principal amount of the SVSP Note and all interest accrued thereon is secured by a priority first lien and security interest on certain assets of GIG and its subsidiaries pursuant to a security agreement (the "Security Agreement") dated August 31, 2010, among GIG, each of its subsidiaries and SVSP.  Subject to and in accordance with the Intercreditor Agreement, the obligations of GIG to SVSP are secured by: (i) a first priority perfected lien and security interest in favor of SVSP in the Cuba Business Collateral, including without limitation the Assigned Agreement, (as defined in the Intercreditor Agreement), (ii) subject and subordinate to the priority lien and security interest in favor of Shelter Island, in the Collateral (other than the Cuba Business Collateral) in accordance with the terms hereof, and (iii) subject and subordinate to the first priority lien and security interest in favor of Taglich and the second priority lien and security interest in favor of Shelter Island, in the Accounts (other than Accounts arising from the Cuba Business Collateral).

3189075-6                                        8

**D. Raytheon Leasing Agreement**

24.     On May 14, 2010, GIA entered into a lease amendment and forbearance agreement with Raytheon Aircraft Credit Corporation ("Raytheon"). The Company had received a notice of default on February 11, 2010, from Raytheon, the Company's principal aircraft lessor. The notice of default outlined that the Company had defaulted on the payment of certain Airliner Operating Lease Agreements (the "Lease Agreements"), pursuant to which GIA currently leases twenty-one (21) Beech 1900D aircraft (the "Raytheon Aircraft"), and that the Company had defaulted in certain other payments under a separate agreement dated as of December 19, 2008 (the "December 2008 Agreement"), which defaults are considered to be defaults under the Lease Agreements. After demand, the Company made the required payment to Raytheon, which allowed it to continue operating.

25.     On February 19, 2010, Raytheon advised the Company that it would forebear from exercising any right under the December 2008 Agreement or the Lease Agreement, provided that the Company remain current in payment of future lease payments and provide Raytheon by April 20, 2010 with a mutually acceptable debt and financial restructuring plan that provides for a feasible basis to enable the Company to continue to meet its ongoing financial obligations under the Lease Agreement and commence to repay restructured amounts due under the December Agreement. The Company provided to Raytheon on April 20, 2010, the required financial restructuring plan. On May 14, 2010, the Company entered into the aforementioned lease amendment and forbearance agreement with Raytheon (the "Raytheon Forbearance Agreement"). Under the terms of the Raytheon Forbearance Agreement, Raytheon agreed that until the earlier of (i) December 6, 2010, (ii) an event of default by GIA under the agreement, (iii) a material adverse change in the Company's current business, or (iv) a bankruptcy event (the "Termination Date"), Raytheon would not terminate the leases for the aircraft covered by the

Lease Agreement, and agreed to extend the term of the leases through December 6, 2010. In exchange, GIA agreed to pay on a current basis all monthly lease payments due under each of the leases, Raytheon agreed that certain missed lease payments would be paid in full on the Termination Date, and Raytheon agreed that the opportunity for the Company to purchase all of the 21 aircraft currently leased from Raytheon would be extended to a date at any time on or before the Termination Date. Pursuant to the Raytheon Forbearance Agreement, if the Company successfully purchased the Raytheon Aircraft on a timely basis, Raytheon agreed to grant certain other concessions in connection with certain current obligations.

26.    As of the Petition Date, the Debtors are current in all obligations due and owing to Raytheon under the Raytheon Forbearance Agreement and intend to continue the perform in accordance with such agreement to accomplish a timely purchase of the aircraft. All of the Raytheon Aircraft and any other equipment leased from Raytheon is excluded from security for the proposed DIP Loan Facility.

### E.  Obligations Under the Pratt and Whitney Agreements

27.    In 2007, the Company entered into a Term Cost Plan with Pratt & Whitney Canada Corp. ("P&W") for Engine Maintenance Services. The parties amended the agreement on April 19, 2007, August 16, 2007, and November 1, 2007, and December 1, 2008. As of the Petition Date, GIA is not current in its obligations to Pratt & Whitney Canada Corp ("P&W"). In respect of certain aircraft engines, P&W provides engine maintenance and overhaul services under an "engine service plan" to GIA in exchange for an hourly charged based on engine operations. As of the Petition Date, GIA owes P&W approximately $2,028,005.75 (the "P&W Debt"). The P&W Debt can be broken down into the following categories:

a.    Past due amounts from pertaining to a restructuring agreement (**$386,209.24**);

    b. Past due amounts from work performed relating to engine service plan obligations, but not paid according to terms (**$1,497,409.73**); and

    c. Accrued amounts due for current work (generally, October 2010) that is not yet payable according to terms (**$144,386.78**).

The Company plans to negotiate with P&W regarding any relevant § 1110 obligations and is confident that stipulations regarding such obligations can be reached in the beginning stages of these Chapter 11 cases.

### F.  Events Leading to Chapter 11

28.    From 2003 until 2007, the Airline experienced strong growth and consistent profitability. The Company completed an Initial Public Offering in December, 2007 raising approximately $5.5 million to pay off debt and provide additional working capital.

29.    Starting in late 2007, spiking oil prices and high maintenance expenses associated with the airline's fleet of EMB-120 aircraft contributed to operating losses through the first nine months of 2008, which created the need for additional working capital to sustain operations. In an effort to improve profitability, management implemented a series of significant actions, including a sale of the EMB-120 fleet, exiting unprofitable markets, and completing a number of reductions in the company's cost structure. By the fourth quarter of 2008, the profitability improvement plans had taken hold and the company experienced improved financial performance.

30.    In September of 2008, the airline raised approximately $6.5 million in debt capital, which met near term capital needs, allowed it to meet other scheduled obligations, and allowed the airline to implement its planned business changes to improve profitability. During late 2008 and the first half of 2009, the airline posted excellent financial results. The company also began to pay down significant amounts of its principal indebtedness to its senior secured

lender, Shelter Island, its aircraft lessor, Raytheon, and its engine service provider, Pratt and Whitney. While these payments were necessary, the repayments absorbed a majority of the positive cash flow generated from improved operations.

31.    During the second half of 2009 and the first half of 2010, results from operations declined as fuel prices climbed once again and, more significantly, the Company experienced a decline in revenues due to weak passenger demand in light of the recession and new competition in several key markets. Management again structured a plan to shift capacity to markets offering better profitability prospects, and undertook a series of financings to improve working capital and fund the capacity reallocations. In addition, the Company engaged in extensive negotiations with Raytheon and, on May 14, 2010, entered into a lease amendment and forbearance agreement.

32.    The process of completing necessary working capital financings was delayed by the abrupt closure earlier this year of the Company's placement agent, Jesup & Lamont. Since that time, the Company has continuously sought to complete the financing efforts, and as a result of the Company's efforts, obtained an investment of $1.5 million from a group of private investors known as SVSP. As part of the SVSP investment, which is more fully described in the Capital Structure Section above, SVSP was granted an option, exercisable during the 90 day period beginning on September 8, 2010 through December 8, 2010, to lend an additional $1 million to the Company in exchange for an additional $1,000,000 Secured Convertible Promissory Note, and an additional Warrant to purchase up to 500,000 shares of common stock at an exercise price of $0.70 per share.

33.    After September 8, 2010, as the Company made decisions relating to potential investment and capital raise opportunities being pursued to complete an acquisition of the Raytheon Aircraft, SVSP led the Company to believe that it intended to exercise its option and

fund the additional $1.0 million investment at the end of October 2010. In making investment and capital raise decisions, the Company relied on representations made by SVSP regarding the additional $1.0 million. Unfortunately, SVSP failed to provide the remaining $1.0 million, leaving the Company in an extraordinarily difficult cash flow position at the end of October. After being informed that SVSP would not provide the additional $1.0 million financing as originally represented, the Company was left to attempt and obtain financing from other sources.

34.      In spite of recently improved year-over-year financial trends, the Debtors have been unable to attract financing without the assistance of a court-supervised financial restructuring. Accordingly, GIG's Board of Directors voted to move forward with Victory Park Capital Advisors, LLC, as explained in the DIP financing portion of this Declaration, and to commence a financial restructuring in Chapter 11, deeming both decisions to be in the best interest of the Company's stakeholders.

## II. **FIRST-DAY MOTIONS**

35.      Concurrently with the filing of these Chapter 11 Cases, the Debtors will be filing a number of First Day Motions. The Debtors request that the Court conduct a hearing as soon as possible after the commencement of the Debtors' bankruptcy cases (the "First Day Hearing"), during which the Court will hear arguments of counsel with respect to the First Day Motions.

36.      I have reviewed each of the First Day Motions, including the exhibits thereto and I believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to preserve its going concern value, to maximize the value of their assets for all creditors of their estates, and to avoid immediate and irreparable harm to the Debtors' estates.

### A. Debtors' *Ex Parte* Motion for Joint Administration (the "Joint Administration Motion")[5]

37.    The Debtors believe that it would be more efficient for the administration of these cases if joint administration were authorized.  The Debtors anticipate that a significant portion of the activity during these cases and most hearings will be substantially identical for all the Debtors resulting in duplicative pleadings repeatedly being filed should joint administration be denied.  Consequently, joint administration would reduce costs and facilitate the economical, efficient and convenient administration of the Debtors' estates.

38.    The Debtors submit that the rights of the creditors of each of the Debtors will not be adversely affected by joint administration of these cases. The Debtors filed the Joint Administration Motion on an *ex parte* basis as contemplated by Local Rule 1015-1(B). The Debtors submit that the entry of an Order approving joint administration of the Debtors' Chapter 11 Cases will be in their best interests and those of their creditors.

### B. Debtors' *Ex Parte* Motion for Authorization to File Consolidated Chapter 11 Case Management Summary

39.    I am advised that in accordance with Local Rule 2081-1(B)(a), the debtor in possession in a Chapter 11 case is directed to file with the Court and serve all parties of record, within the earlier of three business days after relief is entered, or one business day prior to the date of the first scheduled hearing, a completed local form *Chapter 11 Case Management Summary* (the "Case Management Summary") providing certain information regarding the assets, liabilities and financial affairs of Chapter 11 debtors. These Chapter 11 cases were commenced by GIG and four (4) of its related debtor affiliates.

---

[5] Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the

40.      Contemporaneously herewith, the Debtors have each filed in their respective Chapter 11 cases *ex parte* motions seeking joint administration of these Chapter 11 cases.  The Debtors request that the Court authorize them to file a consolidated Case Management Summary, reflecting the assets, liabilities and financial information of each of the Debtors.  The Debtors request authority to file a consolidated Case Management Summary, as the filing of a separate Case Management Summary for each of the numerous Debtors would be burdensome.  In addition, much of the information contained in the Case Management Summary is duplicative for many of the Debtors and the filing of a consolidated Case Management Summary is more efficient and will provide the Court and parties-in-interest with adequate disclosures regarding the assets and liabilities of each Debtor.

41.      The Debtors do not believe that the U.S. Trustee will oppose the relief requested by this motion.  The Debtors state that they will prepare and file separate Case Management Summaries should the U.S. Trustee believe that such separate Case Management Summaries are necessary.  The Debtors believe that filing a consolidated Case Management Summary provides creditors and parties in interest with the financial disclosures contemplated by Local Rule 2081-1(B).

### C. Debtors' Application for Approval, on an Interim and Final Basis, of Employment of Berger Singerman, P.A. as Counsel for Debtors in Possession *Nunc Pro Tunc* to Petition Date (the "Application")

42.      The Debtors seek authority to retain, on an interim basis, Brian K. Gart and the law firm of Berger Singerman, P.A. ("BSPA") as general bankruptcy counsel *nunc pro tunc* to the Petition Date.  The Debtors understand that Mr. Gart and BSPA otherwise have extensive experience representing Chapter 11 debtors in this district (and others across the country) and that they are well-qualified to serve as general bankruptcy counsel to the Debtors. The Debtors

Motion.

believe it is in their best interests, and those of their creditors, that Mr. Gart and BSPA be retained to serve as Debtors' general bankruptcy counsel in their Chapter 11 Cases.

43.    To the best of the Debtors' knowledge, except as disclosed in the Declaration of Brian K. Gart, on Behalf of Berger Singerman, P.A. as Proposed Counsel for Debtors-In-Possession, Nunc Pro Tunc to the Petition Date, affirmed by Mr. Gart and filed by BSPA which accompanies the Application to retain it, neither Mr. Gart nor BSPA has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.  Counsel has informed me that corporations may not appear in a Florida or federal court pro se, and that only a licensed attorney may appear on their behalf.  Because there is a myriad of relief that must be sought from the Court immediately, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened. For example, the Debtors require the Court's approval of an agreement for debtor in possession financing and the use of cash collateral. Without the availability of financing and use of cash, the Debtors will be unable to operate and maximize value for the benefit of their estates. It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided. In that regard, counsel advises that this relief, as contemplated by Bankruptcy Rule 6003, has been granted in other large Chapter 11 cases in this District.  See, e.g., In re Medical Staffing Network Holdings, Inc., et al., Chapter 11 Case No. 10-29101-BKC-EPK (Bankr. S.D. Fla. July 8, 2010); In re Gemini Cargo Logistics, Inc., et al., Chapter 11 Case No. 08-18173-BKC-PGH (Bankr. S.D. Fla. June 20, 2008); In re First NLC Financial Services, LLC, Chapter 11 Case No. 08-10632-BKC-PGH (Bankr. S.D. Fla. Jan. 28, 2008); In re Tousa, Inc., Chapter 11 Case No. 08-10928-BKC-JKO (Bankr. S.D. Fla. Jan. 31, 2008) and by other bankruptcy courts throughout the country.

### D. Debtors' Application for Approval of Employment of The Garden City Group, Inc. as Claims, Noticing, Balloting and Solicitation Agent of the Bankruptcy Court Under 28 U.S.C. § 156(c), *Nunc Pro Tunc* to the Petition Date

44.     The Debtors seek approval of their agreement with The Garden City Group, Inc. ("GCG") and to have GCG appointed as claims, noticing, balloting and solicitation agent of the Court. I am informed that GCG is one of the country's leading Chapter 11 administrators, with experience in noticing, claims administration, balloting, solicitation, and facilitating other administrative aspects of Chapter 11 cases. I am further informed that GCG has substantial experience in cases of this size and complexity, and has acted as the official notice, claims, and balloting agent in many large bankruptcy cases pending in various districts nationwide. The approval of the Debtors' agreement with GCG and GCG's appointment as claims, noticing, balloting and solicitation agent of the Court will facilitate the orderly and efficient management of these Chapter 11 cases. Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtors, their estates and creditors to retain GCG under the terms of its engagement letter.

### E. Debtors' Application for Approval, on an Interim and Final Basis, of Employment of Jetstream Aviation Capital, LLC, as Financial Advisors to the Debtors, *Nunc Pro Tunc* to the Petition Date

45.     The Debtors seek authority to retain, on an interim and final basis, the financial advisory firm of Jetstream Aviation Capital, LLC ("Jetstream"), *nunc pro tunc* to the Petition Date. The Debtors understand that Stuart A. Klaskin ("Klaskin") and Jetstream have significant and extensive experience providing financial advisory services, and have an excellent reputation for providing such services throughout the United States and internationally in restructuring matters, and that they are well-qualified to provide financial advisory services to the Debtors in these cases. The Debtors believe it is in their best interests, and those of their creditors, that

Jetstream be retained to serve as financial advisor to the Debtors in their Chapter 11 cases.

46.     To the best of the Debtors' knowledge, except as disclosed in the *Declaration of Stuart A. Klaskin, on Behalf of Jetstream Aviation Capital, LLC as Proposed Financial Advisor to the Debtors,* affirmed by Mr. Klaskin, which accompanies the Application to retain it, neither Klaskin nor Jetstream has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.

47.     Due to Jetstream's extensive experience acting as financial advisor to companies in restructuring matters, and in light of the pre-petition work done for the Debtors by Jetstream, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of a financial advisor before a final hearing on the application for approval of Jetstream's employment can be convened.   It is, therefore, my belief that only with the granting of interim approval of Jetstream's employment will such immediate and irreparable injury be avoided.

### F. Debtors' Motion for Order Establishing Procedures for Monthly and Interim Compensation and Reimbursement of Expenses for Professionals (the "Interim Compensation Procedures Motion")

48.     The Debtors request the Court to enter an order establishing a procedure for compensating and reimbursing estate retained professionals on a monthly basis, comparable to those established in complex Chapter 11 cases in this and other districts.  In this way, the Court and parties-in-interest can more effectively monitor the fees incurred, and the Debtors will be able to more effectively budget their payments of professional fees, rather than suffer depletions to cash flow on an irregular basis.

49.     In connection with these Chapter 11 Cases, the Debtors have filed an Application to retain BSPA as their general bankruptcy counsel. Because of the likelihood that the Debtors

will seek to employ additional professionals, the process of such professional fee applications may well be burdensome on the Debtors, these professionals and the Court. Thus, implementation of compensation procedures will provide a streamlined and otherwise efficient method for compensating professionals and, as stated, such procedures will allow the Court and parties interest to monitor fees sought by and paid to such professionals.

50.     In summary, the requested monthly compensation procedure would require all professionals retained with Court approval to present to (i) the Debtors; (ii) counsel for the Debtors; (iii) counsel for the Official Committee of Unsecured Creditors, if one is established; (iv) any other appointed committee; (v) Shelter Island; (vi) Taglich; (vii) SVSP, and; (viii) the Office of the United States trustee a detailed statement of services rendered and expenses incurred for the prior month. If no timely objection is filed, the Debtors would promptly pay 80% of the amount of fees incurred for the month, with a 20% holdback, and 100% of out-of-pocket expenses for the month. These payments would be subject to the Court's subsequent approval as part of the normal interim fee application process (approximately every 120 days).

51.     The Debtors have been advised by counsel that the form of relief sought in the Interim Compensation Procedures Motion has been granted in several large Chapter 11 cases in this district and is authorized by Local Rule 2016-1(B)(3)(b). The Debtors submit that the entry of an Order approving these procedures will be in the Debtors' best interests and those of their creditors.

### G. Debtors' Motion for Order Establishing Certain Notice, Case Management and Administrative Procedures

52.     The Debtors seek to establish notice, case management and administrative procedures for the conduct of these Chapter 11 cases, including, but not limited to, scheduling omnibus hearings in advance, providing service via e-mail, maintenance of a website for access

by creditors and parties in interest, and setting up a core list of persons and entities on whom and which service must be made (the "Notice Procedures"). The Notice Procedures, among other things, (a) define the parties who are to receive notice of each document that is filed with the Court, (b) describe what information must be included in notices of requests for relief from the Court, (c) set forth the deadlines for objections to be filed to requests for relief and the date of the hearing at which such requests for relief will be heard, and (d) explain the procedures for service of documents filed with the Court.

53.    The Debtors have thousands of creditors and parties-in-interest, including vendors, lenders and lessors. Therefore, I anticipate that hundreds of creditors and other parties in interest will file requests for service in these Chapter 11 cases. I also expect that numerous motions and applications will be filed in these Chapter 11 cases in pursuit of various forms of relief. By scheduling regular omnibus hearings in advance, parties in interest, and certainly the Debtors, will be better able to plan for and schedule attendance at hearings, thus reducing the need for emergency hearings and/or expedited relief and fostering consensual resolution of important matters. Moreover, by establishing certain notice and service procedures, all parties in interest will be assured of receiving appropriate notice of matters affecting their interests and ample opportunity to prepare for and respond to and be heard on such matters. Based on the foregoing, I submit that the proposed notice, case management and administrative procedures are in the best interests of the Debtors, their creditors and parties in interest.

### H. Debtors' Motion for (A) Authority to Continue Use of Existing Business Forms and Records and Maintenance of Existing Corporate Bank Accounts and Cash Management Systems, and (B) Approval of Investment Guidelines (the "Cash Management Motion")

54.    I understand from counsel that the Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the

administration of Chapter 11 cases. These guidelines require Chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation "debtor-in-possession," the bankruptcy case number, and the type of account. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims. The Debtors seek a waiver of these requirements so that its operations are not further disrupted by the need to alter the cash management system.

55.     Prior to the commencement of these Chapter 11 cases, in the ordinary course of their businesses, the Debtors utilized a network of local, national and foreign banks to efficiently collect, transfer and disburse funds generated on a daily basis from their mainland and international operations (collectively, the "Bank Accounts"). A list of the Debtors' Bank Accounts and the amount on deposit in each such Bank Account as of October 26, 2010 is set forth on **Exhibit "A"** attached to the Cash Management Motion. The Bank Accounts are part of a carefully constructed and highly automated cash management system that ensures the Debtors' ability to efficiently monitor and control their cash position.

56.     The Debtors employ cash management systems in the ordinary course of their businesses. The Debtors' cash management systems are comprised of a network of approximately ten cash accounts maintained throughout the United States. The primary components of the Debtors' existing cash management system are (i) a series of depository accounts maintained with SunTrust ("ST"), JP Morgan Chase and other institutions (collectively, the "Depository Accounts"); (ii) a series of disbursement accounts maintained at

ST and other institutions that are funded from the Depository Accounts and used for the payment of funds to employees, vendors and others (collectively, the "Disbursement Accounts"); and (iii) one account maintained with ST to handle restricted cash balances, *i.e.*, CD's.

57.     The Debtors' cash management system is centrally managed by the Debtors' financial personnel in corporate headquarters, Dania Beach, Florida. Through the utilization of the existing cash management system, the Debtors are able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of the various bank accounts required to effect the collection, disbursement, and movement of cash. The movement of funds through the Debtors' cash management system is illustrated in the chart attached to the Cash Management Motion as **Exhibit "B."**

58.     The cash management systems used by the Debtors constitute ordinary, usual, and essential business practices. These systems allow the Debtors to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, and (c) reduce administrative expenses.

59.     The Debtors' operations require that the cash management systems continue during the pendency of the Chapter 11 cases. If the Debtors were required to adopt a new cash management system, their operations would be severely disrupted, which would have an adverse impact on the Debtors' ability to reorganize. Further, the establishment of new cash accounts and a new collection and disbursement system would result in substantial additional costs to the Debtors' bankruptcy estates. Accordingly, maintenance of the existing cash management system is essential and in the best interests of all creditors and other parties in interest.

60.     The Debtors maintain two depository accounts around the world for deposits.

The Depository Accounts exist for the collection of credit card proceeds, airline clearinghouse settlements, airport station deposits, travel agent settlements, and other methods used by customers for the remittance of amounts owing to GIA.  A number of the GIA Depository Accounts maintained in foreign countries are used to pay general expenses in local currency. The Depository Accounts are maintained at First Caribbean International Bank, Bahamas and JP Morgan Chase, New York.  Funds are transferred manually from the Depository Accounts on a regular basis to the various Disbursement Accounts.

61.    GIA maintains one restricted cash account at ST for the maintenance of restricted cash balances.

62.    GIA maintains a total of one separate disbursement accounts in ST, for special purpose disbursements, including: direct deposit payroll, paper check payroll, ACH settlements, and passenger compensation payments (refunds, lost baggage, and deferred boarding payments). The Disbursement Accounts are funded by the Depository Accounts on an as-needed basis.

63.    GIA maintains one cash account at ST that maintains a nominal balance and is funded on an as-needed basis from the Depository Accounts.

64.    The Debtors request authority to maintain their existing bank accounts and cash management systems in accordance with their usual and customary practices to ensure a smooth transition into Chapter 11 with minimal disruption to operations.  The Debtors further request authority to continue making foreign exchange transactions in the ordinary course of their business.

65.    The Debtors seek a waiver of the requirement that they open a new set of books and records as of the Petition Date.  Opening a new set of books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay.  With the use of computer technology, it is now easy to

differentiate between pre- and post-petition transactions by date. The Debtors, in the ordinary course of their businesses, use many checks, invoices, stationery, and other business forms. By virtue of the nature and scope of the businesses in which the Debtors are engaged and the numerous other parties with whom the Debtors deal, the Debtors need to use their existing business forms without alteration or change. A substantial amount of time and expense would be required in order to print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations. Accordingly, the Debtors request that they be authorized to continue to use their existing business forms and to maintain their existing business records.

66.    I further understand that Bankruptcy Code section 345 establishes certain requirements with respect to all deposits and investments of money of the estate. The Debtors seek a 45-day extension of time to come into compliance with the requirements of section 345 or to request a further waiver of such requirements.

67.    The Debtors have been advised by counsel that the relief requested in the Cash Management Motion has been granted in other large Chapter 11 cases in this district. The Debtors submit that the entry of an Order authorizing the relief sought will be in the Debtors' best interests and those of their creditors.

### I. Debtors' Motion for Order (I) Authorizing Debtors to Pay (A) Certain Prepetition Employee Obligations and (B) Prepetition Withholding Obligations, and (II) Directing Banks to Honor Related Prepetition Transfers (the "Employee Motion")

68.    The Debtors seek the relief requested in the Employee Motion because any delay in paying employee compensation, deductions, or benefits will destroy the Debtors' relationships with the employees and irreparably impair employee morale at the very time when the dedication, confidence, and cooperation of these employees are most critical. The Debtors

face the imminent risk that their operations may be severely impaired if the Debtors are not immediately granted authority to make the payments described in the Employee Motion. Employee support for the Debtors' reorganization efforts is crucial to the success of those efforts, particularly given the unique knowledge of the employees regarding the Debtors' operations. At this critical early stage of these Chapter 11 Cases, the Debtors simply cannot risk the substantial disruption to their business operations that would inevitably attend any decline in work force morale attributable to the Debtors' failure to pay employee compensation, deductions, and benefits in the ordinary course. Finally, to remain in a position to maintain necessary operational integrity, oversight, and quality control, the Debtors must continue their corporate policies of permitting certain employees to incur business-related expenses and thereafter to seek reimbursement by submitting appropriate invoices or vouchers evidencing such out-of-pocket disbursements.

69.    Because the amounts represented by employee compensation, benefits, and deductions are needed to enable the employees to meet their own personal obligations, absent the relief requested in the Employee Motion, the employees could suffer undue hardship and, in many instances, serious financial difficulties. Moreover, without the requested relief, the stability of the Debtors will be undermined by the potential threat that otherwise loyal employees at all levels will seek other employment.

70.    The Debtors further request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts related to employee compensation, deductions, and benefits, whether presented prior to or after the Petition Date, upon the receipt by such bank and institution of notice of such authorization, provided only that sufficient funds are on deposit in the applicable accounts to cover such payments.

71.    As of the Petition Date, GIA employed approximately 619 employees; GCI employed approximately 6 employees; GIG had no employees; and GTA employed approximately 14 employees (collectively, the "Employees"), who, together provide myriad services to the Debtors throughout the country. The Employees serve both national and international airlines that operate in the States of Florida, Ohio, West Virginia, Pennsylvania, New York, and in the countries of Cuba and the Bahamas.

72.    Approximately 537 of the Employees are full-time (the "Full-Time Employees"), while 102 of the Employees are part-time (the "Part- Time Employees").[6] In addition, the Debtors utilize the services of a variety of independent contractors from time to time, all of whom are paid as vendors through the Debtors' normal accounts payable system and not through the normal payroll systems. Approximately 60% of all Employees are hourly wage earners (the "Hourly Employees"), 21% are covered by collective bargaining agreements (the "CBAs")[7] (the "Represented Employees"), while the remaining 19% are salaried personnel (the "Salaried Employees").

73.    The annual payroll for all of the Debtors' Employees is approximately $20,900,000.[8]

74.    The Salaried Employees consist of the Debtors' executive, management, supervisors, certain highly specialized skilled employees and other non-represented Employees. The Salaried Employees are generally paid bi-weekly on varying dates of each month, and are 4 days in arrears depending on their work schedules. As the Debtor operates 7 days a week, a

---

[6] "Part-Time Employees" are defined as those Employees who are normally scheduled to work less than 36 hours per week for an indefinite period.

[7] The Debtors have collective bargaining agreements with the Airline Division of the International Brotherhood of Teamsters.

[8] All average monthly payroll amounts provided herein are based on historical data.

limited number of employees may vary from the 4 days.

75.    The Salaried Employees collectively are paid approximately $ 490,000 per month, and the Debtors' portion of the payroll taxes for these Salaried Employees is approximately $40,000 per month.  The Debtors estimate that, as of Petition Date, accrued but unpaid payroll for the Salaried Employees will be approximately $249,000 and accrued but unpaid payroll taxes will be approximately $19,000.

76.    The Hourly Employees, excluding pilots and first officers, are generally paid bi-weekly, and are 4 days in arrears.  The Hourly Employees, collectively, are paid approximately $793,000 each month, and the Debtors' portion of payroll taxes for those Hourly Employees is approximately $65,000 per month.  (These amounts exclude the Flight Employees, as defined in the Employee Motion).  The Debtors estimate that, as of the Petition Date, accrued but unpaid payroll for the Hourly Employees will be approximately $404,000, and accrued but unpaid payroll taxes will be approximately $30,000.

77.    Pilots and first officers (the "Flight Employees") are paid on a semi-monthly basis, with such payments being made on the 15th and on the last day of each month and are 0 days in arrears.  Flight Employees are paid through the date of payment, but payment for a given month is adjusted after the close of the month.  The payment on the 15th day and the final day of each month are "estimated" payments (each based on 50% of guaranteed earnings for the month) and is adjusted on the 15th day of the following month so that pay for the previous month equals actual earnings for that month.

78.    The Flight Employees, collectively, are paid approximately $462,000 each month, and the Debtors' portion of payroll taxes for those Hourly Employees is approximately $38,000 per month.  The Debtors estimate that, as of the Petition Date, accrued but unpaid payroll for the Flight Employees will be approximately $93,000, and accrued but unpaid payroll

taxes will be approximately $7,000.  It is possible that amounts in excess of the $93,000 figure may be owed based on the "estimated" payments referred to in the preceding paragraph.

79.     The Debtors believe that none of the Debtors' Employees is owed in excess of $10,950 per individual for prepetition wages or salaries.  Thus, all of the Debtors' Employees have a priority claim with respect to all of their accrued but unpaid prepetition wages or salaries pursuant to Section 507(a)(4) of the Bankruptcy Code.

80.     The Debtors offer their Employees other forms of compensation, including vacation time, paid holidays, paid sick leave, and other earned time off, and reimbursement of certain business expenses.  These forms of compensation are usual, customary, and necessary if the Debtors are to retain qualified employees to operate their businesses.

81.     All regular Full-Time Employees are eligible to accrue paid vacation.  The length of service determines a Full-Time Employee's amount of paid vacation, based on the average weekly number of hours normally worked ("Vacation Time").  Vacation Time ranges from 1 day to 4 weeks, based on an Employee's years of service and their date of hire.  Actual payment to Employees for Vacation Time is based on an Employee's years of service and the number of vacation days taken.  The Debtors permit the carryover of Vacation Time from one year to the next only if circumstances are such that an employee is unable to use their prior year's earned vacation time. Management's agreement and approval for this carryover is required.

81.     Employees who retire, resign, or are terminated are, for the most part, entitled to receive a cash payment based on their accrued Vacation Time.

82.     The Debtors maintain information related to accrued Vacation Time for all Employees. The Debtors estimate that, as of November 3, 2010, approximately $408,000 exists in earned, accrued but unpaid Vacation Time for all Employees including the associated employer's liability for taxes.

83.    Eligible Employees accrue sick leave ("Sick Leave") on a monthly basis.  Sick Leave generally accrues at a rate of 0.75 days per month for regular Full-Time Employees. Regular Part-Time Employees do not accrue Sick Leave.  Eligible Employees are subject to a maximum of amount of 20 days accrued Sick Leave.    Employees who resign or are terminated normally are not entitled to any compensation for their accrued and unused Sick Leave.

84.    In addition, Flight Employees are entitled to personal leave in accordance with the Debtors' companies' policies (the "Flight Personal Leave").

85.    The Debtors seek authority to honor in the ordinary course of business all pre-petition accrued Vacation Time, Sick Leave and Personal Leave rights of their  Employees who continue to be employed by the Debtors after the Petition Date.  The Employees will utilize any accrued Vacation Time and Sick Leave in the ordinary course of business.

86.    In the ordinary course of business, the Debtors withhold approximately $7,000 monthly from paychecks of Represented Employees for the payment of dues to unions of which those Employees are members of unions (the "Union Dues").  These withheld amounts then are remitted to the respective unions on a monthly basis, normally in arrears.

87.    The Debtors believe that funds withheld to pay Union Dues, to the extent that they remain in the Debtors' possession, constitute monies held in trust and, therefore, are not property of the Debtors' bankruptcy estates.  The Debtors believe, therefore, that their practice of directing such funds to the appropriate parties is in the ordinary course of business.  The Debtors, however, seek the approval of this Court for the continuation of such practices out of an abundance of caution.

88.    Employees are entitled to reimbursement of certain limited categories of expenses incurred in the ordinary course of business.    The Debtors routinely reimburse Employees for certain expenses incurred within the scope of their employment, including

3189075-6                                          29

expenses for travel, lodging, professional seminars and conventions, ground transportation, meals, supplies, and miscellaneous business expenses (collectively, the "Business Expenses").

89.    In addition, the Debtors reimburse their pilots and first officers, pursuant to the terms of their respective CBAs, for certain expenses incurred while traveling within the scope of their employment, including expenses for lodging, transportation, and telecommunications, as well as a *per diem* based primarily on hours worked (collectively, the "Travel Expenses"). Most Travel Expenses, excluding any *per diem*, are paid directly by the Debtors based upon negotiated arrangements with the outside vendors. All other expenses are reimbursed directly to the Employees in arrears.

90.    The Debtors provide certain Employees with relocation expenses in order to attract desirable candidates to accept positions with the Debtors (the "Relocation Expenses")[9] (and, together with the Business Expenses and the Travel Expenses, the "Reimbursable Expenses"). In addition to the reimbursing individual Employees for their actual out-of-pocket expenditures, the Debtors also directly pay certain relocation-related vendors, including shipping companies, realtors, and a relocation agent. The Debtors seek authority to continue making payments related to Relocation Expenses in the ordinary course in an abundance of caution to ensure the ability to attract prospective employees.

91.    Certain Employees have not yet been reimbursed for Reimbursable Expenses previously incurred. The majority of the Reimbursable Expenses have been incurred through the use of Employees' personal credit card accounts. The Employees submit receipts for reimbursement that are processed through the normal expense report and accounts payable process. It is difficult for the Debtors to estimate the amount of Reimbursable Expenses

---

[9] There are no Relocation Expenses pending as of the Petition Date. The Debtors seek authorization to continue the practice of paying Relocation Expenses on a post-petition basis in the ordinary course of their businesses as they did prior to the Petition Date.

outstanding as of the Petition Date, because not all Employees have submitted expense reports as of the Petition Date. It is critical that the Debtors be authorized to reimburse all such expenses as and when reports are submitted. The Debtors, therefore, seek authority to pay all pre-petition Business Expenses, Travel Expenses, and Relocation Expenses in the ordinary course of business, including those incurred prior to the Petition Date. The Debtors estimate that there is approximately $32,000 in accrued, unpaid pre-petition Reimbursable Expenses.

92.     The Debtors provide a number of Employee medical and dental benefits pursuant to several medical plans (collectively, the "Medical Plans") through a health care provider. For instance, the Debtors have available medical, dental, prescription drug, health savings accounts, and employee assistance programs, provided by major medical and health maintenance organization plans. In general, all full time Employees are eligible for the benefits described in the Employee Motion on the first day of the month following a 90 day period subsequent to their hire date immediately, unless otherwise noted.

93.     Employees are offered a choice between a traditional "fee-for-service" indemnity plan (the "Indemnity Plan"), a health maintenance organization ("HMO") or Health Savings Account type plan. Each of the plans are administered or serviced by CIGNA Healthcare.

94.     The Medical Plans are partially funded through contributions by the Debtors and Employees contribute to the Medical Plans through payroll deductions. The Debtors deduct funds from Employee paychecks prior to plan payments in order to collect Employee contributions. Payment and funding of the Medical Plans is handled on a cash plan basis; monthly pre-payments from Employees for the Medical plans are $85,000. The total cost including the Employee contribution is approximately $160,000.[10]

---

[10]  With respect to Cigna Plan account number 3327528 for certain medical benefits, the Debtors are currently in arrears in the amount of $324,313.81 for the months of September and October 2010. As a result, Cigna has advised that it will discontinue honoring claims under such policy, although such policy

95.    The Debtors request authority to make all payments, claims, and remittances related to the Medical Plans in the ordinary course of business.

96.    The Debtors offer Life Insurance, Supplemental AD&D Insurance & Disability Insurance to certain Employees pursuant to group policies issued by The Hartford (collectively, the "Supplemental Insurance Plans").

97.    The Debtors remit approximately $8,000 per month to The Hartford pursuant to the Supplemental Insurance Plans.  Generally, 90% of the costs for these plans are borne by the Employees.

98.    Amounts to pay for coverage under the Supplemental Insurance Plans are withheld from Employee paychecks and transmitted by the Debtors to The Hartford. The Debtors believe that such withheld funds, to the extent that they remain in Debtors' possession, constitute monies held in trust and, therefore, are not property of the Debtors' bankruptcy estates.  Thus, the Debtors believe that their practice of directing such funds to the appropriate parties is in the ordinary course of business.  The Debtors, however, seek the approval of this Court for the Debtors to continue such practices out of an abundance of caution.[11]

99.    The Debtors offer a 401(k) plan (the "401(k) Plan") for all Employees. Employees are eligible to participate in the plan after completing three months of service.

---

has not been terminated.  Accordingly, as part of the relief sought herein, the Debtors request that they be granted authority to make the pre-petition payment of $324,313.81 to Cigna in order to bring the account current, as well as to continue making the payments to Cigna set forth in the Motion in the ordinary course.

[11] With respect to The Hartford policy 0GL-GLT-GRH 852661 for certain life insurance benefits, the Debtors are currently in arrears in the amount of $24,018.85 for the months of September, October, and November 2010.  As a result, The Hartford has advised that they have cancelled the policy, effective October 31.  Accordingly, as part of the relief sought in the Employee Motion, the Debtors request that they be granted authority to make the pre-petition payment of $24,018.85 to The Hartford in order to reinstate the policy and bring the account current, as well as to continue making the payments to The Hartford set forth in the Employee Motion in the ordinary course.

100.    The Debtors seek authority to pay all amounts related to the 401(k) Plans that arose prior to the Petition Date, as they become due, in the ordinary course of the Debtors' business.

101.    The Debtors provide workers' compensation insurance coverage for the benefit of all Employees.    These benefits are covered primarily under the Debtors' workers' compensation insurance programs, insured primarily by the Pacific Indemnity Company. For international employees and local national employees, the Debtors' workers' compensation insurance program is insured primarily by the Great Northern Insurance Company  Failure to maintain this insurance in the various states in which the Debtors conduct business could result in the institution of administrative or legal proceedings against the Debtors.   The monthly premium for the workers' compensation insurance is approximately $78,000. This amount has been prepaid through the end of 2010, however, payments will begin again in January 2011.

102.    The Debtors seek authority to pay any workers' compensation premium that remained accrued and unpaid as of the Petition Date and continue paying and/or contesting in good faith, as appropriate in the Debtors' business judgment, all amounts related to workers' compensation claims that arose prior to the Petition Date, including, without limitation, any payments to insurers required as a result of such claims, as they become due in the ordinary course of the Debtors' businesses.

103.    In addition to the benefits described above, the Debtors offer certain other benefit programs to various groups of Employees, including, without limitation, substance abuse and other counseling services and discounted Employee and retiree travel.[12]   The Debtors believe that these programs are important to maintaining Employee morale and assisting in the retention

---

[12] The Debtors also provide such travel benefits to current and former non-employee members of the Debtors' board of directors and their immediate families.  The Debtors seek to continue to provide such benefits.

of the Debtors' workforce. The cost of such programs for the Debtors each month is negligible.

104.    The Debtors believe that failing to honor such programs would have an adverse affect on the Debtors' Employees. The Debtors request authority to continue such programs in their sole discretion and make payments pursuant to such programs in the ordinary course of business.

105.    The Debtors routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to third parties. Examples of such withholding are garnishments, health care payments, union dues, and 401k withholdings. The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute monies held in trust and, therefore, are not property of the Debtors' bankruptcy estates. The Debtors request that their practice of directing such funds to the appropriate parties in the ordinary course of business be specifically authorized and approved by the Court out of an abundance of caution.

106.    The Debtors utilize the services of several professionals and consultants in the ordinary course of their businesses in order to facilitate the administration of (and to maintain the books and records in respect of) Employee benefit plans and programs. For instance, the Debtors utilize the services of Merrill Lynch and ADP for managing the 401k plan. The Debtors pay a service fee of approximately $2,000 per month. The Debtors pay certain other third parties for their administrative services related to other benefit programs, such as audit fees for the 401k plan.

107.    These administrative services ensure that the Debtors' plans and programs are operated in the most cost-efficient manner. The Debtors request that they be authorized to continue to pay the various costs incident to maintaining or paying third parties to maintain and provide recordkeeping relating to the various Employee benefit programs.

108.    The Debtors believe that the requested relief will enable them to maintain their current operations without interruption, thereby preserving the value of the business, and, at the same time, maintaining employee morale. Without the relief requested, the Debtors' ability to preserve the assets of the estates for the benefit of all creditors will be dramatically impaired and that a grant of the relief requested will be in the best interests of the Debtors and their creditors.

### J.    Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 363(c) for Authorization to (I) Continue to Administer Workers Compensation Insurance and Other Insurance Policies, and (II) To Continue to Pay Claims to the Extent They Become Due and Payable (the "Insurance Motion")

109.    The Debtors filed the Insurance Motion seeking authorization to continue to administer workers compensation insurance and other insurance policies and to continue to pay claims to the extent they may become due and payable. It is essential to the Debtors' continued operation and reorganization efforts that workers compensation insurance be maintained on an ongoing and uninterrupted basis. In maintaining those obligations, it is crucial that the administrative fees paid to providers and the premiums paid to the states on behalf of the various state-wide workers compensation programs are continued and maintained by the Debtors. The risk that eligible claimants will not receive payments with respect to employment-related injuries may have a devastating effect on the financial well-being and morale of the employees, and their willingness to remain in the Debtors' employ. Departures by employees at this critical time may result in a severe disruption of the Debtors' business to the detriment of all parties in interest. I understand and/or have been advised by counsel that maintenance of the workers compensation insurance is also mandatory under the terms of the secured credit documents, the United States Trustee guidelines, and various state and federal laws.

110.    The Debtors must also maintain their general liability insurance, which provides a comprehensive range of coverage for the Debtors and their properties. If those policies were

allowed to lapse, the Debtors would be exposed to substantial liability for any damages resulting to persons or property of the Debtors and others, and the Debtors would have to bear the costs and expenses of defense litigation. I have been advised by counsel that maintenance of the general liability insurance is required by the United States Trustee.

111.    The Debtors maintain a commercial property insurance policy (the "Commercial Property Insurance") through Lloyds of London. The Commercial Property Insurance policy provides for payment of premiums on an annual basis. All premiums due under the Commercial Property Insurance policy are more particularly described in **Exhibit "A"** attached to the Insurance Motion. The Commercial Property Insurance is critical to the Debtors as it provides coverage for the locations from which they operate. Therefore, the Commercial Property Insurance must be maintained. All premiums due under the Commercial Property Insurance policy are paid through April 9, 2011.

112.    The Debtors maintain a commercial inland marine insurance policy (the "Marine Insurance") through Travelers Property & Casualty Company. The Marine Insurance policy provides for payment of premiums on an annual basis. All premiums due under the Marine Insurance policy are more particularly described in **Exhibit "A"** attached to the Insurance Motion. The Marine Insurance is critical to the Debtors as it provides coverage for equipment and electronic data processing equipment. Therefore, the Marine Insurance must be maintained. All premiums due under the Marine Insurance policy are paid through April 9, 2011.

113.    The Debtors maintain a business automobile insurance policy (the "Business Auto Insurance") through Travelers Indemnity Company. The Business Auto Insurance policy provides for payment of premiums on an annual basis. All premiums due under the Business Auto Insurance policy are more particularly described in **Exhibit "A"** attached to the Insurance Motion. The Business Auto Insurance is critical to the Debtors. If the Debtors were to allow

their Business Auto Insurance to lapse, the Debtors would be exposed to substantial liability for any damage resulting to persons and/or property of the Debtors and others, and the Debtors would have to bear the administrative costs and expenses of defense litigation and possible adverse judgments. Additionally, maintenance of the Business Auto Insurance is mandatory under various state laws. Therefore, the Business Auto Insurance must be maintained. All premiums due under the Business Auto Insurance policy are paid through April 9, 2011.

114.    The Debtors maintain a workers compensation & employers liability insurance policy and program which is provided to all of the Debtors' employees. The Debtors make payments to Pacific Indemnity Company and Zurich, NA in the ordinary course of business for this policy and program. The Debtors also maintain foreign workers compensation insurance policies and make payments to Great Northern Insurance Company in the ordinary course of business (collectively, the "Workers Compensation Insurance"). The Workers Compensation Insurance policies cover the Debtors' employees up through and including January 1, 2011. All premiums due under the Workers Compensation Insurance are more particularly described in **Exhibit "A"** attached to the Insurance Motion. It is essential to the Debtors' continued operation that the Workers Compensation Insurance be maintained on an ongoing and uninterrupted basis. In maintaining those obligations, it is crucial that the administrative fees paid to providers, and the premiums paid on behalf of the Debtors' employees, are continued and maintained. The risk that eligible claimants will not receive payments with respect to employment-related injuries may have a devastating effect on the financial well-being and morale of the employees, and their willingness to remain a member of the Debtors' workforce. There also exists the possibility that government officials might issue a "stop work" order in the event of a cessation of premium payments. A "stop work" order or departures by employees at this critical time could result in a severe disruption of the Debtors' business to the detriment of

all parties in interest. Maintenance of the Workers Compensation Insurance is also mandatory under the United State Trustee Guidelines and various state and federal laws.

115. The Debtors maintains airline liability insurance policies (the "Airline Liability Insurance") through various companies more particularly described in **Exhibit "A"** attached to the Insurance Motion. The Airline Liability Insurance policies provide for payment of premiums on an annual basis. The Airline Liability Insurance is critical to the Debtors as it provides coverage for bodily injury (including passenger), property damage, passenger checked and unchecked baggage, personnel injury, cargo legal liability, contingent hull & liability, aviation premises, ground hangarkeepers, in-flight hangarkeepers, fire legal liability and excess non-aviation liability. Therefore, the Airline Liability Insurance must be maintained. All premiums due under the Airline Liability Insurance policies are paid through September 30, 2011.

116. The Debtors maintain directors and officers insurance liability policies (the "D&O Liability Insurance") and employment practices liability insurance (the "EPLI Insurance") through National Union Fire Insurance Company, Beazley Insurance Company, and Admiral Insurance Company. The Debtors must maintain EPLI and D&O Liability Insurance throughout the pendency of these Chapter 11 cases. The directors and officers, or managers or members of the Debtors that are limited liability companies that fall under the umbrella of the EPLI and D&O Liability Insurance, like any other similarly situated individuals, require insurance so as to protect themselves from liability, but more importantly, be able to focus their efforts on guiding the Debtors through the Chapter 11 bankruptcy process. There is simply no reason why these individuals should have to serve and operate without EPLI and D&O Liability Insurance that was, in the ordinary course of the Debtors' business, in place prior to the Petition Date. Maintenance of the EPLI and D&O Liability Insurance is also mandatory under the

United States Trustee Guidelines, and various state and federal laws. The D&O Liability Insurance policies and programs are more particularly described in **Exhibit "A"** attached to the Insurance Motion. The EPLI and D&O Liability Insurance policies provide for the periodic payment of premiums on a monthly, quarterly, semi-annual or other basis, depending on the specific policy and program. All premiums due under the EPLI and D&O Liability Insurance and paid through December 14, 2010.

117. The Debtors submit that the amounts proposed to be paid with respect to prepetition periods under the workers compensation and general liability insurance policies are small when compared with the harm that would be occasioned if employees needed to further the rehabilitation effort left or if a significant claim arose absent insurance coverage. For all the reasons stated in the Insurance Motion, the maintenance of the workers compensation and general liability, and the payment of all premiums and amounts and continuance of the various administration programs serve the best interests of the bankruptcy estate and is required by the United States Trustee's guidelines and federal and state law as a condition of operations. The relief requested in the Insurance Motion is in the best interests of the Debtors and their estates, and I have been advised by counsel that similar relief has been granted in other large Chapter 11 cases in this district.

118. To the extent that the workers compensation and/or general liability insurance policies may be deemed executory contracts, the Debtors do not at this time seek authority to assume the contracts. The Debtors request only authorization to continue the programs, pay claims in accordance with the programs, and pay such premiums and administrative expenses as may be necessary to keep the policies in force. The Debtors have also requested authority to pay for various insurance coverages related to employee benefits in the Employee Motion.

### K. Debtors' Emergency Motion for Order Authorizing Debtors to Pay Prepetition Sales, Use, Trust Fund, Transportation, Property, and Other Taxes and Similar Obligations (the "Tax Motion")

119.    The Debtors are requesting that the Court enter an order authorizing, but not directing, the Debtors to pay prepetition sales, use, trust fund, transportation, property, and other taxes and similar obligations, as detailed in the Tax Motion, in the ordinary course of the Debtors' businesses.  In addition, the Debtors are requesting that (i) to the extent Debtors have paid certain taxes which should not have been paid, the Court authorize the Debtors to seek a refund of such taxes, and (ii) to the extent that the Debtors dispute any such pre-petition tax, the Court authorize the Debtors to set aside, in a segregated account, funds to pay the subject tax until a final determination is made as to whether the Debtors are obligated to pay the subject tax.

120.    In connection with the operation of their businesses, the Debtors: (a) incur use, liquor, fuel, franchise, property, and excise taxes, collect sales, fuel, and transportation taxes from their customers, and collect or incur payroll and employment-related taxes in favor of various taxing authorities; (b) are responsible for the collection of (i) an excise tax on the amount paid for domestic air transportation, (ii) another excise tax on each domestic segment, international departure, and international arrival, pursuant to Section 4261 of the Internal Revenue Code, charged to GIA's passengers, which, if not paid, may become a liability of GIA, and (iii) an excise tax on the sale of frequent flyer miles, and property transported by air (collectively, the "Taxes"); (c) are charged fees, licenses, and other similar charges and assessments by various licensing authorities, and collect customs, immigration, security, and inspection fees from their customers (collectively, the "Fees"), and (d) collect fees on passenger tickets charged by airports for general passenger facilities at such airports (the "Passenger Facility Charges" or "PFCs").  The Taxes, Fees, and PFCs are paid to various taxing, licensing, and airport authorities (collectively, the "Authorities") on a periodic basis (whether monthly,

quarterly, or yearly) that are established for each particular Tax, Transportation Tax, Fee or PFC.

121.    As of the Petition Date, the Debtors estimate that they have incurred prepetition payroll and employment-related Taxes in the ordinary course of business and that such Taxes are owed (but have not yet been paid) to the Authorities. Those payroll and employment-related taxes will be paid in conjunction with the Debtors' upcoming payroll, which payroll is subject of a separate first day motion.

122.    Separate and apart from the payroll and employment-related taxes, the Debtors estimate that they owe to the Authorities, as of the Petition Date, approximately $225,000.00 in passenger related Taxes, Fees, and PFCs. Additionally, the Debtors estimate that they owe to Authorities approximately $10,000.00 for sales and use and property Taxes as of the Petition Date. Through the Tax Motion, the Debtors seek only the authorization to pay the Authorities the amounts described therein.

123.    If the Taxes, Fees and PFCs are not paid immediately, the Debtors believe that some, if not all, of the Authorities may, pursuant to Bankruptcy Code § 362(b)(9), cause the Debtors to be audited and subjected to various administrative proceedings. Such audits and administrative proceedings, and the accompanying disruption in business activities, would materially and adversely affect the Debtors' reorganization prospects and unnecessarily divert the Debtors' attention away from these cases. Moreover, while reserving the right to argue to the contrary in particular cases, the Debtors believe that they generally do not have any legal or equitable interest under Bankruptcy Code § 541(a)(1) in funds held by them and due in respect of the Taxes, Fees and PFCs.

124.    Accordingly, the Debtors request that the Debtors be authorized, but not directed, to pay the Taxes, Fees and PFCs to the relevant Authorities in the ordinary course of business.

Nothing in the Tax Motion, however, shall preclude the Debtors from contesting, in their sole discretion, the validity and amount of any Taxes, Fees and PFCs under bankruptcy or non-bankruptcy law.

125.    The Debtors further request that all depositories on which checks were drawn in payment of pre-petition amounts to the Authorities be directed to clear such checks as and when presented for payment, if appropriate.

126.    The timely payment of Taxes and Fees is therefore necessary and in the best interest of the Debtors' estates.

> **L.    Debtors' Emergency Motion for Order Authorizing (A) Application of Pre-Petition Payments for Post-Petition Fuel and Related Services; and (B) Debtors to Continue to Honor Obligations Under Fuel Supply Management Agreement (the "Fuel Motion")**

127.    GIA, GCI and non-filing entity GAC (the "Flying Entities") are party to various fuel agreements that are integral to the operation of the Flying Entities. The Flying Entities seek an order permitting them to honor their obligations under all such agreements maintained in accordance with industry custom and practice, and whether written or verbal, for fuel and fuel related services. Most importantly, the Debtors seek the authorization to pay any outstanding pre-petition obligations to any and all parties providing fuel-related services.

128.    The Flying Entities are parties to various agreements for fuel and fuel related services. A non-exclusive list of fuel and fuel related service suppliers (the "Vendors"), along with the current amounts due and owing under the fuel and fuel related service agreements for the Flying Entities, are attached to the Fuel Motion as **Exhibit "A."** The services provided pursuant to the fuel agreements vary by station. In certain instances, the Vendors are responsible for the majority of all fuel-related services for the Flying Entities, including delivery or procurement for delivery, transportation, into-plane fueling and storage of all aviation jet fuel

used by the Flying Entities.  In other instances the vendors with responsibility for delivery, transportation and storage of aviation jet fuel is different from the vendor with responsibility for into-plan fueling.  Under the more significant of these fuel and related service agreements, the Flying Entities work with their vendors to estimate the amount and cost of fuel that will be used at each of the destination airports for the upcoming month, and the Flying Entities are billed and make bi-monthly or weekly payments in advance.  The fuel and related service agreements require the invoice amounts to be paid in advance.  As of the Petition Date, the Flying Entities have obligations due and owing under the Fuel Agreements totaling $1,391,000 as listed on **Exhibit "A"** to the Fuel Motion.

129.    By the Fuel Motion, the Debtors seek an order authorizing: (a) the Flying Entities to pay amounts, if any, due and owing for pre-petition fuel and fuel services; (b) the Flying Entities' Vendors to apply any pre-petition credits or advance payments to post-petition fuel services under the fuel agreements; and, in an abundance of caution, (c) the Flying Entities to honor their ongoing obligations under the fuel agreements post-petition.

130.    The Debtors request that the Court authorize the Flying Entities, in their business discretion, to pay obligations, if any, due and owing for pre-petition fuel and fuel services under the fuel agreements to the parties included on **Exhibit "A"** to the Fuel Motion as well as any parties inadvertently omitted.  If payments are not made to fuel suppliers and service providers for pre-petition services rendered, these parties may elect not to provide further fuel or services to the Flying Entities and their fuel supply could be disrupted, thereby stranding the Flying Entities' aircraft and passengers.

131.    The Debtors also are requesting that the Court authorize the Vendors to apply any pre-payments made by the Flying Entities as of the Petition Date, or credits due to the Flying Entities, to post-petition fuel services, in accordance with the fuel agreements.  Without

this relief, the Flying Entities' fuel supply could be interrupted, and their operations could be harmed. A shortage or elimination of fuel supply would result in a complete discontinuation of passenger service. Accordingly, the Debtors request that, to the extent required, if any, the automatic stay of Bankruptcy Code § 362 be modified to allow for the payments received by the Vendors, or credits due to the Flying Entities pre-petition, to be applied to fuel services occurring post-petition.

132.    The Debtors request that the Court authorize the Flying Entities, in their business discretion, to continue honoring, performing, and exercising their rights and obligations (whether pre-petition or post-petition) under such fuel agreements in the ordinary course of business; provided, however, that doing so shall not give rise to administrative claims solely as a result of the entry of an order providing such authorization.

133.    It is essential that the Flying Entities continue to have available fuel at their disposal at any given time, because a shortage or elimination of fuel to their aircraft would be disastrous to their operations. Therefore, it is critical that the Debtors be granted the relief requested in the Fuel Motion.

> **M.    Debtors' Emergency Motion (A) for Authorization to (i) Obtain Postpetition Financing Pursuant to Sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code and (ii) Use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (b) For Authorization to Grant Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364(c) and (d) of the Bankruptcy Code, and (c) Scheduling a Final Hearing on the Motion (the "DIP Financing Motion")[13]**

134.    The Debtors seek approval of secured, post-petition loan from the DIP Lender pursuant to the terms of the DIP Loan Letter and proposed Interim Order, in an amount sufficient to fund the Debtors' operations and estates, estimated not to exceed $5.0 million. On an interim basis, the Debtors' seek approval of $1.5 million, in accordance with the Approved

---

[13]    Capitalized terms not otherwise defined in this Section M of the Declaration shall have the meanings

Budget,[14] in order to avoid immediate and irreparable harm the Debtors' ongoing business operations and the Debtors' bankruptcy estates prior to a final hearing on the DIP Financing Motion.

135.    As security and adequate protection for the DIP Facility, the Debtors propose granting the Lender, the following: (1) as security for the DIP Indebtedness, security interests and liens (the "DIP Facility Liens") in all currently owned or hereafter acquired assets including, without limitation, accounts, accounts receivable, inventory, customer lists, intellectual property, minerals, mineral rights, plan and equipment patents, trade secrets, property and/or leasehold rights, all other tangible and intangible assets, and any causes of action under the Bankruptcy Code or applicable nonbankruptcy law, expressly excluding recoveries pursuant to Chapter 5 of the Bankruptcy Code (the "Avoidance Actions") and any equipment or other assets as described in Bankruptcy Code §1110; (2) a first priority pledge of the capital stock and/or equity interest held directly or indirectly by each of the Debtors (excluding a pledge of the capital stock/equity interest held by public shareholders/investors in GIG); and (3) constructive control over the Debtors' bank accounts in similar form and substance of a lockbox and/or control accounts customary for transactions of this nature exercisable upon an event of default (all of the foregoing, the "DIP Facility Collateral.").  The Debtors propose to grant:

- pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority senior priming lien (the "Priming Liens") on all of the DIP Facility Collateral, which shall be senior to all other security interests and liens in property of the Debtors' estates in this or any subsequent or superseding cases (including, without limitation, any conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the

ascribed to such terms in the DIP Financing Motion.

Bankruptcy Code or any other proceeding related hereto or thereto); and

- except to the extent otherwise expressly set forth in the Interim Order, or in a written instrument, agreement or other document executed by DIP Lender and subject to paragraph 23 of the Order, the DIP Facility Liens shall not be subject to subordination to any other liens, security interests or claims under Section 510 of the Bankruptcy Code, or otherwise.  Any security interest or lien upon the DIP Facility Collateral which is avoided or otherwise preserved for the benefit of the Debtors' estates under Section 551 or any other provision of the Bankruptcy Code shall be subordinate to the DIP Facility Liens and the Adequate Protection Liens (as defined below); and

- for the avoidance of doubt, the Debtors do not seek to include Section 1110 Equipment, the Avoidance Actions, or any the proceeds thereof, or any equipment or other assets as described in Bankruptcy Code §1110, as part of the DIP Facility Collateral.

136.    Subject to the Carve-Out described in the DIP Financing Motion, the Debtors propose that all of the DIP Indebtedness shall have the highest administrative priority under § 364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in the Chapter 11 Case or any successor case), and shall at all times be senior to the rights of the Debtors, any successor trustee or estate representative in the Chapter 11 Cases or any successor case (the "Superpriority Claims").  The Lender has not consented, through the Budget or otherwise, to the imposition of any costs or expense of administration or other charge, fees, liens, assessment or claim (including, without limitation,

---

[14] A true and correct copy of the Budget is attached to the DIP Financing Motion as Exhibit ___.

any amounts set forth in the Approved Budgets) against DIP Lender, its claims or collateral (including the DIP Facility Collateral) under § 506(c) of the Bankruptcy Code or otherwise, all of which rights the Debtors shall waive pursuant to the terms of an interim order granting this Motion and approving the Interim Financing.

137.    As adequate protection for use of the existing pre-petition secured creditor's Cash Collateral, the Debtors' propose to grant the Junior Lenders Superpriority Claims subject only to the Superpriority Claims of the DIP Lender, the DIP Facility Liens, all other liens and claims afforded to DIP Lender hereunder, and the Carve-Out.

138.    The super-priority administrative expense claims and the liens granted to the DIP Term Loan Lenders pursuant to the Interim Order and the Loan Agreement shall be junior and subordinate only to the Carve-Out, as defined in the Interim Order, to the fees due to the Clerk of the Court and fees due to the United States Trustee.

139.    Through the DIP Financing Motion, the Debtors seek this Court's authorization to use the Junior Lenders' cash collateral within the meaning of Bankruptcy Code § 363(a) (the "Cash Collateral"), pursuant to Bankruptcy Code § 363(c) and to provide adequate protection, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d).    The Junior Lenders have not consented to such use as of the Petition Date.

140.    The Debtors require the use of Cash Collateral, in conjunction with the financing sought herein, as the use of the requested cash collateral will allow for the flow of supplies and services to the Debtors necessary to sustain the Debtors' business operations and enhance the Debtors' prospects for a successful completion of the Chapter 11 Cases.

141.    As adequate protection of Junior Lenders' interests in the DIP Facility Collateral, including use of the Cash Collateral, pursuant to §§ 361, 363 and 552(b) of the Bankruptcy Code, the Debtors reuest that the Junior Lenders be granted valid, binding, enforceable and

perfected additional and replacement liens (the "Adequate Protection Liens") in all property of the Debtors' estates, including the DIP Facility Collateral, to the extent of any decrease in the value of Junior Lenders' interests in the DIP Facility Collateral occurring subsequent to the Petition Date, with such decrease in value to include decreases resulting from the Debtors' use (if any) of Cash Collateral, the depreciation, use, sale, loss, decline in market price of the DIP Facility Collateral, or otherwise. The Debtors' further propose that the Adequate Protection Liens enjoy the same validity and extent as the liens the Junior Lenders held on the Petition Date, but subject and junior to the DIP Lender's super priority Priming Liens and the Carve-Out. For the sake of clarity, the Debtors' do not seek to provide any of the Junior Lenders a lien on any of the Debtors' assets or property, including the DIP Facility Collateral, which they did not have a right to prepetition.

142.    The Debtors use of cash collateral will be subject to the Approved Budget, and solely in compliance therewith and subject further to the terms and conditions of this Interim Order and the DIP Loan Documents. The Debtors submit that by virtue of the replacement liens discussed above, the Junior Lenders will be adequately protected with respect to the Debtors' limited use of Cash Collateral.

143.    The Debtors have no unencumbered funds with which to pay administrative expenses, ongoing wages, salaries and day-to-day operating expenses, including, but not limited to, rents, utilities, fuel, other essential goods and services and other overhead costs, all of which are vital to sustain normal course business operations. Without access to these sources of working capital, the Debtors will be forced to halt operations and unable to preserve their going concern value for the benefit of all creditors of their estates. The proposed DIP Facility, therefore, is essential to sustain the Debtors during these Chapter 11 proceedings and to prevent irreparable harm to the Debtors' estates.

144.    The Debtors are unable to obtain financing in the form of unsecured credit allowable solely as an administrative expense under Section 503(b)(1) of the Bankruptcy Code or solely in exchange for the grant of a "superpriority" administrative claim status under Section 364(c)(1).  The Debtors also are unable to obtain secured financing under Section 364(c)(2) or (c)(3) of the Bankruptcy Code. The Debtors believe that there are no viable financing alternatives available under the circumstances other than the proposed DIP Facility, and substantially all of the Debtors' assets are encumbered by liens and security interests.

145.    The DIP Facility and the Approved Budget provide adequate funds to pay anticipated administrative expenses during the pendency of these Chapter 11 Cases.

146.    The Debtors' decision to obtain the postpetition financing and enter into the DIP Facility is a result of the exercise of sound and reasonable business judgment.  The proposed financing is necessary, essential and appropriate for the continued operations of the Debtors' businesses and the preservation of the assets of the estates.  Given the circumstances of this case and of the Debtors, the terms of the DIP Facility are fair, reasonable and adequate, and the proposed financing is in the best interest of the Debtors' estates.  The terms of the DIP Facility were negotiated at arms' length and in good faith.  The Debtors reasonably believe that no alternative financing is available on any other basis and no better offers or commitments were presented to the Debtors.  The DIP Facility, which is the product of extensive arm's length negotiations between the DIP Lender and the Debtors, provides the Debtors with continued financing pursuant to the Approved Budget, pending approval of the DIP Facility on a permanent basis at the Final Hearing.  The net practical effect of the DIP Facility will be to enable the Debtors to commence and continue to administer their chapter 11 cases in an orderly fashion with the financial resources necessary to maintain operations during the contemplated sales process and attempt to maximize returns to creditors. Therefore, the Debtors

submit that granting of the relief sought is necessary and appropriate and in the best interests of the Debtors and their creditors.

### N. Debtors' Emergency Motion for Authority to Pay Secured and Unsecured Domestic and Foreign Airport Landing Fees and Other Similar Obligations (the "Landing Fees Motion")

147.    The Debtors seek the entry of an order authorizing, but not directing, the Debtors to pay secured and unsecured domestic and foreign airport landing fees and other similar obligations as determined by Debtors in their sole discretion.  The domestic airport authorities and the average monthly landing fees at such airports are identified on Exhibit A to the Landing Fees Motion.

148.    Airlines typically pay fees to the authorities of the airports at which they land.  In many cases, the obligation to pay landing fees is assured by a cash deposit, a surety bond or a standby letter of credit.  The surety bonds are often secured by a letter of credit and the letters of credit are often secured by cash deposits.  Similarly, certain obligations to the U.S. Customs authorities are bonded or secured by letters of credit.  Therefore, the secured airport authorities and U.S. Customs authorities will ultimately be paid notwithstanding Debtors' bankruptcy, and one claim (of the airport authority or U.S. Customs) simply will be exchanged for another claim (of the letter of credit issuer or bonding company).

149.    Debtors seek authority to pay secured prepetition fees owed to airport authorities and U.S. Customs authorities.  A failure to pay these fees at the outset of the cases could be harmful to the Debtors' operations and will result in the estates' needlessly incurring additional costs as parties exercise their rights under surety bonds and letters of credit, charge fees to the Debtors and, in some instances, instigate litigation in this Court to enforce their rights.

150.    The Debtors pay approximately $26,900 landing fees and related fees to the Fort Lauderdale airport authority. These landing fees are fully secured by a letter of credit and cash

deposits.

151.    The Debtors pay approximately $6,100.00 landing fees and related fees to the Greater Orlando Aviation Authority

152.    The Debtors pay approximately $4,800 in landing fees and related fees to Palm Beach County, Fl.

153.    The Debtors pay approximately $18,100 landing fees to the city of Tallahassee,FL airport authority. These landing fees are fully secured by a letter of credit and cash deposits.

154.    Moreover, the Debtors pay for rent, landing fees and other similar services on an unsecured basis to numerous other domestic and foreign airport authorities, as further set forth in **Exhibit "A"** to the Landing Fees Motion.  Failure to pay such obligations in the ordinary course of business may cause serious disruption to the Debtors' operations.

### O.    Debtors' Emergency Motion for an Order Authorizing Payment of Prepetition Claims of Critical Vendors ("Critical Vendor Motion")

155.    The Debtors seek the entry of an order authorizing them to pay the prepetition claims of certain vendors that are critical to the operation of the Debtors' businesses.

156.    Attached to the Critical Vendor Motion as Exhibit "A" is a list of those vendors (collectively, the "Critical Vendors") that the Debtors deem to be critical to their business operations.  The Critical Vendors are essential to the Debtors' business operations as they are primarily source suppliers of components and fuel.

157.    If payment of the claims of the Critical Vendors, the amounts of which are set forth on Exhibit "A" to the Critical Vendor Motion (collectively, the "Critical Vendor Claims"), are not paid, the Critical Vendors will terminate the services they provide to the Debtors and operations of the Debtors' businesses will be jeopardized to the detriment of all creditors.  Most

if not all of the Debtors' business operations are dependent upon the Critical Vendors. Accordingly, interrupting the business relationship of the Debtors, on the one hand, and the Critical Vendors, on the other hand, if not fatal to the Debtors' efforts to reorganization, will severely impair that effort to the detriment of the Debtors' estates and the creditors thereof. I believe that payments of the Critical Vendor Claims is fair and reasonable for the services provided.

158.    In the exercise of my business judgment, I believe the relief requested in the Critical Vendor Motion is in the best interests of the Debtors and their estates, and I have been advised by counsel that similar relief has been granted in other large Chapter 11 cases in this and other districts. In return for payment, Critical Vendors must agree to continue providing services to the Debtors under the same terms and conditions as existed pre-petition.

### P. Debtors' Emergency Motion for Order Authorizing Gulfstream International Airlines, Inc. to Honor Obligations Related to Code Share Agreements, Interline Agreements, Clearinghouse Agreements, Alliance Agreements, Computer Reservation Systems Agreements, ATPCO Agreement, and Various Other Operating Agreements in the Ordinary Course of Business

159.    Certain agreements are required in order for GIA to provide reliable transportation services on an ongoing basis after the Petition Date, and to preserve public confidence, customer loyalty, and essential business relationships. These agreements include, but are not limited to: (1) Interline and Clearinghouse Agreements; (2) Code Share Agreements and Alliance Agreements; and (3) ATPCO Agreements.

160.    GIA flies and operates under Continental Airline's Interline Agreements. Interline Agreements facilitate cooperation among airlines with respect to such critical activities as making reservations and transferring passengers, packages, baggage, and mail between airlines. All major air carriers participate in some form of interline agreement with other

carriers because of the operating efficiencies obtained through their usage.    All payments related to interline agreements are reconciled through clearinghouses.    Clearinghouse Agreements govern the relationships with the clearinghouses, Airlines Clearing House, Inc., and International Air Transport Association Clearinghouse.    Together the Interline and Clearinghouse agreements are an essential and substantial element of GIA's business model, and are necessary for the preservation of GIA's value as a going concern.

161.    GIA is party to a comprehensive marketing agreement and Alliance Agreement with Continental Airlines.  The Alliance Agreement provides numerous benefits to GIA and its customers including, among others, significantly easier access to destinations served solely by Continental pursuant to a Code Share Agreement, streamlined ticketing, baggage handling, and check-in procedures between the two-airlines, and the ability for customers of GIA and Continental to earn frequent flyer miles on flights of either carrier.  GIA also has Code Share Agreements with United Airlines, and Copa Airlines.  These agreements constitute a significant customer benefit for passengers, facilitate the Interline Agreements between the parties, and are necessary for preservation of GIA's value as a going concern.

162.    Under multiple agreements with the Airline Tariff Publishing Company, GIA obtains and publishes information that enables updated vendor databases and pricing.  GIA also maintains various Computer Reservations Systems Agreements, that in conjunction with its Alliance Agreement with Continental, allowing travel agents and online travel agencies to make and confirm reservations, print and issue tickets automatically, and perform internal accounting tasks for travel agents, all with updated flight schedules, fare information, and seat availability. GIA maintains Frequent Flyer Programs, and Pass Agreements, as well.  Frequent Flyer Programs and Pass Agreements along with the ATPC and Computer Reservations System Agreements are an integral component of the business of GIA.

**Q.    Debtors' Emergency Motion for Order Authorizing the Payment of Certain Pre-Petition Claims of, and Honoring Certain Contracts With, Outside Mechanics, Repairmen and Shippers**

163.    GIA, GCI and the non-filing entity GAC use various outside maintenance providers (the "Outside Maintenance Providers") in the course of their business that provide maintenance and overhauls for the fleet of aircraft and aircraft components.    GIA, GCI and GAC are required to perform significant maintenance and overhaul work to maintain their respective fleets of aircraft properly and safely and in accordance with the regulations of the Federal Aviation Administration.    See, e.g., 14 C.F.R. §§ 125.241 to 125.251 (setting forth regular and extensive maintenance requirements for certain types of aircraft).    Most of the Outside Maintenance Providers perform maintenance and repair work (a) pursuant to ongoing maintenance and service contracts (e.g., engine repair contracts), or (b) on a credit basis and subsequently deliver invoices to GIA, GCI and GAC.    Some of the Outside Maintenance Providers provide "on-call" maintenance and repair services at various destinations, which enable the GIA, GCI and GAC to avoid maintaining complete repair facilities and employee mechanics at every destination city.

164.    An integral part of GIA, GCI and GAC's maintenance and repair operations is the use of domestic and foreign commercial common carriers, movers, shippers, freight forwarders and consolidators, delivery services, customs brokers, shipping auditing services, and certain other third-party services providers (collectively, the "Shippers") to ship, transport, store, move through customs, and deliver goods through established national and international distribution networks (payments for which services, including any related taxes and custom duties, are collectively referred to herein as ("Shipping Charges").    A list of the Shippers is attached to the motion as Exhibit "A."

165.    GIA, GCI and GAC rely extensively on the Shippers to transport parts to and

from their Outside Maintenance Providers. The services provided by the Shippers are critical to the day-to-day operations of the Debtors. At any given time, there are numerous shipments en route to or from the Outside Maintenance Providers and, therefore, certain Shippers are currently in possession of engines and other equipment that is vital to operations and may refuse to deliver or release these items until they are paid pre-petition amounts.

166.    GIA, GCI and GAC request authorization to make payment of pre-petition claims to the Outside Maintenance Providers and Shippers and to honor the maintenance contracts, so that GIA, GCI and GAC may continue their operations without the serious disruptions that would result if the Outside Maintenance Providers or Shippers refuse to redeliver aircraft, engines, and other equipment in their possession, or refuse to service the aircraft fleets on an ongoing basis. Absent such payment, the value of the Debtors' estates is likely to suffer drastic diminution.

### III.  DEBTORS' OBJECTIVES IN THESE CASES

167.    The primary purposes of the filing of these Chapter 11 Cases are to (a) restructure the Debtors' finances and emerge from bankruptcy as a viable going-concern, and (b) maximizing the value of the Debtors' assets for all creditors of their estates. The Debtors will strive to restructure their existing debt and equity structure and propose and consummate a Chapter 11 plan of reorganization. In the interim, through the motions described above and other motions and applications the Debtors intend to file shortly after the Petition Date, the Debtors hope to minimize any adverse affects that these Chapter 11 Cases might otherwise have on their business. For all of these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

### IV.  CONCLUSION

168.    To successfully reorganize, the Debtors' immediate objective is to maintain

"business as usual" following the commencement of these cases by minimizing any adverse impact of the filing of these Chapter 11 cases on the Debtors' assets and operations and protect the interests of the employees, passengers, and creditors.  For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions.

## 28 U.S.C. § 1746 DECLARATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this ___4___ day of November, 2010 in Fort Lauderdale, Florida.

David F. Hackett, President and Chief Executive Officer of Gulfstream International Group, Inc., et al.