UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                    Chapter 11 Cases

GULFSTREAM INTERNATIONAL                    Case No. 10-44131-BKC-JKO
GROUP, INC., *et al.*,[1]                         Joint Administration Pending

                          Debtors.
_____/

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
(A) SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105,
361, 362, 364(c)(1), (c)(2),(c)(3), AND (d); (B) GRANTING SECURITY INTERESTS,
SUPERPRIORITY LIENS AND CLAIMS AND ADEQUATE PROTECTION; AND
(C) USE OF CASH COLLATERAL AND (II) SCHEDULING A FINAL HEARING
PURSUANT TO BANKRUPTCY RULE 4001(C)**

**(EMERGENCY HEARING REQUESTED)**

**Statement of Exigent Circumstances**

The Debtors submit that a hearing on this Motion is necessary on an emergency
"first day" basis.  Gulfstream is a passenger airline that operates flights
throughout the United States and the Caribbean.  The Debtors face severe
liquidity problems that necessitated the commencement of these chapter 11 cases.
In the absence of the financing sought herein, the Debtors will not have sufficient
liquidity to continue operations and could not operate with use of cash collateral
alone.  It is therefore critical that the Debtors obtain immediate approval to obtain
post-petition financing for up to $1.5 million under the DIP Facility on an interim
basis pending a final hearing.  Without approval of the post-petition financing, the
Debtors' operations will come to a halt, the value of the Debtors' assets will
decline and creditors and parties in interest will be severely prejudiced.  In
contrast, approval of the post-petition financing on an interim basis will preserve
the value of the Debtors' assets and enable the Debtors to continue their
operations and allow for an orderly restructuring.

---

[1] The address of each of the Debtors is 3201 Griffin Road, 4th Floor, Fort Lauderdale, FL 33312;
and the last four digits of the taxpayer identification number of each of the Debtors follows in
parenthesis:  (i) Gulfstream International Group, Inc. (3956); (ii) Gulfstream International
Airlines, Inc. (1720); (iii) Gulfstream Training Academy, Inc. (5843); (iv) GIA Holdings Corp.,
Inc. (9548); and (v) Gulfstream Connection, Inc. (1208).

Gulfstream International Group, Inc. ("GIG"), Gulfstream International Airlines, Inc. ("GIA"), Gulfstream Training Academy, Inc. ("GTA"), GIA Holdings Corp., Inc. ("GIA Holdings") and Gulfstream Connection, Inc. ("GCI") (collectively, the "Debtors"), by and through undersigned counsel, pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), (2), (3) and 364(d), Fed. R. Bankr. P. 4001(d) and 9014, and Local Rule 4001-3, file this motion (the "Motion") seeking entry of an order (the "Interim Order") in the form attached as **Exhibit "A**:"[2] (I) authorizing the Debtors to obtain secured post-petition financing; (II) granting Lender a perfected first priority senior priming lien on all of the DIP Facility Collateral pursuant to 11 U.S.C. § 364(d)(1); (III) granting Lender a first priority pledge of the capital stock and/or equity interest held directly or indirectly by each of the Debtors;[3] (IV) authorizing the Debtors use cash collateral; (V) granting adequate protection; and (VI) scheduling a final hearing to consider entry of a final order approving the post-petition financing under the DIP Financing Agreement. In support of this motion (the "Motion"), the Debtors rely upon the *Declaration in Support of First Day Pleadings* (the "First Day Declaration"), and respectfully represent as follows:

**STATEMENT OF RELIEF REQUESTED**
**PURSUANT TO BANKRUPTCY RULE 4001(d)(1)(B)**

1.      The Debtors seek the entry of the proposed *Interim Order (I) Authorizing (A) Secured Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(c)(1), (2), and (3) and 364(d); (B) Granting Security Interests, Superpriority Claims And Adequate Protection; and (C) Use Of Cash Collateral and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule*

---

[2] Capitalized terms ascribed in this motion and not otherwise defined herein shall have the meaning's ascribed to them in the Interim Order.

[3] Such pledge shall not include a pledge of capital stock/equity interest held by shareholders/investors in Gulfstream International Group, Inc.

*4001(c)* (the "Interim Order") in the form attached hereto as Exhibit A, as well as a Final Order

authorizing the Debtors to:

a.  Obtain post-petition financing from the Lender pursuant to the terms of the DIP Loan Documents and the Approved Budget,[4] under the DIP Facility not to exceed approximately $5.0 million, with $1.5 million to be provided on an interim basis to avoid immediate and irreparable harm;

b.  Grant to Lender, in accordance with Bankruptcy Code § 364(c)(1), a lien with claims holding a priority over all administrative expenses of the kind specified in Bankruptcy Code § 503(b) or 507(b).  In addition, the security interests and liens in the Collateral securing the Loan shall be authorized and approved by the Court pursuant to Bankruptcy Code § 364(c)(2), (3), and 364(d) to constitute a lien on and in the Collateral ranking prior to all other claims and liens of the Debtors, except for the Carve-Out as defined below (the "***Priming Lien***").  The Priming Lien will be senior in priority to all security interests and liens securing the indebtedness and other obligations owing under any of the Debtors' prepetition loan and security agreements.  The Priming Lien shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the Agent or the Lender upon entry of the Interim Order.

2.      In addition, the Debtors request that the Court schedule an interim hearing and a

final hearing to consider this Motion.

## SUMMARY OF TERMS OF FINANCING[5]

3.      Pursuant to Bankruptcy Rule 4001, Local Rule 4001-2, 4001-3 and the *Guidelines*

*for Motions Seeking to Authority to Use Cash Collateral and Motions Seeking Approval of*

*Postpetition Financing* (the "Guidelines") [CG-7], the Debtors highlight in bold as well as

---

[4] From and after the Final Hearing approving the financing sought herein, the Approved Budget shall be subject to modification and/or amendment with the approval of Lender and Agent.

[5] Capitalized terms not defined in this summary have the meanings ascribed in the proposed Interim Order.

summarize, in bullet point form, the essential terms of the proposed use of cash collateral and

post-petition financing as follows:[6]

| **Material Terms of Proposed Financing** | | **Location in Proposed Interim Order** |
|---|---|---|
| • The lender shall be Victory Park Capital Advisors, LLC (the "Lender") or its affiliated designees or affiliates. | | Preamble |
| • The principal amount of the DIP Term Loan shall be $5.0 million ("DIP Term Loan Principal Amount"). On an interim basis, the Debtors are seeking only $1.5 million of the DIP Term Loan Principal Amount to avoid immediate and irreparable harm. | | Paragraph I, pg. 5 Paragraph 2, pg. 7 |
| • Interest payable monthly in arrears at rate of 15% per annum (based on a 360 day year and for the actual number of days elapsed). Debtors shall prepay three (3) interest payments under the Loan on the Initial Closing Date. In the event of a default of Event of Default, the DIP Term Loan shall bear interest at 20% per annum on any outstanding advances.  • The DIP Term Loan Fee: payment of 2% fee, payable in cash to the Lender on the Initial Closing Date.  • The DIP Term Loan includes a 3% Success Fee, fully earned as of the Final Hearing, payable in cash to the Lender on the Due Date.  • The DIP Term Loan includes a maintenance fee of $5,000 per month. | | Paragraph 4, pg. 7 Paragraph 5, pg. 8 |
| • The proceeds of the Loan nor the Carve-Out (as defined below) may not be utilized to prosecute any action against the Lender or the Agent, whatsoever. | | Paragraph 19(c), pg. 24 |
| • The Loan Obligations shall become due and payable in full in cash upon the earlier of (the "Due Date"): | | Paragraph 6, pg. 8 |

---

[6] For purposes of completeness, parties should refer to the terms and conditions contained within the executed Letter Agreement, a true and correct copy of which is attached hereto as **Exhibit "B."**

| | | |
|---|---|---|
| (i) termination of the stay period specified in Bankruptcy Code § 1110, or the Debtors' failure to reach arrangements (including arrangements with the Aircraft Lessor) reasonably satisfactory to Agent, Lender and Debtors regarding the Debtors' assets that are subject to Section 1110); (ii) ninety (90) days after the commencement of the Bankruptcy Cases; (iii) the substantial consummation of a confirmed plan of reorganization; (iv) conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code; (v) appointment of a trustee for the Debtors; (vi) dismissal of any of the Bankruptcy Cases; (vii) thirty (30) days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such thirty (30) day period; (viii) the date on which the Court enters a final order approving a post-petition financing between the Debtors and another lender(s) or investor(s) (as the case may be) (other than Lender); (ix) repayment in full in cash of the Loan Obligations; and (x) three (3) business days after the Agent or the Lender notifies the Debtors in writing of an Event of Default which is not subsequently cured or waived by the end of such notice period. | | |
| • The Debtors and Lender will continue to cooperate to develop an agreement for a sale of the Debtors' assets free and clear of liens and claims (under which Lender would provide the "stalking horse" purchase transaction), or a Plan of Reorganization, under which Lender and Debtors would be co-sponsors (a "Lender Sponsored Transaction"), subject to the conditions contained within the Letter Agreement. | | N/A |
| • Events of Default are summarized as follows:<br><br>a) Debtors shall fail to pay any Loan Obligation as due;<br><br>b) Any report, certificate or other document delivered to the Agent or the Lender;<br><br>c) Debtors shall fail to perform or comply with any covenant or agreement;<br><br>d) The failure of Debtors to comply in all material respects with each and all of the | | Paragraph 22, pg. 24 |

terms and conditions of the Interim Order, the Final Order and the Letter Agreement;

e) Any of the Debtors is enjoined, restrained or in any way prevented by the order of any court or any governmental authority from conducting all or any material part of its business for more than three (3) consecutive days;

f) Any material damage to, or loss, theft or destruction of, any Collateral, as more fully explained in the Letter Agreement;

g) The entry of an order in the Bankruptcy Cases which stays, modifies (in any manner adverse to the Agent or the Lender), or reverses the Interim Order or Final Order or which otherwise materially adversely affects, as determined by the Agent in its reasonable discretion, the effectiveness of the Interim Order or Final Order without the express written consent of the Agent;

h) The conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code;

i) Removal of any of the senior management who must remain in the employ of the Debtors;

j) The appointment of a trustee for the Debtors;

k) The dismissal of any of the Bankruptcy Cases without Agent or Lender consent;

l) Relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 with effects as defined in the Letter Agreement;

m) Subject to conditions in the Letter Agreement, the filing of any application by Debtors without the express written consent of the Agent for the approval of a super-priority claim in the Bankruptcy Cases which is pari passu with or senior to the priority of the

| | | |
|---|---|---|
| claims of the Agent or the Lender if proceeds are not to be used to pay the Loan;<br><br>n) The payment or other discharge by Debtors of any prepetition indebtedness without the written consent of the Agent or Lender;<br><br>o) Subject to the terms of the Letter Agreement, the filing of any motion by Debtors seeking, or the entry of any order in the Bankruptcy Cases: (a) permitting working capital or other financing; (b) granting a lien on, or security interest in, any of the Collateral; (c) except as permitted by this Letter Agreement, the Interim Order or the Final Order, permitting the use of any of the Collateral pursuant to Bankruptcy Code § 363(c) without the prior written consent of the Agent, permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Bankruptcy Code § 506(c); or (d) dismissing the Bankruptcy Cases, unless the Agent has sought or consented in writing to such relief by the Court;<br><br>p) The Debtors filing of a motion or other pleading seeking the entry of an order confirming a plan of reorganization that does not contemplate paying the Lender in full; or<br><br>q) A challenge to the validity, priority, perfection or enforceability of the DIP Facility. | | |
| • As more fully described in the Letter Agreement, the Loan shall be secured by: (i) a perfected first priority lien on all assets, excluding recoveries pursuant to Chapter 5 of the Bankruptcy Code (and also expressly excluding any equipment or other assets as described in Bankruptcy Code § 1110); (ii) a first priority pledge of the capital stock and/or equity interest held directly or indirectly by each of the Debtors; and (iii) constructive control over the Debtors' bank accounts in similar form and substance of lockbox and/or control accounts customary for transactions of this nature exercisable upon an Event | | Paragraph 7, pg. 9 |

| | | |
|---|---|---|
| of Default and stay relief from the Court (collectively the "Collateral"). | | |
| • The Debtor shall comply with all covenants contained with and more fully described in the Letter Agreement. | | Paragraph 21, pg. 24 |
| • Carve-Out for (i) all U.S. Trustee fees, (ii) fees due to the Clerk of the Bankruptcy Court; (iii) actual fees and expenses incurred by professionals prior to the occurrence of the Termination Date so long as within the Approved Budgets and allowed by the Bankruptcy Court; and (iv) actual fees and expenses incurred by professionals of the Debtors appointed in the Debtors' bankruptcy cases in the amounts incurred (and subsequently approved by the Bankruptcy Court) in an amount not to exceed the sum of $200,000 to be funded upon the occurrence of an Event of Default for payment of post-default expenses, all on terms and conditions acceptable to the DIP Term Loan Lender. | | Paragraph 17, pg. 17 |
| • The Debtors shall reimburse the Agent and the Lender for all costs incurred in connection with the Loan and/or, the Loan Obligations and/or any Lender Sponsored Transaction. | | N/A |

## I.   Jurisdiction and Background

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The statutory bases for the relief requested herein are sections 105 and 507 of title 11 of the United States Code (the "Bankruptcy Code").

7.     On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11, title 11 of the Bankruptcy Code.

8.     The Debtors are operating their businesses and managing their affairs as debtors in possession.  11 U.S.C. §§ 1107(a) and 1108.

9.    For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the First Day Declaration.

## II.    Debtors' Capital Structure[7]

10.    As of August 31, 2010, GIG was indebted to Shelter Island in the aggregate principal amount of $3,634,000 together with accrued and unpaid interest thereon as of that date hereof in the amount of $11,731.27 (the "Shelter Island Debt") pursuant to a Securities Purchase Agreement dated August 31, 2008, between Shelter Island and GIG (the "Shelter Island Securities Purchase Agreement"), and that certain $5,100,000 Secured Original Issue Discount Debenture entered into on September 19, 2008, and effective on August 31, 2008, as amended by that Forbearance Agreement and Amendment to Debenture dated February 26, 2010 (together with all other documents executed in connection with the Shelter Island Debt and in effect on the date hereof, collectively, the "Shelter Island Debt Documents").

11.    The obligations of GIG under the Shelter Island Debt Documents are secured by a lien and security interest (the "Shelter Island Lien") in and to all of the assets and properties of GIG and its Subsidiaries and, all stock in the Subsidiaries, whether now owned or hereafter acquired and any and all additions and accessions to any of the foregoing, and any and all replacements, products, proceeds (including insurance proceeds) and substitutions of any of the foregoing wherever located (collectively, the "Collateral"), subject and subordinate only to (i)

---

[7] A chart summarizing the Debtors' Capital Structure is attached hereto as **Exhibit "C."**  In addition the Capital Structure Summary, the Shelter Island Opportunity Fund, LLC ("Shelter Island"), Taglich Brothers, Inc. ("Taglich") as collateral agent on its own behalf and for the Purchasers listed on Exhibit A to the Taglich Debt Documents (together with Taglich, individually and collectively, the "Taglich Note Purchasers"), and SAH-VUL Strategic Partners I, LLC ("SVSP") are parties to that certain Waiver, Consent and Intercreditor Agreement (the "Intercreditor Agreement"), dated August 31, 2010.  A true and correct copy of the Intercreditor Agreement is attached hereto as **Exhibit "D."**

the first priority lien and security interest in favor of SVSP in the Cuba Business Collateral, and (ii) the first priority lien and security interest in favor of Taglich in the Accounts (other than Accounts arising from the Cuba Business Collateral).

12. As of August 31, 2010, GIG was indebted to the Taglich Note Purchasers in the aggregate principal amount of $1,050,000, together with accrued and unpaid interest thereon as of the date hereof in the amount of $67,148.92 (the "Taglich Debt") pursuant to a Purchase Agreement dated as of February 26, 2010 among GIG, Taglich and the Taglich Note Purchasers (the "Taglich Purchase Agreement"), which Taglich Debt is evidenced by GIG's notes in the aggregate principal amount of $1,050,000 in favor of the Taglich Note Purchasers, and which are guaranteed by each Subsidiary of GIG (together with all other documents executed in connection with the Taglich Debt and in effect on the date hereof, collectively, the "Taglich Debt Documents").

13. The obligations of GIG under the Taglich Debt Documents are secured by a lien and security interest (the "Taglich Lien") in the "Accounts" (as that term is defined in the Security Agreement dated as of February 26, 2010 among GIG, Taglich, as agent for the Taglich Note Purchasers, and certain subsidiaries of GIG) of GIG and its Subsidiaries, whether now owned or hereafter acquired and any and all additions and accessions to any of the foregoing, and any and all replacements, proceeds (including credit insurance proceeds of such Accounts) and substitutions of any of the foregoing wherever located (collectively, the "Taglich Collateral") subject and subordinate to the first priority lien and security interest in favor of SVSP in the Cuba Business Collateral in accordance with the terms hereof.

14. On September 8, 2010, GIG completed a $1,500,000 debt financing, effective as of August 31, 2010 (the "SVSP Financing"), pursuant to a securities purchase agreement dated

August 27, 2010 (the "SVSP Purchase Agreement") with SVSP.  Under the terms of the SVSP Purchase Agreement, GIG issued to SVSP a $1,500,000 principal amount 8% Secured Convertible Promissory Note due August 31, 2011 (the "SVSP Note"), convertible into shares of the GIG's common stock, par value $0.01 per share, at a conversion price of $.70 per share, subject to certain adjustments as set forth therein, and warrants to purchase $750,000 shares of Common Stock at an exercise price of $0.70 per share, subject to certain adjustments as set forth therein, for a period beginning on the date of issuance through August 31, 2015.

15.     Cash advances pursuant to the SVSP Note were made by SVSP to GIG in accordance with the following schedule:  (a) $500,000 was advanced on September 8, 2010 (the "Initial Closing Date"); (b) $500,000 advanced on September 10, 2010; and (c) $500,000 advanced on September 24, 2010.  In addition, SVSP and its designees were granted an option (the "SVSP Option"), exercisable during the 90 day period beginning on the Initial Closing Date through December 8, 2010 (the "Option Period"), to lend an additional $1,000,000 to GIG in exchange for an additional $1,000,000 Secured Convertible Promissory Note (the "Additional SVSP Note"), and an additional Warrant to purchase up to 500,000 shares of common stock at an exercise price of $0.70 per share.  As discussed below, SVSP did not exercise the SVSP Option.

16.     Payment of the principal amount of the SVSP Note and all interest accrued thereon is secured by a priority first lien and security interest on certain assets of GIG and its subsidiaries pursuant to a security agreement (the "Security Agreement") dated August 31, 2010, among GIG, each of its subsidiaries and SVSP.  Subject to and in accordance with the Intercreditor Agreement, the obligations of GIG to SVSP are secured by:  (i) a first priority perfected lien and security interest in favor of SVSP in the Cuba Business Collateral, including without limitation the Assigned Agreement (as defined in the Intercreditor Agreement),

11

(ii) subject and subordinate to the priority lien and security interest in favor of Shelter Island in the Collateral (other than the Cuba Business Collateral), and (iii) subject and subordinate to the first priority lien and security interest in favor of Taglich and the second priority lien and security interest in favor of Shelter Island, in the Accounts (other than Accounts arising from the Cuba Business Collateral).

### III.    Requested Relief and Basis Therefor

*Approval of Financing Under Section 364(c) and (d) of the Bankruptcy Code*

17.    The Debtors seek approval of secured, post-petition loan from the Lender pursuant to the terms of the Letter Agreement and proposed Interim Order, in an amount sufficient to fund the Debtors' operations and estates, estimated not to exceed $5.0 million.  On an interim basis, the Debtors' seek approval of $1.5 million, in accordance with the Approved Budget,[8] in order to avoid immediate and irreparable harm the Debtors' ongoing business operations and the Debtors' bankruptcy estates prior to a final hearing on this Motion.

18.    As security and adequate protection for the DIP Facility, the Debtors propose granting the Lender, the following: (1) as security for the DIP Indebtedness, security interests and liens (the "DIP Facility Liens") in all currently owned or hereafter acquired assets including, without limitation, accounts, accounts receivable, inventory, customer lists, intellectual property, minerals, mineral rights, plan and equipment patents, trade secrets, property and/or leasehold rights, all other tangible and intangible assets, and any causes of action under the Bankruptcy Code or applicable nonbankruptcy law, expressly excluding: a) recoveries pursuant to Chapter 5 of the Bankruptcy Code "Avoidance Actions," and b) any aircraft or equipment or other assets as described in Bankruptcy Code §1110; (2) a first priority pledge of the capital stock and/or equity

---

[8] A true and correct copy of the Approved Budget is attached hereto as **Exhibit "E."**

interest held directly or indirectly by each of the Debtors (excluding a pledge of the capital stock/equity interest held by shareholders/investors in GIG); and (3) constructive control over the Debtors' bank accounts in similar form and substance of a lockbox and/or control accounts customary for transactions of this nature exercisable upon an event of default (all of the foregoing, the "DIP Facility Collateral."). The Debtors propose to grant:

(a)    pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority senior priming lien (the "Priming Liens") on all of the DIP Facility Collateral, which shall be senior to all other security interests and liens in property of the Debtors' estates in this or any subsequent or superseding cases (including, without limitation, any conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto); and

(b)    except to the extent otherwise expressly set forth in the Interim Order, or in a written instrument, agreement or other document executed by DIP Lender and subject to paragraph 23 of the Order, the DIP Facility Liens shall not be subject to subordination to any other liens, security interests or claims under Section 510 of the Bankruptcy Code, or otherwise. Any security interest or lien upon the DIP Facility Collateral which is avoided or otherwise preserved for the benefit of the Debtors' estates under Section 551 or any other provision of the Bankruptcy Code shall be subordinate to the DIP Facility Liens and the Adequate Protection Liens (as defined below).

**For the avoidance of doubt, the Debtors do not seek to include Avoidance Actions, or any the proceeds thereof, or any equipment or other assets as described in Bankruptcy Code §1110, as part of the DIP Facility Collateral.**

19.     Subject to the Carve-Out described herein, the Debtors propose that all of the DIP Indebtedness shall have the highest administrative priority under § 364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in the Chapter 11 Case or any successor case), and shall at all times be senior to the rights of the Debtors, any successor trustee or estate representative in the Chapter 11 Cases or any successor case (the "Superpriority Claims").  The Lender has not consented, through the Budget or otherwise, to the imposition of any costs or expense of administration or other charge, fees, liens, assessment or claim (including, without limitation, any amounts set forth in the Approved Budgets) against DIP Lender, its claims or collateral (including the DIP Facility Collateral) under § 506(c) of the Bankruptcy Code or otherwise, all of which rights the Debtors shall waive pursuant to the terms of an interim order granting this Motion and approving the Interim Financing.

20.     Through this Motion, the Debtors propose that the DIP Facility Liens shall be deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of § 362 of the Bankruptcy Code, (i) Lender may, at its sole option, file or record or cause the Debtors to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the Debtors' expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) Lender

may require the Debtors to deliver to Lender any chattel paper, instruments or securities evidencing or constituting any DIP Facility Collateral, and the Debtors are directed to cooperate and comply therewith.  If Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Facility Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in these Chapter 11 Cases as of the commencement of these Chapter 11 Cases but with the priorities as set forth herein.  DIP Lender or Junior Lenders may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtors have real or personal property.

21.    The super-priority administrative expense claims and the liens granted to the DIP Term Loan Lenders pursuant to the Interim Order and the Loan Agreement shall be junior and subordinate on to the Carve-Out, as defined in the Interim Order, to the fees due to the Clerk of the Court and fees due to the United States Trustee.

### *Approval of the Use of Junior Lenders' Cash Collateral*

22.    Through this Motion, the Debtors seek this Court's authorization to use the Junior Lenders' cash collateral within the meaning of Bankruptcy Code § 363(a) (the "Cash Collateral"), pursuant to Bankruptcy Code § 363(c) and to provide adequate protection, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d).  The Junior Lenders have not consented to such use as of the date of the filing of this Motion.

23.     The Debtors require the use of cash collateral, in conjunction with the financing sought herein, as the use of the requested cash collateral will allow for the flow of supplies and services to the Debtors necessary to sustain the Debtors' business operations and enhance the Debtors' prospects for a successful completion of the Chapter 11 Cases.

24.     As adequate protection of Junior Lenders' interests in the DIP Facility Collateral, including use of the Cash Collateral, pursuant to §§ 361, 363 and 552(b) of the Bankruptcy Code, the Debtors submit that the Junior Lenders be granted valid, binding, enforceable and perfected additional and replacement liens (the "Adequate Protection Liens") in all property of the Debtors' estates, including the DIP Facility Collateral, to the extent of any decrease in the value of Junior Lenders' interests in the DIP Facility Collateral occurring subsequent to the Petition Date, with such decrease in value to include decreases resulting from the Debtors' use (if any) of Cash Collateral, the depreciation, use, sale, loss, decline in market price of the DIP Facility Collateral, or otherwise.  The Debtors' further propose that the Adequate Protection Liens enjoy the same validity and extent as the liens the Junior Lenders held on the Petition Date, but subject and junior to the DIP Lender's super priority Priming Liens and the Carve-Out.

25.     The Debtors use of cash collateral will be subject to the Approved Budgets, and solely in compliance therewith and subject further to the terms and conditions of this Interim Order and the DIP Loan Documents.  The Debtors submit that by virtue of the replacement liens discussed above, the Junior Lenders will be adequately protected with respect to the Debtors' limited use of Cash Collateral.  The Lender consents to the Debtors' requested use of such cash collateral.

## IV.     Authority for Relief

### *Approval of the Proposed Financing is Warranted Under the Circumstances*

26.     The Bankruptcy Code authorizes this Court to approve the DIP Facility in the manner proposed in the Interim Order.  Specifically, section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Court may authorize the debtor to obtain credit or incur debt (1) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (2) secured by a lien on property of the estate that is not otherwise subject to a lien, (3) secured by a junior lien on property of the estate that is subject to a lien, *see* 11 U.S.C. § 364(c), or (4) secured by a senior or equal lien on property of the debtor's estate that is subject to a lien if the debtor is unable to obtain such credit otherwise and there is adequate protection of the interest of the lien holder whose lien is being primed.  *See* 11 U.S.C. § 364(d)(1).

27.     Because the Debtors propose to obtain financing under the DIP Facility with priority over all administrative expense and that is secured by first priority priming liens on property of the estate that is subject to the liens of the Prepetition Lenders, approval of the DIP Facility is governed by both sections 364(c) and 364(d) of the Bankruptcy Code.

28.     The Debtors submit that ample justification exists for approval of the DIP Facility.  The first requirement for approval of post-petition financing under both sections 364(c) and 364(d) is that the debtors in possession are unable to obtain such credit otherwise.  In the circumstances of this case, the Debtors are unable to obtain a working capital facility of the type and magnitude needed to finance their operations and the other administrative expenses of this case on an unsecured basis, or secured solely by junior liens on property of the estate.  Indeed, given the nature of the Debtors' borrowing needs, potential alternative sources of financing, obtainable on an expedited basis and on reasonable terms are not available, and the Debtors have

sought, right up to the time of the filing of these cases, unsuccessfully, such financing.  *See Bray v. Shenandoah Federal  Say. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c)); *Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.)*, 300 B.R. 861, 863 (Bankr. W.D. Pa. 2003); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing"); *see also 495 Cent. Park*, *Ave Corp.*, 136 B.R., 630-31 (Bankr. S.D.N.Y. 1992) (holding that debtor must make an effort to obtain credit without the requirement of a priming lien but is not required to seek credit from every possible lender); *In re Dunes Casino Hotel*, 69 B.R. 784, 796 (Bankr. D. N.J. 1986) (holding that the debtor had made required efforts under section 364(d)(1) based on evidence that the debtor had attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but that at least three such lenders were willing to advance funds secured by a superpriority lien); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that the fact that two national banks had refused to grant unsecured loans was sufficient to support conclusion that the requirement under section 364(d)(1) was met).

29.    The second statutory requirement for obtaining postpetition credit under section 364(d)(1) is that the secured creditors whose liens are being "primed" by the DIP Lender must be provided with adequate protection of their interests in their collateral.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (*en banc*) (noting that adequate protection is required under section 364(d)(1)(B) of the Bankruptcy Code to insure that the creditor receives the value for which it bargained prebankruptcy); *Dunes Casino*, 69 B.R. at 793 (holding that

"[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy").

30.    Under section 361 of the Bankruptcy Code, adequate protection may be provided by, among other things, requiring a debtor in possession to make a cash payment or payments or by providing a replacement lien to the extent that post-petition liens result in a decrease in the value of a pre-petition lender's interest in the property of the estate.   Any proposal for post-petition financing should "provide the pre-petition secured creditor with the same level of protection it would have it there had not been post-petition superpriority financing" *Id.*; *Swedeland*, 16 F.3d at 564.

31.    Because the decisional law requires that adequate protection be provided to secured creditors in the event that a debtor seeks to invoke the protections made available by 11 U.S.C. § 364(d), the Court must first have a firm grasp on the nature of liens at issue, *i.e.*, those that require adequate protection, as well the likelihood that such liens are valid.   In that regard, the Debtors' capital structure, which is discussed in detail above, is summarized in the Capital Structure Summary.   A review of the Capital Structure Summary is important because that review will make clear why the Court should focus on important questions regarding validity, priority and extent of the existing "liens," and give proper weight to the questions concerning validity, priority and extent when considering the totality of circumstances affecting the  adequate protection analysis.

32.    In short, the Capital Structure Summary and public filings with the S.E.C. show that the "liens" held by Shelter Island, Taglich and SVSP (the "Alleged Liens") present many of the classic indicia of equity investments and therefore may ultimately be best categorized as equity interests as opposed to debt.   In determining whether adequate protection exists so as to

allow the proposed financing, this Court should not presume based on the publically filed documents that the Alleged Liens are valid liens securing borrowed debt as opposed to equity interests, or that such "liens" are not subject to equitable subordination or recharacterization.[9] While the Debtors intend to challenge the Alleged Liens, the Court knows that such a challenge can not be resolved within the time period that the proposed financing is being sought.

33.     The question the Court must answer is "what facts in the record justify increasing the risk of non-performance on the existing lenders?"  At least one court has stated that general question as follows:  "The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized..."  *See In re Aqua Associates*, 123 B.R 192, 196 (Bankr. E.D. Pa. 1991) (finding that the presence of an equity cushion is not the sole factor to be considered and stating "Therefore, we believe that, while the presence of an equity cushion should be a relevant factor, it should not be a determinative factor in any "adequate protection" analysis, and particularly one relating to § 364(d)(1)(B).").

34.     Ultimately, the Court must determine whether the Debtors have met their burden and proven that adequate protection exists so that interests of Shelter Island, Taglich and SVSP can be primed, and whether such a form of risk-shifting is justified under the facts and circumstances of these cases.  At least with respect to SVSP, assuming that SVSP is properly characterized as the holder of an equity interest (as the Debtors believe the Capital Structure Summary indicates), then it was always their intention to bear the risk of such non-payment.

---

[9]  Specifically, the Debtors' intend, if necessary, to seek equitable subordination or recharacterization of the Alleged Liens and indebtedness associated therewith based on certain findings that need not be determined at the first day hearings in these cases.

35.    The recent decision of the District Court for the Southern District of Florida in *In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716 (S.D. Fla. 2010) addresses the issues of priming DIP loans pursuant to §364(d). The facts of these bankruptcy cases are far different from the facts in *Fontainebleau*. These cases involve a Lender who is providing an enabling DIP Loan in order to facilitate to a transaction within a very limited period of time – as opposed to the case in *Fontainebleau* where the Debtor sought numerous rounds of "interim" financing. *See id.* at 723. Here, the Debtors will not have the luxury of multiple rounds of interim financing, but instead will need to move quickly under the terms and conditions of the DIP Facility. In addition, the pre-petition lenders in the instant case are arguably subject to recharacterization and/or equitable subordination – factors that were not directly addressed or considered in *Fontainebleau.*

36.    As outlined above, no other postpetition credit is available to the Debtors. In addition, with respect to adequate protection, the Junior Lenders will be granted additional and replacement liens in all property of the Debtors' estates subject only to (i) the DIP Lender's super priority priming liens, (ii) existing liens and unavoidable encumbrances that are valid, binding and enforceable and perfected liens existing in the DIP Facility Collateral on the Petition Date, and (iii) the Carve-Out. The additional and replacement liens will ensure that the Junior Lenders will retain the full benefit of subordinated liens on all available collateral to the extent such liens and encumbrances are not subsequently subordinated or set aside. *See In re Delaware & Hudson Ry, Co.*, 124 B.R., 169, 177-78 (D. Del. 1991) (priming lien under section 364(d) of the Bankruptcy Code may serve as adequate protection where, absent financing, value of collateral may be impaired); *In re JKJ Chevrolet, Inc.*, 190 B.R. 542, 548 (Bankr. E.D. Va. 1995) (rejecting creditor's adequate protection challenge where it was granted replacement liens by

debtor); *In re Craddock-Terry Shoe Corp.,* 98 B.R. 250, 256 (Bankr. W.D. Va. 1988) (holding that replacement liens provided adequate protection sufficient to deny motion to lift automatic stay).  Absent the financing sought herein, the Debtors' operations would be forced to cease, and the pre-petition secured creditors' collateral would be significantly impaired.  In addition to the obvious deterioration in going concern and goodwill value, the Debtors derive significant revenue pursuant to a services agreement (the aforementioned "Cuba Business") between GIA and Gulfstream Air Charters ("GAC") dated August 9, 2003, and amended on March 14, 2006 (the "Services Agreement").   Pursuant to the Services Agreement, GIA provides use of its aircraft, flight crews, the Gulfstream name, insurance, service personnel, ground handling, security, and administrative support and the Debtors receive 75% of the operating profit of GAC. Without the proposed financing, and continued operations, the revenues derived under the Services Agreement would cease almost immediately and thus impair the collateral value of any secured creditor claiming a lien against such revenues.

37.     Additionally, the appropriate method of valuation to gauge whether a creditor is adequately protected in a reorganization case is the going concern or fair market value of the property.  *In re Automatic Voting Mach. Corp.*, 26 B.R. 970, 972 (Bankr. W.D.N.Y. 1983).  Here, the Debtors are working toward the reorganization or sale of their businesses as going concerns, and thus propose, for purposes of establishing adequate protection, that the assets subject to the security interests of the Junior Lenders be valued accordingly.  *See In re Beker Industries Corp*., 58 B.R. 725, 738-39 (Bankr. S.D.N.Y. 1986) (for purposes of determining adequate protection for debentureholders, who objected to grant of superpriority status to lenders who would provide additional financing to debtor-in-possession, use of going concern value, rather than liquidation value, of debtor-in-possession's facilities was appropriate); *see also In re Pelham Enterprises,*

*Inc.*, 376 B.R. 684, 692 (Bankr. N.D. Ill. 2007) (valuing property for purposes of section 506(a)(1) with respect to its actual use in the operation of the debtor's business as a going concern); *cf. Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997) (the proposed disposition or use of the collateral is of paramount importance to the valuation question); *GECC v. QPL Components, Inc. (In re QPL Components, Inc.)*, 20 B.R. 342, 345 (Bankr. E.D.N.Y. 1982) (the judicial test for determining where to assess collateral's value requires court to make an informed projection as to the amount recoverable upon conversion of the collateral into cash in a commercially reasonable manner, in other words, fair market value).

38.    Even if the Court were to determine that the appropriate standard for valuation for adequate protection in this case is not full fair market or going concern value, but rather some lesser amount, that amount should be a figure closer to full going concern value than liquidation value. The Supreme Court has weighed in on valuation and determined that, at least for confirmation and cramdown purposes, collateral that a debtor proposes to retain and use should be valued at replacement value rather than either the foreclosure value or the average of foreclosure value and replacement values. *Id. Rash*, 520 U.S. 953 (1997) (noting that replacement value is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain property of a like age and condition from a willing seller"). Similarly, the Eleventh Circuit has evaluated valuation for purposes of adequate protection under §363(e) and determined that, at least for inventory, the appropriate standard is "wholesale value". *In re George Ruggiere Chrysler*, 727 F.2d. 1017 (11th Cir. 1984) (noting that wholesale value is the amount which the creditor would receive by the collateral's customary or reasonable means of disposition).

39.     Within the §364(d) context the courts that have not employed full fair market value or full going concern value, have employed a variety of standards, based upon the facts and circumstances of each case.  *See In re Campbell Sod, Inc.*, 378 B.R. 647 (Bankr. D.Kan. 2007) (employing a "holistic" approach weighing the likelihood of collateral depreciation or appreciation, the prospects of a successful reorganization, and the existence or non-existence of equity); *In re Phoenix Steel Corp.*, 39 B.R. 218 (D.Del. 1984) (using an "interim value" – a mean between liquidation and going-concern value – an approach that appears to have been rejected by the Supreme Court in *Rash*). The Debtors operate an airline passenger service, have significant receivables (including the Cuba receivables, from a non-debtor entity generated as a result of the Debtors ongoing operations), and the existence of the DIP facility enables the Debtor to preserve the status quo until such time as a reorganization or a sale of the business as a going concern can be formulated.   The "replacement value", "wholesale value", and "holistic" approaches employed by the courts that do not apply the full going concern standard, all envision the Court taking into account the full nature of the Debtor's business and the value of all of its assets as an operating entity.  For all of the foregoing reasons, if this court should find that full going-concern value is not appropriate, some value on the continuum closer to going-concern than liquidation is appropriate.

40.     The Debtors intend to introduce evidence that even if the appropriate value for adequate purposes is determined to be less than full fair market or going concern value, sufficient equity exists in the assets utilized by the Debtors to operate which adequately protect pre-petition secured creditors' interests even in the event of a subsequent liquidation.  The Debtors intend to also introduce evidence that secured creditors interests are not harmed by, and that their pre-petition protections are not reduced by, the grant this DIP Facility, and that in fact the existence

of the DIP Facility will increase the value of the Collateral.  With the DIP Facility, the Debtors will continue to have an operating airline as well as revenue sources that will be preserved, and the DIP financing enables all of this to continue and likely result in the post-petition enhancement of the value of the assets securing all the pre-petition secured claims.  Even in the absence of equitable subordination, recharacterization, or set aside of any liens, the Debtors are confident that the valuation evidence presented to the Court at the first day hearing on this Motion will support the Debtors' argument that the proposed financing can be approved by this Court on a priming basis.

41.     Because of the Debtors' immediate need for the liquidity provided by the DIP Facility, the Debtors, in the exercise of reasoned business judgment, and in consultation with their professional advisors, has concluded that the DIP Lender is the only lender able to offer a post-petition credit facility sufficient to meet the Debtors' working capital and case funding needs on the terms, and within the time frame, required by the Debtors.  Indeed, without immediate access to liquidity sufficient to sustain normal course business operations, the value of the Debtors' assets will be severely, if not irreparably, harmed to the extreme detriment of the Debtors' creditors, employees and estates.

42.     Moreover, the Debtors have exercised sound business judgment in negotiating and agreeing to the proposed DIP Facility, and believe that the terms of the DIP Facility are fair and reasonable, and are in the best interests of its estate.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decision, including decisions to borrow money.  *See In re Snowshoe Co.*, 789 F.2d at 1088; *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).  Among other things, the Debtors believe that the funding to be provided pursuant to the DIP Facility (in accordance with the Budget) will be sufficient

to fund all operating and case administration expenses through the conclusion of the Debtors' chapter 11 cases.  The pricing and other terms on which the DIP Facility is based are eminently fair and reasonable under the circumstances.  The cost and expense of alternative financing (to the extend available) would be detrimental to the Debtors' estates.

43.    In addition, and as noted above, without the DIP Facility, the Debtors would be unable to continue to obtain necessary goods and services, pay their employees and preserve the going concern value of their enterprises through the conclusion of these cases.  The DIP Facility also should provide the Debtors' vendors, suppliers and customers the needed confidence to continue their relationships with the Debtors.

44.    Thus, for all of the foregoing reasons, the Debtors submit that the DIP Facility should be approved pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code.

### *Approval of the Use of Cash Collateral Is Warranted Under the Circumstances*

45.    Subject to certain conditions, a bankruptcy court may authorize the use of cash collateral by a debtor with such use being generally governed by 11 U.S.C. § 363.  If a debtor does not obtain consent to use cash collateral, 11 U.S.C. § 363(c)(2) provides that a debtor must obtain court approval for the requested use of cash.  *In re Sharon Steel Corp.*, 159 B.R. 165, 168 (Bankr. W.D. Pa. 1993) (noting further that "11 U.S.C. § 363(e) provides that the court shall prohibit or condition such use [of cash collateral] as is necessary to provide adequate protection of [the secured lender's] interest.").  The *Sharon Steel* Court summed up the purpose of adequate protection as follows:

> The purpose of providing "adequate protection" is to insure that a secured creditor receives in value essentially what he bargained for. *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir.1987); H.R.Rep. No. 595, 95th Cong., 1st Sess. 339 (1977), reprinted in 1978 U.S. Code Cong. & Admin. News, pp. 5787, 6295. The means of adequate protection provided by § 361 are not exclusive. *In re O'Connor*, 808 F.2d at 1397; *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir.1984). Exactly what

constitutes adequate protection must be decided on a case by case basis. *In re O'Connor,* 808 F.2d at 1396-97.

*Id.* at 169.

46.    Once a court makes a determination that the interests in cash collateral will be adequately protected under a debtor's proposed usage, authorization of such usage is appropriate. *In re Markim, Inc.*, 15 B.R. 56 (Bankr. E.D. Pa. 1981) (stating "[s]ince we conclude that the debtor's application proposes a method by which the creditors who have a security interest in the cash collateral will be adequately protected under the debtor's proposal, we will authorize the debtor to use the cash collateral").

47.    In this case, Debtors' requested use of cash collateral will not adversely impact the Junior Lenders, or any other party with an alleged interest in cash collateral, and thus no harm will result from the granting of the relief requested herein.  Specifically, the use of cash collateral requested in this Motion will benefit all parties as it will allow for the continuation of the Debtors' operations and the avoidance of immediate and irreparable harm.

## V.  Interim Approval of Post-Petition Financing

48.    Fed. R. Bankr. P. 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code § 364 may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.  The Debtors are seeking such interim relief through this Motion.

49.    The Debtors request that the Court conduct an expedited preliminary hearing on the Motion no later than November 5, 2010 and authorize the Debtors to obtain the financing

requested herein on an interim basis until a final hearing to avoid immediate and irreparable harm to Debtors' estates.

**WHEREFORE**, the Debtors respectfully request the entry of an order (i) granting this Motion, (ii) authorizing the Debtors to obtain post-petition financing pursuant to the DIP Financing Agreements on an interim basis, (iii) authorizing the use of cash collateral sought herein, (iv) scheduling a hearing to consider final approval of the financing sought herein; and (v) granting such other and further relief as is just and proper.

Dated:   November 4, 2010        Respectfully submitted,

BERGER SINGERMAN, P.A.
*Proposed Counsel for Debtors*
350 E. Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL 33301
Tel. (954) 525-9900
Fax (954) 523-2872

By:   /s/  *Brian K. Gart*
      Brian K. Gart
      Florida Bar No.  381152
      bgart@bergersingerman.com
      Douglas A. Bates
      Florida Bar No. 791431
      dbates@bergersingerman.com

.

# EXHIBIT "A"

## (Proposed Order)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                              Chapter 11 Cases

GULFSTREAM INTERNATIONAL                            Case No.
GROUP, INC., *et al.,*[1]                           Joint Administration Pending

            Debtors.
_____/

**INTERIM ORDER (I) AUTHORIZING (A) SECURED
POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105,
361, 362, AND 364(c) AND (d); (B) GRANTING SECURITY INTERESTS,
SUPERPRIORITY LIENS ANDCLAIMS AND ADEQUATE PROTECTION; AND (C)
USE OF CASH COLLATERAL AND (II) SCHEDULING A FINAL HEARING
PURSUANT TO BANKRUPTCY RULE 4001(C)**

Upon the motion (the "Motion") dated November __, 2010 of debtors and debtors-in-

possession, Gulfstream International Group Inc. ("Gulfstream"), and its co-debtors, Gulfstream

---

[1] The address of each of the Debtors is 3201 Griffin Road, 4th Floor, Fort Lauderdale, FL 33312; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis:   (i) Gulfstream International Group, Inc. (3956); (ii) Gulfstream International Airlines, Inc. (1720); (iii) Gulfstream Training Academy, Inc. (5843); (iv) GIA Holdings Corp., Inc. (9548); and (v) Gulfstream Connection, Inc. (1208).

International Group, Inc., Gulfstream International Airlines, Inc., Gulfstream Training Academy, Inc., GIA Holdings Corp., Inc., and Gulfstream Connection, Inc., (collectively the "Debtors"), (a) requesting entry of an order authorizing the Debtors pursuant to Sections 363(c), 364(c) and 364(d) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") and Rules 2002, 4001(c) and (d) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 4001-2, 4001-3, 9013-(G) and 9013-(H), inter alia, (i) to obtain post-petition financing (the "Post-Petition Financing") pursuant to the terms of the DIP Documents (as defined below) from Victory Park Capital Advisors, LLC, on behalf of one or more entities for which it acts as investment manager, ("Victory Park") and any other lender(s) acceptable to Victory Park (collectively with Victory Park, the "Lender" or "Sponsor") and in Lender's (or its designees' or assignees') capacity as the Post-Petition Financing lender, sometimes referred to, individually or collectively, as the "DIP Lender"), (ii) to grant DIP Lender, pursuant to Bankruptcy Code §§ 364(c) and 364(d), first priority and priming security interests in all of the Debtors' currently owned and after-acquired assets and property to secure the Debtors' obligations under the Post-Petition Financing; (iii) to grant DIP Lender priority in payment with respect to the obligations incurred in connection with the Post-Petition Financing over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below; and (iv) to provide adequate protection to Junior Lenders (as defined below), (b) seeking this Court's authorization to use Junior Lenders' cash collateral within the meaning of Bankruptcy Code § 363(a) (the "Cash Collateral"), pursuant to Bankruptcy Code § 363(c) and to provide adequate protection, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d); (c) seeking a preliminary hearing (the "Preliminary Hearing") on the Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001 (the "Interim Order") authorizing the Debtors to borrow under the Post-

Petition Financing the amounts set forth in and limited by the Approved Budget (as defined below), upon the terms and conditions set forth in this Order pending the Final Hearing referred to below; and (d) requesting that a final hearing (the "Final Hearing") be scheduled by this Court to consider entry of a final order (the "Final Order") authorizing on a final basis, inter alia, the Post-Petition Financing and use of the Cash Collateral; and due and sufficient notice of the Motion under the circumstances having been given; and the Preliminary Hearing on the Motion having been held before this Court; and upon the entire record made at the Preliminary Hearing; and this Court having found good and sufficient cause appearing therefor;

IT IS HEREBY FOUND:

A.    Unless otherwise indicated herein, all capitalized terms used but not defined herein shall have the meanings given in the DIP Documents (as hereafter defined).

B.    On November 4, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief with this Court under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

C.    This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

D.    Lender has no pre-petition relationship with the Debtors. On November 3, 2010, Lender and Debtor entered into that certain Debtor-In-Possession Term Loan/Potential Bankruptcy Emergence Transaction Letter Agreement, a copy of which is attached as Exhibit "A" hereto and incorporated herein by reference (the "DIP Loan Letter"). The Debtors' presently outstanding obligations to creditors that claim security interests in the DIP Facility Collateral include (a) indebtedness due Shelter Island Opportunity Fund, LLC, ("Shelter Island

Debt") pursuant to a securities purchase agreement and a secured original issue discount debenture, including warrants which the Debtors agreed to purchase following the retirement of the balance of such debt; (b) indebtedness due Taglich Brothers, Inc. ("TBI Debt"), and (c) indebtedness due SAH-VUL Strategic Partners I, LLC ("SAH-VUL Debt") (the holders of such debt being called, collectively, the "Junior Lenders")

E.     Given the Debtors' current financial condition, the Debtors are unable to operate solely with use of Cash Collateral.  Moreover, the Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense.  Financing on a post-petition basis is not otherwise available without the Debtors granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in §§ 503(b) and 507(b) of the Bankruptcy Code, other than as described below, and securing such indebtedness and obligations with the first priority priming liens and security interests in and the liens upon the property described below pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code.  The Junior Lenders are adequately protected by the current value of the collateral pledged to secure the Post-Petition Financing and the obligations owing to the Junior Lenders.

F.     Notice of the Preliminary Hearing and the relief requested in the Motion has been given to (i) the Office of the United States Trustee, (ii) the creditors holding the 20 largest unsecured claims against each of the Debtors; and (iii) the Junior Lenders, which comprise the known holders of pre-petition liens against the Debtors' property.  No official committee of unsecured creditors (the "Committee") has as yet been appointed in the Chapter 11 Cases.

G.     Based on the record presented to this Court by the Debtors, it appears that the Post-Petition Financing and use of Cash Collateral have been negotiated in good faith and at arm's-length between the Debtors and DIP Lender, and any credit extended and loans made to

the Debtors pursuant to the Interim Order shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of, Section 364(e) of the Bankruptcy Code and the DIP Lender shall have all of the protections thereunder.

H.    Based on the record before this Court, it appears that the terms of this Interim Order, including, without limitation, the terms of the Post-Petition Financing and use of Cash Collateral, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

I.    The Debtors have requested immediate entry of this Interim Order, so that the DIP Lender will advance the initial $1.5 million funding as contemplated by the DIP Loan Letter, as modified and supplemented by this Interim Order.  The permission granted herein to use Cash Collateral and obtain the Post-Petition Financing and obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, allow for the flow of supplies and services to the Debtors necessary to sustain the Debtors' business operations and enhance the Debtors' prospects for a successful completion of the Chapter 11 Cases.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Preliminary Hearing, and the undersigned consents of the Debtors, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED DETERMINED AND DECREED** that:

1.    <u>Motion Granted</u>.  The Motion is granted, subject to the terms and conditions set forth in this Interim Order.

2.      <u>Authorization</u>.  The Debtors are expressly authorized and empowered to (i) obtain the Post-Petition Financing, use the Cash Collateral, and perform their obligations strictly pursuant to the provisions of this Interim Order; and (ii) enter into such other agreements, instruments and documents as may be necessary or required or requested by DIP Lender in its sole discretion to evidence the obligations to DIP Lender to consummate the terms and provisions of the Motion and this Interim Order and to evidence perfection of the liens and security interests to be given to DIP Lender (any and all such other agreements, instruments and documents, as may be necessary to be considered at the Final Hearing (as defined below) and the DIP Loan Letter shall hereinafter be referred to as the "<u>DIP Loan Documents</u>").  DIP Lender may, at its option, advance the Post-Petition Financing pursuant to the same terms as the DIP Loan Letter, as modified and supplemented by this Interim Order, without the need for further execution or documentation.  The borrowing(s) made under the credit facility maintained under the DIP Loan Documents (the "<u>DIP Facility</u>") and all other indebtedness and obligations incurred on or after the Petition Date with respect to loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to this Interim Order and the DIP Loan which may now or from time to time hereafter be owing by the Debtors to DIP Lender (including principal, accrued and unpaid interest, fees, costs and expenses, including without limitation attorneys' fees and expenses, and any other amounts owed under this Order or the DIP Loan Documents) are referred to herein as the "<u>DIP Indebtedness</u>."  The Debtors and Lender may enter into any nonmaterial amendments of or modification to the DIP Loan Documents without the need of further notice and hearing or order of this Court.  The DIP Lender is hereby authorized and directed to immediately advance up to the $1.5 million initial funding approved herein pursuant to the Approved Budget (as defined below).  The DIP Loan Letter and this Interim Order shall govern such initial funding.

3.      <u>Borrowing; Use of Cash Collateral</u>. Subject to the Approved Budgets (as defined in paragraph 19, below) and solely in compliance therewith and subject further to the terms and conditions of this Interim Order and the DIP Loan Documents, (a) Lender hereby consents, and the Court determines that the Junior Lenders are adequately protected, with respect to the Debtors' limited use of Cash Collateral, and (b) DIP Lender will provide the DIP Facility in accordance with the terms of the DIP Loan Documents.

4.      <u>Interest, Fees, Costs and Expenses</u>.  The DIP Indebtedness shall bear interest at the applicable rates (including default and non-default interest rates) set forth in the DIP Loan Documents.  Notwithstanding the foregoing, nothing in this Interim Order shall be construed to limit or otherwise impair the joint and several liability of the Debtors for all of the DIP Indebtedness under the DIP Loan Documents.  DIP Lender and the Agent shall be paid all of their reasonable Costs and Expenses (as defined and set forth in the DIP Loan Letter), subject to review and approval by the Court if there is an objection to same.  The Initial Retainer and the Additional Retainer are hereby deemed fully earned upon payment thereof as consideration for DIP Lender's strategic direction, due diligence, work performed and other good and sufficient value provided to the Debtors.  The Debtors' prior payment of the Initial Retainer and the Additional Retainer is hereby ratified and allowed in full, including DIP Lender's right to retain any unused amount thereof.  Notwithstanding anything to the contrary herein, neither the Initial Retainer nor the Additional Retainer shall constitute a cap on the Costs and Expenses incurred by the DIP Lender and/or the Agent or allowed by this Court, as such Costs and Expenses may exceed the amount of the Initial Retainer and the Additional Retainer.  The Debtors and their respective estates have waived and released any and all claims each may have against Victory Park, the Agent, the Lender and/or DIP Lender with respect to the Initial Retainer and/or the Additional Retainer pursuant to Chapter 5 of the Bankruptcy Code or any other applicable law.

This waiver and release shall be binding on any subsequently appointed Committee or successor, including but not limited to any subsequently appointed chapter 11 trustee, chapter 7 trustee and any liquidating trustee.

      5.      <u>DIP Fee; Success Fee; Maintenance Fee</u>.  Each of the DIP Fee and the Maintenance Fee is hereby approved and allowed in its entirety and shall be paid pursuant to the DIP Loan Letter.  The Success Fee shall be heard at the Final Hearing.

      6.      <u>Termination of the DIP Facility and Use of Cash Collateral</u>.  DIP Lender's obligation to provide the DIP Facility in accordance with the DIP Loan Documents and Lender's consent to the use of the Cash Collateral shall immediately and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole discretion), and all DIP Indebtedness shall be immediately due and payable in cash upon the earliest to occur of the following (the "<u>Termination Date</u>"):

      (i)      One Business Day following the Final Hearing Date (as defined below) if a Final Order (as defined below) has not been entered by December ____, 2010;

      (ii)      termination of the stay period specified in §1110 of the Bankruptcy Code, or the Debtors' failure to reach arrangements (including arrangements with Raytheon Aircraft Credit Corporation), hereinafter "RACC") reasonably satisfactory to Agent, DIP Lender, RACC and the Debtors regarding the Debtors' assets that are subject to §1110 of Bankruptcy Code);

      (iii)      ninety (90) days after the commencement of the Chapter 11 Cases;

      (iv)      the date of final indefeasible payment and satisfaction in full in cash of the DIP Indebtedness;

      (v)      the effective date of any confirmed plan of reorganization in the Chapter 11 Cases;

      (vi)      the consummation of the sale or other disposition of all or substantially all of the assets of the Debtors;

      (vii)      the occurrence of any breach by the Debtors of this Interim Order (including, but not limited to, the Debtors' failure to adhere to the Approved Budgets as set forth in ordering paragraph 19 of this

Interim Order or violation of any of the covenants provided for in ordering paragraph 21 of this Order) or the Final Order, or under any of the DIP Loan Documents;

(viii)   the Debtor and the DIP Lender shall fail to reach agreement, satisfactory to the DIP Lender in its sole discretion, with respect to modifications to the Approved Budget with respect to periods following the second week of the period covered thereby;

(ix)   the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code;

(x)   upon and following the entry of an order authorizing the appointment in any of the Debtors' Chapter 11 Cases of a trustee or an examiner without the prior written consent of DIP Lender (which consent may be withheld, or, if given revoked, by DIP Lender in its sole discretion), or if any Debtor applies for, consents to, or acquiesces in, any such appointment without the prior written consent of DIP Lender (which consent may be withheld in its sole discretion);

(xi)   this Interim Order or the Final Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of DIP Lender (which consent may be withheld in its sole discretion);

(xii)   the Court enters an order granting a party relief from the automatic stay with respect to any portion of the DIP Facility Collateral provided that the value of the relevant collateral is more than $50,000;

(xiii)   this or any other Court enters an order or judgment in any of the Chapter 11 Cases modifying, limiting, subordinating or avoiding the priority of the DIP Indebtedness, or the perfection, priority or validity of DIP Lender's DIP Facility Liens or imposing, surcharging or assessing against DIP Lender or its claims, DIP Facility Collateral or any fees, costs or expenses, whether pursuant to § 506(c) of the Bankruptcy Code or otherwise; or

(xiv)   three (3) business days after the Agent or the DIP Lender notifies the Debtors in writing of an Event of Default (as defined and set forth in the DIP Loan Letter) which is not subsequently cured or waived by the end of such notice period.

7.    <u>Liens to Secure the DIP Indebtedness</u>.  As security for the DIP Indebtedness, DIP Lender is hereby granted the following security and priming liens (the "<u>DIP Facility Liens</u>") in

9

all currently owned or hereafter acquired property and assets of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, all cash, goods, accounts, accounts receivable, instruments, documents, chattel paper, inventory, cash in advance deposits, general intangibles, payment intangibles, goodwill, investment property (including, without limitation, ownership interests in corporations, partnerships, and limited liability companies), financial assets, security accounts, deposit accounts, real estate, intellectual property, software, machinery, leasehold interests, equipment, fixtures, aircraft, vehicles, trademarks, trade names, licenses, causes of action (excluding, however, actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under §§ 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (collectively, "Avoidance Actions")) and actions and recoveries thereon against third parties, tax refund claims, commercial tort claims and insurance proceeds (including, without limitation, any director & officer insurance proceeds), and the proceeds, products, rents and profits of all of the foregoing; provided, however, any equipment or other assets as described in §1110 of the Bankruptcy Code including all aircraft and engines leased from RACC shall be expressly excluded by this Interim Order (all of the foregoing, the "DIP Facility Collateral"):

      (a)      pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority senior priming lien (the "Priming Liens") on all of the DIP Facility Collateral, which shall be senior to all other security interests and liens in property of the Debtors' estates in this or any subsequent or superseding cases (including, without limitation, any conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto); and

(b)        except to the extent otherwise expressly set forth in this Interim Order, or in a written instrument, agreement or other document executed by DIP Lender and subject to paragraph 10 of this Order, the DIP Facility Liens shall not be subject to subordination to any other liens, security interests or claims under Section 510 of the Bankruptcy Code, or otherwise.  Any security interest or lien upon the DIP Facility Collateral which is avoided or otherwise preserved for the benefit of the Debtors' estates under Section 551 or any other provision of the Bankruptcy Code shall be subordinate to the DIP Facility Liens and the Adequate Protection Liens (as defined below); and

(c)        a first priority pledge of the capital stock and/or equity interest held directly or indirectly by each of the Debtors (for the avoidance of doubt, such pledge shall not include a pledge of the capital stock/ equity interest held by shareholders/investors in Gulfstream International Group, Inc.)

8.        Adequate Protection Liens.  As adequate protection of Junior Lenders' interests in the DIP Facility Collateral, including use of the Cash Collateral pursuant to §§ 361, 363 and 552(b) of the Bankruptcy Code, Junior Lenders are hereby granted valid, binding, enforceable and perfected additional and replacement liens (the "Adequate Protection Liens") in all property of the Debtors' estates, including the DIP Facility Collateral, to the extent of any decrease in the value of Junior Lenders' interests in the DIP Facility Collateral occurring subsequent to the Petition Date, with such decrease in value to include decreases resulting from the Debtors' use (if any) of Cash Collateral, the depreciation, use, sale, loss, decline in market price of the DIP Facility Collateral, or otherwise.  The Adequate Protection Liens shall enjoy the same validity and extent as the liens the Junior Lenders held on the Petition Date, but subject and junior to the DIP Lender's super priority Priming Liens and the Carve-Out (as defined in paragraph 17).

Under no circumstances shall any of the Junior Lenders have a lien on any of the Debtors' assets or property, including the DIP Facility Collateral, which it did not have a right to prepetition.

9. <u>Superpriority Claims</u>. Subject to the Carve-Out described in ordering paragraph 17 below, all of the DIP Indebtedness shall have the highest administrative priority under § 364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in the Chapter 11 Case or any successor case), and shall at all times be senior to the rights of the Debtors, any successor trustee or estate representative in these Chapter 11 Cases, any successor Chapter 11 cases, or any Chapter 7 cases upon any conversion of these cases (the "<u>Superpriority Claims</u>"). Nothing in this Order or the Approved Budgets (as defined below) shall constitute the consent by DIP Lender to the imposition of any costs or expense of administration or other charge, fees, liens, assessment or claim (including, without limitation, any amounts set forth in the Approved Budgets) against DIP Lender, its claims or collateral (including the DIP Facility Collateral) under § 506(c) of the Bankruptcy Code or otherwise, all of which rights have been waived pursuant to the terms of this Interim Order and the DIP Loan Letter.

10. <u>Perfection of DIP Facility Liens and Adequate Protection Liens</u>. The DIP Facility Liens and the Adequate Protection Liens shall be, and they hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; <u>provided</u>, <u>however</u>, that notwithstanding the provisions of § 362 of the Bankruptcy Code, (i) DIP Lender may, at its sole option, file or record or cause the Debtors to obtain any such landlord or

warehousemen lien waivers or other third party consents or execute, file or record, at the Debtors' expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender may require the Debtors to deliver to DIP Lender any chattel paper, instruments or securities evidencing or constituting any DIP Facility Collateral, and the Debtors are directed to cooperate and comply therewith.  If DIP Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Facility Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in these Chapter 11 Cases as of the commencement of these Chapter 11 Cases but with the priorities as set forth herein.  DIP Lender or Junior Lenders may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtors have real or personal property.

11.     <u>Waiver</u>.  The Debtors and their estates (and any party in interest acting on behalf of the Debtors) hereby irrevocably waive, and are barred from asserting or exercising any right (a) without DIP Lender's prior written consent (which may be withheld in their sole discretion) or (b) without prior indefeasible payment and satisfaction in full in cash of the DIP Indebtedness: (i) to grant or impose, or request that the Court grant or impose, under § 364 of the Bankruptcy Code or otherwise, liens on or security interests in any DIP Facility Collateral, which are <u>pari passu</u> with or senior to the DIP Facility Liens or the Adequate Protection Liens; (ii) to return goods pursuant to § 546(h) of the Bankruptcy Code to any creditor of the Debtors or to consent

to any creditor taking any setoff against any of such creditor's pre-petition indebtedness based upon any such return pursuant to § 553(b)(1) of the Bankruptcy Code or otherwise; (iii) to seek a surcharge of the DIP Facility Collateral under § 506(c) of the Bankruptcy Code; (iv) to seek non-consensual use of Cash Collateral under § 363 of the Bankruptcy Code; (v) to modify or affect any of the rights of  the DIP Lender or the Junior Lenders under this Interim Order or any DIP Loan Documents by any order entered in any of the Chapter 11 Cases or any successor cases; or (vi) propose a plan of reorganization or liquidation, or seek an extension of the exclusive right to file a plan or solicit acceptances with respect to any plan of reorganization or liquidation without the written consent of the DIP Lender.

12.    <u>Sale Out of the Ordinary Course of Business</u>.  The Debtors may not propose a sale of any of their assets outside the ordinary course of business (whether under a plan of reorganization or otherwise) unless (a) the DIP Lender consents to such sale, (b) all proceeds realized from any Court-approved sale are transferred to DIP Lender for immediate application in reduction of the DIP Indebtedness and, upon payment in full in cash of all amounts owed to DIP Lender, the obligations owed to the Junior Lenders, in the manner set forth in this Interim Order and in the priority provided by their agreements with the Debtors and by law; and (b) the sale application expressly provides that DIP Lender and the Junior Lender may exercise their right to credit bid their indebtedness under § 363(k) of the Bankruptcy Code, provided that in the event of a credit bid by any Junior Lender, DIP Lender may, in its sole discretion, elect to have the DIP Indebtedness paid in full in cash as a condition to the effectiveness of any such credit bid.

13.    <u>Books and Records</u>.  The Debtors shall permit DIP Lender and any authorized representatives designated by DIP Lender (including, without limitation, its auditors, appraisers and financial advisors) to visit and inspect any of the properties of any Debtors, including the

Debtors' respective financial and accounting records, and to make copies and take extracts therefrom, and to discuss any Debtor's affairs, finances and business with such Debtors' officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested.  Without limiting the generality of the foregoing, the Debtors shall promptly provide to DIP Lender and DIP Lender's designated representatives any information or data reasonably requested to monitor the Debtors' compliance with the covenants and the provisions of the DIP Loan Documents and this Order and to perform appraisals or other valuation analyses of the property of the Debtors.

14.    <u>Credit Bid Plan Right</u>.  As contemplated by the DIP Loan Letter, the Agent and DIP Lender shall have the right under §  363(k) of the Bankruptcy Code to credit bid up to the full amount of the DIP Indebtedness in connection with any sale of the Debtors' assets under a plan of reorganization or otherwise.

15.    <u>Plan Right</u>.  If the Debtors have not received a Court order approving the Section 1110 Stipulation (as defined in the DIP Loan Letter) before the termination of the stay period specified in § 1110 of the Bankruptcy Code, then, notwithstanding § 1121 of the Bankruptcy Code, the Agent and the DIP Lender shall have the right to file a plan and disclosure statement and the Debtors' exclusivity shall be terminated only as to the DIP Lender's rights in this paragraph 15.

16.    <u>Modification of Automatic Stay; Other Remedies</u>.

(a)    Except as set forth in subparagraph (b) of this paragraph, which governs any action of DIP Lender to foreclose on their liens on any DIP Facility Collateral or to exercise any other default-related remedies (other than those specifically referenced in the next sentence), the automatic stay pursuant to § 362 of the Bankruptcy Code is hereby vacated as to DIP Lender to permit it to perform in accordance with, and exercise, enjoy

and enforce their respective rights, benefits, privileges and remedies pursuant to this Interim Order and the DIP Loan Documents without further application or motion to, or order from, the Court, and regardless of any change in circumstances (whether or not foreseeable), and neither Section l05 of the Bankruptcy Code nor any other provision of the Bankruptcy Code, or any other law, shall be utilized to prohibit DIP Lender from the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies.  DIP Lender is hereby granted leave to receive and apply payments to the DIP Indebtedness from collections on and proceeds of the DIP Facility Collateral in the manner specified in this Order and the DIP Loan Documents.  In addition, DIP Lender is hereby granted leave to, among other things, to (a) file or record any financing statements, mortgages or other instruments or other documents to evidence the Adequate Protection Liens or the DIP Facility Liens, (b) to charge and collect any interest, fees, costs, and expenses and other amounts accruing at any time under the DIP Loan Documents or this Interim Order as provided therein, (c) to give the Debtors any notice provided for in any of the DIP Loan Documents or this Interim Order, and (d) upon the occurrence of the Termination Date, and without application or motion to, or order from the Court or any other court, (i) terminate the DIP Facility and the DIP Loan Documents, (ii) declare all DIP Indebtedness immediately due and payable, and (iii) revoke the Debtors' right, if any, under this Interim Order and/or the other DIP Loan Documents to use Cash Collateral.

(b)    Upon the occurrence of the Termination Date, the DIP Lender may file a motion to terminate the automatic stay which shall be served by hand delivery, facsimile or overnight mail on counsel to the Debtors, the Committee (if any) and the Office of the United States Trustee, and the Court shall conduct a hearing on an expedited or

emergency basis (but in no event later than three (3) business days after service of such notice) to consider terminating the automatic stay under § 362 of the Bankruptcy Code in favor of the DIP Lender for the purpose of allowing the DIP Lender to exercise all of its rights and remedies under the DIP Loan Documents, this Interim Order or applicable law, including, without limitation, causing the Debtors to engage in a process to liquidate their assets pursuant to § 363 of the Bankruptcy Code, foreclosing or otherwise enforcing their liens on any or all of the DIP Facility Collateral. The only issue that may be raised or addressed at such hearing is whether the Termination Date has occurred. Subject to the Debtors' right to contest whether the Termination Date has occurred, the Debtors shall cooperate with DIP Lender in connection with any enforcement action by such parties by, among other things, (i) providing access to its premises to representatives of DIP Lender, (ii) providing DIP Lender or its designees access to the Debtors' books and records, (iii) performing all other obligations set forth in this Interim Order and/or the other DIP Loan Documents, and (iv) taking reasonable steps to safeguard and protect the DIP Facility Collateral until DIP Lender can make adequate provision to protect and safeguard the DIP Facility Collateral, and the Debtors shall not otherwise interfere or encourage others to interfere with enforcement of the rights of DIP Lender.

17.    <u>Carve-Out</u>.

(a)    Subject to the remaining provisions of this paragraph, the Adequate Protection Liens, the DIP Facility Liens, the Superpriority Claims, the 507(b) Claim and all liens and claims of Junior Lenders referenced or defined herein shall be subject to (a) the payment of any unpaid fees payable pursuant to 28 U.S.C. § 1930 (including, without limitation, fees under 28 U.S.C. § 1930(a)(6)), (b) the fees due to the Clerk of the Court; (c) the actual fees and expenses incurred by professionals, for the period prior to the

Case 10-44131-JKO    Doc 8    Filed 11/04/10    Page 47 of 90

occurrence of a Termination Date, retained by an order of the Court entered pursuant to Sections 327 or 1103(b) of the Bankruptcy Code, provided they are within the amounts set forth in the Approved Budget and are subsequently allowed by the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code; and, (d) the payment of, following the occurrence of the Termination Date, allowed professional fees and disbursements incurred after the Termination Date by the professionals retained, pursuant to Sections 327, 328 or 1103(a) of the Bankruptcy Code, by the Debtors and the Committee, in an aggregate amount not to exceed $200,000 (of which (i) $175,000 shall be allocated for the benefit of Debtors' professionals, and (ii) $25,000 shall be allocated for the benefit of the Committee Professionals) to the extent such amounts are not otherwise payable from retainers or the Professional Expense Escrow (defined below) (the "Carve-Out").

(b)      Notwithstanding anything to the contrary in this Interim Order or the DIP Loan Documents, no proceeds of the DIP Indebtedness or Cash Collateral (including any pre-petition retainer funded by DIP Lender) pursuant to the DIP Loan Documents, nor any DIP Facility Collateral (or proceeds thereof) may be used to pay any claims for services rendered by any of the Debtors' professionals, any other entity or the Committee's professionals, if any, in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief (x) invalidating, setting aside, avoiding, disallowing or subordinating, in whole or in part, the DIP Indebtedness or the liens and security interests of DIP Lender in the DIP Facility Collateral; or (y) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise

3183072-7                                          18

by DIP Lender of any of its rights and remedies under this Interim Order and/or the DIP Loan Documents or DIP Lender's enforcement or realization upon any of the liens on or security interests in any DIP Facility Collateral.  DIP Lender and Junior Lenders shall retain their rights as a party in interest to object to any fee applications or other claims of any entity, including but not limited to the Debtors' and the Committee's, if any, professionals.

(c)      The Debtors are authorized to use proceeds of the DIP Facility in accordance with the Approved Budget to pay such compensation and expense reimbursements of professional persons retained by the Debtors (the "Debtor Professionals") and any Committee appointed by the United States Trustee (the "Committee Professionals") as may be awarded by the Court pursuant to Section 328, 330 or 331 of the Bankruptcy Code (the "Professional Expenses").   The Debtor Professionals and the Committee Professionals, if any, shall be permitted to submit to the Debtors, with copies to counsel for the DIP Lender, periodic statements (but no more frequently than on a monthly basis) for services rendered and reimbursable expenses incurred by them (the "Conditional Professional Expenses").  So long as the Termination Date has not occurred, the DIP Lender shall advance commencing within two days after entry of this Order and continuing on Monday of each week thereafter, the amounts set forth in the Approved Budget, and allocated for such fees and expenses; said funds shall be advanced to and segregated and escrowed in an escrow account maintained by counsel for the Debtors for payment to the Committee Professionals and the Debtor Professionals, in accordance with the procedures which may be approved by the Court for the payment of professionals (the "Professional Expense Escrow").    Funds deposited in the Professional Expense Escrow shall be available and may be used by the Debtors solely

for the payment of the Conditional Professional Expenses and the Professional Expenses (to the extent not previously paid).  Neither the Debtors nor any creditor of any of the Debtors (except for the DIP Lender) shall have a claim or interest in the funds on deposit in the Professional Expense Escrow, other than the entitlement of the Debtors or a successor trustee to receive; (i) any balance remaining in the Professional Expense Escrow after payment in full of (a) the Professional Expenses that have accrued and that are allowed by final order of the Court and (b) the Obligations; and (ii) any amounts paid from the Professional Expense Escrow but subsequently disallowed by final order of the Court that are not otherwise payable to the DIP Lender.  Nothing in this paragraph 17 shall prejudice or impair the rights of either the Debtor Professionals or the Committee Professionals to request an award of compensation in excess of the amounts set forth in the Approved Budget (the "Unbudgeted Professional Expenses") or the rights of the DIP Lender to object to the amount or reasonableness of the Conditional Professional Expenses, the Professional Expenses or the Unbudgeted Professional Expenses.

18.    Cash Collection Procedures.  From and after the date of the entry of this Interim Order all collections and proceeds of any DIP Facility Collateral or services provided by the Debtors and all other cash or cash equivalents which shall at any time come into the possession or control of the Debtors, or to which the Debtors shall become entitled at any time shall be deposited in accounts as are designated by DIP Lender from time to time, and such collections and proceeds upon such deposit shall remain and be part of the DIP Facility Collateral, and be released to Debtors as provided for in the Approved Budget.  In the event the Debtors intend to open any new bank accounts that would affect the right and ability of DIP Lender to receive any proceeds as contemplated by this Order, the Debtors shall first obtain a "lock box agreement" or other written confirmation to the satisfaction of DIP Lender from the relevant banking institution

recognizing the rights of the DIP Lender as provided for in this Order.    All financial institutions in which any lockboxes, blocked accounts or other accounts of the Debtors are located are hereby authorized and directed to comply with any request of DIP Lender to turnover to DIP Lender all funds therein without offset or deduction of any kind.

19.    <u>Budget; Use of Cash Collateral and DIP Facility Proceeds</u>.

(a)    Attached as <u>Exhibit B</u> hereto and incorporated herein by reference is a budget (which has been approved solely as to the period pending the Final Hearing by DIP Lender) setting forth by line item all projected cash receipts, sales and cash disbursements for the time period from  November ___, 2010 through _____ ___, 2011 (the "<u>Initial Approved Budget</u>").  The Debtor and DIP Lender shall promptly after entry of this Interim Order negotiate any changes to the Initial Approved Budget requested by the DIP Lender with respect to the period pending the Final Hearing.  If DIP Lender does not approve the Budget in its sole discretion as to the period pending the Final Hearing or any period subsequent to the Final Hearing, such failure shall constitute an Event of Default.  The Initial Approved Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) to which DIP Lender agrees in its sole discretion (each such additional budget, a "<u>Supplemental Approved Budget</u>").  The aggregate of all items approved by DIP Lender in the Initial Approved Budget and any and all Supplemental Approved Budgets (acceptable to DIP Lender in its sole discretion) shall constitute an "<u>Approved Budget</u>."

(b)    Debtors may use Cash Collateral and the proceeds of the DIP Facility exclusively to pay for the expenses incurred by Debtors as provided for in the Approved Budget.  Debtors represent and warrant that (a) the expenditures set forth in the Approved

Budget constitute all of Debtors projected expenses during the period of the Approved Budget, and (b) the Cash Collateral and the sums to be advanced by DIP Lender pursuant to the DIP Facility are sufficient to pay all of the expenses set forth in the Approved Budget. Debtors' sales and cash receipts shall not be less than as set forth in the Approved Budget and Debtors' expenses shall not exceed those set forth in the Approved Budget, in all cases subject to the Approved Sales Variance, the Approved Cash Receipts Variance, and the Approved Disbursements Variance (all as defined below, and collectively, the "Approved Variances"). Notwithstanding the foregoing, DIP Lender shall have no obligation to provide the DIP Facility if the Debtors exceed the overadvance limits provided in the Approved Budgets. As used herein, the Approved Variances include, and are defined and calculated as follows:

(i)     "Approved Sales Variance" means a negative variance of less than 5%, between Debtors' actual sales and Debtors' projected sales measured commencing as of the end of the first week covered by the Approved Budget and each week thereafter for both (i) the one-week period concluding with the week during which the variance is being calculated, and (ii) cumulatively from the commencement of the Chapter 11 Cases concluding with the week during which the variance is being calculated;

(ii)    "Approved Cash Receipts Variance" means a negative variance of less than 5%, between Debtors' actual cash receipts and Debtors' projected cash receipts measured commencing as of the end of the first week covered by the Approved Budget and each week thereafter for both (i) the one-week period concluding with the week during which the variance is being calculated, and (ii) cumulatively from the commencement of the Chapter 11 Cases concluding with the week during which the variance is being calculated;

(iii)   "Approved Disbursements Variance" means a positive variance of (A) less than 5%, between Debtors' actual disbursements and Debtors' projected disbursements, on a line item basis, and (B) less than 5% of the Debtors' actual disbursements and Debtors' projected disbursements, on a cumulative basis, each measured commencing as of the end of the first week covered by the Approved Budget and each week thereafter for both (i) the one-week period concluding with the week during which the variance

is being calculated, and (ii) cumulatively from the commencement of the Chapter 11 Cases concluding with the week during which the variance is being calculated.

(c)     Neither the proceeds of the DIP Facility nor the Carve-Out shall be utilized (i) to attack the validity, priority or enforceability of any of the post-petition liens or security interests of the DIP Lender or the Agent, (ii) to research, review, analyze or investigate with respect to or in connection with any litigation, claim, objection or cause of action of any kind or nature whatsoever against Victory Park, the Lender, the DIP Lender or the Agent (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other conduct), or (iii) to file, prosecute or otherwise pursue any litigation, claim, objection or cause of action of any kind or nature whatsoever against Victory Park, the Lender, the DIP Lender or the Agent (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other conduct).

20.     _Financial Reporting_.  The Debtors shall provide the following reports to DIP Lender: (i) no later than 5:00 p.m. (Eastern Time) each business day, a log of each of the daily disbursements and collections; (ii) no later than 5:00 p.m. (Eastern time) each Wednesday, (A) a comparison of the items in the Budget for the preceding week to the Debtors' actual performance that includes a narrative summary of any material variances from the Approved Budget for the preceding week, (B) an accounts receivable aging report by customer, (C) a detailed inventory listing report, (D) a detailed fixed asset listing report, and (E) a report of headcount and salaries by division; and (iii)  no later than the 20th day of each month, beginning November 20, 2010, the Debtors' financial statements (including detail by operating division and consolidated balance sheets, income statements and cash flow statements) for the immediately preceding month.

21.    <u>Covenants</u>.  The Debtors shall timely comply with all of the covenants set forth in this Interim Order and the DIP Loan Documents.  The covenants set forth in the DIP Loan Letter are incorporated herein in their entirety.

22.    <u>Events of Default</u>.  The Events of Default set forth in the DIP Loan Letter are hereby approved and incorporated herein in their entirety.

23.    <u>Release</u>.  The Debtors and their respective estates hereby release and discharge the Lender, DIP Lender, Agent and Victory Park, and each of the existing and former general partners, shareholders, directors, officers, fiduciaries, principals, managers, investment managers, members, employees, investors, representatives, agents, subsidiaries, predecessors, successors, assigns, affiliates, affiliated funds and managed accounts, portfolio companies, and related entities of the foregoing (collectively, the "Releasees"), of and from any and all claims, actions, charges, suits, liabilities, damages, contracts, agreements and promises, of any kind or nature whatsoever, known or unknown, foreseen or unforeseen, suspected or unsuspected, latent or patent, fixed or contingent, existing or hereafter arising, in law, equity, or otherwise, which the Debtors would have been legally entitled to assert in their own right or on behalf of any other person or entity against any of the Releasees, whether or not any of the facts or legal bases therefor were known or existed on or before the date of this Order, based upon or related to, in whole or in part, any funding of the DIP Indebtedness, DIP Loan Documents, DIP Facility or any transaction contemplated thereby, or any other acts, omissions or aspect of the pre-petition relationship between any of the Releasees and the Debtors.  This waiver and release shall be binding on any subsequently appointed Committee or successor, including but not limited to any subsequently appointed chapter 11 trustee, chapter 7 trustee and any liquidating trustee.

24.    <u>DIP Lender, Reservation of Rights; No Waiver</u>.  DIP Lender does not waive, and expressly reserves, any and all claims, defenses, rights and remedies they have pursuant to any or

all of the DIP Loan Documents, this Interim Order, the Bankruptcy Code and/or other applicable law against the Debtors and any officer, director, employee, agent or other representative of the Debtors. Notwithstanding anything to the contrary contained in the Interim Order, DIP Lender reserves the right to seek additional relief from the Court on any issue that may arise in connection with the Chapter 11 Cases.

25. <u>Effect of Dismissal, Conversion or Substantive Consolidation</u>. If any Chapter 11 Case is dismissed, converted, otherwise superseded or substantively consolidated, DIP Lender's rights and remedies under this Order and the DIP Loan Documents shall be and remain in full force and effect as if such Chapter 11 Case had not been dismissed, converted, superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, supercission or substantive consolidation, all of the terms and conditions of this Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

26. <u>Order Binding on Successors</u>. The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender and the Debtors and their respective successors and assigns (including any trustee or other estate representative appointed as a representative of the Debtors' estate or of any estate in any successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

27. <u>No Liability to Third Parties</u>. DIP Lender shall not (i) have liability to any third party nor shall it be deemed to be in control of the operations of the Debtors or to be acting as a "controlling person", "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the Internal Revenue Code, the Unites States Comprehensive, Environmental Response, Compensation and

Liability Act as amended, or any similar Federal or state statute), or owe any fiduciary duty to the Debtors, its creditors or its estate, and (ii) DIP Lender's relationship with the Debtors shall not constitute nor be deemed to constitute a joint venture or partnership with the Debtors.

28.    <u>Order Binding Upon Parties in Interest</u>.  All of the provisions of this Interim Order shall be final and binding on the Debtors (including, without limitation, their successors and assigns), the Debtors' shareholders, and all creditors and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed.

29.    <u>Effect of Modification of Interim Order</u>.  The Debtors shall not, without DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents.  If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without Lender's prior written consent, such stay, modification or <u>vacatur</u> shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

30.    <u>Safe Harbor</u>.  The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtors to obtain credit on the terms and conditions upon which the Debtors and DIP Lender have agreed.  Thus, each of such terms and conditions constitutes a part of the authorization

under § 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in § 364(e) of the Bankruptcy Code.

31.    <u>Subsequent Hearing; Procedure for Objections and Entry of Final Order</u>.   The Motion is set for a final hearing ("<u>Final Hearing</u>") before this Court at __:___ _m. on _____, 2010 (such date or such later date to which the Final Hearing is adjourned or continued with DIP Lender's consent, the "<u>Final Hearing Date</u>"), at which time any party in interest may present any timely filed objections to the entry of a final order and the remaining Post-Petition Financing, in form and substance reasonably acceptable to DIP Lender in its sole discretion (the "<u>Final Order</u>").   The Debtors shall promptly serve a copy of this Order, by regular mail upon (i) the parties identified in finding paragraphs K, N, O, P and Q hereof; (ii) appropriate state and federal taxing authorities; (iii) the creditors holding the 20 largest unsecured claims of each of the Debtors, or the Committee, if appointed; and (iv) any other party which theretofore has filed in the Chapter 11 Cases a request for special notice with this Court and served such request upon Debtors' counsel.   Any objections to this Interim Order and the entry of a Final Order on the Motion shall be in writing and shall be filed with the Court and served so that they not later than two (2) business days before the date scheduled for the Final Hearing and served so that they are received on or before 4:00 p.m. (Eastern Time) of such date by (i) Berger Singerman, P.A., counsel for the Debtors, 350 E. Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301, Attn: Brian K. Gart, Esq.; (ii) Akerman Senterfitt, counsel for DIP Lender, 350 E. Las Olas Boulevard, Suite 1600, Fort Lauderdale, Florida 33301, Attn:  Michael I. Goldberg, Esq.;  (iii) Greenberg Traurig LLP, counsel for Shelter Island Opportunity Fund, LLC, 333 Avenue of the Americas, Suite 4400, Miami, FL 33131-3238, Attn:   Paul J. Keenan, Jr., Esq.; (iv) Bilzin Sumberg Baena Price & Axelrod LLP, counsel for SAH-VUL Strategic Partners I, LLC, 1450 Brickell Avenue, 23rd Floor, Miami, FL 33131-3456, Attn:  Scott I. Baena, Esq. and Matthew I.

Kramer, Esq., (v) Gulfstream Funding II, LLC, c/o Taglich Brothers, Inc., as Agent for

Gulfstream Funding II, LLC, 275 Madison Avenue, Suite 1618, New York, NY 10016; (vi) the

Office of the United States Trustee, 51 Southwest First Avenue, Room 1204, Miami, FL 33130;

and (vii) counsel for the Official Committee of Unsecured Creditors, if one is established.  Any

objections by creditors or other parties in interest to any of the provisions of this Order shall be

deemed waived unless filed and served in accordance with this paragraph.

32.    <u>Objections Overruled or Withdrawn</u>.  All objections to the entry of this Interim

Order have been withdrawn or are herby overruled.

33.    <u>Controlling Effect of Order</u>.  To the extent any provisions in this Interim Order

conflict with any provisions of the Motion, or any DIP Loan Document the provisions of this

Interim Order shall control.

34.    <u>Order Effective</u>.  This Interim Order shall be effective as of the date of signature

by the Court.

# # #

<u>Submitted by:</u>
Brian K. Gart, Esq.
Douglas A. Bates, Esq.
BERGER SINGERMAN, P.A.
350 East Las Olas Blvd., Suite 1000
Fort Lauderdale, FL  33301
Telephone: (954) 525-9900
Facsimile: (954) 523-2872
bgart@bergersingerman.com
dbates@bergersingerman.com

<u>Copy furnished to:</u>
Brian K. Gart, Esq.
*(Attorney Gart is directed to serve a conformed copy of this Order and to file a Certificate of Service with the Court).*

## EXHIBIT "B"

**(Letter Agreement)**

VPC

## Debtor-In-Possession Term Loan/Potential Bankruptcy Emergence Transaction

### Letter Agreement

#### November 3, 2010

| | |
|---|---|
| **Debtors:** | Gulfstream International Group Inc. and any and all current and future affiliates and subsidiaries (whether or not wholly owned) as joint and several borrowers (collectively, the "*Debtors*"). |
| **Lender/Sponsor:** | Victory Park Capital Advisors, LLC, on behalf of one or more entities for which it acts as investment manager, ("*Victory Park*") and any other lender(s) acceptable to Victory Park (collectively with Victory Park, the "*Lender*" or "*Sponsor*"). |
| **Agent:** | Victory Park Management, LLC shall act as administrative and collateral agent (the "*Agent*"). |
| **Type:** | Debtor-in-Possession Term Loan (the "*Loan*" or "*DIP Facility*"), and potential emergence transaction. |
| **Commitment:** | $5,000,000 (the "*Commitment*"). |
| **Initial Disbursement:** | Upon entry of an interim financing order (the "*Interim Order*") by the applicable United States Bankruptcy Court in Florida (the "*Court*") presiding over the Chapter 11 proceedings of the Debtors (the "*Bankruptcy Cases*") under Bankruptcy Code § 364(c) and (d) (in form and substance agreeable to the Debtors, Lender and Agent), $1,500,000 of the Commitment shall be funded by the Lender (the "*Initial Disbursement*"). |
| **Final Disbursement:** | Upon entry of a final financing order (the "*Final Order*") by the Court presiding over the Bankruptcy Cases under Bankruptcy Code § 364(c) and (d) (in form and substance agreeable to the Debtors, Lender and Agent), $3,500,000 of the Commitment shall be funded by the Lender (the "*Final Disbursement*"). |
| **Closing Date:** | Closing of the Loan with respect to the Initial Disbursement anticipated to be promptly upon entry of the Interim Order, but no later than two (2) days after entry of such order (the "*Initial Closing Date*"). |
| | Closing of the Loan with respect to the Final Disbursement anticipated to be promptly upon entry of the Final Order, but no later than three (3) days after entry of such order. |
| **Use of Proceeds:** | Proceeds of the Loan shall be utilized as follows: (i) costs, expenses, closing payments, and all other payment amounts contemplated herein; (ii) general working capital and operational expenses (in accordance with a weekly cash flow budget prepared by the Debtors, in form and substance acceptable to the Lender and Agent on a line-by-line basis, subject to a five percent (5%) variance on a cumulative basis for each such line item of expense (the "*Budget*")); and (iii) scheduled aircraft lease and other payments due to Raytheon Aircraft Credit Corporation ("*RACC*") before the scheduled expiration of the term of the Debtors' agreements with RACC, on December 8, 2010, or if such term is extended by RACC, during the period contemplated by Bankruptcy Code § 1110(a)(2), or as may be extended pursuant to a Stipulation in form and substance acceptable to the Debtors, Agent, Lender and RACC under Bankruptcy Code § 1110(b) (the "*Section 1110 Stipulation*"), with all such payments to be included and approved as part of the Budget. |
| | For the avoidance of doubt, neither the proceeds of the Loan nor the Carve-Out (as defined below) shall be utilized (i) to attack the validity, priority or enforceability of any of the post-petition liens or security interests of the Lender or the Agent, (ii) to research, review, analyze or investigate with respect to or in connection with any litigation, claim, objection or cause of action of any kind or nature whatsoever against the Lender or the Agent (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other conduct), or (iii) to file, prosecute or otherwise pursue any litigation, claim, objection or cause of action of any kind or nature whatsoever against the Lender or the Agent (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other conduct). |
| **Interest:** | Fifteen percent (15.0%) per annum (the "*Interest*"). Interest shall be payable monthly in cash in arrears; provided however that the Debtors shall prepay three (3) interest payments under the Loan on the Initial Closing Date. |

**VPC**

| | |
|---|---|
| **Default Interest:** | Upon the occurrence of an Event of Default (as defined below) and during the continuation of such default, interest shall accrue on any outstanding advances at twenty percent (20%) per annum (the "*Default Interest*"). |
| **DIP Fee:** | Two percent (2.0%) of the Commitment, which amount shall be fully earned and payable in cash to Lender on the Initial Closing Date in the form of a closing payment payable from the proceeds of the Loan. |
| **Success Fee:** | Three percent (3.0%) of the Commitment, which amount shall be fully earned on the Initial Closing Date and payable in cash to Lender on the Due Date. |
| **Maintenance Fee:** | $5,000 per month, which amount shall be payable in cash to Agent on the Initial Closing Date and every thirty (30) days thereafter from the proceeds of the Loan pursuant to the Budget. |
| **Costs/ Expenses:** | The Debtors shall reimburse the Agent and the Lender for all costs incurred in connection with the Loan, the Loan Obligations (as defined below) and/or any Lender Sponsored Transaction (as defined below), including, without limitation, legal fees, advisor fees, consultant fees, costs and expenses, collateral valuations, appraisals, surveys, field examinations, third party diligence, lien searches, filing fees, and all other out-of-pocket costs and expenses in any way related to the Loan and/or Loan Obligations and the enforcement thereof and any Lender Sponsored Transaction (collectively, the "*Costs and Expenses*"). In the event that the Loan is not consummated, the Lender and the Agent shall have the right to seek reimbursement of all reasonable Costs and Expenses incurred with respect thereto as an administrative expense of the Debtors' estates pursuant to Bankruptcy Code § 503(b). |
| **Term:** | Any and all then current outstanding principal amount of the Loan (the "*Loan Principal*") plus any unpaid accrued interest or Default Interest (as the case may be) plus any Costs and Expenses or other amounts due under the Loan, this Letter Agreement, the Interim Order and the Final Order (each, a "*Loan Obligation*" and collectively, the "*Loan Obligations*") shall become due and payable in full in cash upon the earlier of (the "*Due Date*"): (i) termination of the stay period specified in Bankruptcy Code § 1110, or the Debtors' failure to reach arrangements (including arrangements with RACC) reasonably satisfactory to Agent, Lender and Debtors regarding the Debtors' assets that are subject to Section 1110); (ii) ninety (90) days after the commencement of the Bankruptcy Cases; (iii) the substantial consummation (as defined in Bankruptcy Code § 1101 and which for purposes hereof shall be no later than the effective date) of a confirmed plan of reorganization; (iv) conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code; (v) appointment of a trustee for the Debtors; (vi) dismissal of any of the Bankruptcy Cases; (vii) thirty (30) days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such thirty (30) day period; (viii) the date on which the Court enters a final order approving a post-petition financing between the Debtors and another lender(s) or investor(s) (as the case may be) (other than Lender); (ix) repayment in full in cash of the Loan Obligations; and (x) three (3) business days after the Agent or the Lender notifies the Debtors in writing of an Event of Default which is not subsequently cured or waived by the end of such notice period. The Agent and the Lender may extend the Due Date in their sole discretion. In the event that the parties consummate a Lender Sponsored Transaction, as referred to below, the Loan Obligations will be treated in accordance with the terms of such Lender Sponsored Transaction. |

*Governing Terms*

| | |
|---|---|
| **Lender Sponsored Transaction:** | The Debtors and Lender will continue to cooperate to develop an agreement for a sale of the Debtors' assets free and clear of liens and claims (under which Lender would provide the "stalking horse" purchase transaction), or a Plan of Reorganization, under which Lender and Debtors would be co-sponsors (a "*Lender Sponsored Transaction*"), which would require, involve and is expressly subject to and conditioned upon: (a) the completion of Lender's due diligence satisfactory to Lender in its sole discretion, (b) negotiating an agreement with RACC acceptable to the Lender, Debtors and RACC, (c) reaching terms for applying the Loan Obligations within the capital structure of the Reorganized Debtor or consideration for the purchase of the Debtors' assets in a § 363 sale satisfactory to Lender in its sole discretion; and (d) negotiating and executing definitive documents acceptable to the Lender and the Debtors as required for the transaction. For the avoidance of doubt, the Lender and the Debtors specifically acknowledge and agree that they have not reached any binding agreement or understanding regarding any Lender Sponsored Transaction. |

**VPC**

| | |
|---|---|
| **Collateral:** | The Loan shall be secured by: (i) a perfected first priority lien on any and all current and future assets of the Debtors of any nature or type whatsoever including, without limitation, accounts, accounts receivable, inventory, customer lists, intellectual property, minerals, mineral rights, plant and equipment patents, trade secrets, property and/or leasehold rights, all other tangible and intangible assets, and any causes of action under the Bankruptcy Code or applicable non-bankruptcy law, excluding recoveries pursuant to Chapter 5 of the Bankruptcy Code (and also expressly excluding any equipment or other assets as described in Bankruptcy Code § 1110); (ii) a first priority pledge of the capital stock and/or equity interest held directly or indirectly by each of the Debtors (for the avoidance of doubt, such pledge shall not include a pledge of the capital stock/ equity interest held by shareholders/investors in Gulfstream International Group, Inc.); and (iii) constructive control over the Debtors' bank accounts in similar form and substance of lockbox and/or control accounts customary for transactions of this nature exercisable upon an Event of Default and stay relief from the Court, or as may be provided in the Interim Order and Final Order (collectively the "*Collateral*"). The Debtors shall take any steps requested by the Agent, including the execution of Control Agreements and Pledge Agreements to assure that the Agent's interest in the Collateral is perfected. |
| **Priority:** | The Loan shall be authorized and approved by the Court pursuant to Bankruptcy Code § 364(c)(1) to be incurred as, and shall constitute, claims with a priority over all administrative expenses of the kind specified in Bankruptcy Code § 503(b) or 507(b). The security interests and liens in the Collateral securing the Loan shall be authorized and approved by the Court pursuant to Bankruptcy Code § 364(c)(2), (3), and 364(d) to constitute a lien on and in the Collateral ranking prior to all other claims and liens of the Debtors, except for the Carve-Out as defined below (the "*Priming Lien*"). The Priming Lien will be senior in priority to security interests and liens securing the indebtedness and other obligations owing under any of the Debtors' prepetition loan and security agreements. The Priming Lien shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the Agent or the Lender. |
| **Carve-Out:** | The fees and expenses incurred by the Debtors' retained professionals in the Bankruptcy Cases and the quarterly fees of the US Trustee under 28 U.S.C. § 1930 may be paid by the Debtors from the Collateral, subject to and in accordance with the Budget and subject to entry of any required orders of the Court (the "*Carve-Out*"), the amount of which Carve-Out shall not exceed $200,000 in the aggregate, excluding any amounts of time charges and expenses incurred or recorded by the Debtors' professionals prior to an Event of Default. The Lender and the Agent shall have the right to increase the amount of the Carve-Out in their sole discretion. The Lender's and Agent's liens on the Collateral and the Lender's and Agent's administrative expense claims provided for herein shall be subject and subordinate only to the Carve-Out. |
| **Representations and Warranties:** | The Debtors shall make usual and customary representations and warranties for transactions of this nature, including, without limitation, good standing of each of the Debtors; no consent or approval is required other than the Interim Order and Final Order; due authorization, execution and delivery of loan documents; no violation of material agreements entered into after the commencement of the Bankruptcy Cases; no violation of law as a result of the execution of the Loan documents; no liens on the assets of the Debtors except for certain liens permitted by the Agent and the Lender; compliance with applicable laws and regulations; no material change in business; no unstayed litigation that is reasonably likely to have a material adverse effect on the operations of the Debtors taken as a whole; no information furnished by Debtors to the Agent or Lender or the Court contains any material misstatement of fact or omitted to state a material fact necessary to make the statements therein not materially misleading; taxes paid to the extent required by law; and material returns filed. |
| **Covenants:** | The Debtors shall comply with all of the following covenants:<br><br>1. The Debtors shall promptly provide the Agent with updates of any material developments in connection with the Debtors' reorganization efforts under the Bankruptcy Cases, whether in connection with an asset sale, plan of reorganization or otherwise;<br><br>2. The Debtors shall deliver the Budget as updated on a weekly basis to the Agent (in form and substance reasonably acceptable to the Agent), including, without limitation, forecasts, sales pipeline, accounts receivable and cash flow;<br><br>3. The Debtors shall deliver a bi-monthly payroll report to the Agent (in form and substance reasonably acceptable to the Agent); |

VPC

4.  The Debtors shall operate the their businesses in accordance with the Budget, and the requirements of the Bankruptcy Code and orders of the Bankruptcy Court;

5.  The Debtors shall not provide maintenance service, aircraft parts, fuel or any other resources or services: (a) to any aircraft that is not actively in service and generating revenue for the Debtors' business (for the avoidance of doubt, permitted aircraft shall include those certain: twenty-one (21) Beech 1900D aircraft leased from RACC, two (2) Beech 1900D aircraft leased from Computer Sciences Corporation, Inc. ("*CSC*"), two (2) Piper PA-31 Navajo Chieftain aircraft leased from Thomas L. Cooper ("*Cooper*"), and one (1) Piper PA-31 Navajo Chieftain aircraft leased from Thomas A. McFall ("*McFall*")); (b) in connection with any maintenance event that may be considered unnecessary by industry standards; or (c) any maintenance event that does not fall within the scope of the Debtors' existing agreements with RACC, CSC, Cooper or McFall;

6.  Without the prior written consent of the Agent or the Lender, the Debtors shall not seek, consent to, or permit to occur any of the following:

    a.  Any order which authorizes the rejection of any leases of any of the Debtors without the Agent's prior written consent;

    b.  Any modification, stay, vacation or amendment to the Final Order to which the Agent has not consented in writing;

    c.  A priority claim or administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including without limitation, any administrative expense of the kind specified in Bankruptcy Code § 105, 326, 328, 330, 331, 364(c) 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114) equal or superior to the priority claim of the Agent and the Lender in respect of the obligations hereunder, except with respect to the Carve-Out;

    d.  Any lien on any Collateral having a priority equal or superior to the lien securing the obligations hereunder, other than with respect to the Carve-Out;

    e.  Any order which authorizes the payment of any indebtedness incurred prior to the petition date without the Agent's prior written consent;

    f.  Any order seeking authority to take any action that is prohibited by the terms of this Letter Agreement, the Interim Order or the Final Order or refrain from taking any action that is required to be taken by the terms of this Letter Agreement, the Interim Order or the Final Order; or

    g.  Any other action that would materially adversely affect the Agent or the Lender in any way without the prior written consent of the Agent or the Lender.

6.  Debtors shall continue to cooperate with Lender regarding a Lender Sponsored Transaction.

**Event(s) of Default:**   Each of the following shall constitute an "*Event of Default*", unless otherwise waived by the Agent in its sole discretion:

1.  Debtors shall fail to pay any Loan Obligation after such payment has become due;

2.  Any report, certificate or other document delivered to the Agent or the Lender pursuant to this Letter Agreement, the Interim Order or the Final Order shall have been incorrect in any material respect when made or deemed made;

3.  Debtors shall fail to perform or comply with any covenant or agreement contained in this Letter Agreement, the Interim Order or the Final Order;

4.  The failure of Debtors to comply in all material respects with each and all of the terms and conditions of the Interim Order, the Final Order and this Letter Agreement;

5.  Any of the Debtors is enjoined, restrained or in any way prevented by the order of any court or any governmental authority from conducting all or any material part of its business for more than three (3) consecutive days;

**VPC**

6. Any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty (whether or not insured) which causes, for more than three (3) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Debtors, if any such event or circumstance could reasonably be expected to have a material adverse effect;

7. The entry of an order in the Bankruptcy Cases which stays, modifies (in any manner adverse to the Agent or the Lender), or reverses the Interim Order or Final Order or which otherwise materially adversely affects, as determined by the Agent in its reasonable discretion, the effectiveness of the Interim Order or Final Order without the express written consent of the Agent;

8. The conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code;

9. Any of the following employees of the Debtors is removed, terminated or replaced, or otherwise ceases to participate actively in management of the Debtors, in each case without the written consent of the Agent or Lender: (a) Dave Hackett (President & CEO), (b) Leo Krupilis (Sr. VP Maintenance), (c) Phil LeFevre (VP Director of Operations), (d) Roy Canter (Sr. VP Customer Service), (e) Pete Taggart (VP of SOCC), (f) Eddie Panella (Director of Financial Reporting), or (g) Donna Bascombe (Revenue Accounting Manager);

10. The appointment of a trustee for the Debtors;

11. The dismissal of any of the Bankruptcy Cases; provided that the Agent and the Lender have not consented in writing to such dismissal;

12. The entry of any order which provides relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 that permits any creditor to (a) realize upon, or to exercise any right or remedy with respect to, any material portion of the Collateral, or (b) to terminate any license, franchise or similar agreement, wherein either case the exercise of such right or remedy or such realization or termination would be reasonably likely to have a material adverse effect;

13. Subject to the allowance and payment of any amounts due under the Carve-Out, the filing of any application by Debtors without the express written consent of the Agent for the approval of a super-priority claim in the Bankruptcy Cases which is pari passu with or senior to the priority of the claims of the Agent or the Lender, or there shall arise any such super-priority claim under the Bankruptcy Code, provided that the filing of any such application shall not be deemed an Event of Default if the proceeds of the funding supporting such claim will be used to pay the Loan;

14. The payment or other discharge by Debtors of any prepetition indebtedness without the written consent of the Agent or Lender;

15. The filing of any motion by Debtors seeking, or the entry of any order in the Bankruptcy Cases: (a) permitting working capital or other financing (other than ordinary course trade debt or unsecured debt) for any of the Debtors from any person other than the Agent (unless the proceeds of such financing are to be used to pay in full all obligations arising under this Letter Agreement, the Interim Order and the Final Order); (b) granting a lien on, or security interest in, any of the Collateral, other than with respect to this Letter Agreement (unless such liens are granted in connection with a financing, the proceeds of which are to be applied to the payment in full of all obligations arising under this Letter Agreement, the Interim Order and the Final Order, and other than liens granted as adequate protection for pre petition liens on the Debtors' assets, which adequate protection liens are junior in priority to the Lender's super priority priming liens); (c) except as permitted by this Letter Agreement, the Interim Order or the Final Order, permitting the use of any of the Collateral pursuant to Bankruptcy Code § 363(c) without the prior written consent of the Agent, permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Bankruptcy Code § 506(c); or (d) dismissing the Bankruptcy Cases, unless the Agent has sought or consented in writing to such relief by the Court;

16. The filing of a motion or other pleading seeking the entry of an order confirming a plan of reorganization (and/or approving a disclosure statement related thereto) that does not require payment in full in cash of all obligations under this Letter Agreement, the Interim Order and the Final Order on the consummation date of such plan of reorganization, and as to which Lender has not consented in writing; or

**VPC**

17. The filing of any pleading by any of the Debtors challenging the validity, priority, perfection or enforceability of this Letter Agreement or the obligations hereunder, or any lien granted pursuant to this Letter Agreement, the Interim Order or the Final Order is determined to be null and void, invalid or unenforceable by the Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Bankruptcy Cases.

| | |
|---|---|
| **Default Remedies:** | Upon three (3) business days' written notice of an Event of Default which is not subsequently cured or waived during such notice period: |

1. The Loan shall mature and any and all Loan Obligations shall become due and payable in full in cash;

2. The Agent and the Lender shall have standing to move for an order to cause the Debtors to engage in a process to liquidate their assets pursuant to Bankruptcy Code § 363; and

3. The Agent and the Lender shall have the right to seek an emergency hearing requesting relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 that permits the Agent and the Lender to realize upon, or to exercise any right or remedy with respect to, any portion of the Collateral.

| | |
|---|---|
| **Prepayment(s):** | The Debtors shall have the right (but not the obligation) to prepay the Loan Obligations (in cash) in whole or in part. |
| **Reservation of Rights:** | Nothing in this Letter Agreement is intended or shall be construed to waive any of the Agent's or the Lender's rights to object to or otherwise contest the reasonableness of the fees and expenses of the Debtors' retained professionals. Such rights are hereby reserved in their entirety. |

If the Debtors have not received a Court order approving the Section 1110 Stipulation before the termination of the stay period specified in Bankruptcy Code § 1110, then, notwithstanding Bankruptcy Code § 1121, the Agent and the Lender shall have the right to file a plan and disclosure statement (the "*Plan Right*"). The Plan Right shall be approved by the Court pursuant to the Interim Order and Final Order, and shall be a condition to consummating the Loan.

The Agent and the Lender shall have the right under Bankruptcy Code § 363(k) to credit bid up to the full amount of the Loan Obligations in connection with any sale of the Debtors' assets under a plan of reorganization or otherwise (the "*Credit Bid Right*"). The Credit Bid Right shall be approved by the Court pursuant to the Interim Order and Final Order, and shall be a condition to consummating the Loan.

| | |
|---|---|
| **Retainer:** | An initial retainer of $50,000 (the "*Initial Retainer*") was received by the Agent on October 25, 2010, to pay for future Costs and Expenses incurred by the Agent and/or the Lender. An additional retainer of $50,000 (the "*Additional Retainer*") was received by the Agent on October 29, 2010, to pay for future Costs and Expenses incurred by the Agent and/or the Lender. Debtors recognize that the Initial Retainer and the Additional Retainer are only retainers to secure payment of the Lender's and/or Agent's future costs and expenses and is not a cap on such future costs and expenses which may exceed the amount of the Initial Retainer and the Additional Retainer. The Debtors acknowledge and agree that the Initial Retainer and the Additional Retainer were fully earned upon payment thereof as consideration for Victory Park's strategic direction, due diligence, work performed and other good and sufficient value provided to the Debtors hereunder. The Interim Order and the Final Order shall include a provision ratifying the payment of the Initial Retainer and the Additional Retainer and waiving and releasing any claims the Debtors and/or their respective estates may have against Victory Park, Agent and/or Lender with respect to the Initial Retainer and/or the Additional Retainer pursuant to Chapter 5 of the Code or any other applicable law. |
| **Closing Conditions:** | This Letter Agreement is subject to, amongst other items, the following: |

1. Completion of business and legal due diligence satisfactory to the Agent and Lender in their sole discretion;

2. Execution of definitive legal documentation acceptable to the Agent and Lender in their sole discretion;

3. Payment in full in cash of the Initial Retainer and the Additional Retainer; and

---

**VPC**

> 4.  Entry of the Interim Order and Final Order by the Court, authorizing borrowing pursuant to this Letter Agreement.

This Letter Agreement does not set forth all the terms and conditions of the Loan described herein. Rather, it is only an outline, in summary format, of major points of understanding, which will form the basis of the definitive documentation. The definitive documentation will be prepared by the Agent and the Lender.

This Letter Agreement is not, and shall not be deemed to be, a binding agreement by the Agent or the Lender to provide the Loan described herein. Such agreement will arise only upon the execution and delivery by the Debtors of definitive documentation satisfactory in form and substance to the Agent and the Lender and the fulfillment, to the satisfaction of the Agent and the Lender, of the conditions precedent required by the Agent and the Lender and set forth herein and therein. Notwithstanding the foregoing, the rights of the Agent and the Lender and the corresponding obligations of the Debtors under "Costs/ Expenses" and "Retainer" shall be binding on the parties hereto upon the execution of this Letter Agreement.

In the event that the Debtors elect not to consummate the transaction contemplated herein or the Debtors are unable, for any reason, to obtain the Interim Order from the Court on or before November 8, 2010 (or as soon thereafter as the Court's calendar shall permit), this Letter Agreement shall automatically terminate (unless extended in writing by the Agent and the Lender). Any disputes arising in connection with this letter, or the definitive documents referred to herein, shall be determined by the Florida Bankruptcy Court having jurisdiction and venue over the Debtors cases.

This Letter Agreement and the terms set forth herein are confidential, and the Debtors shall not disclose the terms of this Letter Agreement, or the fact that negotiations between the Agent, the Lender and the Debtors are ongoing, to any third party other than RACC, including any other source of potential financing for the Debtors; provided, however, that the Debtors shall disclose the terms of this Letter Agreement for purposes of seeking approval of the Loan by the Court.

*    *    *    *    *

If the above is acceptable to the Debtors, please sign and return the enclosed copy of this Letter Agreement to the Agent no later than the close of business on *November 3, 2010*.

*Acknowledged, Accepted, and Agreed to:*

DEBTORS:                          GULFSTREAM INTERNATIONAL GROUP, INC.

                                 By:  David F. Hackett
                                 Its:  Chief Executive Officer and President

LENDER:                          VICTORY PARK CAPITAL ADVISORS, LLC

                                 By:  Scott R. Zemnick
                                 Its: General Counsel

AGENT:                           VICTORY PARK MANAGEMENT, LLC

                                 By:  Matthew Ray
                                 Its:  Manager

**<u>EXHIBIT "C"</u>**

**(Capital Structure Summary)**

| Date | Secured Party | Debtors | Amount of Investment or Financing | Amount Outstanding as of 08/31/2010 | Collateral Description | Interests Obtained or Conveyed | Warrants |
|---|---|---|---|---|---|---|---|
| 9/18/2008 | Shelter Island Opportunity Fund, LLC ("Shelter Island") | GIGI, GUA Holdings, GTA, GCI, GIGI | Original Amount $5,100,000 | Aggregate Principal = $3,834,000 Accrued and Unpaid Interest = $11,731.27 | All Assets subject and subordinate to the liens of SVSP and Taglich pursuant to the Intercreditor Agreement | Warrants and put rights with respect to such warrants | |
| 2/26/2010 | Taglich Brothers, Inc. & Taglich Note Purchasers ("Taglich") | GIGI | $1,050,000 | Aggregate Principal = $1,050,000; Accrued and Unpaid Interest = $67,148.92 | Pursuant to the Intercreditor Agreement, Taglich obtained a first priority lien and security interest in the "accounts" subject only to the first priority lien of SVSP in the Cuba Business Collateral | | |
| 9/8/2010 | SAH-VUL Strategic Partners I LLC ("SVSP") | GIGI, GUA Holdings, GTA, GCI | $1,500,000, contingent $1,000,000 | SVSP Note: $1,500,000, (as of 9/08/10) | Pursuant to the Intercreditor Agreement, SVSP has a first priority lien and security interest in the Cuba Business Collateral, including Accounts, a lien subject and subordinate to the liens of Shelter Island in all other collateral, and a second priority lien in Accounts, other than the Cuba Business Accounts, subject and subordinate to the first priority lien in favor of Taglich, and the second priority lien in favor of Shelter Island. | Convertible promissory note, warrants to purchase common stock, option for additional convertible note with associated warrants, and two Board of Director seats, with option for third. | |
| TOTAL | | | $8,600,000 | $8,262,880 | | | |

**<u>EXHIBIT "D"</u>**

**(Intercreditor Agreement)**

## WAIVER, CONSENT AND INTERCREDITOR AGREEMENT

THIS WAIVER, CONSENT, AND INTERCREDITOR AGREEMENT is entered into as of the 31st day of August, 2010 (this "Agreement") by and among TAGLICH BROTHERS, INC., a New York corporation ("Taglich") with an address of 275 Madison Avenue, Suite 1618, New York, NY 10016, as collateral agent on its own behalf and for the Purchasers listed on Exhibit A to the Taglich Debt Documents (as hereinafter defined) (together with Taglich, individually and collectively, the "Taglich Note Purchasers"); SHELTER ISLAND OPPORTUNITY FUND, LLC, a Delaware limited liability company ("Shelter Island") with a place of business, c/o RAM Capital Resources, LLC, at 535 Fifth Avenue, 25th floor, New York, NY 10017; SAH-VUL STRATEGIC PARTNERS I, LLC, a Florida limited liability company ("SVSP") with an address of 1690 S. Congress Avenue, Suite 200, Delray Beach, FL 33445; GULFSTREAM INTERNATIONAL GROUP, INC. a Delaware corporation ("Gulfstream" or the "Debtor") with a place of business at 3201 Griffin Road, Ft. Lauderdale, Florida 33312; and the Gulfstream Subsidiaries signatory hereto below.

## RECITALS

WHEREAS, Gulfstream is currently indebted to Shelter Island in the aggregate principal amount of $3,634,000 together with accrued and unpaid interest thereon as of the date hereof in the amount of $11,731.27 (the "Shelter Island Debt") pursuant to a Securities Purchase Agreement dated August 31, 2008, between Shelter Island and Gulfstream (the "Shelter Island Securities Purchase Agreement"), and that certain $5,100,000 Secured Original Issue Discount Debenture entered into on September 19, 2008, and effective on August 31, 2008, as amended by that Forbearance Agreement and Amendment to Debenture dated February 26, 2010 (together with all other documents executed in connection with the Shelter Island Debt and in effect on the date hereof, collectively, the "Shelter Island Debt Documents"); and

WHEREAS, the obligations of Gulfstream under the Shelter Island Debt Documents are secured by a lien and security interest (the "Shelter Island Lien") in and to all of the assets and properties of Gulfstream and its Subsidiaries and, all stock in the Subsidiaries, whether now owned or hereafter acquired and any and all additions and accessions to any of the foregoing, and any and all replacements, products, proceeds (including insurance proceeds) and substitutions of any of the foregoing wherever located (collectively, the "Collateral"), subject and subordinate to the first priority lien and security interest in favor of SVSP in the Cuba Business Collateral in accordance with the terms hereof and the first priority lien and security interest in favor of Taglich in the Accounts (other than Accounts arising from the Cuba Business Collateral) ; and

WHEREAS, Gulfstream is currently indebted to the Taglich Note Purchasers in the aggregate principal amount of $1,050,000, together with accrued and unpaid interest thereon as of the date hereof in the amount of $67,148.92 (the "Taglich Debt") pursuant to a Purchase Agreement dated as of February 26, 2010 among Gulfstream, Taglich and the Taglich Note Purchasers (the "Taglich Purchase Agreement"), which Taglich Debt is evidenced by Gulfstream's notes in the aggregate principal amount of $1,050,000 in favor of the Taglich Note Purchasers, and which are guaranteed by each Subsidiary of Gulfstream (together with all other documents executed in connection with the Taglich Debt and in effect on the date hereof, collectively, the "Taglich Debt Documents"); and

WHEREAS, the obligations of Gulfstream under the Taglich Debt Documents are secured by a lien and security interest (the "Taglich Lien") in the "Accounts" (as that term is defined in the Security Agreement dated as of February 26, 2010 among Gulfstream, Taglich, as agent for the Taglich Note Purchasers, and certain subsidiaries of Gulfstream) annexed as an exhibit to the Taglich Purchase Agreement) of Gulfstream and its Subsidiaries, whether now owned or hereafter acquired and any and all

additions and accessions to any of the foregoing, and any and all replacements, proceeds (including credit insurance proceeds of such Accounts) and substitutions of any of the foregoing wherever located (collectively, the "Taglich Collateral") subject and subordinate to the first priority lien and security interest in favor of SVSP in the Cuba Business Collateral in accordance with the terms hereof; and

WHEREAS, Gulfstream (a) is currently indebted to SVSP for $500,000 and may be indebted to SVSP for up to $1,500,000 pursuant to a $1,500,000 Secured Convertible Promissory Note dated as of August 31, 2010 (the "Initial SVSP Note") evidencing a loan or loans from SVSP to Gulfstream in the aggregate principal amount of up to $1,500,000, and (b) may be further indebted to SVSP for up to an additional $1,000,000 upon exercise of an option (the "SVSP Option") to purchase at any time on or before November 30, 2010, up to an additional $1,000,000 secured convertible promissory note (the "Additional SVSP Note" and with the Initial SVSP Note, the "SVSP Notes"); which SVSP Notes is and will be guaranteed by each Subsidiary of Gulfstream (together with the Loan Documents (as defined in the SVSP Notes) and all other documents executed in connection with the SVSP Debt, collectively, the "SVSP Debt Documents"); and

WHEREAS, the obligations of Gulfstream under the SVSP Debt Documents are secured by: (i) a first priority perfected lien and security interest in favor of SVSP in the Cuba Business Collateral, including without limitation the Assigned Agreement (defined below), (ii) subject and subordinate to the priority lien and security interest in favor of Shelter Island, the Collateral (other than the Cuba Business Collateral) in accordance with the terms hereof, and (iii) subject and subordinate to the first priority lien and security interest in favor of Taglich and the second priority lien and security interest in favor of Shelter Island, in the Accounts (other than Accounts arising from the Cuba Business Collateral), in accordance with the terms hereof; and

WHEREAS, SVSP would not agree to make the loans evidenced by the SVSP Notes unless: (i) the Existing Lenders agree to subordinate their respective Shelter Island Lien and Taglich Lien to the Priority SVSP Lien, and (ii) the Existing Lenders waive any and all financial covenants contained in the Existing Debt Documents for one year from the date of this Agreement, including with respect to Shelter Island, but not limited to, those covenants contained in Section 4.16 of the Shelter Island Securities Purchase Agreement; and

WHEREAS, Shelter Island and Taglich would not agree to permit the Debtor to grant to SVSP the security interests granted under the SVSP Debt Documents unless SVSP enters into this Agreement with such holders of the Existing Debt(s).

<u>TERMS</u>

NOW THEREFORE, the parties hereto agree as follows:

1.    <u>Definitions</u>. As used herein, the following terms shall be defined as follows:

"Assigned Agreement" means the Services Agreement, dated August 3, 2003, between Gulfstream International Airlines, Inc., a Florida corporation ("GIA"), and Gulfstream Air Charter, Inc., a Delaware corporation (successor to Gulfstream Air Charter, Inc., a Florida corporation), as amended on March 14, 2006, and as may be further amended from time to time, and all rights thereunder and all proceeds thereof, including without limitation: (a) any revenues or other benefits arising thereunder, and all monies, documents or instruments, or other property at any time and from time to time payable, receivable, or otherwise distributable in connection therewith, including, without limitation, proceeds of any insurance, indemnity, warranty or guaranty with respect thereto; (b) all rights, claims, powers, privileges, and remedies thereunder; and (c) all power and authority to enforce, compel

2

performance, perform, collect, receive, and receipt for all or any of the foregoing; as more specifically described in the Collateral Assignment.

"Autec Agreements" means the collective reference to (a) the subcontract agreement (number 05-C-1277-03) dated as of April 1, 2006, between GIA and Computer Sciences Corporation, and (b) the Used Beechcraft 1900D Airliner Operating Lease Agreement dated June 8, 2006, between CSC Applied Technologies LLC, as lessor, and GIA, as lessee.

"Collateral Assignment" means the Security Agreement and Collateral Assignment of Contract from GIA in favor of SVSP dated August 31, 2010.

"Cuba Business Collateral" means the Assigned Agreement and all other rights, revenues, and assets directly or indirectly arising or related to aircraft travel between the United States and Cuba, and all proceeds thereof, as more specifically described in the Collateral Assignment, including, without limitation, special collateral account number: 1000114180812; account name: Gulfstream International Airlines, Inc.; with SunTrust Bank (together with all amendments, modifications and replacements thereof, the "Collateral Account"), which Collateral Account may be amended, modified or replaced at the sole discretion of SVSP.

"Debt" means any or all of the Existing Debt and the SVSP Debt.

"Debt Documents" means the Shelter Island Debt Documents, the Taglich Debt Documents, and the SVSP Debt Documents.

"Default" means an Existing Debt Default and/or an SVSP Debt Default.

"Enforcement Action" means with respect to Gulfstream or any Subsidiary: (a) to take from or for the account of Gulfstream or any Subsidiary, by set-off or in any other manner, except acceptance of regularly scheduled payments in accordance with the terms of any of applicable debt documents, the whole or any part of any moneys which may now or hereafter be owing by Gulfstream or any Subsidiary, (b) to sue for payment of, or to initiate or participate with others in any suit, action or proceeding against Gulfstream or any Subsidiary to (i) enforce payment of or to collect the whole or any part of any debt, or (ii) commence judicial enforcement of any of the rights and remedies regarding any debt, (c) to accelerate any debt, (d) to take any action under the provisions of any state or federal law, including, without limitation, the Uniform Commercial Code, or under any contract or agreement, to enforce, foreclose upon, take possession of or sell any property or assets of Gulfstream or any such co-obligor or guarantor, (e) to file or join in filing any involuntary petition in bankruptcy, or otherwise initiate or participate in similar insolvency reorganization, or moratorium proceedings for the benefit of creditors; (g) to repossess or sell, through judicial proceedings or otherwise, any of the Collateral; or (h) initiate Proceedings to enforce the existing guaranties.

"Equity Rights" means all rights of SVSP under the SVSP Notes with respect to equity in Gulfstream, including without limitation the right to convert the SVSP Debt to equity as provided in the SVSP Notes, and all other rights and remedies of SVSP under the SVSP Notes relating to SVSP's potential equity interest in Gulfstream.

"Existing Debt(s)" means the Shelter Island Debt and the Taglich Debt.

"Existing Debt Default" means a default in the payment of any of the Existing Debt, or a default in the performance of any term, covenant or condition contained in any of the Existing Debt Documents, or any other occurrence permitting a Existing Lender to accelerate the payment of all or any portion of any of the Existing Debt, and shall also include any SVSP Debt Default.

3

"Existing Debt Documents" means the Shelter Island Debt Documents and the Taglich Debt Documents.

"Existing Lender(s)" means Taglich, the Taglich Note Purchasers, and Shelter Island.

"Existing Lien(s)" means the Shelter Island Lien and the Taglich Lien.

"Lender(s)" means the individual or collective reference, as applicable, to Shelter Island, Taglich and/or SVSP.

"Liens" means the Existing Liens and the SVSP Liens.

"Priority Shelter Island Lien" means a first priority perfected lien and security interest in favor of Shelter Island in all Collateral (other than the Accounts and the Cuba Business Collateral, as to which Shelter Island's liens and security interests shall have the respective priorities set forth herein).

"Priority SVSP Lien" means a first priority perfected lien and security interest in favor of SVSP in the Cuba Business Collateral, including without limitation, the Assigned Agreement to secure up to $2.5 million of SVSP Notes, plus accrued interest thereon.

"Priority Taglich Lien" means a first priority perfected lien and security interest in favor of Taglich in all Accounts, but excluding the Cuba Business Collateral.

"Proceeding" means any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, dissolution, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the liquidation, dissolution or other winding up of Gulfstream or any Subsidiary.

"Subordinated Existing Lender Liens" means any and all liens and security interests in favor of any Existing Lender in the Cuba Business Collateral, which shall be junior, subject, and subordinated to the Priority SVSP Lien, subject to and in accordance with the terms hereof.

"Subordinated SVSP Lien" means a perfected lien and security interest in favor of SVSP in (i) all Collateral (other than the Cuba Business Collateral), junior only to the Priority Shelter Island Lien, subject to and in accordance with the terms hereof; and (ii) Accounts (other than Accounts arising from the Cuba Business Collateral), junior only to the Priority Taglich Lien and the Priority Shelter Island Lien, subject to and in accordance with the terms hereof.

"Subsidiaries" means the collective reference to Gulfstream International Airlines, Inc., a Florida corporation, Gulfstream Training Academy, Inc., a Florida corporation, Gulfstream Connection, Inc., a Florida corporation and GIA Holdings Corp., Inc., a Delaware corporation.

"SVSP Debt " means indebtedness of up to $2,500,000, as may be evidenced by the SVSP Notes, and interest accrued thereon all obligations of Gulfstream and its Subsidiaries to SVSP under the SVSP Notes and the other Loan Documents (as defined in the SVSP Notes).

"SVSP Debt Default" means a default in the payment of the SVSP Debt or in the performance of any term, covenant or condition contained in any SVSP Debt Documents, or any other occurrence permitting SVSP to accelerate the payment of all or any portion of the SVSP Debt , and shall also include any Existing Debt Default.

"SVSP Liens" means the Priority SVSP Lien and the Subordinated SVSP Lien.

2.      Consent, Subordination, Waiver and Covenants.

(a) Subject in each case to the terms of this Agreement, each Existing Lender hereby:

(i) consents to the SVSP Debt Documents, the SVSP Debt, the Priority SVSP Lien, the Subordinated SVSP Lien, and the incurrence, granting, performance and enforcement thereof, and agrees that the entering into and performance thereof by Gulfstream and the Subsidiaries in accordance with their terms shall not constitute a default under any of the Existing Debt Documents, and waives any and all terms, covenants and conditions of the Existing Debt Documents that conflict with or are inconsistent with the foregoing;

(ii) subordinates, and, as between SVSP and each Existing Lender, as applicable, makes inferior in priority, operation and effect, for all purposes and in all respects, the Subordinated Existing Lender Liens to the Priority SVSP Lien, regardless of the time, manner or order of perfection of any such liens and security interests;

(iii) agrees that it will not contest the validity, perfection, or enforceability of the SVSP Debt, the SVSP Debt Documents, the Priority SVSP Lien, the Subordinated SVSP Lien, and that the priority among the Lenders with respect to the Liens shall be as set forth in this Agreement; and

(iv) consents to the filing by SVSP and its agents of UCC Financing Statements related to the SVSP Debt, the Priority SVSP Lien, the Subordinated SVSP Lien, and to evidence the priority thereof in accordance with the terms of this Agreement.

(b) Taglich hereby further agrees to waive the application of any and all financial covenants contained in the Taglich Debt Documents through December 31, 2010. Shelter Island hereby further agrees to waive the application of the financial covenants arising under Section 4.16 of the Shelter Island Securities Purchase Agreement for the periods ending June 30, 2010, September 30, 2010 and December 31, 2010 and the application of the covenants under Section 4.14 of the Shelter Island Securities Purchase Agreement.

(c) Subject in each case to the terms of this Agreement, and without limiting any Equity Rights of SVSP, SVSP hereby:

(i) consents to the Existing Debt Documents, the Existing Debt, the Priority Shelter Island Lien, the Priority Taglich Lien, and the incurrence, granting, performance and enforcement thereof, and agrees that the entering into and performance thereof by Gulfstream and the Subsidiaries in accordance with their terms shall not constitute a default under any of the SVSP Debt Documents; and

(ii) subordinates, as between SVSP and each Existing Lender, as applicable, and makes inferior in priority, operation and effect, for all purposes and in all respects, the Subordinated SVSP Lien to the Priority Shelter Island Lien and the Priority Taglich Lien, regardless of the time, manner or order of perfection of any such liens and security interests.

(iii) agrees that it will not contest the validity, perfection, or enforceability of the Shelter Island Lien, the Taglich Lien or the Existing Debt Documents and that the priority among the Lenders with respect to the Liens shall be as set forth in this Agreement; and

(iv) consents to the filing by the Existing Lenders and their agents of UCC Financing Statements or continuation statements related to the Existing Debt, the Existing Liens and to evidence the priority thereof in accordance with the terms of this Agreement.

(d) Should any party to this Agreement accept or receive any payment from Gulfstream or any of its Subsidiaries in contravention of this Agreement, such party shall promptly notify the other parties hereto, and the party or parties receiving such payment will hold the same in trust for the party or parties entitled to receive the same.

3.    <u>Enforcement Actions</u>.   No Lender will, while this Agreement is in effect, initiate any Enforcement Action to seek or enforce collection of any debt, or otherwise accelerate such debt, including the filing of a claim or a petition for relief in bankruptcy or similar proceedings, except to the extent otherwise permitted under its respective Debt Documents, each Lender may proceed to declare a default under its Debt Documents, accelerate or demand payment of the Debt Documents held by it, and enforce any other right or remedy available to it against Gulfstream or any Subsidiary; provided, however, that if a Lender determines to accelerate the Debt owed to it, or to demand payment thereof, or to declare a default thereunder, or take any other action to enforce rights or remedies thereunder, it shall give no less than five (5) business days' prior written notice to the other Lenders that there exists a Default, and such Default has not been cured or waived.  Any and all proceeds or recoveries from such efforts by Lenders shall be subject to the provisions of this Agreement.

4.    <u>Lien Priorities</u>.   Without limiting any of the foregoing, each of the parties hereto acknowledge and agree, notwithstanding the date, manner, or order of perfection of the security interests in and liens on any collateral, and notwithstanding any provision of the Uniform Commercial Code or any applicable law or decision, as between the Lenders, the Lenders shall rank as follows with respect to their respective security interests in the collateral referenced herein:

(a) With respect to the Cuba Business Collateral: (i) SVSP has a first priority lien and security interest in the Cuba Business Collateral, and all payments and proceeds arising thereunder at any time; (ii) any payments or proceeds arising under the Cuba Business Collateral received by or on behalf of any Existing Lender before payment in full of the SVSP Debt shall be held in trust for and promptly paid to SVSP; (iii) Shelter Island's lien and security interest in the Cuba Business Collateral shall be second in priority, subject only to the Priority SVSP Lien; and (iv) Taglich shall have no lien or security interest in the Cuba Business Collateral.

(b) With respect to the Collateral (other than the Cuba Business Collateral and the Accounts), that: (i) Shelter Island has a first priority lien and security interest in the Collateral (other than the Cuba Business Collateral and the Accounts), and all payments and proceeds arising thereunder at any time; (ii) any payments or proceeds arising under the Collateral (other than the Cuba Business Collateral and the Accounts) received by or on behalf of any Lender other than Shelter Island before payment in full of the Shelter Island Debt shall be held in trust for and promptly paid to Shelter Island; (iii) SVSP's liens and security interests in the Collateral (other than the Cuba Business Collateral and the Accounts), shall be second in priority, subject only to Shelter Island's lien and security interest in the Collateral; and (iv) Taglich shall not have a lien or security interest in the Collateral or the Cuba Business Collateral.

(c) With respect to the Accounts (other than accounts arising from the Cuba Business Collateral), that: (i) Taglich has a first priority lien and security interest therein, and all payments and proceeds arising thereunder at any time; (ii) any payments or proceeds arising under the Accounts (other than accounts arising from the Cuba Business Collateral) received by or on behalf of any Lender other than Taglich before payment in full of the Taglich Debt shall be held in trust for and promptly paid to Taglich; (iii) Shelter Island's lien and security interest in the Accounts (other than accounts arising from the Cuba Business Collateral) shall be second in priority, subject only to the Priority Taglich Lien therein; and (iv) SVSP's lien and security interest in the Accounts (other than accounts arising from the Cuba Business Collateral) shall be third in priority, subject only to the Priority Taglich Lien and the Priority Shelter Island Lien in such Accounts (other than accounts arising from the Cuba Business Collateral) as provided for herein.

5.    Intentionally Omitted.

6.    Payments After Declaration of Default, Acceleration, or Demand for Payment. In the event of receipt by a Lender of any payments under its respective Debt Documents after the first to occur of a declaration of default under the Debt Documents of any Lender or acceleration or demand for payment of any Lender, all money collected or received by the Lenders such payments shall be held in trust by the Lender receiving any such payment, and shall promptly be applied as follows:

(a)    All proceeds of the Cuba Business Collateral shall be paid to SVSP for application to the SVSP Debt. After the SVSP Debt is paid in full, and to the extent that Shelter Island has a security interest therein, the remaining proceeds thereof shall be paid to Shelter Island for application to the Shelter Island Debt.

(b)    All proceeds of the Collateral (other than the Cuba Business Collateral and the Accounts) shall be paid to Shelter Island for application to the Shelter Island Debt. After the Shelter Island Debt is paid in full, any remaining proceeds thereof shall be paid to SVSP for application to the SVSP Debt.

(c)    All proceeds of the Accounts (other than the Cuba Business Collateral) shall be paid to Taglich for application to the Taglich Debt. After the Taglich Debt is paid in full, any remaining proceeds of the Accounts (other than Accounts arising from the Cuba Business Collateral) shall be paid to Shelter Island for application to the Shelter Island Debt. After the Shelter Island Debt is paid in full, any remaining proceeds of the Accounts shall be paid to SVSP for application to the SVSP Debt.

7.    Notice of Default. Each Lender agrees to give the other Lenders notice of the occurrence of any Default of the Debt owed to such Lender in accordance with the terms hereof. Notwithstanding the foregoing, the failure to provide any such notice shall not affect the rights of the party to whom such notice is owed under this Agreement.

8.    Prepayments. Except for the absolute rights upon the occurrence and during the continuation of a Default or Event of Default of (i) SVSP to demand and receive prepayments of SVSP Debt with respect to the Priority SVSP Lien, (ii) Shelter Island to demand and receive prepayments of Shelter Island Debt with respect to the Priority Shelter Island Lien, and (iii) Taglich to demand and receive prepayments of Taglich Debt with respect to the Priority Taglich Lien; neither the Debtor nor any Subsidiary shall prepay, in whole or in part, any indebtedness or other obligations in respect of Debt without the prior written consent of the Lenders

9.    Additional Agreements of the Parties.

9.1    Offering Proceeds.

(a)    In the event of any public or private offering of equity securities of Gulfstream or any debt securities of Gulfstream that are convertible into or exchangeable for equity securities of Gulfstream, which, either in one such offering or a series of offerings, raises less than $3,500,000 of equity, the net proceeds (defined as gross proceeds less sales commissions, underwriting discounts and other customary offering expenses) received by Gulfstream shall be applied as follows:

(1)    first to the purchase of aircraft currently under lease;

(2)    second, to pay the cash portion of the consideration payable for the potential acquisition of "Project M" (the terms of which have been previously identified to SVSP);

provided, that the terms of such acquisition do not otherwise violate any affirmative or negative covenants of the Debtor to the Lenders;

(3)     third, to provide Gulfstream and its Subsidiaries with working capital in such amounts as shall be reasonably acceptable to Gulfstream and reasonably acceptable to the Lenders; and

(4)     fourth, to the Lenders in pro-rata amounts, as the then outstanding amount of the respective Debt held by each of them bears to aggregate Debt then owed to all Lenders.

(b)     In the event of any public or private offering of equity securities of Gulfstream or any debt securities of Gulfstream that are convertible into or exchangeable for equity securities of Gulfstream which, in one such offering or a series of offerings, raises in excess of $3,500,000 of equity, the net proceeds (defined as gross proceeds less sales commissions, underwriting discounts and other customary offering expenses) received by Gulfstream shall be applied as follows: 10% of each dollar of net proceeds raised in excess of $3,500,000 (the "Excess") shall be delivered to Shelter Island as a prepayment on the Shelter Island Debt which shall be applied in the inverse order of maturity and Shelter Island shall waive the prepayment fee on such proceeds. The remaining balance of such proceeds shall be applied in accordance with clause (a) above.

9.2     Sale of Certain Specific Assets.  In the event that by December 31, 2010, Gulfstream shall have not raised at least $3,500,000 of equity capital, at the request of SVSP, the Debtor shall engage the services of an independent investment banker acceptable to SVSP and the Existing Lenders to sell all of its rights under the Autec Agreements or the Assigned Agreement (the "Specific Assets"). In such connection, the Debtor shall complete an offering memorandum or information statement in respect of the Specific Assets by November 30, 2010 and engage the services of an acceptable investment banker by January 10, 2011. The final terms and conditions under which such Specific Assets shall be sold shall be acceptable to SVSP and Shelter Island. Notwithstanding anything to the contrary in this Agreement, all net proceeds from a sale of (i) the Autec Agreements shall be delivered (A) first, to the extent of any proceeds from the Accounts included in the Autec Agreements, to Taglich for application against the then outstanding amount of the Taglich Debt and all interest accrued thereon, (B) then to Shelter Island for application against the then outstanding amount of the Shelter Island Debt and all interest accrued thereon, and (C) thereafter, any excess net proceeds available, if any, shall be payable to SVSP in reduction of the SVSP Debt, and (ii) the Assigned Agreement shall be delivered first, to SVSP for application against the then outstanding amount of the SVSP Debt and all interest accrued thereon, and thereafter any excess net proceeds, if any, shall be payable to Shelter Island in reduction of the Shelter Island Debt.

9.3     Subordination Fee.     In consideration for its entering into this Agreement and subordinating its Shelter Island Lien to the Priority SVSP Lien, the Debtor agrees to pay to Shelter Island a fee in the amount of $250,000, which fee shall be fully earned upon execution of this Agreement, and payable as follows:

(a)     $125,000 payable in cash, at the rate of $41,667 on the date of this Agreement, and $41,666 in two additional installments payable immediately following each $500,000 advance by SVSP under the Initial SVSP Note, which are expected to be made on or before September 10, 2010 and September 24, 2010, respectively. In the event that the additional $500,000 advances are not made by SVSP in accordance with the previous sentence, the two remaining installments of $41,667 payable to Shelter Island shall be due and payable 45 days from the execution of this Agreement; and

(b)    a $125,000 increase in the notes evidencing the Shelter Island Debt upon execution of this Agreement.

10.    Representations and Warranties.

(a) Shelter Island hereby represents and warrants to SVSP that as of the date hereof: (i) Shelter Island is duly formed and validly existing under the laws governing its formation; (ii) Shelter Island has the power and authority to enter into, execute, deliver and carry out the terms of this Agreement, all of which have been duly authorized by all proper and necessary action; (iii) the execution of this Agreement by Shelter Island will not violate or conflict with the organizational documents of Shelter Island, any material agreement binding upon Shelter Island or any law, regulation or order or require any consent or approval which has not been obtained; (iv) this Agreement is the legal, valid and binding obligation of Shelter Island, enforceable against Shelter Island in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by equitable principles; (v) Shelter Island is the sole owner, beneficially and of record, of the Shelter Island Debt Documents and the Shelter Island Debt, and (vi) Shelter Island has a warrant to purchase 900,257 shares of Gulfstream's common stock and a warrant to purchase 70,000 shares of Gulfstream's common stock.

(b) Taglich hereby represents and warrants to SVSP that as of the date hereof: (i) Taglich is duly formed and validly existing under the laws governing its formation; (ii) Taglich has the power and authority to enter into, execute, deliver and carry out the terms of this Agreement, (iii) Taglich has obtained the approval of a majority of the Taglich Note Purchasers which approval is all of the authorization required of the Taglich Note Purchasers, (iv) Taglich will obtain approvals from 100% of the Taglich Note Purchasers by not later than September 10, 2010, (v) this Agreement is valid and binding with respect to the Taglich Debt, the Taglich Collateral, and the Taglich Note Purchasers; (vi) the execution of this Agreement by Taglich will not violate or conflict with the organizational documents of Taglich, any material agreement binding upon Taglich, including, without limitation the Taglich Purchase Agreement, or any law, regulation or order or require any consent or approval which has not been obtained; (vii) this Agreement is the legal, valid and binding obligation of Taglich, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by equitable principles; and (viii) the Taglich Note Purchasers are the sole owners, beneficially and of record, of the Taglich Debt and the notes evidencing such debt.  Taglich hereby further represents and warrants to SVSP that Taglich has provided written notice of this Agreement and the terms hereof to the Taglich Note Purchasers.

(c) SVSP hereby represents and warrants to the Existing Lenders that as of the date hereof: (i) SVSP is duly formed and validly existing under the laws of the State of Florida; (ii) SVSP has the power and authority to enter into, execute, deliver and carry out the terms of this Agreement, all of which have been duly authorized by all proper and necessary action; (iii) the execution of this Agreement by SVSP will not violate or conflict with the organizational documents of SVSP, any material agreement binding upon SVSP or any law, regulation or order or require any consent or approval which has not been obtained; and (iv) this Agreement is the legal, valid and binding obligation of SVSP, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or by equitable principles.

(d) Gulfstream hereby represents and warrants to SVSP and Existing Lenders that as of the date hereof: (i) Gulfstream is duly formed and validly existing under the laws of the State of Delaware; (ii) Gulfstream has the power and authority to enter into, execute, deliver and carry out the terms of this

Agreement, all of which have been duly authorized by all proper and necessary action; (iii) the execution of this Agreement by Gulfstream will not violate or conflict with the organizational documents of Gulfstream, any material agreement binding upon Gulfstream or any law, regulation or order or require any consent or approval which has not been obtained; and (iv) this Agreement is the legal, valid and binding obligation of Gulfstream, enforceable against Gulfstream in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or by equitable principles.

11.    SVSP Equity Rights. Notwithstanding anything to the contrary herein, nothing in this Agreement will limit or impair SVSP's Equity Rights.

12.    Costs. Gulfstream shall pay or reimburse the Lenders for all of their costs and expenses incurred in connection with the administration, supervision, collection, or enforcement of or preservation of any rights under, this Agreement, including, without limitation, the fees and disbursements of counsel for the Lenders, including attorneys' fees out of court, in trial, on appeal, in bankruptcy Proceedings, or otherwise. If Taglich fails to obtain 100% of the consents required by Section 10(b)(iv) of this Agreement, and any claim is asserted by any holder of Taglich Debt or any other third party that Taglich was not authorized to execute this Agreement, Taglich agrees to pay SVSP for all of its costs and expenses incurred in connection with the enforcement of, or the preservation of any rights under, this Agreement against any holder of Taglich Debt or Taglich, including, without limitation, the fees and disbursements of counsel for SVSP, including attorneys' fees out of court, in trial, on appeal, or otherwise, regardless of whether SVSP is the prevailing party.

13.    Modification. Any modification or waiver of any provision of this Agreement, or any consent to any departure by any party from the terms hereof, shall not be effective in any event unless the same is in writing and signed by the Lenders, and then such modification, waiver or consent shall be effective only in the specific instance and for the specific purpose given. Any notice to or demand on any party hereto in any event not specifically required hereunder shall not entitle the party receiving such notice or demand to any other or further notice or demand in the same, similar or other circumstances unless specifically required hereunder.

14.    Further Assurances. Each party to this Agreement promptly will execute and deliver such further instruments and agreements and do such further acts and things as may be reasonably requested in writing by any other party hereto that may be necessary or desirable in order to effect fully the purposes of this Agreement.

15.    Notices. Unless otherwise specifically provided herein, any notice delivered under this Agreement shall be in writing addressed to the respective party as set forth in the Recitals and may be personally served, telecopied or sent by overnight courier service or certified or registered United States mail and shall be deemed to have been given (a) if delivered in person, when delivered; (b) if delivered by telecopy, on the date of transmission if transmitted on a business day before 12:00 noon (New York time) or, if not, on the next succeeding business day; (c) if delivered by overnight courier, one business day after delivery to such courier properly addressed; or (d) if by United States mail, four business days after deposit in the United States mail, postage prepaid and properly addressed.

16.    Successors and Assigns. This Agreement shall inure to the benefit of, and shall be binding upon, the respective successors and assigns of SVSP, Existing Lenders and Gulfstream. To the extent permitted under their respective debt documents, any lender may, from time to time, without notice to is the other lender, assign or transfer any or all of their debt or any interest therein to any person or entity, provided however, that any assignee must agree to assume and be bound by all terms hereof, and must accept such assignment subject to the terms of this Agreement, and, notwithstanding any such assignment or transfer,

or any subsequent assignment or transfer, the assigned debt shall, subject to the terms hereof, be and remain subject to the terms and conditions of this Agreement, and every permitted assignee or transferee of any of the assigned debt or of any interest therein shall, to the extent of the interest of such permitted assignee or transferee in the assigned debt, be entitled to rely upon and be the third party beneficiary of the subordination provided under this Agreement and shall be entitled to enforce the terms and provisions hereof to the same extent as if such assignee or transferee were initially a party hereto.

17.    Relative Rights. This Agreement shall define the relative rights of SVSP and Existing Lenders. Nothing in this Agreement shall (a) impair, as among Gulfstream and SVSP and as between Gulfstream and Existing Lenders, the obligation of Gulfstream with respect to the payment of the SVSP Debt and the Existing Debt in accordance with their respective terms or (b) affect the relative rights of SVSP or any Existing Lender with respect to any other creditors of Gulfstream.

18.    Conflict. In the event of any conflict between any term, covenant or condition of this Agreement and any term, covenant or condition of any of the Existing Debt Documents, the provisions of this Agreement shall control and govern; provided that, solely as between and with respect to the Existing Lenders, in the event of any conflict between any term, covenant or condition of this Agreement and any term, covenant or condition of that certain Waiver, Consent and Intercreditor Agreement dated as of February 26, 2010 among Taglich, as Collateral Agent, Shelter Island and Gulfstream (the "February Intercreditor Agreement"), solely as to any of the relative rights, remedies and obligations of Taglich or the Taglich Note Purchasers, on the one hand, and Shelter Island, on the other hand, not relating to or involving any of the rights, remedies and obligations of SVSP, the provisions of the February Intercreditor Agreement shall govern.

19.    Headings. The paragraph headings used in this Agreement are for convenience only and shall not affect the interpretation of any of the provisions hereof.

20.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

21.    Severability. In the event that any provision of this Agreement is deemed to be invalid, illegal or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court or governmental authority, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby, and the affected provision shall be modified to the minimum extent permitted by law so as most fully to achieve the intention of this Agreement.

22.    Applicable Law. This Agreement shall be governed by and shall be construed and enforced in accordance with the internal laws of the State of Florida, without regard to conflicts of law principles.

23.    **CONSENT TO JURISDICTION. EACH OF THE PARTIES HERETO HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF FLORIDA AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS. EACH OF THE PARTIES HERETO EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. IN ANY LITIGATION, TRIAL, ARBITRATION OR OTHER DISPUTE RESOLUTION PROCEEDING RELATING TO THIS AGREEMENT, EACH PARTY WILL USE ALL COMMERCIALLY REASONABLE EFFORTS TO COMPLY WITH DISCOVERY REQUIREMENTS AND SCHEDULES AS SET BY THE COURT OR OTHER DULY APPOINTED ARBITER OF SUCH PROCEEDING.**

24.    <u>WAIVER OF JURY TRIAL</u>.  **EACH OF THE PARTIES HERETO HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE DEBT DOCUMENTS. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE RESPECTIVE DEBT DOCUMENTS AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH OF PARTIES WARRANTS AND REPRESENTS THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

25.    <u>Bankruptcy</u>.  To the extent that any Lender receives payments on or proceeds of any collateral that is subject to this Agreement which are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law, or equitable cause, then, to the extent of such payment or proceeds actually returned or repaid by such Lender, the debt owed to such Lender, or part thereof, intended to be satisfied shall be revived and continue in full force and effect as if such payments or proceeds had not been received by such Lender. Each of the Lenders further agrees that if any Lender determines to provide debtor-in-possession financing to the Debtor, no Lender shall "roll-up" its existing pre-petition Debt into a debtor-in-possession credit facility without the prior written consent of all of the other Lenders.

26.    <u>Additional Indebtedness</u>.  Each of the parties hereto acknowledge and agree that after giving effect to the transactions contemplated by the SVSP Debt Documents, the Debtor's assets are fully encumbered and there is no remaining equity in the Debtor's assets to provide collateral security for additional indebtedness for borrowed money without resulting in the diminution in the value of each of the Lender's liens and security interests. Debtor and each of its Subsidiaries shall be required to obtain the consent of each of the Lenders before any of them shall be authorized to incur any further indebtedness for borrowed money, regardless of whether  bankruptcy proceedings have commenced regarding Debtor or any Subsidiary.

[The remainder of this page intentionally left blank – signature page follows.]

IN WITNESS WHEREOF, the parties hereto have executed the within as of the date first above

TAGLICH BROTHERS, INC.,
a New York corporation, on its own behalf
and as collateral agent (for the Purchasers):

By: _____
    Name: ROBERT SCHROEDER
    Title: VICE PRESIDENT

SHELTER ISLAND OPPORTUNITY
FUND, LLC, a Delaware limited liability
company

By: _____
    Name:
    Title:

GULFSTREAM INTERNATIONAL
GROUP, INC., a Delaware corporation

By: _____
    Name: David F. Hackett
    Title: President

SAH-VUL STRATEGIC PARTNERS I,
LLC, a Florida limited liability company

By: _____
    Name: William J. Caragol
    Title: Manager

ACCEPTED AND AGREED TO:

GIA HOLDINGS CORP., INC., a
Delaware corporation

By: _____
    Name: David F. Hackett
    Title: President

IN WITNESS WHEREOF, the parties hereto have executed the within as of the date first above

TAGLICH BROTHERS, INC.,
a l         l corporation, on its own
behalf and as collateral agent (for the
Purchasers):

By: _____
    Name:
    Title:

SHELTER   ISLAND   OPPORTUNITY
FUND, LLC, a Delaware limited liability
company

By _____
   Name: Michael Coiley
   Title: Authorized Signor

GULFSTREAM      INTERNATIONAL
GROUP, INC., a Delaware corporation

By: _____
    Name: David F. Hackett
    Title: President

SAB-VEL  STRATEGIC  PARTNERS  I,
I LC, a Florida limited liability company

By _____
   Name: William J. Caragol
   Title: Manager

ACCEPTED AND AGREED TO

GIA HOLDINGS CORP., INC., a
Delaware corporation

By: _____
    Name: David F. Hackett
    Title: President

WITNESS WHEREOF, the parties hereto have executed the within as of the date first above

EAGLICH BROTHERS, INC.,
a [        ] corporation, on its own
behalf and as collateral agent (for the
Purchasers)

By _____
    Name
    Title


SHELTER    ISLAND    OPPORTUNITY
FUND, LLC a Delaware limited liability
company

By _____
    Name: Michael Corley
    Title: Authorized Signor


GULFSTREAM        INTERNATIONAL
GROUP, INC., a Delaware corporation

By _____
    Name: David F. Hackett
    Title: President


SAH-VEL STRATEGIC PARTNERS I,
LLC, a Florida limited liability company

By _____
    Name: William J. Cangol
    Title: Manager


ACCEPTED AND AGREED TO

GIA HOLDINGS CORP., INC., a
Delaware corporation

By _____
    Name: David F. Hackett
    Title: President

13

IN WITNESS WHEREOF, the parties hereto have executed the within as of the date first above

TAGLICH BROTHERS, INC.,
a New York corporation, on its own behalf
and as collateral agent (for the Purchasers):

By: _____
   Name:
   Title:


SHELTER ISLAND OPPORTUNITY
FUND, LLC, a Delaware limited liability
company

By: _____
   Name:
   Title:


GULFSTREAM INTERNATIONAL
GROUP, INC., a Delaware corporation

By: _____
   Name: David F. Hackett
   Title: President


SAH-VUL STRATEGIC PARTNERS I,
LLC, a Florida limited liability company

By: _____
   Name: William J. Caragol
   Title: Manager


ACCEPTED AND AGREED TO:

GIA HOLDINGS CORP., INC., a
Delaware corporation

By: _____
   Name: David F. Hackett
   Title: President

GULFSTREAM    INTERNATIONAL
AIRLINES, INC., a Florida corporation

By: _____

    Name: David F. Hackett
    Title: President


GULFSTREAM TRAINING ACADEMY,
INC., a Florida corporation

By: _____

    Name: David F. Hackett
    Title: President


GULFSTREAM CONNECTION, INC.,
a Florida corporation

By: _____

    Name: David F. Hackett
    Title: President

# EXHIBIT "E"

**(Budget)**

# GULFSTREAM INTERNATIONAL AIRLINES

## November

| | Actual Thru 1-Nov | 2-Nov | 3-Nov | 4-Nov | 5-Nov | WEEK TOTAL 5-Nov $1,005 | 8-Nov | 9-Nov | 10-Nov | 11-Nov | 12-Nov | WEEK TOTAL 12-Nov $1,034 | 15-Nov | 16-Nov | 17-Nov | 18-Nov | 19-Nov | WEEK TOTAL 19-Nov $1,054 | 22-Nov | 23-Nov | 24-Nov | 25-Nov |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING REVENUE** | | | | | | | | | | | | | | | | | | | | | | |
| **BEGINNING BALANCE** | 461 | 438 | 162 | 202 | 635 | 461 | 726 | 604 | 318 | 141 | 645 | 726 | 57 | 53 | 371 | 465 | 1,072 | 57 | 583 | 1,471 | 1,407 | 1,431 |
| **SOURCES-OPERATING** | | | | | | | | | | | | | | | | | | | | | | |
| Continental Weekly Revenue Advance | | | | 540 | | 540 | | | | 545 | | 545 | | | | 540 | | 540 | | | 540 | |
| Airline Clearing House - Revenue | | | | | | | | | | | | | | | | | | | | | | |
| Airline Clearing House - Expense | | | | | | | | | | | | | | | | | | | | | | |
| Essential Air Service - DOT | | | | | | | | | | | | | | 1,759 | | 664 | | | | | | |
| Airline Clearing House - IATA | | | | | | | | | | | | | | (1,200) | | 35 | | | | | | |
| Cuba Charter | | | | | | | | | 200 | | | 200 | 100 | | | | | | 100 | | | |
| Charter | | | | | | 24 | | | | | | | | | | | | | | | | |
| Surplus & Other | 3 | 3 | | 14 | | | | | | | | | | | | | | | | | | |
| Mesa/Raytheon | | | | | | | | | | | | | | | | | | | | | | |
| Aztec Corsair - Bahamas | | | | | | | | (100) | | | | (100) | | | | | | | | | | |
| Aztec Contract | | 7 | | | 42 | | | | | | | | | | | | | | | | | |
| Other | | | | 42 | | 42 | | | | | | | | | | | | | | | | |
| DIP Financing | | | | | 1,500 | 1,500 | | | | | | | | | | | 1,000 | 1,000 | | | | |
| **TOTAL RECEIPTS** | 3 | 7 | 56 | 540 | 1,500 | 2,106 | - | (100) | 200 | 545 | - | 645 | 4 | 4 | 563 | 1,243 | - | 1,918 | 1,000 | - | 645 | - |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | | | | |
| **Payroll** | | | | | | | | | | | | | | | | | | | | | | |
| Net | | | | | 400 | 400 | | | | | 196 | 196 | | | | | 400 | 400 | | | | 400 |
| Taxes | | | | | 124 | 124 | | | | | 80 | 80 | | | | | 124 | 124 | | | | 124 |
| Headcount Reductions | | | | | | | | | | | | | | | | | | | | | | |
| Salary Reductions | | | | | | | | | | | | | | | | | | | | | | |
| Union Contract Savings | | | | | | | | | | | | | | | | | | | | | | |
| **Aircraft Maintenance** | | | | | | | | | | | | | | | | | | | | | | |
| All Other (Flight Safety incl.) | | | | 10 | | 10 | 5 | | | | | 5 | 5 | | | | | 5 | | | | |
| **Flight Operations** | | | | | | | | | | | | | | | | | | | | | | |
| Fuel & Oil | 23 | | 39 | | 50 | 112 | | | 50 | | | 50 | | | 50 | | | 50 | | | 60 | |
| Ford & Lodging | | | | | | | | | | | | | | | | | | | | | | |
| Aircraft Rental | | | | | 441 | 441 | | | | | | | | | | | | | | | | |
| Rotable Parts-1900 | | | | | 40 | 40 | | | | | 20 | 20 | | | | | 20 | 20 | | | 20 | |
| Consumable Parts-1900 | | | | | 20 | 20 | | | | | 50 | 50 | | | | | 100 | 100 | | | 100 | |
| Engine Reserve | | | | | 50 | 50 | | | | | 50 | 50 | | | | | 150 | 150 | | | 150 | |
| All Other | | | 1 | | 150 | 150 | | | 8 | | 41 | 41 | | | 5 | | 43 | 43 | | 5 | 8 | |
| Critical Vendor Payments | | | | | 10 | 11 | | | 50 | | 50 | 50 | | | 25 | | 75 | 75 | | | 25 | |
| **Stations** | | | | | | | | | | | | | | | | | | | | | | |
| Landing Fees | | | | | | | | | | | | | | | | | | | 85 | | | |
| Other Airport Fees | | | | | | | | | | | | | | | | | | | 175 | | | |
| Ground Handling | | | | | | | | | | | | | | | | | 25 | 62 | 52 | | | |
| All Other (TSA incl.) | | | | | | | | | | | | | | | | | 25 | 25 | 25 | | 25 | |
| **Sales and Reservations** | | | | | | | | | | | | | | | | | | | | | | |
| All Other | 2 | | | | | 2 | | | | | | | | | 2 | | 3 | 3 | | | | |
| **General & Administrative / Other** | | | | | | | | | | | | | | | | | | | | | | |
| Insurance (Hull & Pax Liab) | | | | 16 | 16 | 16 | 108 | | | 17 | 22 | 116 | | | | 16 | | | | | | |
| Insurance (Other/WC/Health, etc…) | | | | 22 | 22 | 22 | 9 | | | | 22 | 22 | | | | 22 | 22 | 22 | | | | 22 |
| ADH / IATA | | | | | | | | 70 | 360 | | 87 | 369 | | 11 | | | | | | | 70 | |
| Excise taxes | 3 | | | | | 3 | | | 4 | 9 | 13 | 13 | | | | | 6 | 6 | | 3 | | |
| Other | | 8 | | | 3 | 8 | | | | | 10 | 10 | | | | | | | | | | |
| Legal & Acctg | | | | | | | | | | | | | | | | | | | | | | |
| Critical Vendors | | | | | | | | | 10 | | | | | | | 25 | | 25 | | | | |
| DIP Payments | | | | | | | | | | | | | | | | | | | | | | |
| Utilities, Rent & Other | | | | | | | | | | | | | | | | 6 | | 6 | | | | |
| Payments to Professionals | | | | | | | | | | | | | | | | | | | | | | |
| **TOTAL DISBURSEMENTS** | 26 | 283 | 16 | 35 | 86 | 1,841 | 9 | 186 | 377 | 41 | 588 | 1,314 | 15 | 53 | 245 | 15 | 483 | 1,392 | 116 | 68 | 621 | - |
| **CONSOLIDATED CASH** | 438 | 162 | 202 | 635 | 706 | 706 | 604 | 318 | 141 | 645 | 57 | 57 | 53 | 371 | 465 | 1,072 | 583 | 583 | 1,471 | 1,407 | 1,431 | 1,431 |

**GULFSTREAM INTERNATIONAL AIRLINES**

November

| | 26-Nov | WEEK TOTAL $ 28-Nov | 29-Nov | 30-Nov | 1-Dec | 2-Dec | 3-Dec | WEEK TOTAL $ 3-Dec | MONTH TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **OPERATING REVENUE** | | | | | | | | | |
| **BEGINNING BALANCE** | 1,431 | 1,431 | 1,422 | 1,185 | 1,017 | 1,094 | 1,110 | 1,422 | 461 |
| **SOURCES-OPERATING** | | | | | | | | | |
| Continental Weekly Revenue Advance | | 540 | | | | 583 | | 583 | 2,165 |
| Airline Clearing House - Revenue | | | 159 | | | | | | 1,759 |
| Airline Clearing House - Expense | | | 47 | | | | | | (1,200) |
| Essential Air Service - DOT | | | | | | | | | 664 |
| Airline Clearing House - DOT | | | | | | | | | 35 |
| Cuba Charter | | | | | | | | | 400 |
| Charter | | 100 | | | 100 | | | 100 | |
| Surplus & Other | 5 | 18 | | | | | | | (28) |
| Ministry of Tourism - Bahamas | | | | | | | | | 240 |
| Aztec Contract | 240 | 240 | | | | | | | 240 |
| Other | 30 | 30 | | | | | | | 42 |
| DIP Financing | | 1,000 | | | | | | 1,500 | 2,500 |
| **TOTAL RECEIPTS** | 245 | 1,898 | 5 | 5 | 105 | 588 | 5 | 708 | 7,777 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | |
| **Payroll** | | | | | | | | | |
| Net | | | | | | | | | 582 |
| Taxes | | | | | | | | | 20 |
| Headcount Reductions | | | | | | | | | |
| Salary Reductions | | | | | | | | | |
| Union Contract Savings | | | | | | | | | |
| **Flight Operations** | | | | | | | | | |
| Fuel & Oil | 60 | 120 | | 60 | | | 60 | 120 | 441 |
| All/Other ( Flight Safety incl.) | 20 | 30 | | | | | | | 50 |
| **Aircraft Maintenance** | | | | | | | | | |
| Aircraft Rental | | | | | | 400 | | | 1,155 |
| Vendor Chqds | 40 | 40 | | | | 124 | | | 375 |
| Rotable Parts-1900 | 40 | 20 | | | | | | 20 | 160 |
| Consumable Parts-1900 | 50 | 50 | | | | | | 50 | 80 |
| Engine Reserve | 30 | 30 | | | | | | 65 | 200 |
| All/Other | | 180 | | | | | | | 600 |
| Critical Vendor Payments | | 25 | | | | 25 | | 25 | 143 |
| **Stations** | | | | | | | | | |
| Landing Fees | | | | | | | | | 150 |
| Other Airport Fees | | 85 | | | | | | | 112 |
| Ground Handling | | | | 108 | | | | 108 | 85 |
| All/Other (TSA incl.) | | 52 | | | | | | | 175 |
| **Sales and Reservations** | | | | | | | | | |
| All/Other | | 25 | | | | | | | 52 |
| **General & Administrative / Other** | | | | | | | | | |
| Insurance (Hull & Pax Liab) | 7 | 7 | | | | 7 | 7 | 7 | 224 |
| Insurance - Other (WC Health etc...) | | 70 | | | | | | | 46 |
| ACH / IATA | | | | | | | 22 | 22 | 414 |
| Excise taxes | | | | | | | | | 44 |
| Other | 6 | 9 | 3 | | 6 | | 6 | 9 | 53 |
| Legal & Acctg | 21 | 86 | | | | | | | 18 |
| Critical Vendors | | | | | | | | 14 | 70 |
| Utilities, Rent & Other | | 25 | 25 | | | 15 | | 40 | 172 |
| DIP Payments | | | | | | | | | |
| Payments to Professionals | | | | | | | | | 429 |
| **TOTAL DISBURSEMENTS** | 254 | 1,059 | 242 | 173 | 28 | 572 | 235 | 1,250 | 7,221 |
| **CONSOLIDATED CASH** | 1,422 | 1,422 | 1,185 | 1,017 | 1,094 | 1,110 | 880 | 880 | 1,017 |

# GULFSTREAM INTERNATIONAL AIRLINES

## December

| | Actual Thru | 1-Jan | 2-Jan | 3-Jan | 4-Jan | WEEK TOTAL 4-Jan | 7-Jan | 8-Jan | 9-Jan | 10-Jan | 11-Jan | WEEK TOTAL 11-Jan | 14-Jan | 15-Jan | 16-Jan | 17-Jan | 18-Jan | WEEK TOTAL 18-Jan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BEGINNING BALANCE** | 0 | 0 | 0 | 60 | 638 | 0 | 638 | 295 | 238 | 158 | 676 | 638 | 370 | 278 | 734 | 350 | 1,269 | 370 |
| **SOURCES-OPERATING** | | | | | | | | | | | | | | | | | | |
| Continental Weekly Revenue Advance | - | - | - | 568 | - | 568 | - | - | - | 560 | - | 560 | - | - | 600 | - | - | 600 |
| Airline Clearing House - Revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Airline Clearing House - Expense | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Essential Air Service - DOT | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Airline Clearing House - IATA | - | - | - | - | - | - | 100 | - | - | - | - | 100 | 100 | - | - | 35 | - | 35 |
| Cuba Charter | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Charter | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Surface & Other | - | - | - | - | - | - | 5 | 5 | 5 | 5 | 5 | 25 | 5 | 5 | 5 | 5 | 5 | 25 |
| Ministry of Tourism - Bahamas | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Autec Contract | 0 | 0 | 10 | - | 10 | 10 | - | 10 | - | - | - | 10 | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL RECEIPTS** | - | 0 | 0 | 568 | - | 568 | 105 | 15 | 5 | 565 | 5 | 695 | 105 | 597 | - | 1,304 | 5 | 2,016 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | |
| **Payroll** | | | | | | | | | | | | | | | | | | |
| Net | - | - | - | - | - | - | 441 | - | - | - | - | 441 | 196 | - | 360 | - | - | 596 |
| Taxes | - | - | (35) | (5) | - | - | 5 | - | - | - | - | 5 | 5 | 80 | - | 124 | - | 204 |
| Headcount Reductions | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Salary Reductions | - | - | (35) | (5) | - | - | - | - | - | - | - | - | (19) | (4) | (35) | (5) | - | - |
| Union Contract Savings | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Flight Operations** | | | | | | | | | | | | | | | | | | |
| Fuel & Oil | - | - | - | - | - | - | 5 | 60 | 25 | - | 60 | 120 | - | 60 | - | - | 60 | 120 |
| Food & Lodging | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Aircraft Rental | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| All Other / Flight Safety incl) | - | - | - | - | - | - | 2 | 4 | - | 6 | - | 12 | - | - | 2 | - | 3 | 5 |
| **Aircraft Maintenance** | | | | | | | | | | | | | | | | | | |
| Vendor O'hauls | - | - | - | - | - | - | - | - | 46 | 17 | 70 | 46 | - | - | 25 | 176 | 62 | 198 |
| Rotable Parts-1900 | - | - | - | - | - | - | - | 3 | - | 9 | 6 | 87 | 11 | - | 20 | 3 | 18 | 22 |
| Consumable Parts-1900 | - | - | - | - | - | - | - | - | - | - | - | 25 | 4 | - | - | 6 | 16 | 31 |
| Engine Reserve | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 29 |
| All Other | - | - | - | - | - | - | - | 5 | 8 | 6 | 40 | 53 | 5 | - | 8 | - | 40 | 53 |
| **Stations** | | | | | | | | | | | | | | | | | | |
| Landing Fees | - | - | - | - | - | - | - | - | - | - | 40 | 40 | - | 5 | - | - | 40 | 40 |
| Other Airport Fees | - | - | - | - | - | - | - | - | - | - | 50 | 50 | - | - | - | - | 50 | 50 |
| Ground Handling | - | - | - | - | - | - | - | - | - | - | 50 | 50 | - | - | - | - | 50 | 50 |
| All Other (TSA incl.) | - | - | - | - | - | - | - | - | - | - | - | 5 | - | - | - | - | 5 | 5 |
| **Sales and Reservations** | | | | | | | | | | | | | | | | | | |
| All Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **General & Administrative / Other** | | | | | | | | | | | | | | | | | | |
| Insurance (Hull & Pax Liab) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Insurance - Other(W.C.,Health, etc...) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| ACH / IATA | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Excise taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Legal & Acctg | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Critical Vendors | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities, Rent & Other | - | - | - | - | - | - | - | - | 6 | - | 25 | 6 | - | 6 | 6 | 29 | - | 6 |
| DIP Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 15 | 25 | 29 |
| Payments to Professionals | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL DISBURSEMENTS** | 0 | 0 | 60 | 10 | - | 10 | 295 | 72 | 85 | 47 | 311 | 963 | 197 | 141 | 389 | 385 | 360 | 1,535 |
| **CONSOLIDATED CASH** | 0 | 0 | (60) | 638 | 638 | 638 | 448 | 238 | 158 | 676 | 370 | 370 | 278 | 734 | 350 | 1,269 | 914 | 914 |