

**ORDERED in the Southern District of Florida on November 10, 2010.**

John K. Olson, Judge
United States Bankruptcy Court

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| GULFSTREAM INTERNATIONAL GROUP, INC., *et al.,*[1] | Case No. 10-44131-BKC-JKO Jointly Administered |
| Debtors. | |
| _____/ | |

### INTERIM ORDER (I) AUTHORIZING (A) SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND 364(c) AND (d); (B) GRANTING SECURITY INTERESTS, SUPERPRIORITY LIENS AND CLAIMS AND ADEQUATE PROTECTION; AND (C) USE OF CASH COLLATERAL AND (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(C)

**THIS MATTER** came before the Court for a preliminary hearing on the 5th day of

November, 2010 at 2:00 p.m., in Fort Lauderdale, Florida, upon the motion (the "Motion") dated

---

[1] The address of each of the Debtors is 3201 Griffin Road, 4th Floor, Fort Lauderdale, FL 33312; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis: (i) Gulfstream International Group, Inc. (3956); (ii) Gulfstream International Airlines, Inc. ("**GIA**") (1720); (iii) Gulfstream Training Academy, Inc. (5843); (iv) GIA Holdings Corp., Inc. (9548); and (v) Gulfstream Connection, Inc. (1208).

November 4, 2010 of debtors and debtors-in-possession, Gulfstream International Group Inc. ("Gulfstream"), and its co-debtors, Gulfstream International Group, Inc., Gulfstream International Airlines, Inc. ("GIA"), Gulfstream Training Academy, Inc., GIA Holdings Corp., Inc., and Gulfstream Connection, Inc., (collectively the "Debtors"), (a) requesting entry of an order authorizing the Debtors pursuant to Sections 363(c), 364(c) and 364(d) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") and Rules 2002, 4001(c) and (d) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 4001-2, 4001-3, 9013-(G) and 9013-(H), inter alia, (i) to obtain post-petition financing (the "Post-Petition Financing") pursuant to the terms of the DIP Documents (as defined below) from Victory Park Capital Advisors, LLC, on behalf of one or more entities for which it acts as investment manager, ("Victory Park") and any other lender(s) acceptable to Victory Park (collectively with Victory Park, the "DIP Lender" or "Sponsor"), (ii) to grant DIP Lender, pursuant to Bankruptcy Code §§ 364(c) and 364(d), first priority and priming security interests in all of the Debtors' currently owned and after-acquired assets and property to secure the Debtors' obligations under the Post-Petition Financing; (iii) to grant DIP Lender priority in payment with respect to the obligations incurred in connection with the Post-Petition Financing over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below; and (iv) to provide adequate protection to Junior Lenders (as defined below), (b) seeking this Court's authorization to use Junior Lenders' cash collateral within the meaning of Bankruptcy Code § 363(a) (the "Cash Collateral"), pursuant to Bankruptcy Code § 363(c) and to provide adequate protection, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d); (c) seeking a preliminary hearing (the "Preliminary Hearing") on the Motion to consider entry of this Interim Order pursuant to Bankruptcy Rule 4001 (the "Interim Order") authorizing the Debtors to borrow under the Post-Petition Financing in the amounts set

forth in and limited by the Approved Budget (as defined below), upon the terms and conditions set forth in this Interim Order pending the Final Hearing referred to below; and (d) requesting that a final hearing (the "Final Hearing") be scheduled by this Court to consider entry of a final order (the "Final Order") authorizing on a final basis, inter alia, the Post-Petition Financing and use of the Cash Collateral; and due and sufficient notice of the Motion under the circumstances having been given; and the Preliminary Hearing on the Motion having been held before this Court on November 5, 2010 at 2:00 p.m. (EDT); and upon the entire record made at the Preliminary Hearing; and this Court having found good and sufficient cause appearing therefore;

IT IS HEREBY FOUND:

A.      Unless otherwise indicated herein, all capitalized terms used but not defined herein shall have the meanings given in the DIP Documents (as hereafter defined).

B.      On November 4, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief with this Court under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

C.      This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

D.      DIP Lender has no pre-petition relationship with the Debtors. On November 3, 2010, DIP Lender and Debtor entered into that certain Debtor-In-Possession Term Loan/Potential Bankruptcy Emergence Transaction Letter Agreement, a copy of which is attached as **Exhibit "A"** hereto and incorporated herein by reference (the "DIP Loan Letter"). The Debtors' presently outstanding obligations to creditors that claim pre-petition security interests in the DIP Facility Collateral include (a) indebtedness due Shelter Island Opportunity

Fund, LLC, ("Shelter Island Debt") pursuant to a securities purchase agreement and a secured original issue discount debenture, including warrants which the Debtors agreed to purchase following the retirement of the balance of such debt; (b) indebtedness due Taglich Brothers, Inc. ("TBI Debt"), and (c) indebtedness due SAH-VUL Strategic Partners I, LLC ("SAH-VUL Debt") (the holders of such secured debt being called, collectively, the "Junior Lenders").

E.        Given the Debtors' current financial condition, the Debtors are unable to operate solely with use of Cash Collateral. Moreover, the Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense. Debtors' assert that financing on a post-petition basis is not otherwise available without the Debtors granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in §§ 503(b) and 507(b) of the Bankruptcy Code, other than as described below, and securing such indebtedness and obligations with the first priority priming liens and security interests in and the liens upon the property described below pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code.

F.        Notice of the Preliminary Hearing and the relief requested in the Motion has been given to (i) the Office of the United States Trustee, (ii) the creditors holding the 20 largest unsecured claims against each of the Debtors; and (iii) the Junior Lenders, which comprise the known holders of pre-petition liens against the Debtors' property. No official committee of unsecured creditors (the "Committee") has as yet been appointed in the Chapter 11 Cases.

G.        Based on the proffers and argument presented by the Debtors at the Preliminary Hearing, it appears that the Post-Petition Financing and use of Cash Collateral have been negotiated in good faith and at arm's-length between the Debtors and DIP Lender, and any credit extended and loans made to the Debtors pursuant to the Interim Order shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the

meaning of, Section 364(e) of the Bankruptcy Code and the DIP Lender shall have all of the protections thereunder, without limitation, to the extent of the Initial Funding (as defined below). SAH-VUL and the other Junior Lenders reserve their rights to object to and disagree with this finding solely with respect to any subsequent borrowings under the DIP Facility (as defined below).

H.       Based on the record before this Court, it appears that the terms of this Interim Order, including, without limitation, the terms of the Post-Petition Financing (to the extent of the Initial Funding) and use of Cash Collateral, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. SAH-VUL and the other Junior Lenders reserve their rights to object to and disagree with this finding solely with respect to any subsequent borrowings under the DIP Facility (as defined below).

I.       The Debtors had requested approval of the Motion at the Preliminary Hearing, so that the DIP Lender would immediately advance the initial $1.7 million funding (the "Initial Funding") as contemplated by the DIP Loan Letter, as modified and supplemented by this Interim Order, pursuant to the Approved Budget (as defined below). The permission granted herein to use Cash Collateral and obtain the Post-Petition Financing (to the extent of the Initial Funding) is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, allow for the timely payment of payroll to the approximately 600 employees of the Debtor, assure the flow of supplies and services to the Debtors necessary to sustain the Debtors' business operations, preserve valuable contractual rights with RACC (as defined below) inuring to the Debtors that may be lost in the absence of

the entry of this Interim Order and enhance the Debtors' prospects for a successful completion of the Chapter 11 Cases.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Preliminary Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED DETERMINED AND DECREED** that:

1.    Motion Granted.  The Motion is granted, subject to the terms and conditions set forth in this Interim Order.

2.    Authorization.  The Debtors are expressly authorized and empowered to (i) obtain the Post-Petition Financing (to the extent of the Initial Funding), use the Cash Collateral, and perform their obligations strictly pursuant to the provisions of this Interim Order; and (ii) enter into such other agreements, instruments and documents as may be necessary or required or requested by DIP Lender in its sole discretion to evidence the obligations to DIP Lender to consummate the terms and provisions of the Motion and this Interim Order and to evidence perfection of the liens and security interests to be given to DIP Lender (any and all such other agreements, instruments and documents, as may be necessary to be considered at the Final Hearing (as defined below) and the DIP Loan Letter shall hereinafter be referred to as the "DIP Loan Documents").  DIP Lender may advance the Post-Petition Financing (to the extent of the Initial Funding) pursuant to the same terms as the DIP Loan Letter, as modified and supplemented by this Interim Order, without the need for execution of further documentation. The borrowing(s) made under the credit facility maintained under the DIP Loan Documents (the "DIP Facility") and all other indebtedness and obligations incurred on or after the Petition Date with respect to loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to this Interim Order and the DIP Loan which may now or from time to time hereafter be owing by the Debtors to DIP Lender (including principal, accrued and unpaid interest, fees,

costs and expenses, including without limitation, reasonable attorneys' fees and expenses, and any other amounts owed under this Order or the DIP Loan Documents) are referred to herein as the "DIP Indebtedness." The Debtors and Lender may enter into any nonmaterial amendments of, or modification to, the DIP Loan Documents without the need of further notice and hearing or order of this Court. At the Preliminary Hearing, the DIP Lender was authorized and directed to immediately advance the Initial Funding approved herein pursuant to the Approved Budget (as defined below), as further modified at the Preliminary Hearing pursuant to paragraphs 5, 8 and 31 below. The DIP Loan Letter and this Interim Order shall govern the Initial Funding.

3.      Borrowing; Use of Cash Collateral. Subject to the Approved Budgets (as defined in paragraph 19, below) and solely in compliance therewith and subject further to the terms and conditions of this Interim Order and the DIP Loan Documents, (a) the Debtors may use Cash Collateral (subject to the SAH-VUL Carveout (as defined below)), (b) the Court determines that the Junior Lenders (other than SAH-VUL) are adequately protected to the extent of the Initial Funding pending the Final Hearing with respect to the Debtors' limited use of Cash Collateral, (c) DIP Lender will provide the Post-Petition Financing to the extent of the Initial Funding in accordance with the terms of the DIP Loan Documents and this Interim Order, and (d) SAH-VUL has agreed that it is adequately protected solely to the extent of the Initial Funding by the provisions of paragraphs 8 and 31 of this Interim Order.

4.      Interest, Fees, Costs and Expenses. The DIP Indebtedness shall bear interest at the applicable rates (including default and non-default interest rates) set forth in the DIP Loan Documents. The Debtors shall prepay one-month's interest on the Initial Closing Date. Notwithstanding the foregoing, nothing in this Interim Order shall be construed to limit or otherwise impair the joint and several liability of the Debtors for all of the DIP Indebtedness under the DIP Loan Documents. DIP Lender and the Agent shall be paid all of their reasonable

Costs and Expenses (as defined and set forth in the DIP Loan Letter), subject to review and approval by the Court as to reasonableness if there is an objection to same. The Debtors' prior payment of the Initial Retainer and the Additional Retainer is hereby ratified and allowed in full, and the DIP Lender and Agent shall apply the Initial Retainer and the Additional Retainer to its Costs and Expenses. Notwithstanding anything to the contrary herein, neither the Initial Retainer nor the Additional Retainer shall constitute a cap on the Costs and Expenses incurred by the DIP Lender and/or the Agent or allowed by this Court, as such Costs and Expenses may exceed the amount of the Initial Retainer and the Additional Retainer. The Debtors and their respective estates have waived and released any and all claims each may have against the Agent and/or DIP Lender with respect to the Initial Retainer and/or the Additional Retainer pursuant to Chapter 5 of the Bankruptcy Code or any other applicable law. This waiver and release shall be binding on any subsequently appointed Committee or successor, including but not limited to any subsequently appointed chapter 11 trustee, chapter 7 trustee and any liquidating trustee. The rights of the Junior Lenders, the Committee (if any), or any other creditor to object to the reasonableness of the amounts of any of DIP Lender's Cost and Expenses are preserved by this Interim Order. The DIP Lender's Costs and Expenses will be applied against the Initial Retainer and Additional Retainer. Any portion of the Initial Retainer and Additional Retainer not used to cover Costs and Expenses will be applied first to any outstanding fees, second to any accrued and unpaid interest, and third to any outstanding principal at the time the DIP Lender's claim is paid in full in cash.

5.    DIP Fee; Success Fee; Maintenance Fee. The DIP Fee, Interest (one month, prepaid) and the Maintenance Fee are hereby approved, allowed and earned in their entirety pursuant to the DIP Loan Letter, provided, however, as announced on the record at the Preliminary Hearing, the DIP Fee with respect to the Initial Funding shall equal $34,000 (2% of

the Initial Funding), and the DIP Fee with respect to any subsequent borrowings shall equal 2%

thereof. The allowance and payment of the Success Fee shall be considered at the Final Hearing.

6.    <u>Termination of the DIP Facility and Use of Cash Collateral</u>.  From and after the

Initial Funding, the DIP Lender's obligation to provide the DIP Facility in accordance with the

DIP Loan Documents and Lender's consent to the use of the Cash Collateral shall immediately

and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole

discretion), and all DIP Indebtedness shall be immediately due and payable in cash upon the

earliest to occur of the following (the "<u>Termination Date</u>"):

    (i)    One Business Day following the Final Hearing Date (as defined below) if a Final Order (as defined below) has not been entered by December 2, 2010;

    (ii)    termination of the stay period specified in §1110 of the Bankruptcy Code, or the Debtors' failure to reach arrangements (including arrangements with Raytheon Aircraft Credit Corporation, hereinafter "RACC") reasonably satisfactory to Agent, DIP Lender, RACC and the Debtors regarding the Debtors' assets that are subject to §1110 of Bankruptcy Code;

    (iii)    ninety (90) days after the commencement of the Chapter 11 Cases;

    (iv)    the date of final indefeasible payment and satisfaction in full in cash of the DIP Indebtedness;

    (v)    the effective date of any confirmed plan of reorganization in the Chapter 11 Cases;

    (vi)    the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors;

    (vii)    the occurrence of any breach by the Debtors of this Interim Order (including, but not limited to, the Debtors' failure to adhere to the Approved Budgets as set forth in ordering paragraph 19 of this Interim Order or violation of any of the covenants provided for in ordering paragraph 21 of this Order) or the Final Order, or under any of the DIP Loan Documents;

    (viii)    the Debtor and the DIP Lender shall fail to reach agreement, satisfactory to the DIP Lender in its sole discretion, with respect to modifications to the Approved Budget with respect to budget periods subsequent to the Final Hearing;

3226521-2

(ix)    the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code;

(x)    upon and following the entry of an order authorizing the appointment in any of the Debtors' Chapter 11 Cases of a trustee or an examiner without the prior written consent of DIP Lender (which consent may be withheld, or, if given revoked, by DIP Lender in its sole discretion), or if any Debtor applies for, consents to, or acquiesces in, any such appointment without the prior written consent of DIP Lender (which consent may be withheld in its sole discretion);

(xi)    this Interim Order or the Final Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of DIP Lender (which consent may be withheld in its sole discretion);

(xii)    the Court enters an order granting a party relief from the automatic stay with respect to any portion of the DIP Facility Collateral provided that the value of the relevant collateral is more than $50,000;

(xiii)    this or any other Court enters an order or judgment in any of the Chapter 11 Cases modifying, limiting, subordinating or avoiding the priority of the DIP Indebtedness, or the perfection, priority or validity of DIP Lender's DIP Facility Liens or imposing, surcharging or assessing against DIP Lender or its claims, DIP Facility Collateral or any fees, costs or expenses, whether pursuant to § 506(c) of the Bankruptcy Code or otherwise; or

(xiv)    three (3) business days after the Agent or the DIP Lender notifies the Debtors in writing of an Event of Default (as defined and set forth in the DIP Loan Letter) which is not subsequently cured or waived by the end of such notice period.

7.    <u>Liens to Secure the DIP Indebtedness</u>. As security for all or any portion of the DIP Indebtedness, including the Initial Funding, the DIP Lender is hereby irrevocably granted the following security and priming liens (the "<u>DIP Facility Liens</u>") in all currently owned or hereafter acquired property and assets of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, all cash,

goods, accounts, accounts receivable, instruments, documents, chattel paper, inventory, cash in advance deposits, general intangibles, payment intangibles, goodwill, investment property (including, without limitation, ownership interests in corporations, partnerships, and limited liability companies), financial assets, security accounts, deposit accounts, real estate, real estate leases, executory contracts and unexpired leases, intellectual property, software, machinery, leasehold interests, equipment, fixtures, vehicles, trademarks, trade names, licenses, causes of action (excluding, however, actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under §§ 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (collectively, "Avoidance Actions")) and actions and recoveries thereon against third parties, tax refund claims, commercial tort claims and insurance proceeds (including, without limitation, any director & officer insurance proceeds), and the proceeds, products, rents and profits of all of the foregoing; provided, however, any equipment or other assets as described in §1110 of the Bankruptcy Code, including without limitation, all leased aircraft and engines (including those leased from RACC), as well as the aircraft leases with RACC, shall be expressly excluded by this Interim Order (all of the foregoing, the "DIP Facility Collateral"):

   (a) pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority senior priming lien (the "Priming Liens") on all of the DIP Facility Collateral, which shall be senior to all other security interests and liens in property of the Debtors' estates in this or any subsequent or superseding cases (including, without limitation, any conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto); and

   (b) except to the extent otherwise expressly set forth in this Interim Order, or in a written instrument, agreement or other document executed by DIP Lender and

subject to paragraph 10 of this Order, the DIP Facility Liens shall not be subject to subordination to any other liens, security interests or claims under Section 510 of the Bankruptcy Code, or otherwise. Any security interest or lien upon the DIP Facility Collateral which is avoided or otherwise preserved for the benefit of the Debtors' estates under Section 551 or any other provision of the Bankruptcy Code shall be subordinate to the DIP Facility Liens and the Adequate Protection Liens (as defined below); and

(c)     a first priority pledge of the capital stock and/or equity interest held directly or indirectly by each of the Debtors (for the avoidance of doubt, such pledge shall not include a pledge of the capital stock and/or equity interests held by any shareholders or investors in Gulfstream International Group, Inc.)

8.     Adequate Protection Liens. As adequate protection of Junior Lenders' interests in the DIP Facility Collateral, including use of the Cash Collateral pursuant to §§ 361, 363 and 552(b) of the Bankruptcy Code, Junior Lenders are hereby granted valid, binding, enforceable and perfected additional and replacement liens (the "Adequate Protection Liens") in all property of the Debtors' estates, including the DIP Facility Collateral, to the extent of any decrease in the value of Junior Lenders' interests in the DIP Facility Collateral occurring subsequent to the Petition Date, with such decrease in value to include decreases resulting from the Debtors' use (if any) of the Cash Collateral, the depreciation, use, sale, loss, decline in market price of the DIP Facility Collateral, or otherwise. The Adequate Protection Liens shall enjoy the same validity and extent as the liens the Junior Lenders held on the Petition Date, but subject and junior to the DIP Lender's superpriority Priming Liens and the Carve-Out (as defined in paragraph 17). Under no circumstances shall any of the Junior Lenders have a lien on any of the Debtors' assets or property, including the DIP Facility Collateral, which it did not have a right to prepetition. Further, (in addition to the Debtors' waiver and release set forth in paragraph 31 below), as based

on the agreement of the Debtors, DIP Lender and SAH-VUL announced on the record at the Preliminary Hearing, SAH-VUL shall receive additional adequate protection of its pre-petition claim and security by the Debtors' agreement to segregate and not use, pending the Final Hearing, the first $200,000 of proceeds actually received by Debtor, GIA from ongoing performance of the Services Agreement with Gulfstream Air Charter, Inc. (the "SAH VUL Carveout"). Pending a determination at or after the Final Hearing, with respect to future use or other disposition, the "SAH-VUL Carveout," shall not become or constitute a part of the DIP Facility Collateral.

9. **Superpriority Claims.** Subject to the Carve-Out described in paragraph 17 below, all or any portion of the DIP Indebtedness shall irrevocably have the highest administrative priority under § 364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in the Chapter 11 Case or any successor case), and shall at all times be senior to the rights of the Debtors, any successor trustee or estate representative in these Chapter 11 Cases, any successor Chapter 11 cases, or any Chapter 7 cases upon any conversion of these cases (the "Superpriority Claims"). Subject to the Carve-Out described in paragraph 17 below, nothing in this Interim Order or the Approved Budgets (as defined below) shall constitute the consent by DIP Lender to the imposition of any costs or expense of administration or other charge, fees, liens, assessment or claim (including, without limitation, any amounts set forth in the Approved Budgets) against DIP Lender, its claims or collateral (including the DIP Facility Collateral) under § 506(c) of the Bankruptcy Code or otherwise, all of which rights have been waived pursuant to the terms of this Interim Order and the DIP Loan Letter.

10.    Perfection of DIP Facility Liens and Adequate Protection Liens. The DIP Facility Liens and the Adequate Protection Liens shall be, and they hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of § 362 of the Bankruptcy Code, (i) DIP Lender may, at its sole option, file or record or cause the Debtors to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the Debtors' expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender may require the Debtors to deliver to DIP Lender any chattel paper, instruments or securities evidencing or constituting any DIP Facility Collateral, and the Debtors are directed to cooperate and comply therewith. If DIP Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Facility Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in these Chapter 11 Cases as of the commencement of these Chapter 11 Cases but with the priorities as set forth herein. DIP Lender or Junior Lenders may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtors have real or personal property.

11.    <u>Waiver</u>. The Debtors and their estates (and any party in interest acting on behalf of the Debtors) hereby irrevocably waive, and are barred from asserting or exercising any right (a) without DIP Lender's prior written consent (which may be withheld in their sole discretion) or (b) without prior indefeasible payment and satisfaction in full in cash of the DIP Indebtedness: (i) to grant or impose, or request that the Court grant or impose, under § 364 of the Bankruptcy Code or otherwise, liens on or security interests in any DIP Facility Collateral, which are <u>pari passu</u> with or senior to the DIP Facility Liens or the Adequate Protection Liens; (ii) to return goods pursuant to § 546(h) of the Bankruptcy Code to any creditor of the Debtors or to consent to any creditor taking any setoff against any of such creditor's pre-petition indebtedness based upon any such return pursuant to § 553(b)(1) of the Bankruptcy Code or otherwise (with the exception of the relief afforded the Debtors in this Court's *Order Authorizing Gulfstream International Airlines, Inc. to Honor Obligations Related to Code Share Agreements, Interline Agreements, Clearinghouse Agreements, Alliance Agreements, Computer Reservation Systems Agreements, ATPCO Agreement and Various Other Operating Agreements in the Ordinary Course of Business*, Docket Entry No. 66); (iii) to seek a surcharge of the DIP Facility Collateral under § 506(c) of the Bankruptcy Code; (iv) to seek non-consensual use of Cash Collateral under § 363 of the Bankruptcy Code; (v) to modify or affect any of the rights of the DIP Lender or the Junior Lenders under this Interim Order or any DIP Loan Documents by any order entered in any of the Chapter 11 Cases or any successor cases; or (vi) propose a plan of reorganization or liquidation, or seek an extension of the exclusive right to file a plan or solicit acceptances with respect to any plan of reorganization or liquidation without the written consent of the DIP Lender that does not provide for and require payment in full in cash of the DIP Indebtedness on the Effective Date.

12.     <u>Sale Out of the Ordinary Course of Business</u>.  The Debtors may not propose a sale of any of their assets outside the ordinary course of business (whether under a plan of reorganization or otherwise) if such sale does not provide for the payment in full in cash of the DIP Indebtedness on the closing date of such sale, unless (a) the DIP Lender consents to such sale (b) all proceeds realized from any Court-approved sale are transferred to DIP Lender for immediate application in reduction of the DIP Indebtedness and, upon payment in full in cash of all amounts owed to DIP Lender, the obligations owed to the Junior Lenders, in the manner set forth in this Interim Order and in the priority provided by their agreements with the Debtors and by law, and (c) the sale application expressly provides that DIP Lender and the Junior Lenders may exercise their right to credit bid their indebtedness under § 363(k) of the Bankruptcy Code, provided that in the event of a credit bid by any Junior Lender, DIP Lender may, in its sole discretion, elect to have the DIP Indebtedness paid in full in cash as a condition to the effectiveness of any such credit bid.

13.     <u>Books and Records</u>.  The Debtors shall permit DIP Lender and any authorized representatives designated by DIP Lender (including, without limitation, its auditors, appraisers and financial advisors) to visit and inspect any of the properties of any Debtors, including the Debtors' respective financial and accounting records, and to make copies and take extracts therefrom, and to discuss any Debtor's affairs, finances and business with such Debtors' officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested.  Without limiting the generality of the foregoing, the Debtors shall promptly provide to DIP Lender and DIP Lender's designated representatives any information or data reasonably requested to monitor the Debtors' compliance with the covenants and the provisions of the DIP Loan Documents and this Order and to perform appraisals or other valuation analyses of the property of the Debtors.

14.     <u>Credit Bid Plan Right</u>. As contemplated by the DIP Loan Letter, DIP Lender shall have the right under § 363(k) of the Bankruptcy Code to credit bid up to the full amount of or any portion of the DIP Indebtedness in connection with any sale of the Debtors' assets under a plan of reorganization or otherwise.

15.     <u>Plan Right</u>. If the Debtors have not received a Court order approving the Section 1110 Stipulation (as defined in the DIP Loan Letter) before the termination of the stay period specified in § 1110 of the Bankruptcy Code, then, notwithstanding § 1121 of the Bankruptcy Code, the DIP Lender shall have the right to file a plan and disclosure statement and the Debtors' exclusivity shall be terminated only as to the DIP Lender's rights in this paragraph 15.

16.     <u>Modification of Automatic Stay; Other Remedies</u>.

(a)     Except as set forth in subparagraph (b) of this paragraph, which governs any action of DIP Lender to foreclose on their liens on any DIP Facility Collateral or to exercise any other default-related remedies (other than those specifically referenced in the next sentence), the automatic stay pursuant to § 362 of the Bankruptcy Code is hereby vacated as to DIP Lender to permit it to perform in accordance with, and exercise, enjoy and enforce their respective rights, benefits, privileges and remedies pursuant to this Interim Order and the DIP Loan Documents without further application or motion to, or order from, the Court, and regardless of any change in circumstances (whether or not foreseeable), and neither Section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code, or any other law, shall be utilized to prohibit DIP Lender from the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies. DIP Lender is hereby granted leave to receive and apply payments to the DIP Indebtedness from collections on and proceeds of the DIP Facility Collateral in the manner specified in this Interim Order and the DIP Loan Documents. In addition, DIP

Lender is hereby granted leave to, among other things, to (a) file or record any financing statements, mortgages or other instruments or other documents to evidence the Adequate Protection Liens or the DIP Facility Liens, (b) to charge and collect any interest, fees, costs, and expenses and other amounts accruing at any time under the DIP Loan Documents or this Interim Order as provided therein, (c) to give the Debtors any notice provided for in any of the DIP Loan Documents or this Interim Order, and (d) upon the occurrence of the Termination Date, and without application or motion to, or order from this Court or any other court, (i) terminate the DIP Facility and the DIP Loan Documents, (ii) declare all DIP Indebtedness immediately due and payable, and (iii) revoke the Debtors' right, if any, under this Interim Order and/or the other DIP Loan Documents to use the Cash Collateral.

(b)     Upon the occurrence of the Termination Date, the DIP Lender may file a motion to terminate the automatic stay which shall be served electronically, by hand delivery, facsimile or overnight mail on counsel to the Debtors, the Committee (if any), the Junior Lenders, RACC and the Office of the United States Trustee, and the Court shall conduct a hearing on an expedited or emergency basis (but in no event later than three (3) business days after service of such notice) to consider terminating the automatic stay under § 362 of the Bankruptcy Code in favor of the DIP Lender for the purpose of allowing the DIP Lender to exercise all of its rights and remedies under the DIP Loan Documents, this Interim Order or applicable law, including, without limitation, causing the Debtors to engage in a process to liquidate their assets pursuant to § 363 of the Bankruptcy Code, foreclosing or otherwise enforcing their liens on any or all of the DIP Facility Collateral. The only issue that may be raised or addressed by the Debtors at such hearing is whether the Termination Date has occurred. Subject to the Debtors' right to

contest whether the Termination Date has occurred, the Debtors shall cooperate with DIP Lender in connection with any enforcement action by, among other things, (i) providing access to its premises to representatives of DIP Lender, (ii) providing DIP Lender or its designees access to the Debtors' books and records, (iii) performing all other obligations set forth in this Interim Order and/or the other DIP Loan Documents, and (iv) taking reasonable steps to safeguard and protect the DIP Facility Collateral until DIP Lender can make adequate provision to protect and safeguard the DIP Facility Collateral, and the Debtors shall not otherwise interfere or encourage others to interfere with enforcement of the rights of DIP Lender.

17.    Carve-Out.

(a)    Subject to the remaining provisions of this paragraph, the Adequate Protection Liens, the DIP Facility Liens, the Superpriority Claims, any 507(b) Claim and all liens and claims of Junior Lenders referenced or defined herein shall be subject to (a) the payment of any unpaid fees payable pursuant to 28 U.S.C. § 1930 (including, without limitation, fees under 28 U.S.C. § 1930(a)(6)), (b) the fees due to the Clerk of the Court; (c) the actual fees and expenses incurred by professionals, for the period prior to the occurrence of a Termination Date, retained by an order of the Court entered pursuant to Sections 327, 328, 363 or 1103(b) of the Bankruptcy Code, provided they are within the amounts set forth in the Approved Budget and are subsequently allowed by the Bankruptcy Court under Sections 330, 331 or 363 of the Bankruptcy Code; and, (d) the payment of, following the occurrence of the Termination Date, allowed professional fees and disbursements incurred after the Termination Date by the professionals retained, pursuant to Sections 327, 328, 363 or 1103(a) of the Bankruptcy Code, by the Debtors and the Committee, in an aggregate amount not to exceed $200,000 (of which (i)

$175,000 shall be allocated for the benefit of Debtors' professionals, and (ii) $25,000 shall be allocated for the benefit of the Committee Professionals) to the extent such amounts are not otherwise payable from retainers or the Professional Expense Escrow (defined below) (the "Carve-Out"). DIP Lender and Junior Lenders shall retain their rights as a party in interest to object to any fee applications or other claims of any entity, including but not limited to the Debtors' and the Committee's, if any, professionals.

(b)    Notwithstanding anything to the contrary in this Interim Order or the DIP Loan Documents, no proceeds of the DIP Indebtedness or Cash Collateral pursuant to the DIP Loan Documents, nor any DIP Facility Collateral (or proceeds thereof) may be used to pay any claims for services rendered by any of the Debtors' professionals, any other entity or the Committee's professionals, if any, in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief (x) invalidating, setting aside, avoiding, disallowing or subordinating, in whole or in part, the DIP Indebtedness or the liens and security interests of DIP Lender in the DIP Facility Collateral; or (y) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by DIP Lender of any of its rights and remedies under this Interim Order and/or the DIP Loan Documents or DIP Lender's enforcement or realization upon any of the liens on or security interests in any DIP Facility Collateral.

(c)    The Debtors are authorized to use proceeds of the DIP Facility in accordance with the Approved Budget to pay U.S. Trustee quarterly fees and such compensation and expense reimbursements of professional persons retained by the Debtors (the "Debtor Professionals") and any Committee appointed by the United States

Trustee (the "Committee Professionals") as may be awarded by the Court pursuant to Section 328, 330 or 331 of the Bankruptcy Code (the "Professional Expenses"). The Debtor Professionals and the Committee Professionals, if any, shall be permitted to submit to the Debtors, with copies to counsel for the DIP Lender, periodic statements (but no more frequently than on a monthly basis) for services rendered and reimbursable expenses incurred by them (the "Conditional Professional Expenses"). So long as the Termination Date has not occurred, the DIP Lender shall advance the amounts set forth in the Approved Budget, and allocated for such fees and expenses; said funds shall be advanced to and segregated and escrowed in an escrow account maintained by counsel for the Debtors for payment to the Committee Professionals and the Debtor Professionals, in accordance with the procedures which may be approved by the Court for the payment of professionals (the "Professional Expense Escrow"). Funds deposited in the Professional Expense Escrow shall be available and may be used by the Debtors solely for the payment of the Conditional Professional Expenses and the Professional Expenses (to the extent not previously paid). Neither the Debtors nor any creditor of any of the Debtors (except for the DIP Lender) shall have a claim or interest in the funds on deposit in the Professional Expense Escrow, other than the entitlement of the Debtors or a successor trustee to receive; (i) any balance remaining in the Professional Expense Escrow after payment in full of the Professional Expenses that have accrued and that are allowed by final order of the Court; and (ii) any amounts paid from the Professional Expense Escrow but subsequently disallowed by final order of the Court that are not otherwise payable to the DIP Lender. Nothing in this paragraph 17 shall prejudice or impair the rights of either the Debtor Professionals or the Committee Professionals to request an award of compensation in excess of the amounts set forth in the Approved

Budget (the "Unbudgeted Professional Expenses") or the rights of the DIP Lender to object to the amount or reasonableness of the Conditional Professional Expenses, the Professional Expenses or the Unbudgeted Professional Expenses.

18.    Cash Collection Procedures.  Except as provided in paragraph 8 above, from and after the date of the entry of this Interim Order all collections and proceeds of any DIP Facility Collateral or services provided by the Debtors and all other cash or cash equivalents which shall at any time come into the possession or control of the Debtors, or to which the Debtors shall become entitled at any time shall be deposited in accounts as are designated by DIP Lender from time to time, and such collections and proceeds upon such deposit shall remain and be part of the DIP Facility Collateral, and be released to Debtors as provided for in the Approved Budget.  In the event the Debtors intend to open any new bank accounts that would affect the right and ability of DIP Lender to receive any proceeds as contemplated by this Order, the Debtors shall first obtain a "lock box agreement" or other written confirmation to the satisfaction of DIP Lender from the relevant banking institution recognizing the rights of the DIP Lender as provided for in this Order.   Except as it relates to the segregated account used solely to maintain the SAH-VUL Carveout, all financial institutions in which any lockboxes, blocked accounts or other accounts of the Debtors are located are hereby authorized and directed to comply with any request of DIP Lender to turnover to DIP Lender all funds therein without offset or deduction of any kind.

19.    Budget; Use of Cash Collateral and DIP Facility Proceeds.

(a)    Attached as **Exhibit "B"** hereto and incorporated herein by reference is a budget (which has been approved solely as to the period pending the Final Hearing by DIP Lender) setting forth by line item all projected cash receipts, sales and cash disbursements for the time period from  November 4, 2010 through December 1, 2010

(the "Initial Approved Budget"). The Debtor and DIP Lender shall promptly after entry of this Interim Order negotiate any changes to the Initial Approved Budget requested by the DIP Lender with respect to the period pending the Final Hearing. If DIP Lender does not approve the Budget in its sole discretion as to any period subsequent to the Final Hearing, such failure shall constitute an Event of Default. The Initial Approved Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) to which DIP Lender agrees in its sole discretion (each such additional budget, a "Supplemental Approved Budget"). The aggregate of all items approved by DIP Lender in the Initial Approved Budget and any and all Supplemental Approved Budgets (acceptable to DIP Lender in its sole discretion) shall constitute an "Approved Budget." The Junior Lenders shall be provided notice of any changes to the Approved Budget and shall have the right to object to such changes at or prior to the Final Hearing.

(b)     Except as it relates to the SAH-VUL Carveout, Debtors may use Cash Collateral and the proceeds of the DIP Facility exclusively to pay for the operating expenses and costs of administration incurred by Debtors as provided for in the Approved Budget. Debtors represent and warrant that (a) the expenditures set forth in the Approved Budget constitute all of Debtors projected costs and expenses during the period of the Approved Budget, and (b) the Cash Collateral and the sums to be advanced by DIP Lender pursuant to the DIP Facility are sufficient to pay all of the expenses set forth in the Approved Budget. Debtors' sales and cash receipts shall not be less than as set forth in the Approved Budget and Debtors' expenses shall not exceed those set forth in the Approved Budget, in all cases subject to the Approved Sales Variance, the Approved Cash Receipts Variance, and the Approved Disbursements Variance (all as defined

below, and collectively, the "Approved Variances"). Notwithstanding the foregoing, DIP

Lender shall have no obligation to provide the DIP Facility if the Debtors exceed the

overadvance limits provided in the Approved Budgets. As used herein, the Approved

Variances include, and are defined and calculated as follows:

    (i)    "Approved Sales Variance" means a negative variance of less than 5%, between Debtors' actual sales and Debtors' projected sales measured commencing as of the end of the first week covered by the Approved Budget and each week thereafter for both (i) the one-week period concluding with the week during which the variance is being calculated, and (ii) cumulatively from the commencement of the Chapter 11 Cases concluding with the week during which the variance is being calculated;

    (ii)    "Approved Cash Receipts Variance" means a negative variance of less than 5%, between Debtors' actual cash receipts and Debtors' projected cash receipts measured commencing as of the end of the first week covered by the Approved Budget and each week thereafter for both (i) the one-week period concluding with the week during which the variance is being calculated, and (ii) cumulatively from the commencement of the Chapter 11 Cases concluding with the week during which the variance is being calculated;

    (iii)    "Approved Disbursements Variance" means a positive variance of (A) less than 5%, between Debtors' actual disbursements and Debtors' projected disbursements, on a line item basis, and (B) less than 5% of the Debtors' actual disbursements and Debtors' projected disbursements, on a cumulative basis, each measured commencing as of the end of the first week covered by the Approved Budget and each week thereafter for both (i) the one-week period concluding with the week during which the variance is being calculated, and (ii) cumulatively from the commencement of the Chapter 11 Cases concluding with the week during which the variance is being calculated.

    (c)    Neither the proceeds of the DIP Facility nor the Carve-Out shall be

utilized (i) to attack the validity, priority or enforceability of any of the post-petition liens

or security interests of the DIP Lender or the Agent, (ii) to research, review, analyze or

investigate with respect to or in connection with any litigation, claim, objection or cause

of action of any kind or nature whatsoever against the Sponsor, the DIP Lender or the

Agent (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other conduct), or (iii) to file, prosecute or otherwise pursue any litigation, claim, objection or cause of action of any kind or nature whatsoever against the Sponsor, the DIP Lender or the Agent (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other conduct).

20.    Financial Reporting.    The Debtors shall provide the following reports to DIP Lender and SAH-VUL: (i) no later than 5:00 p.m. (Eastern Time) each business day, a log of each of the daily disbursements and collections; (ii) no later than 5:00 p.m. (Eastern time) each Wednesday, (A) a comparison of the items in the Approved Budget for the preceding week to the Debtors' actual performance that includes a narrative summary of any material variances from the Approved Budget for the preceding week, (B) an accounts receivable aging report by customer, (C) a detailed inventory listing report, (D) a detailed fixed asset listing report, and (E) a report of headcount and salaries by division; and (iii) no later than the 20th day of each month, beginning November 20, 2010, the Debtors' financial statements (including detail by operating division and consolidated balance sheets, income statements and cash flow statements) for the immediately preceding month.

21.    Covenants.    The Debtors shall timely comply with all of the covenants set forth in the DIP Loan Letter, as modified and supplemented by this Interim Order.

22.    Events of Default.    The Events of Default set forth in the DIP Loan Letter are hereby approved and incorporated herein in their entirety, provided, however, that paragraph 9 of such Events of Default, as announced on the record at the Preliminary Hearing and agreed to by the DIP Lender is modified by this Interim Order to delete the language "or otherwise ceases to participate actively in management of the Debtors," and shall not apply to any voluntary resignation of the employees identified in such paragraph 9.

23.    Release.  The Debtors and their respective estates hereby release and discharge the Sponsor, DIP Lender and Agent, and each of the existing and former general partners, shareholders, directors, officers, fiduciaries, principals, managers, investment managers, members, employees, investors, representatives, agents, subsidiaries, predecessors, successors, assigns, affiliates, affiliated funds and managed accounts, portfolio companies, and related entities of the foregoing (collectively, the "Releasees"), of and from any and all claims, actions, charges, suits, liabilities, damages, contracts, agreements and promises, of any kind or nature whatsoever, known or unknown, foreseen or unforeseen, suspected or unsuspected, latent or patent, fixed or contingent, existing or hereafter arising, in law, equity, or otherwise, which the Debtors would have been legally entitled to assert in their own right or on behalf of any other person or entity against any of the Releasees, whether or not any of the facts or legal bases therefore were known or existed on or before the date of this Order, based upon or related to, in whole or in part, any funding of the DIP Indebtedness, DIP Loan Documents, DIP Facility or any transaction contemplated thereby, or any other acts, omissions or aspect of the pre-petition relationship between any of the Releasees and the Debtors.  This waiver and release shall be binding on any subsequently appointed Committee or successor, including but not limited to any subsequently appointed Chapter 11 trustee, Chapter 7 trustee and any liquidating trustee.

24.    DIP Lender, Reservation of Rights; No Waiver.  DIP Lender does not waive, and expressly reserves, any and all claims, defenses, rights and remedies they have pursuant to any or all of the DIP Loan Documents, this Interim Order, the Bankruptcy Code and/or other applicable law against the Debtors and any officer, director, employee, agent or other representative of the Debtors.  Notwithstanding anything to the contrary contained in the Interim Order, DIP Lender reserves the right to seek additional relief from the Court on any issue that may arise in connection with the Chapter 11 Cases.

25.    <u>Effect of Dismissal, Conversion or Substantive Consolidation</u>. If any Chapter 11 Case is dismissed, converted, otherwise superseded or substantively consolidated, DIP Lender's rights and remedies under this Order and the DIP Loan Documents shall be and remain in full force and effect as if such Chapter 11 Case had not been dismissed, converted, superseded or substantively consolidated.    Furthermore, notwithstanding any such dismissal, conversion, supersession or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

26.    <u>Order Binding on Successors</u>. Except as provided in paragraph 31 below, The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender and the Debtors and their respective successors and assigns (including any trustee or other estate representative appointed as a representative of the Debtors' estate or of any estate in any successor cases).    No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

27.    <u>No Liability to Third Parties</u>. DIP Lender shall not (i) have liability to any third party nor shall it be deemed to be in control of the operations of the Debtors or to be acting as a "controlling person", "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the Internal Revenue Code, the Unites States Comprehensive, Environmental Response, Compensation and Liability Act as amended, or any similar Federal or state statute), or owe any fiduciary duty to the Debtors, its creditors or its estate, and (ii) DIP Lender's relationship with the Debtors shall not constitute nor be deemed to constitute a joint venture or partnership with the Debtors.

28.    <u>Order Binding Upon Parties in Interest</u>. Except as provided in paragraph 31 below, all of the provisions of this Interim Order shall be final and binding on the Debtors

| 3226521-2                                27

(including, without limitation, their successors and assigns), the Debtors' shareholders, and all creditors and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed.

29.    Effect of Modification of Interim Order. The Debtors shall not, without DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents. If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without DIP Lender's prior written consent, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

30.    Safe Harbor. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtors to obtain credit on the terms and conditions upon which the Debtors and DIP Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under § 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in § 364(e) of the Bankruptcy Code.

31.    SAH-VUL Waiver and Release. In consideration of SAH-VUL's agreement (as announced on the record at the Preliminary Hearing) to consent to the Priming Liens granted by

this Interim Order to the extent of the Initial Funding, the Debtors' have agreed to waive, release and forgo any challenge to the validity, priority, or extent of the SAH-VUL Debt (and the pre-petition liens securing same), including any causes of action for equitable subordination or recharacterization. Such waiver shall only be binding upon the Debtors and shall not be binding upon the Debtors' estates or on any creditors, the Committee (if appointed), or any subsequently appointed Chapter 11 or Chapter 7 trustee.

32.    Subsequent Hearing; Procedure for Objections and Entry of Final Order.  The Motion is set for a final hearing ("Final Hearing") before this Court at 1:30 p.m. on December 1, 2010 (such date or such later date to which the Final Hearing is adjourned or continued with DIP Lender's consent, the "Final Hearing Date"), at which time any party in interest may present any timely filed objections to the entry of a final order and the remaining Post-Petition Financing, in form and substance reasonably acceptable to DIP Lender in its sole discretion (the "Final Order"). The Debtors shall promptly serve a copy of this Order, upon (i) the Junior Lenders, RACC and their respective counsel, if identified; (ii) appropriate state and federal taxing authorities; (iii) the creditors holding the 20 largest unsecured claims of each of the Debtors, or the Committee, if appointed; and (iv) any other party which theretofore has filed in the Chapter 11 Cases an appearance and request for notice with this Court and served such request upon Debtors' counsel. Any objections to the entry of a Final Order on the Motion shall be in writing and shall be filed with the Court and served so that they not later than two (2) business days before the date scheduled for the Final Hearing and served so that they are received on or before 4:00 p.m. (Eastern Time) of such date by (i) Berger Singerman, P.A., counsel for the Debtors, 350 E. Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301, Attn: Brian K. Gart, Esq.; (ii) Akerman Senterfitt, counsel for DIP Lender, 350 E. Las Olas Boulevard, Suite 1600, Fort Lauderdale, Florida 33301, Attn: Michael I. Goldberg, Esq. and James Fierberg, Esq., (One

S.E. Third Avenue, Miami, FL 33131); (iii) Greenberg Traurig LLP, counsel for Shelter Island Opportunity Fund, LLC, 333 Avenue of the Americas, Suite 4400, Miami, FL 33131-3238, Attn: Paul J. Keenan, Jr., Esq.; (iv) Bilzin Sumberg Baena Price & Axelrod LLP, counsel for SAH-VUL Strategic Partners I, LLC, 1450 Brickell Avenue, 23rd Floor, Miami, FL 33131-3456, Attn: Scott I. Baena, Esq. and Matthew I. Kramer, Esq., (v) Gulfstream Funding II, LLC, c/o Taglich Brothers, Inc., as Agent for Gulfstream Funding II, LLC, 275 Madison Avenue, Suite 1618, New York, NY 10016; (vi) the Office of the United States Trustee, 51 Southwest First Avenue, Room 1204, Miami, FL 33130; and (vii) counsel for the Official Committee of Unsecured Creditors, if one is established. Any objections by creditors or other parties in interest to any of the provisions of this Interim Order being included in the Final Order shall be deemed waived unless filed and served in accordance with this paragraph.

33.    Objections Overruled or Withdrawn. All objections to the entry of this Interim Order have been withdrawn, resolved by agreement as embodied herein, or are herby overruled.

34.    Controlling Effect of Order. To the extent any provisions of this Interim Order conflict with any provisions of the Motion, or any DIP Loan Document the provisions of this Interim Order shall control.

35.    Order Effective. This Interim Order shall be effective *nunc pro tunc* as of the Initial Funding so that such funding could be initiated prior to the entry of this Interim Order as necessary to avoid irreparable harm to the Debtors' businesses and assets.

# # #

Submitted by:
Brian K. Gart, Esq.
Douglas A. Bates, Esq.
BERGER SINGERMAN, P.A.
350 East Las Olas Blvd., Suite 1000
Fort Lauderdale, FL 33301

3226521-2

Telephone: (954) 525-9900
Facsimile: (954) 523-2872
bgart@bergersingerman.com
dbates@bergersingerman.com

Copy furnished to:
Brian K. Gart, Esq.
*(Attorney Gart is directed to serve a conformed copy of this Order and to file a Certificate of Service with the Court).*

**EXHIBIT "A"**
**(Letter Agreement)**

VPC

## Debtor-in-Possession Term Loan/Potential Bankruptcy Emergence Transaction

### Letter Agreement

#### November 3, 2010

| | |
|---|---|
| **Debtors:** | Gulfstream International Group Inc. and any and all current and future affiliates and subsidiaries (whether or not wholly owned) as joint and several borrowers (collectively, the *"Debtors"*). |
| **Lender/Sponsor:** | Victory Park Capital Advisors, LLC, on behalf of one or more entities for which it acts as investment manager, (*"Victory Park"*) and any other lender(s) acceptable to Victory Park (collectively with Victory Park, the *"Lender"* or *"Sponsor"*). |
| **Agent:** | Victory Park Management, LLC shall act as administrative and collateral agent (the *"Agent"*). |
| **Type:** | Debtor-in-Possession Term Loan (the *"Loan"* or *"DIP Facility"*), and potential emergence transaction. |
| **Commitment:** | $5,000,000 (the *"Commitment"*). |
| **Initial Disbursement:** | Upon entry of an interim financing order (the *"Interim Order"*) by the applicable United States Bankruptcy Court in Florida (the *"Court"*) presiding over the Chapter 11 proceedings of the Debtors (the *"Bankruptcy Cases"*) under Bankruptcy Code § 364(c) and (d) (in form and substance agreeable to the Debtors, Lender and Agent), $1,500,000 of the Commitment shall be funded by the Lender (the *"Initial Disbursement"*). |
| **Final Disbursement:** | Upon entry of a final financing order (the *"Final Order"*) by the Court presiding over the Bankruptcy Cases under Bankruptcy Code § 364(c) and (d) (in form and substance agreeable to the Debtors, Lender and Agent), $3,500,000 of the Commitment shall be funded by the Lender (the *"Final Disbursement"*). |
| **Closing Date:** | Closing of the Loan with respect to the Initial Disbursement anticipated to be promptly upon entry of the Interim Order, but no later than two (2) days after entry of such order (the *"Initial Closing Date"*). |
| | Closing of the Loan with respect to the Final Disbursement anticipated to be promptly upon entry of the Final Order, but no later than three (3) days after entry of such order. |
| **Use of Proceeds:** | Proceeds of the Loan shall be utilized as follows: (i) costs, expenses, closing payments, and all other payment amounts contemplated herein; (ii) general working capital and operational expenses (in accordance with a weekly cash flow budget prepared by the Debtors, in form and substance acceptable to the Lender and Agent on a line-by-line basis, subject to a five percent (5%) variance on a cumulative basis for each such line item of expense (the *"Budget"*)); and (iii) scheduled aircraft lease and other payments due to Raytheon Aircraft Credit Corporation (*"RACC"*) before the scheduled expiration of the term of the Debtors' agreements with RACC, on December 6, 2010, or if such term is extended by RACC, during the period contemplated by Bankruptcy Code § 1110(a)(2), or as may be extended pursuant to a Stipulation in form and substance acceptable to the Debtors, Agent, Lender and RACC under Bankruptcy Code § 1110(b) (the *"Section 1110 Stipulation"*), with all such payments to be included and approved as part of the Budget. |
| | For the avoidance of doubt, neither the proceeds of the Loan nor the Carve-Out (as defined below) shall be utilized (i) to attack the validity, priority or enforceability of any of the post-petition liens or security interests of the Lender or the Agent, (ii) to research, review, analyze or investigate with respect to or in connection with any litigation, claim, objection or cause of action of any kind or nature whatsoever against the Lender or the Agent (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other conduct), or (iii) to file, prosecute or otherwise pursue any litigation, claim, objection or cause of action of any kind or nature whatsoever against the Lender or the Agent (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other conduct). |
| **Interest:** | Fifteen percent (15.0%) per annum (the *"Interest"*). Interest shall be payable monthly in cash in arrears; provided however that the Debtors shall prepay three (3) interest payments under the Loan on the Initial Closing Date. |

**VPC**

| | |
|---|---|
| **Default Interest:** | Upon the occurrence of an Event of Default (as defined below) and during the continuation of such default, interest shall accrue on any outstanding advances at twenty percent (20%) per annum (the "*Default Interest*"). |
| **DIP Fee:** | Two percent (2.0%) of the Commitment, which amount shall be fully earned and payable in cash to Lender on the Initial Closing Date in the form of a closing payment payable from the proceeds of the Loan. |
| **Success Fee:** | Three percent (3.0%) of the Commitment, which amount shall be fully earned on the Initial Closing Date and payable in cash to Lender on the Due Date. |
| **Maintenance Fee:** | $5,000 per month, which amount shall be payable in cash to Agent on the Initial Closing Date and every thirty (30) days thereafter from the proceeds of the Loan pursuant to the Budget. |
| **Costs/ Expenses:** | The Debtors shall reimburse the Agent and the Lender for all costs incurred in connection with the Loan, the Loan Obligations (as defined below) and/or any Lender Sponsored Transaction (as defined below), including, without limitation, legal fees, advisor fees, consultant fees, costs and expenses, collateral valuations, appraisals, surveys, field examinations, third party diligence, lien searches, filing fees, and all other out-of-pocket costs and expenses in any way related to the Loan and/or Loan Obligations and the enforcement thereof and any Lender Sponsored Transaction (collectively, the "*Costs and Expenses*"). In the event that the Loan is not consummated, the Lender and the Agent shall have the right to seek reimbursement of all reasonable Costs and Expenses incurred with respect thereto as an administrative expense of the Debtors' estates pursuant to Bankruptcy Code § 503(b). |
| **Term:** | Any and all then current outstanding principal amount of the Loan (the "*Loan Principal*") plus any unpaid accrued interest or Default Interest (as the case may be) plus any Costs and Expenses or other amounts due under the Loan, this Letter Agreement, the Interim Order and the Final Order (each, a "*Loan Obligation*" and collectively, the "*Loan Obligations*") shall become due and payable in full in cash upon the earlier of (the "*Due Date*"): (i) termination of the stay period specified in Bankruptcy Code § 1110, or the Debtors' failure to reach arrangements (including arrangements with RACC) reasonably satisfactory to Agent, Lender and Debtors regarding the Debtors' assets that are subject to Section 1110); (ii) ninety (90) days after the commencement of the Bankruptcy Cases; (iii) the substantial consummation (as defined in Bankruptcy Code § 1101 and which for purposes hereof shall be no later than the effective date) of a confirmed plan of reorganization; (iv) conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code; (v) appointment of a trustee for the Debtors; (vi) dismissal of any of the Bankruptcy Cases; (vii) thirty (30) days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such thirty (30) day period; (viii) the date on which the Court enters a final order approving a post-petition financing between the Debtors and another lender(s) or investor(s) (as the case may be) (other than Lender); (ix) repayment in full in cash of the Loan Obligations; and (x) three (3) business days after the Agent or the Lender notifies the Debtors in writing of an Event of Default which is not subsequently cured or waived by the end of such notice period. The Agent and the Lender may extend the Due Date in their sole discretion. In the event that the parties consummate a Lender Sponsored Transaction, as referred to below, the Loan Obligations will be treated in accordance with the terms of such Lender Sponsored Transaction. |

*Governing Terms*

| | |
|---|---|
| **Lender Sponsored Transaction:** | The Debtors and Lender will continue to cooperate to develop an agreement for a sale of the Debtors' assets free and clear of liens and claims (under which Lender would provide the "stalking horse" purchase transaction), or a Plan of Reorganization, under which Lender and Debtors would be co-sponsors (a "*Lender Sponsored Transaction*"), which would require, involve and is expressly subject to and conditioned upon: (a) the completion of Lender's due diligence satisfactory to Lender in its sole discretion, (b) negotiating an agreement with RACC acceptable to the Lender, Debtors and RACC, (c) reaching terms for applying the Loan Obligations within the capital structure of the Reorganized Debtor or consideration for the purchase of the Debtors' assets in a § 363 sale satisfactory to Lender in its sole discretion; and (d) negotiating and executing definitive documents acceptable to the Lender and the Debtors as required for the transaction. For the avoidance of doubt, the Lender and Debtors specifically acknowledge and agree that they have not reached any binding agreement or understanding regarding any Lender Sponsored Transaction. |

**VPC**

| | |
|---|---|
| **Collateral:** | The Loan shall be secured by: (i) a perfected first priority lien on any and all current and future assets of the Debtors of any nature or type whatsoever including, without limitation, accounts, accounts receivable, inventory, customer lists, intellectual property, minerals, mineral rights, plant and equipment patents, trade secrets, property and/or leasehold rights, all other tangible and intangible assets, and any causes of action under the Bankruptcy Code or applicable non-bankruptcy law, excluding recoveries pursuant to Chapter 5 of the Bankruptcy Code (and also expressly excluding any equipment or other assets as described in Bankruptcy Code § 1110); (ii) a first priority pledge of the capital stock and/or equity interest held directly or indirectly by each of the Debtors (for the avoidance of doubt, such pledge shall not include a pledge of the capital stock/ equity interest held by shareholders/investors in Gulfstream International Group, Inc.); and (iii) constructive control over the Debtors' bank accounts in similar form and substance of lockbox and/or control accounts customary for transactions of this nature exercisable upon an Event of Default and stay relief from the Court, or as may be provided in the Interim Order and Final Order (collectively the *"Collateral"*). The Debtors shall take any steps requested by the Agent, including the execution of Control Agreements and Pledge Agreements to assure that the Agent's interest in the Collateral is perfected. |
| **Priority:** | The Loan shall be authorized and approved by the Court pursuant to Bankruptcy Code § 364(c)(1) to be incurred as, and shall constitute, claims with a priority over all administrative expenses of the kind specified in Bankruptcy Code § 503(b) or 507(b). The security interests and liens in the Collateral securing the Loan shall be authorized and approved by the Court pursuant to Bankruptcy Code § 364(c)(2), (3), and 364(d) to constitute a lien on and in the Collateral ranking prior to all other claims and liens of the Debtors, except for the Carve-Out as defined below (the *"Priming Lien"*). The Priming Lien will be senior in priority to security interests and liens securing the indebtedness and other obligations owing under any of the Debtors' prepetition loan and security agreements. The Priming Lien shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the Agent or the Lender. |
| **Carve-Out:** | The fees and expenses incurred by the Debtors' retained professionals in the Bankruptcy Cases and the quarterly fees of the US Trustee under 28 U.S.C. § 1930 may be paid by the Debtors from the Collateral, subject to and in accordance with the Budget and subject to entry of any required orders of the Court (the *"Carve-Out"*), the amount of which Carve-Out shall not exceed $200,000 in the aggregate, excluding any amounts of time charges and expenses incurred or recorded by the Debtors' professionals prior to an Event of Default. The Lender and the Agent shall have the right to increase the amount of the Carve-Out in their sole discretion. The Lender's and Agent's liens on the Collateral and the Lender's and Agent's administrative expense claims provided for herein shall be subject and subordinate only to the Carve-Out. |
| **Representations and Warranties:** | The Debtors shall make usual and customary representations and warranties for transactions of this nature, including, without limitation, good standing of each of the Debtors; no consent or approval is required other than the Interim Order and Final Order; due authorization, execution and delivery of loan documents; no violation of material agreements entered into after the commencement of the Bankruptcy Cases; no violation of law as a result of the execution of the Loan documents; no liens on the assets of the Debtors except for certain liens permitted by the Agent and the Lender; compliance with applicable laws and regulations; no material change in business; no unstayed litigation that is reasonably likely to have a material adverse effect on the operations of the Debtors taken as a whole; no information furnished by Debtors to the Agent or Lender or the Court contains any material misstatement of fact or omitted to state a material fact necessary to make the statements therein not materially misleading; taxes paid to the extent required by law; and material returns filed. |
| **Covenants:** | The Debtors shall comply with all of the following covenants: |

1. The Debtors shall promptly provide the Agent with updates of any material developments in connection with the Debtors' reorganization efforts under the Bankruptcy Cases, whether in connection with an asset sale, plan of reorganization or otherwise;

2. The Debtors shall deliver the Budget as updated on a weekly basis to the Agent (in form and substance reasonably acceptable to the Agent), including, without limitation, forecasts, sales pipeline, accounts receivable and cash flow;

3. The Debtors shall deliver a bi-monthly payroll report to the Agent (in form and substance reasonably acceptable to the Agent);

**VPC**

4. The Debtors shall operate the their businesses in accordance with the Budget, and the requirements of the Bankruptcy Code and orders of the Bankruptcy Court;

5. The Debtors shall not provide maintenance service, aircraft parts, fuel or any other resources or services: (a) to any aircraft that is not actively in service and generating revenue for the Debtors' business (for the avoidance of doubt, permitted aircraft shall include those certain: twenty-one (21) Beech 1900D aircraft leased from RACC, two (2) Beech 1900D aircraft leased from Computer Sciences Corporation, Inc. ("*CSC*"), two (2) Piper PA-31 Navajo Chieftain aircraft leased from Thomas L. Cooper ("*Cooper*"), and one (1) Piper PA-31 Navajo Chieftain aircraft leased from Thomas A. McFall ("*McFall*")); (b) in connection with any maintenance event that may be considered unnecessary by industry standards; or (c) any maintenance event that does not fall within the scope of the Debtors' existing agreements with RACC, CSC, Cooper or McFall;

6. Without the prior written consent of the Agent or the Lender, the Debtors shall not seek, consent to, or permit to occur any of the following:

   a. Any order which authorizes the rejection of any leases of any of the Debtors without the Agent's prior written consent;

   b. Any modification, stay, vacation or amendment to the Final Order to which the Agent has not consented in writing;

   c. A priority claim or administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including without limitation, any administrative expense of the kind specified in Bankruptcy Code § 105, 326, 328, 330, 331, 364(c) 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114) equal or superior to the priority claim of the Agent and the Lender in respect of the obligations hereunder, except with respect to the Carve-Out;

   d. Any lien on any Collateral having a priority equal or superior to the lien securing the obligations hereunder, other than with respect to the Carve-Out;

   e. Any order which authorizes the payment of any indebtedness incurred prior to the petition date without the Agent's prior written consent;

   f. Any order seeking authority to take any action that is prohibited by the terms of this Letter Agreement, the Interim Order or the Final Order or refrain from taking any action that is required to be taken by the terms of this Letter Agreement, the Interim Order or the Final Order; or

   g. Any other action that would materially adversely affect the Agent or the Lender in any way without the prior written consent of the Agent or the Lender.

6. Debtors shall continue to cooperate with Lender regarding a Lender Sponsored Transaction.

**Event(s) of Default:**     Each of the following shall constitute an "*Event of Default*", unless otherwise waived by the Agent in its sole discretion:

1. Debtors shall fail to pay any Loan Obligation after such payment has become due;

2. Any report, certificate or other document delivered to the Agent or the Lender pursuant to this Letter Agreement, the Interim Order or the Final Order shall have been incorrect in any material respect when made or deemed made;

3. Debtors shall fail to perform or comply with any covenant or agreement contained in this Letter Agreement, the Interim Order or the Final Order;

4. The failure of Debtors to comply in all material respects with each and all of the terms and conditions of the Interim Order, the Final Order and this Letter Agreement;

5. Any of the Debtors is enjoined, restrained or in any way prevented by the order of any court or any governmental authority from conducting all or any material part of its business for more than three (3) consecutive days;

6. Any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty (whether or not insured) which causes, for more than three (3) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Debtors, if any such event or circumstance could reasonably be expected to have a material adverse effect;

7. The entry of an order in the Bankruptcy Cases which stays, modifies (in any manner adverse to the Agent or the Lender), or reverses the Interim Order or Final Order or which otherwise materially adversely affects, as determined by the Agent in its reasonable discretion, the effectiveness of the Interim Order or Final Order without the express written consent of the Agent;

8. The conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code;

9. Any of the following employees of the Debtors is removed, terminated or replaced, or otherwise ceases to participate actively in management of the Debtors, in each case without the written consent of the Agent or Lender: (a) Dave Hackett (President & CEO), (b) Leo Krupilis (Sr. VP Maintenance), (c) Phil LeFevre (VP Director of Operations), (d) Roy Canter (Sr. VP Customer Service), (e) Pete Taggart (VP of SOCC), (f) Eddie Panella (Director of Financial Reporting), or (g) Donna Bascombe (Revenue Accounting Manager);

10. The appointment of a trustee for the Debtors;

11. The dismissal of any of the Bankruptcy Cases; provided that the Agent and the Lender have not consented in writing to such dismissal;

12. The entry of any order which provides relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 that permits any creditor to (a) realize upon, or to exercise any right or remedy with respect to, any material portion of the Collateral, or (b) to terminate any license, franchise or similar agreement, wherein either case the exercise of such right or remedy or such realization or termination would be reasonably likely to have a material adverse effect;

13. Subject to the allowance and payment of any amounts due under the Carve-Out, the filing of any application by Debtors without the express written consent of the Agent for the approval of a super-priority claim in the Bankruptcy Cases which is pari passu with or senior to the priority of the claims of the Agent or the Lender, or there shall arise any such super-priority claim under the Bankruptcy Code, provided that the filing of any such application shall not be deemed an Event of Default if the proceeds of the funding supporting such claim will be used to pay the Loan;

14. The payment or other discharge by Debtors of any prepetition indebtedness without the written consent of the Agent or Lender;

15. The filing of any motion by Debtors seeking, or the entry of any order in the Bankruptcy Cases: (a) permitting working capital or other financing (other than ordinary course trade debt or unsecured debt) for any of the Debtors from any person other than the Agent (unless the proceeds of such financing are to be used to pay in full all obligations arising under this Letter Agreement, the Interim Order and the Final Order); (b) granting a lien on, or security interest in, any of the Collateral, other than with respect to this Letter Agreement (unless such liens are granted in connection with a financing, the proceeds of which are to be applied to the payment in full of all obligations arising under this Letter Agreement, the Interim Order and the Final Order, and other than liens granted as adequate protection for pre petition liens on the Debtors' assets, which adequate protection liens are junior in priority to the Lender's super priority priming liens); (c) except as permitted by this Letter Agreement, the Interim Order or the Final Order, permitting the use of any of the Collateral pursuant to Bankruptcy Code § 363(c) without the prior written consent of the Agent, permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Bankruptcy Code § 506(c); or (d) dismissing the Bankruptcy Cases, unless the Agent has sought or consented in writing to such relief by the Court;

16. The filing of a motion or other pleading seeking the entry of an order confirming a plan of reorganization (and/or approving a disclosure statement related thereto) that does not require payment in full in cash of all obligations under this Letter Agreement, the Interim Order and the Final Order on the consummation date of such plan of reorganization, and as to which Lender has not consented in writing; or

**VPC**

17. The filing of any pleading by any of the Debtors challenging the validity, priority, perfection or enforceability of this Letter Agreement or the obligations hereunder, or any lien granted pursuant to this Letter Agreement, the Interim Order or the Final Order is determined to be null and void, invalid or unenforceable by the Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Bankruptcy Cases.

**Default Remedies:** Upon three (3) business days' written notice of an Event of Default which is not subsequently cured or waived during such notice period:

1. The Loan shall mature and any and all Loan Obligations shall become due and payable in full in cash;

2. The Agent and the Lender shall have standing to move for an order to cause the Debtors to engage in a process to liquidate their assets pursuant to Bankruptcy Code § 363; and

3. The Agent and the Lender shall have the right to seek an emergency hearing requesting relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 that permits the Agent and the Lender to realize upon, or to exercise any right or remedy with respect to, any portion of the Collateral.

**Prepayment(s):** The Debtors shall have the right (but not the obligation) to prepay the Loan Obligations (in cash) in whole or in part.

**Reservation of Rights:** Nothing in this Letter Agreement is intended or shall be construed to waive any of the Agent's or the Lender's rights to object to or otherwise contest the reasonableness of the fees and expenses of the Debtors' retained professionals. Such rights are hereby reserved in their entirety.

If the Debtors have not received a Court order approving the Section 1110 Stipulation before the termination of the stay period specified in Bankruptcy Code § 1110, then, notwithstanding Bankruptcy Code § 1121, the Agent and the Lender shall have the right to file a plan and disclosure statement (the "*Plan Right*"). The Plan Right shall be approved by the Court pursuant to the Interim Order and Final Order, and shall be a condition to consummating the Loan.

The Agent and the Lender shall have the right under Bankruptcy Code § 363(k) to credit bid up to the full amount of the Loan Obligations in connection with any sale of the Debtors' assets under a plan of reorganization or otherwise (the "*Credit Bid Right*"). The Credit Bid Right shall be approved by the Court pursuant to the Interim Order and Final Order, and shall be a condition to consummating the Loan.

**Retainer:** An initial retainer of $50,000 (the "*Initial Retainer*") was received by the Agent on October 25, 2010, to pay for future Costs and Expenses incurred by the Agent and/or the Lender. An additional retainer of $50,000 (the "*Additional Retainer*") was received by the Agent on October 29, 2010, to pay for future Costs and Expenses incurred by the Agent and/or the Lender. Debtors recognize that the Initial Retainer and the Additional Retainer are only retainers to secure payment of the Lender's and/or Agent's future costs and expenses and is not a cap on such future costs and expenses which may exceed the amount of the Initial Retainer and the Additional Retainer. The Debtors acknowledge and agree that the Initial Retainer and the Additional Retainer were fully earned upon payment thereof as consideration for Victory Park's strategic direction, due diligence, work performed and other good and sufficient value provided to the Debtors hereunder. The Interim Order and the Final Order shall include a provision ratifying the payment of the Initial Retainer and the Additional Retainer and waiving and releasing any claims the Debtors and/or their respective estates may have against Victory Park, Agent and/or Lender with respect to the Initial Retainer and/or the Additional Retainer pursuant to Chapter 5 of the Code or any other applicable law.

**Closing Conditions:** This Letter Agreement is subject to, amongst other items, the following:

1. Completion of business and legal due diligence satisfactory to the Agent and Lender in their sole discretion;

2. Execution of definitive legal documentation acceptable to the Agent and Lender in their sole discretion;

3. Payment in full in cash of the Initial Retainer and the Additional Retainer; and

**VPC**

4. Entry of the Interim Order and Final Order by the Court, authorizing borrowing pursuant to this Letter Agreement.

This Letter Agreement does not set forth all the terms and conditions of the Loan described herein. Rather, it is only an outline, in summary format, of major points of understanding, which will form the basis of the definitive documentation. The definitive documentation will be prepared by the Agent and the Lender.

This Letter Agreement is not, and shall not be deemed to be, a binding agreement by the Agent or the Lender to provide the Loan described herein. Such agreement will arise only upon the execution and delivery by the Debtors of definitive documentation satisfactory in form and substance to the Agent and the Lender and the fulfillment, to the satisfaction of the Agent and the Lender, of the conditions precedent required by the Agent and the Lender and set forth herein and therein. Notwithstanding the foregoing, the rights of the Agent and the Lender and the corresponding obligations of the Debtors under "Costs/ Expenses" and "Retainer" shall be binding on the parties hereto upon the execution of this Letter Agreement.

In the event that the Debtors elect not to consummate the transaction contemplated herein or the Debtors are unable, for any reason, to obtain the Interim Order from the Court on or before November 8, 2010 (or as soon thereafter as the Court's calendar shall permit), this Letter Agreement shall automatically terminate (unless extended in writing by the Agent and the Lender). Any disputes arising in connection with this letter, or the definitive documents referred to herein, shall be determined by the Florida Bankruptcy Court having jurisdiction and venue over the Debtors cases.

This Letter Agreement and the terms set forth herein are confidential, and the Debtors shall not disclose the terms of this Letter Agreement, or the fact that negotiations between the Agent, the Lender and the Debtors are ongoing, to any third party other than RACC, including any other source of potential financing for the Debtors; provided, however, that the Debtors shall disclose the terms of this Letter Agreement for purposes of seeking approval of the Loan by the Court.

\*     \*     \*     \*     \*

**EXHIBIT "B"**
**(Budget)**

3226521-2

**GULFSTREAM INTERNATIONAL AIRLINES**
November

| | Actual Thru 1-Nov | 2-Nov | 3-Nov | 4-Nov | 5-Nov | WEEK TOTAL 5-Nov | 8-Nov | 9-Nov | 10-Nov | 11-Nov | 12-Nov | WEEK TOTAL 12-Nov | 15-Nov | 16-Nov | 17-Nov | 18-Nov | 19-Nov | WEEK TOTAL 19-Nov | 22-Nov | 23-Nov | 24-Nov | 25-Nov |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING RECEIPTS** | | | | | | | | | | | | | | | | | | | | | | |
| BEGINNING BALANCE | 461 | 438 | 182 | 202 | 635 | $ 1,005 | 726 | 604 | 318 | 141 | 645 | $ 1,034 | 57 | 53 | 371 | 465 | 1,072 | $ 1,054 | 57 | 588 | 1,471 | 1,407 | 1,431 |
| **SOURCES-OPERATING** | | | | | | | | | | | | | | | | | | | | | | |
| (Continental Weekly Revenue Advance | | | | | | | | | | | | | | | | | | | | | | |
| (ACH Clearing House - Revenue | | | | | | | | | | | | | | | | | | | | | | |
| Airline Clearing House - Revenue | | | 540 | | | 540 | | | | 645 | | 545 | | | | 540 | | 540 | | | 540 | | |
| Airline Clearing House - Expense | | | | | | | | | | | | | | | 1,759 | | | 1,759 | | | | |
| Essential Air Service - DOT | | | | | | | | | | | | | | | (1,200) | | | (1,200) | | | | |
| Airline Clearing House - IATA | | | | | | | | | | | | | | | 664 | | | 664 | | | | |
| Code Charter | | | | | | | | | | | | | 35 | | | 35 | | 35 | | | | |
| Other Charter | | | | | | | | | 200 | | | 200 | | 100 | | | | 100 | | | | |
| Survice & Other | | | | | | | | | | | | | | | | | | | 100 | | | |
| Ministry of Tourism - Bahamas | 3 | 7 | 14 | | | 24 | | (100) | | | | (100) | 4 | 4 | 4 | 4 | 4 | 20 | | 4 | | 5 |
| Fuel Contract | | | | | | | | | | | | | | | | | | | | | | |
| Other | | | | 42 | | 42 | | | | | | | | | | | | | | | | |
| DIP Financing | | | | 1,500 | | 1,500 | | | | | | | | | | 1,000 | | 1,000 | | | | |
| **TOTAL RECEIPTS** | 3 | 7 | 56 | 540 | | 2,100 | - | (100) | 200 | 545 | - | 645 | 4 | 4 | 563 | 104 | 4 | 4 | | 4 | 645 | |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | | | | |
| **Payroll** | | | | | | | | | | | | | | | | | | | | | | |
| Net | 23 | 38 | | | | | | 50 | | 50 | | 100 | | | 50 | | 50 | 160 | | 60 | | |
| Taxes | | | | | | | | | | | | | | | | | | | | | | |
| Headcount Reductions | | | | | | | | | | | | | | | | | | | | | | |
| Salary Reductions | | | | | | | | | | | | | | | | | | | | | | |
| Union Contract Savings | | | | | | | | | | | | | | | | | | | | | | |
| **Flight Operations** | | | | | | | | | | | | | | | | | | | | | | |
| Fuel & Oil | | | | 400 | 124 | 400 124 | | | | | 196 80 | 196 80 | | | 400 124 | | | 400 124 | | | | |
| Ford & Lodging | | | | | | | | | | | | | | | | | | | | | | |
| Aircraft Rental | | 10 | | | | | | | | | | | | | | | | | | | | |
| All Other (Flight Safety Incl.) | | | | 441 | 441 10 | | 5 | | | | | 5 | | | | | | 5 | 5 | | | |
| **Aircraft Maintenance** | | | | | | | | | | | | | | | | | | | | | | |
| Vendor Outside | | | | | 40 | 40 | | | | | 40 | 40 | | | | 40 | | 40 | | | | |
| Rotable Parts<1500 | | | | | 20 | 20 | | | | | 20 | 20 | | | | 20 | | 20 | | | | |
| Consumable Parts<1500 | | | | | 50 | 50 | | | | | 150 | 150 | | | 50 | 50 | | 100 | | | | |
| Engine Reserve | | | | | 150 | 150 | | | | | 159 | 159 | | | | 150 | | 150 | | | | |
| All Other | | | 1 | | 10 | 11 | | | 50 | | 41 | 41 | | 5 | | 30 | | 30 | | 6 | | |
| **Stations** | | | | | | | | | | | | | | | | | | | | | | |
| Critical Vendor Payments | | | | | | | | | 8 | 3 | 50 | 50 | | 8 | | 50 | | 50 | | | | |
| Landing Fees | | | | | | | | | | | | | | | | | | | | | | |
| Other Airport Fees | | | | | | | | | | | | | | | | | | | 86 | | | |
| Ground Handling | | | | | | | | | | | | | | | | | | | 175 | | | |
| All Other (TSA Incl.) | | | | | | | | | | | | | | | 5 | 25 | | 25 | 52 | | | 25 |
| **Sales and Reservations** | | | | | | | | | | | | | | | | | 62 | 62 | 87 | | | 25 |
| Jet Fuel | 2 | | | | 2 | | | | | | | | | | | | | 3 | 6 | | | |
| **General & Administrative / Other** | | | | | | | | | | | | | | | | | | | | | | |
| Insurance (Hull & Pax Liab) | | | | | | | | | | | | | | | | | | | | | | |
| Insurance - Other(WC, Health, etc...) | | | | | | | | | 390 | | | | | | | | | | | | | |
| Insurance / IATA | | 16 | | 16 | 16 | 16 9 | | 8 | | | | | | | | | | | 22 | | | |
| (Other Taxes) | 3 | 8 | 72 | 22 | 22 8 | | | 70 | | 22 | 116 369 | | 11 | | 11 | | 22 | | | | | 78 |
| Other | | | | | 8 | 8 | | 4 | | 17 | 87 13 | | 3 | | | 16 | 6 | | 25 | | | |
| Legal & Assoc | | | | | | | | | | 9 | 10 | | | | | | | | | | | |
| Critical Vendors | | | | | | | | 10 | | | | | | | | | | | | 3 | | |
| Utilities, Rent & Other | | | | | | | | | | | | | | | 6 | | | 6 | 6 | | | |
| DIP Payments | 25 | 224 | 15 | 88 | 274 | 88 | 122 | 8 | | 15 | 15 | 15 | | 75 | 29 | | | 35 | 90 | | | |
| (Payments to Professionals | | 233 | 19 | 1,017 | | | | | | 41 | | | 8 | 248 | | 15 | 658 | | 38 | 26 | | |
| **TOTAL PAYMENTS** | 438 | 182 | 202 | 1,400 | 726 | 1,541 | 604 | 318 | 141 | 645 | 588 | 1,314 | 53 | 371 | 485 | 104 | 1,072 | 1,332 | 583 | 1,471 | 1,407 | 1,431 |
| **CONSOLIDATED CASH** | 438 | 182 | 202 | 635 | 726 | 726 | 604 | 318 | 141 | 645 | 57 | 57 | 53 | 371 | 485 | 1,072 | 583 | 583 | 1,471 | 1,407 | 1,431 | 1,431 |

## GULFSTREAM INTERNATIONAL AIRLINES

### November

| | 25-Nov | WEEK TOTAL 26-Nov $ | 29-Nov | 30-Nov | 1-Dec | 2-Dec | 3-Dec | WEEK TOTAL 3-Dec $ | MONTH TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **OPERATING RECEIPTS** | | | | | | | | | |
| BEGINNING BALANCE | 1,431 | 593 | 1,422 | 1,185 | 1,017 | 1,094 | 1,110 | 1,422 | 481 |
| **SOURCES-OPERATING** | | | | | | | | | |
| Continental Weekly Revenue Advance | | 540 | | | | | 583 | 583 | 2,166 |
| Airline Clearing House - Revenue | | | | | | | | | 1,759 |
| Airline Clearing House - Expenses | | | | | | | | | (1,200) |
| Essential Air Service - DOT | | | | | | | | | 664 |
| Airline Clearing House - IATA | | | | | | | | | 35 |
| Code Charter | 100 | 100 | | | | 100 | | 100 | 400 |
| Charter | | | | | | | | | |
| Scrap & Other | 6 | 18 | 5 | | 5 | 5 | 5 | 25 | (28) |
| Ministry of Tourism - Bahamas | | | | | | | | | |
| Aztec Contract | 240 | 240 | | | | | | | 240 |
| Other | | | | | | | | | 42 |
| DIP Financing | | 1,000 | | | | | | | 2,500 |
| **TOTAL RECEIPTS** | 245 | 1,898 | 5 | 5 | 105 | 588 | 708 | | 7,777 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | |
| **Payroll** | | | | | | | | | |
| Net | 60 | 120 | 159 | 60 | 400 | 400 | 539 | 539 | 1,155 |
| Taxes | 20 | 20 | 47 | | | 174 | 171 | 171 | 375 |
| Headcount Reductions | | | | | | | | | |
| Salary Reductions | | | | | | | | | |
| Union Contract Savings | | | | | | | | | |
| **Flight Operations** | | | | | | | | | |
| Fuel & Oil | | | | | | | | | 582 |
| Food & Lodging | | | | | | | | | 630 |
| Aircraft Rental | | 85 | | | | | | | 441 |
| All Other / Flight Safety incl. | 30 | 30 | | | | | | 120 | 50 |
| **Aircraft Maintenance** | | | | | | | | | |
| Vendor/Others | 40 | 40 | | | | 40 | | 40 | 160 |
| Rotable Parts-1900 | 20 | 20 | | | | 20 | | 20 | 80 |
| Consumable Parts-1900 | 50 | 50 | | | | 50 | | 50 | 200 |
| Engine Reserve | | 150 | | | | | | | 600 |
| All Other | | 43 | | 5 | 22 | 8 | 30 | 65 | 143 |
| **Sales and Reservations** | | | | | | | | | |
| All Other | | 25 | | | | | | | 150 |
| Critical Vendor Payments | | | | | | | | | |
| **Stations** | | | | | | | | | |
| Landing Fees | | 85 | | | | | | | 85 |
| Other Airport Fees | | 175 | | | | | | | 175 |
| Ground Handling | | 52 | | | | | | | 52 |
| All Other (TSA incl.) | | 25 | | | | 25 | | 25 | 112 |
| **General & Administrative / Other** | | | | | | | | | |
| Insurance (Hull & Pax Liab) | | | | 108 | | | 198 | 198 | 7 |
| Insurance - Other(W/C, Health, etc...) | 7 | 7 | | | | 7 | 22 | 22 | 221 |
| ACH/IATA | | | | | | | | | 411 |
| Escrow Taxes | | | | | | | | | 44 |
| Other | 6 | 9 | 3 | | | 6 | 9 | 9 | 283 |
| Legal & Acctg | | | | | | | | | 18 |
| Critical Vendors | | | | | | | | | |
| Utilities, Rent & Other | 21 | 27 | 8 | | 6 | | 14 | 14 | 710 |
| DIP Payments | | 36 | | | | | | | 772 |
| Payments to Professionals | | 25 | 25 | | | 15 | 40 | 40 | 629 |
| **TOTAL DISBURSEMENTS** | 254 | 1,899 | 242 | 173 | 28 | 572 | 1,250 | | 7,229 |
| **CONSOLIDATED CASH** | 1,422 | 1,422 | 1,185 | 1,017 | 1,094 | 1,110 | 880 | 880 | 1,017 |

**GULFSTREAM INTERNATIONAL AIRLINES**

| December | Actual Thru 29-Nov | 30-Nov | 1-Dec | 2-Dec | 3-Dec | WEEK TOTAL 3-Dec | 6-Dec | 7-Dec | 8-Dec | 9-Dec | 10-Dec | WEEK TOTAL 10-Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BEGINNING BALANCE | 1,422 | 1,185 | 1,017 | 1,160 | 1,171 | 1,422 | 941 | 598 | 541 | 461 | 979 | 941 |
| **SOURCES-OPERATING** | | | | | | | | | | | | |
| Continental Weekly Revenue Advance | | | | 568 | | 568 | | | | 560 | | 560 |
| Airline Clearing House - Revenue | | | | | | | | | | | | |
| Airline Clearing House - Expense | | | | | | | | | | | | |
| Essential Air Service - DOT | | | | | | | | | | | | |
| Cuba Charter | | | 100 | | | 100 | 100 | | | | | 100 |
| Airline Clearing House - IATA | | | | | | | | | | | | |
| Charter | 5 | 5 | 5 | 5 | 5 | 25 | 5 | 5 | 5 | 5 | 5 | 25 |
| Sunpac & Other | | | | | | | | | | | | |
| Ministry of Tourism - Bahamas | | 0 | 0 | | | | | | | | | |
| Aztec Contract | 0 | 0 | | | | | | | | | | |
| Other | | | | | | | | 10 | | | | 10 |
| Other | | | | | | | | | | | | |
| **TOTAL RECEIPTS** | 5 | 5 | 105 | 573 | 5 | 693 | 105 | 15 | 5 | 565 | 5 | 695 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | |
| **Payroll** | | | | | | | | | | | | |
| Net | 159 | | | 400 | | 559 | | | | | | |
| Taxes | 47 | | | 124 | | 171 | | 60 | | | | |
| Headcount Reductions | | | (35) | (5) | | | | | | | | |
| Salary Reductions | | | (35) | (5) | | | | | | | | |
| Union Contract Savings | | | | | | | | | | | | |
| **Flight Operations** | | | | | | | | | | | | |
| Fuel & Oil | | 80 | | | 60 | 120 | | 60 | | | 60 | 120 |
| Food & Lodging | | | | | | | | | | | | |
| Aircraft Rental | | | | | | | 441 | | | | | 441 |
| All Other (Flight Safety incl.) | | | | | | | 5 | | | | | 5 |
| **Aircraft Maintenance** | | | | | | | | | | | | |
| Vendor O'hauls | | | | | 40 | 40 | | | | | 40 | 40 |
| Rotable Parts-1900 | | | | | 20 | 20 | | | | | 20 | 20 |
| Consumable Parts-1900 | | | | | 50 | 50 | | | | | 50 | 50 |
| Engine Reserve | | | | | | | | | | | | |
| All Other | | | | 8 | 30 | 65 | | | | | 40 | 53 |
| **Stations** | | | | | | | | | | | | |
| Landing Fees | | | | | | | | | | | | |
| Other Airport Fees | | 108 | | | | 108 | | | | | | |
| Ground Handling | | | | | 7 | 7 | | | | | | |
| All Other (TSA incl.) | | | | | 22 | 22 | | | | | | |
| **Sales and Reservations** | | | | | | | | | | | | |
| All Other | | | | 25 | | 25 | | | 25 | | | 25 |
| **General & Administrative / Other** | | | | | | | | | | | | |
| Insurance (Hull & Pax Liab) | | | | | | | | | | | | |
| Insurance - Other(W/C,Health,etc...) | | | | | 7 | 7 | | | | | | |
| ACH / IATA | | | | | 22 | 22 | | | 46 | | | 46 |
| Excise taxes | | | | | | | | | | | | |
| Other | | 6 | | | 9 | 9 | | 3 | | 17 | 70 | 87 |
| Legal & Acct'g | | | | | | 18 | | | | 9 | 6 | 18 |
| Critical Vendors | | | | | | | | | | | | |
| Utilities, Rent & Other | 8 | | 10 | | | | | | | | | |
| DIP Payments | | | | | | | | | | | | |
| Payments to Professionals | 25 | | | 15 | | 40 | | | | | 25 | 40 |
| **TOTAL DISBURSEMENTS** | 242 | 173 | (38) | 562 | 235 | 1,254 | 448 | 72 | 85 | 47 | 311 | 963 |
| **CONSOLIDATED CASH** | 1,185 | 1,017 | 1,160 | 1,171 | 941 | 941 | 598 | 541 | 461 | 979 | 673 | 673 |

## GULFSTREAM INTERNATIONAL AIRLINES
### December

| December | 13-Dec | 14-Dec | 15-Dec | 16-Dec | 17-Dec | WEEK TOTAL 17-Dec |
|---|---|---|---|---|---|---|
| **BEGINNING BALANCE** | 673 | 581 | 1,037 | 653 | 1,572 | 673 |
| **SOURCES-OPERATING** | | | | | | |
| Continental Weekly Revenue Advance | | | | 600 | | 600 |
| Airline Clearing House - Revenue | | 1,792 | | | | 1,792 |
| Airline Clearing House - Expense | | (1,200) | | | | (1,200) |
| Essential Air Service - DOT | | | | 664 | | 664 |
| Airline Clearing House - IATA | | | | 35 | | 35 |
| Cuba Charter | 100 | | | | | 100 |
| Charter | - | | | | | - |
| Survac & Other | 5 | 5 | 5 | 5 | 5 | 25 |
| Ministry of Tourism - Bahamas | | | | | | |
| Aztec Contract | | | | | | |
| Other | | | | | | |
| Other | | | | | | |
| **TOTAL RECEIPTS** | 105 | 597 | 5 | 1,304 | 5 | 2,016 |
| **OPERATING DISBURSEMENTS** | | | | | | |
| **Payroll** | | | | | | |
| Net | 196 | | 360 | | 40 | 596 |
| Taxes | | 80 | | 124 | | 204 |
| Headcount Reductions | | | (35) | (5) | | |
| Salary Reductions | | | | | | |
| Union Contract Savings | (19) | (4) | | | | |
| **Flight Operations** | | | | | | |
| Fuel & Oil | | 60 | | | 60 | 120 |
| Food & Lodging | | | | | | |
| Aircraft Rental | | | | | | |
| All Other ( Flight Safety incl.) | 5 | | | | | 6 |
| **Aircraft Maintenance** | | | | | | |
| Vendor O'hauls | | | | | 40 | 40 |
| Rotable Parts-1900 | | | | | 20 | 20 |
| Consumable Parts-1900 | | | | | 50 | 50 |
| Engine Reserve | | | | | - | - |
| All Other | 5 | 5 | 8 | 5 | 40 | 63 |
| **Stations** | | | | | | |
| Landing Fees | | | | | | |
| Other Airport Fees | | | | | | |
| Ground Handling | | | | | | |
| All Other (TSA incl.) | | | 25 | | 62 | 87 |
| **Sales and Reservations** | | | | | | |
| All Other | | | 2 | | 3 | 5 |
| **General & Administrative / Other** | | | | | | |
| Insurance (Hull & Pax Liab) | | | | 176 | 22 | 198 |
| Insurance - Other(W/C,Health,etc...) | | | | | 22 | 22 |
| ACH / IATA | 11 | | | 20 | | 31 |
| Excise taxes | 4 | | | | | 29 |
| Other | | | 3 | 6 | 16 | 29 |
| Legal & Acctg | | | | | | 29 |
| Critical Vendors | | | | | | - |
| Utilities, Rent & Other | | | | 29 | | 40 |
| DIP Payments | | | | 6 | | 6 |
| Payments to Professionals | | | | | | - |
| **TOTAL DISBURSEMENTS** | 197 | 141 | 389 | 385 | 360 | 1,535 |
| **CONSOLIDATED CASH** | 581 | 1,037 | 653 | 1,572 | 1,217 | 1,217 |