UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
**www.flsb.uscourts.gov**

In re:                                          Chapter 11 Cases

GULFSTREAM INTERNATIONAL                        Case No.: 10-44131-JKO
GROUP, INC., *et al.*,[1]                       Jointly Administered

       Debtors.

_____/

**DEBTORS' EMERGENCY MOTION FOR ORDERS PURSUANT
TO 11 U.S.C. §§ 105, 363 AND 365 AND FED. R.
BANKR. P. 2002, 6004, 6006 AND 9014 (A) APPROVING
(I) BIDDING PROCEDURES, (II) FORM AND MANNER
OF SALE NOTICES, AND (III) SALE HEARING DATE AND
(B) AUTHORIZING AND APPROVING (I) SALE OF A PORTION OF OR
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR
OF CERTAIN LIENS, CLAIMS, AND ENCUMBRANCES, AND (II) ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES[2]**

**(Emergency Hearing Requested)**

**The Debtors submit that a preliminary hearing on this Sale Motion is necessary in order to approve the expedited bidding procedures described herein and that such approval is necessary on an emergency basis. As discussed at the "First Day Hearings," the Debtors face severe liquidity problems which problems necessitated the commencement of these chapter 11 cases. While immediate liquidity crises were alleviated in the short term by the entry of the Interim DIP Order, in the event of the failure to finalize a transaction with Victory Park, as discussed more fully in the DIP Motion and herein, the Debtors will require an emergency sale process in order to preserve the value of their assets in an extremely compressed time period. The compressed time period is occasioned, in part, by the deadline of December 6, 2010 by which the Debtors, or a third party purchaser, must take advantage of certain benefits made available through the RACC Forbearance Agreement, including that certain Purchase Option discussed herein. Expedited approval of the bid procedures requested as part of this Sale Motion will allow the Debtors to maximize and preserve the value of the Debtors' bankruptcy estates.**

---

[1] The address of each of the Debtors is 3201 Griffin Road, 4th Floor, Fort Lauderdale, FL 33312; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis: (i) Gulfstream International Group, Inc. (3956); (ii) Gulfstream International Airlines, Inc. (1720); (iii) Gulfstream Training Academy, Inc. (5843); (iv) GIA Holdings Corp., Inc. (9548); and (v) Gulfstream Connection, Inc. (1208).

[2] Capitalized terms not otherwise defined herein shall carry the same definition as in the Interim DIP Order (D.E. # 76).

Gulfstream International Group, Inc., Gulfstream International Airlines, Inc., Gulfstream Training Academy, Inc., GIA Holdings Corp., Inc, and Gulfstream Connection, Inc., (each, a "Debtor," and, collectively, the "Debtors"), by and through undersigned counsel, hereby move (the "Sale Motion") this Court for orders under 11 U.S.C. §§ 105, 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (a) approving (i) bidding procedures at a preliminary hearing, (ii) form and manner of sale notices, and (iii) sale hearing date and (b) authorizing and approving (i) the sale of a portion of or substantially all of the Debtors' assets free and clear of liens, claims, and encumbrances, and (ii) the assumption and assignment of executory contracts and unexpired leases.  In the alternative, the Debtors seek the authority of this Court to assume and assign the Lease Agreements (defined below).  In support of this Motion, the Debtors respectfully represent as follows:

## I.    Jurisdiction

1.    This Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper in this District pursuant to 28 U.S.C. § 1408.

## II.    Background

2.    On November 4, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

3.    The Debtors are operating their businesses and managing their affairs as debtors in possession.  11 U.S.C. §§ 1107(a) and 1108.  As of the date of the filing of this Motion, no creditors' committee has been appointed in these bankruptcy cases.

4.      The statutory predicates for the relief requested herein are §§ 105(a), 363, 365 and 1146 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

5.      For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the First Day Declaration of Mr. David Hackett (the "First Day Declaration").

### III.      Relief Requested

6.      By this Sale Motion, the Debtors seek (i) the entry of an order approving the Bidding Procedures (defined below) and certain notice procedures in connection with the sale of a portion of or substantially all of the Debtors' assets following a preliminary hearing, (ii) the entry of an order authorizing and approving the sale, the assumption and assignment of executory contracts and unexpired leases, and (iii) approval of a shortened notice period for the approval of the relief sought herein.  In the alternative, the Debtors seek the authority of this Court to assume and assign the Lease Agreements (defined below).

7.      While the Debtors' immediate liquidity crises were assuaged by the entry of the Interim DIP Order, in the event of a failure to finalize a Lender Sponsored Transaction with Victory Park acceptable to RACC,[3] the Debtors will require an emergency sale process in order to preserve the value of their assets in an extremely compressed time period to accomplish that goal by December 6, 2010 and maintain the benefits of the Purchase Option (as defined below) previously negotiated with RACC.  As discussed in the First Day Declaration, and addressed at the "first day" hearings in these cases on November 5, 2010, in the event that a sale is not consummated, the Debtors would be faced with the imminent loss of their fleet of leased aircraft on December 7, 2010.  Accordingly, the Debtors have concluded that it may be necessary to

---

[3] Throughout this Sale Motion, Raytheon Aircraft Credit Corporation shall be referred to as "RACC."

conduct an auction for the sale of the Debtors' assets if the Lender Sponsored Transaction does not consummate by December 6, 2010.

8.    Throughout 2010, the Debtors have been actively marketing their business and assets for sale, in conjunction with continued efforts for additional financing.  The Debtors' efforts led to the Letter Agreement with Victory Park, which agreement provides for the possibility of the Lender Sponsored Transaction.  Given the Debtors' severe liquidity restraints, the Debtors' interim post-petition financing alone will not accommodate continued operations in Chapter 11 during the proposed sale process.  The Debtors and Victory Park continue to work diligently to satisfy the conditions required by the Letter Agreement and the Interim DIP Order (defined below).  While the closing of a Lender Sponsored Transaction with Victory Park remains the Debtors' preferred choice for a prompt and expeditious resolution of these cases, the Debtors recognize that the need to timely maintain the benefits of the RACC Forbearance Agreement (defined below) mandates consideration of alternative transactions.  Accordingly, it is essential that bid procedures be established, and a sale process approved, as soon as possible so that the value of the Debtors' estates can be maximized and preserved.

9.    In addition, since entry into the Lease Amendment and Forbearance Agreement with RACC dated May 13, 2010 (the "RACC Forbearance Agreement"), the Debtors have actively sought other forms of debt financing and equity infusions from its existing Junior Lenders (defined below), including SVSP, and engaged in concerted efforts to find a buyer  for the Debtors' assets and operations, including the purchase of the Raytheon Aircraft (defined below) prior to the termination of the Lease Agreements.

## IV.    The Interim DIP Loan Facility

10.     Through the efforts of the Debtors and their financial advisors, the Debtors were able to secure $5.0 million of debtor-in-possession financing (the "DIP Commitment") from Victory Park Capital ("Victory Park").   The terms of the DIP Commitment are more fully described in the Letter Agreement which is included as an exhibit to the DIP Motion (defined below).

11.     On November 4, 2010, the Debtors filed the *Debtors' Motion for Interim and Final Orders (I) Authorizing (A) Secured Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(C)(1), (C)(2),(C)(3), And (D); (B) Granting Security Interests, Superpriority Liens And Claims And Adequate Protection; And (C) Use Of Cash Collateral And (Ii) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001(C)* (the "DIP Motion") (D.E. #8) seeking interim financing in the amount of $1.5 million.   Pursuant to agreements reached prior to the hearing on the DIP Motion, as reported to the Court on the record at the hearing on the DIP Motion, the interim financing made available pursuant to *the Interim Order (I) Authorizing (A) Secured Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, and 364(c) and (d); (B) Granting Security Interests, Superpriority Liens and Claims And Adequate Protection; and (C) Use Of Cash Collateral; and (II) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001(C)*  (the "Interim DIP Order") (D.E. #75) was increased to $1,700,000 (the "Interim DIP Loan").

12.     The Debtors' capital structure is more fully described in the DIP Motion and the First Day Declaration.   As described in the DIP Motion, the Debtors are indebted to Shelter Island Opportunity Fund, LLC ("Shelter Island"), Taglich Brothers, Inc. ("Taglich") as collateral agent on its own behalf and for the Purchasers listed on Exhibit A to the Taglich Debt Documents (together with Taglich, individually and collectively, the "Taglich Note Purchasers"),

and SAH-VUL Strategic Partners I, LLC ("SVSP") (collectively, the "Junior Lenders").  The Junior Lenders are parties to that certain Waiver, Consent and Intercreditor Agreement (the "Intercreditor Agreement"), dated August 31, 2010 which more fully describes each lenders particular collateral and seniority.

13.     At the first day hearing on the DIP Motion, SVSP reached an agreement with the Debtors regarding the interim relief sought through the DIP Motion.  The agreement, as approved in the Interim DIP Order and described on the record, provided that the Debtors would segregate the first $200,000 of cash generated from the Services Agreement (the "Services Agreement") with Gulfstream Air Charter, Inc. ("GAC") which Services Agreement was subsequently amended on March 14, 2006 through the First Amendment to Services Agreement (the "Services Agreement Amendment") in order to provide adequate protection to SVSP and that Victory Park would increase the initial amount of the Interim DIP Loan to $1.7 million. With respect to Shelter Island, the Debtors were not able to reach a resolution and thus Shelter Island prosecuted its objection to the DIP Motion and the interim financing sought therein.  After the hearing on the DIP Motion, the Court overruled Shelter Island's objection.

14.     As part of the Letter Agreement, which agreement formed the basis of the DIP Motion and the Interim DIP Loan, Victory Park and the Debtors agreed to continue to cooperate to develop an agreement for a sale of the Debtors' assets free and clear of liens and claims under which Lender would provide the "stalking horse" purchase transaction, or fund a Plan of Reorganization, under which Lender and Debtors would be co-sponsors (a "Lender Sponsored Transaction"), subject to the conditions contained within the Letter Agreement.  As of the date of this Sale Motion, the Debtors have not yet finalized the Lender Sponsored Transaction with Victory Park.  The Lender Sponsored Transaction is expressly conditioned upon reaching an

agreement with RACC acceptable to the Lender, the Debtors and RACC for the exercise of the Purchase Option.

15.     The relief granted in the Interim DIP Order has permitted the Debtors to sustain operations while Victory Park completes its due diligence pursuant to the Letter Agreement and while the Debtors and Victory Park attempt to document and consummate the Lender Sponsored Transaction.  The Final Hearing on the DIP Motion is set for December 1, 2010.

## V.      RACC Leases

16.     As the Court was made aware at the "First Day Hearings" in this case, on May 13, 2010, GIA entered into the RACC Forbearance Agreement pertaining to the extension of those certain Operating Lease Agreements (the "Lease Agreements"), pursuant to which GIA currently leases twenty-one (21) Beech 1900D aircraft (the "Raytheon Aircraft"), and that the Company had defaulted in certain other payments under a separate agreement dated as of December 19, 2008 (the "December 2008 Agreement"), which defaults are considered to be defaults under the Lease Agreements.  After demand, the Debtors made the required payment to RACC, which allowed it to continue operating the Raytheon Aircraft.

17.     Under the terms of the RACC Forbearance Agreement, RACC agreed that until the earlier of (i) December 6, 2010, (ii) an event of default by GIA under the agreement, (iii) a material adverse change in the Debtors' current business, or (iv) a bankruptcy event (the "Termination Date"), RACC would not terminate the Lease Agreements and agreed to extend the term of the Lease Agreements through December 6, 2010.  In exchange, GIA agreed to pay on a slightly advanced basis all monthly lease payments due under each of the Lease Agreements, RACC agreed that certain missed lease payments could be paid in full on the Termination Date, and RACC confirmed that the opportunity for the Debtors to purchase all of the Raytheon

Aircraft would be extended to a date at any time on or before the Termination Date at an agreed single aggregate net payment amount to be disclosed to proposed purchasers except under an appropriate confidentiality agreement (the "Purchase Option"). Additionally, pursuant to the RACC Forbearance Agreement, if the Debtors successfully purchased the Raytheon Aircraft on a timely basis, RACC agreed to grant certain other concessions in connection with certain current obligations.

18.     As of the Petition Date, the Debtors are current in all obligations due and owing to RACC under the RACC Forbearance Agreement and intend to continue the perform in accordance with such agreement to accomplish a timely purchase of the Raytheon Aircraft through closing the Lender Sponsored Transaction or the sale process proposed herein to be approved by the Court. However, if the Lender Sponsored Transaction is not successful, the Debtors need an alternative strategy so that the benefits of the RACC Forbearance Agreement and related Purchase Option are not lost, and so the Debtors can retain possession and operating their fleet.

19.     The Debtors place significant value on the Purchase Option and want to ensure that all possible efforts are undertaken to realize the benefits of the Purchase Option and the earlier agreements reached with RACC. In furtherance of that goal, the Debtors have retained the services of Jetstream Aviation Management, LLC ("Jetstream") as financial advisors to the Debtors. The Debtors intend that Jetstream will, among other things, assist the Debtors in continuing to identify qualified bidders that will be able to take advantage of the Purchase Option and structure a sale of the Offered Assets (as defined below) in the event that Victory Park determines that it is not able to proceed with the Lender Sponsored Transaction. Jetstream will be assisting the Debtors in implementing the sale process described below.

20.     Because of the significance of the Purchase Option,[4] any Qualified Bidder, as defined below, will be required to provide satisfactory assurances of ability to perform under the RACC Forbearance Agreement if such agreement is assumed and assigned and/or assurances of the ability to exercise the Purchase Option on or before December 6, 2010, unless RACC is prepared to extend the Termination Date, or the Court allows such an extension as part of a ruling binding upon RACC as to the proposed bidding procedures.

## VI.     Proposed Bidding Procedures

21.     The Debtors respectfully request that the Court approve expedited bidding procedures at a preliminary hearing no later than November 24, 2010 substantially in the form attached hereto as Exhibit A ("Bidding Procedures") in connection with the sale of all or a portion of the Debtors' assets with a final sale hearing ("Sale Hearing") to occur by December 5, 2010 so that a timely closing of the Purchase Option can occur by that date, if necessary.  A summary of the key Bidding Procedures is described below:

- Qualification.  In order to perform due diligence and be allowed to submit a bid for some or all of the Debtors' assets, including, but not limited to, the Raytheon Aircraft (pursuant to the Purchase Option), the equity security interests of GIA, all rights associated with the Debtors' operations and the operations of the airline, all assets and rights necessary to operate the airline now and in the future, that certain Services Agreement (the "Services Agreement") with Gulfstream Air Charter, Inc. ("GAC"), which Services Agreement was subsequently amended on March 14, 2006 through the First Amendment to Services Agreement (the "Services Agreement Amendment") and any assets related thereto, that certain agreement with CSC Applied Technologies, LLC (the "CSC Agreement" or the "Autec Agreement") and any assets related thereto, spare parts and equipment, the operating assets the Debtors use in connection therewith, with each of such assets being offered in tandem with others or separately (the "Offered Assets"), a party expressing an interest in the Offered Assets (a "Potential Bidder") must provide to the Debtors (a) an executed confidentiality agreement in form and substance satisfactory to the Debtors, (b) a statement demonstrating to the Debtors' satisfaction a bona fide interest in purchasing some or all of the Offered Assets

---

[4] Throughout this Sale Motion, the Debtors refer to the Purchase Option and the ability to take advantage of the benefits of that option.  For purposes of clarity, the Debtors note that any purchaser who exhibits the "ability to perform" under the Purchase Option will perform by tendering all applicable payments directly to RACC.

and describing the Potential Bidder's proposed transaction, and (c) a statement demonstrating the Potential Bidder's ability to close a transaction within the significantly shortened time period required by virtue of the Purchase Option. A Potential Bidder that satisfies these requirements will become a "Qualified Bidder."

- **Bid Deadline and Requirements**.  A bid is a signed agreement from a Qualified Bidder offering to purchase all or a portion of the Offered Assets that is irrevocable until two business days after the earlier of (a) the closing of the sale of the applicable Offered Assets (including the Raytheon Aircraft pursuant to the Purchase Option by December 6, 2010), whether or not to such Qualified Bidder or (b) 30 days after the Sale Hearing, provided the Purchase Option has been otherwise timely performed.  **All bids for the Offered Assets shall be submitted so that they are actually received by no later than 12:00 noon (Eastern Time)** ("Bid Deadline") on December 1, 2010, by (i) Gulfstream International, 3201 Griffin Road, 4th Floor, Fort Lauderdale, FL 33312 (Attn: David Hackett; (ii) attorneys for the Debtors, Berger Singerman P.A., 350 East Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301 (Attn: Brian K. Gart, Esq.); (iii) financial advisors for the Debtors, JetStream Aviation Management, LLC, 2601 South Bayshore Drive, Suite 630, Miami, Florida 33133 (Attn:  Stuart A. Klaskin); (iv) counsel for Shelter Island, Greenberg Traurig, P.A., 1221 Brickell Ave, Miami, Florida 33131 (Attn: Paul J. Keenan); (v) counsel for Taglich, Bast Amron LLP, 1 SE 3rd Ave, Suite 1440, Miami, Florida 33131 (Attn: Jeffrey Bast); (vi) counsel for SVSP, Bilzin Sumberg Baena Price & Axelrod, LLP, 1450 Brickell Ave, Suite 2300, Miami, Florida 33131 (Attn: Scott Baena); and (vii) counsel for the Committee of Creditors Holding Unsecured Claims (the "Committee"), if appointed in these cases.

- **Required Supporting Materials**.  A Qualified Bidder shall accompany its bid with:

  - a executed asset purchase agreement, in a form to be reviewed by the Debtors, detailing all of the terms and conditions of the proposed transaction;

  - written evidence of available cash, a commitment for financing or ability to obtain a satisfactory commitment if selected as the Successful Bidder (as defined in the Bidding Procedures), and such other evidence of ability to consummate the transaction as the Debtors may reasonably request (including the ability to close the Purchase Option with RACC no later than December 6, 2010, before the Termination Date, unless such date is extended);

  - a copy of a board resolution or similar document demonstrating the authority of the Qualified Bidder to make a binding and irrevocable bid on the terms proposed;

  - any pertinent factual information regarding the Qualified Bidder's

operations that would assist the Debtors in their analysis of any regulatory or other issues that may effect or delay consummation of a transaction with the Qualified Bidder; and

- to the extent that the Qualified Bidder proposes to include in its bid the assumption and assignment of executory contracts or unexpired leases, a schedule showing such contracts or leases to be assumed and assigned together with evidence of the Qualified Bidder's ability to provide adequate assurance of future performance of such contracts, such as audited financial statements of the Qualified Bidder, information regarding the capitalization of the Qualified Bidder, information allowing the Debtors to evaluate the value of any guaranties being provided by affiliates of a Qualified Bidder of its obligations under any assumed and assigned executory contracts or leases, and the Qualified Bidder's intentions with respect to the assumption of the collective bargaining agreement between the Debtors and the Air Line Pilots Association, International ("ALPA") (an "Adequate Assurance Package") provided, however, Debtors shall make a good faith effort to cause the Successful Bidder (as defined below) to assume the obligations of the Debtors under the current collective bargaining agreement with ALPA in connection with the sale of the Offered Assets and otherwise comply with the requirements of Section 1113 of the Bankruptcy Code.

- <u>Good Faith Deposit</u>.  In order to participate in the Auction, a Qualified Bidder must accompany its bid with a good faith deposit equal to 10% of the bid's proposed purchase price in the form of a wire transfer or certified or cashier's check (the "Good Faith Deposit") payable to the trust account for the attorneys for the Debtors, provide evidence of an immediate ability to fund the closing of the Purchase Option before the Termination Date, unless such date is extended

- <u>Stalking Horse Bidder, Breakup Fee and Expense Reimbursement</u>.  Prior to or after the submission of bids, the Debtors, with the consent of RACC, if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee, may enter into an agreement ("Stalking Horse Bid"), subject to higher and better offers at the Auction (as defined below), providing for a Breakup fee up to 3% of the proposed purchase price (the "Breakup Fee") and/or reimbursement of documented out-of-pocket expenses incurred in connection with the negotiation of the Stalking Horse Bid up to $150,000 (the "Expense Reimbursement").  The Debtors' agreement to the Stalking Horse Bid will be contingent on the Stalking Horse providing, as part of the agreement, sufficient financing to allow the Debtors to continue operations pending a closing on the sale of the Offered Assets or a closing of the Purchase Option on a timely basis.

- <u>Baseline Bid</u>.  Qualified Bidders that have submitted Qualified Bids are eligible to participate in the auction (the "Auction").  Unless there is a Stalking Horse Bid, at least one business day prior to the Auction, the Debtors will select, with the

consent of RACC, if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Committee and the Junior Lenders, the best bid ("Baseline Bid") to serve as the starting point for the Auction. Unless there is a Stalking Horse Bid, the Baseline Bid will be the qualified bid which proposes the highest and best economic consideration to the Debtors in the Debtors' sole business judgment.    At least one business day prior to the Auction, the Debtors will provide all Qualified Bidders with a copy of the Stalking Horse Bid or the Baseline Bid, as is applicable.

- Auction.  If more than one qualified bid is received by the Bid Deadline, the Debtors will conduct the Auction.  The Auction shall take place at 10:00 a.m. (Prevailing Eastern Time) on December 5, 2010, at Berger Singerman, P.A., 350 East Las Olas Blvd., Suite 1000, Fort Lauderdale, Florida 33301.  Only a Qualified Bidder who has submitted a qualified bid will be eligible to participate at the Auction.

- Bidding Increment.  The minimum bidding increment at the auction shall be $10,000 or such other amount as the Debtors determine is appropriate, plus the amount of any Breakup Fee and/or Expense Reimbursement if the Debtors have entered into a Stalking Horse Bid, provided, however, that the Debtors reserve the right to change the bidding increments at the Auction.  The Debtors also retain discretion, with the consent of RACC, if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee, with respect to how to conduct the Auction if bids are received on differing packages of Offered Assets.

- Acceptance of Qualified Bid.  The Debtors presently intend to consummate the sale with the successful bidder who the Debtors determine to have made the highest and best offer (the "Successful Bidder") for all or a part of the Debtors' assets.  However, the Debtors' presentation to the Bankruptcy Court for approval of the bid made by the Successful Bidder does not constitute the Debtors' acceptance of the bid.  The Debtors will be deemed to have accepted such Bid only when such bid has been approved by order of the Bankruptcy Court.

- Reservation of Rights.  The Debtors, with the consent of RACC, if required in connection with a transaction involving the Raytheon Aircraft, and in consultation with the Junior Lenders and the Committee, (i) may determine which qualified bid, if any, is the highest or otherwise best offer, and (ii) may reject at any time, any bid that the Debtors determine in their sole discretion to be: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the sale transaction, or (c) contrary to the best interests of the Debtors, their estates and creditors.

- Return of Deposits.  The Good Faith Deposit of a Qualified Bidder shall be returned within three business days of the earlier of (a) the closing of a sale transaction on all or a portion of the Offered Assets on which the Qualified Bidder made a bid or (b) 30 days after the Sale Hearing.

- <u>Miscellaneous</u>.  Only the Junior Lenders (only to the extent of their secured claims and only to the extent of a request of the sale of their collateral) and Victory Park (only to the extent of the DIP Loan Indebtedness) may exercise their right to credit bid their indebtedness under Section 365(k) of the Bankruptcy Code, provided that in the event of a credit bid by the Junior Lenders, Victory Park may, in its discretion, elect to have its indebtedness paid in full as a condition to the making of a credit bid by the Junior Lenders.  Notwithstanding anything contained to the contrary in the Bidding Procedures, the Junior Lenders and Victory Park shall be deemed Qualified Bidders and neither the Junior Lenders nor Victory Park shall be required to provide a deposit or an Adequate Assurance Package if the Junior Lenders or Victory Park submit a credit bid.

22.    The Bidding Procedures are intended to provide a flexible process where the Debtors will be soliciting bids on both a going-concern basis and bids for all or a portion of the Debtors' other assets.  This flexible process will allow the Debtors to maximize the value of their assets given the severe liquidity constraints and accompanying time pressures they currently face (most notably the time pressure occasioned by the December 6, 2010 termination of the Lease Agreements).  The Debtors expressly reserve the right, with the consent of RACC, if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with Junior Lenders and the Committee, to modify the relief requested in this Motion prior to or at the applicable hearings, including modifying the proposed Bidding Procedures.  Moreover, the Debtors reserve the right, with the consent of RACC, if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee, to adjourn the Auction or the Sale Hearing or remove any assets from the sale if the Debtors determine, with the consent of RACC, if required in connection with a transaction involving the Raytheon Aircraft and after consultation with the Junior Lenders and the Committee, that such action will maximize value to their estates.

### VII.    <u>Authority to Offer Breakup Fee and Expense Reimbursement</u>

23.    The Debtors have determined, in their reasonable business judgment, that a sale of their assets at this time, even without a traditional "stalking horse" bidder, is warranted and

necessary.  However, the Debtors request that they be authorized to enter into an agreement that provides a bidder who is willing to serve as a stalking horse bidder a Breakup Fee of up to 3% of the total value offered by such stalking horse bidder in its bid and/or reimbursement of documented out-of-pocket expenses that are actually incurred up to $150,000.

24.     The ability of the Debtors to offer potential purchasers bidding protections is beneficial to the Debtors' estates and creditors because the Debtors can provide the incentive required to induce a bidder to submit or increase its bid prior to the Auction.  The ability to offer the Breakup Fee may induce bids for some or all of the Offered Assets that would not otherwise be made.  In addition, to the extent bids can be improved prior to the Auction, a higher floor will have been established for further bidding at the Auction.  Thus, even if a Qualified Bidder is awarded a Breakup Fee, and that Qualified Bidder is not a winning bidder, the Debtors and their estates will have benefited from the higher floor established by such bid.  The Debtors will exercise prudent business judgment before offering or agreeing to any bidding protection and will only do so if such protection, in the reasonable business judgment of the Debtors, will likely result in the realization of greater value for the Debtors and their estates.

25.     Approval of breakup fees, expense reimbursements and other forms of bidding protection in connection with the sale of significant assets pursuant to Section 363 of the Bankruptcy Code has become an established practice in Chapter 11 cases.  Three different approaches have been used by the bankruptcy courts in assessing the validity and enforceability of bidding incentives.  The first approach – the business judgment test – is based on the corporate control cases and applies the business judgment rule to make certain that bidding is promoted, not deterred and that the fees are reasonable in relationship to the size of the transaction and the bidder's efforts.  See *In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Col. 1992); *In re*

*Integrated Resources, Inc.*, 135 B.R. 746, 753 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650 S.D.N.Y. 1992), appeal dismissed, 3 F. 3d 49 (2d Cir. 1993); *In re 995 Fifth Avenue Assocs.*, LP. 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989); see also *Cottle v. Stores Communications, Inc.*, 849 F. 2d 570 (11th Cir. 1988) (using business judgment test in corporate control context).  This approach also has been endorsed by a leading bankruptcy treatise.  See 3 Collier on Bankruptcy § 363.02[6] at 363-21 (15th ed. 2005) (courts "should approve [bidding incentives] unless they are unreasonable or appear more likely to chill the bidding process than to enhance it.").  The second approach – the best interests of the estate test – focuses on whether the bidding incentive at issue is in the best interests of the estate to ensure that the debtor's estate is not unduly burdened and that the relative rights of the parties are protected.  See *In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994); see also *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995.  The third approach – the administrative claim test – considers whether the bidding incentive at issue is "actually necessary to preserve the value of the estate." See *In re O'Brien Environmental Energy, Inc.*, 181 F. 3d 527, 535 (3d Cir. 1999), see also *AgriProcessors, Inc.. v. Iowa Quality Beef Supply Network, L.L.C.* (*In re Tama Beef Packing, Inc.*), 290 B.R. 90, 97-98 (B.A.P. 8th 2003); *In re Dorado Marine, Inc.*, 332 B.R. 637 (M.D. Fla. 2005).

　　　　26.　　　The Debtors submit that under each of the above tests the proposed Breakup Fee and Expense Reimbursement will not chill bidding but enhance it and that the proposed Breakup Fee and Expense Reimbursement will preserve and enhance the value of the estates' assets.  The Debtors also submit that granting prospective authority to provide the Breakup Fee and Reimbursement Expense is appropriate given the expedited nature of the auction process in these cases where the Debtors may not have an ability to obtain a court order approving an agreement

to provide an Breakup Fee and Expense Reimbursement between the time such an agreement is reached and the Bid Deadline.

## VIII.   Proposed Shortened Notice of the Sale Hearing

27.    Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide its creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested.  However, pursuant to Federal Rule of Bankruptcy Procedure 9006(c), the Court has the authority to limit that notice period based on cause shown.  Because of the exigent circumstances facing the Debtors and the extremely narrow time frame within which the Debtors, or a third party purchaser, may exercise the Purchase Option, the Debtors submit that cause exists for the shortened notice period requested herein and thus are seeking to have the Court approve the relief sought herein on the limited notice requested.

28.    The Debtors have served, or will serve, this Motion on: (a) the Office of the United States Trustee; (b) respective counsel to the Junior Lenders; (c) counsel to RACC, (d) those creditors holding the 20 largest unsecured claims against the Debtors' estate; (e) all parties known to be asserting a lien in the Debtors' assets; (f) all counterparties to executory contracts and unexpired leases potentially to be assumed and assigned; (g) all state attorney generals in states where the Debtors conduct business; and (h) various federal and state tax and environmental authorities, including the Internal Revenue Service and the Environmental Protection Agency; (i) the Federal Aviation Administration and Department of Transportation; and (j) counsel to the Committee (when such counsel is selected).

29.    The Debtors also will serve by regular mail, email and facsimile a notice of the Auction and the Sale Hearing (the "Auction and Hearing Notice"), which includes, among other

things, the date, time and place of the Auction and the Sale Hearing and information for how to learn about the deadline for filing any objections to the relief requested herein once they are set by the Court, and, therefore, complies with Bankruptcy Rule 2002(c). The Auction and Hearing Notice will be served on all creditors of the Debtors prior to the bid procedures hearing on this Motion. The Auction and Hearing Notice also includes instructions for how to obtain a copy of this Motion and the Bidding Procedures Order, once entered, on the website of the Debtors' claims agent, Garden City Group ("GCG"), at http://www.gulfstreamreorg.com (the "Website"). The Debtors also will post a copy of the highest and best bid at the Auction on the Website as soon as it is available.

30.     The Debtors submit that the methods of notice described in this Motion comply fully with Bankruptcy Rule 2002 in terms of the form of notice required  and submit that the exigencies presented by the facts and circumstances of the case necessitate and therefore justify the limited notice period for the proposed Bidding Procedures and the sale of the Offered Assets. Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

## IX.     Sale of the Debtors' Assets is Warranted

31.     Under section 363 of the Bankruptcy Code, a debtor in possession may sell property of its estate outside of the ordinary course of its business, subject to the approval of the court after notice and a hearing.  *See* 11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtor.  *See Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*,

126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate may be conducted if a good business reason exists to support it."); *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Chateaugay Corp.,* 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus. v. McClung,* 789 F.2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under [section] 363(b)(1) when a sound business purpose dictates such action.").

32.     Courts typically consider four factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property, and (d) whether the parties have acted in good faith. *See, e.g., In re Weatherly Frozen Food Group, Inc.,* 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991).

33.     Here, each of these four factors has been satisfied. First, sound business reasons exist for the Debtors' efforts to sell their assets.  The Debtors currently have inadequate liquidity to continue operating for an extended period and the termination date for the Lease Agreements is quickly approaching.   In the event that Victory Park fails to proceed with the Lender Sponsored Transaction, the Debtors will need to move forward expeditiously with an asset sale. A rapid, but orderly sale of the Offered Assets will minimize the liquidity the Debtors need to continue operations while providing a way for the Debtors to monetize the Offered Assets for the benefit of its creditors. Second, as discussed above, the Debtors will be providing adequate and reasonable notice to interested parties of the opportunity to bid on the Offered Assets and of the opportunity to object to the sale of those assets. *See, e.g., Folger Adam Security Inc. v. DeMatteis/MacGregor*, 209 F.3d 252, 265 (3d Cir. 2000) (stating that notice is sufficient if it

includes "the time and place of any public sale, the terms and conditions of any private sale, states the time for filing objections and, if real estate is being sold, provides a general description of the property").  Third, the proposed Bidding Procedures provide for an open and competitive bidding process for the Offered Assets.  Fourth, the Debtors are proceeding in good faith and will make a showing at the Sale Hearing that the purchaser or purchasers of the Offered Assets have acted in good faith.  Accordingly, the Auction and sale of the Offered Assets pursuant to the proposed Bidding Procedures should be approved.

### X.      Sale of Assets Free and Clear of Certain Liens, Claims and Encumbrances

34.      Pursuant to Section 363(f) of the Bankruptcy Code, a debtor may sell property under Bankruptcy Code Section 363(b) free and clear of liens, claims and encumbrances if one of the following conditions is satisfied: (i) applicable nonbankruptcy law permits the sale of the property free and clear of such interest; (ii) the entity holding the lien, claim or encumbrance consents to the sale; (iii) the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (iv) the interest is in bona fide dispute; or (v) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest. 11 U.S.C. § 363(f).  *See In re Smart World Tech., LLC*, 423 F.3d 166, 169 n. 3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests.  It thus allows purchasers ... to acquire assets [from a debtor] without any accompanying liabilities"); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *3 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

35.      To facilitate the sale of the Offered Assets, the Debtors request that the Court authorize the sale of the Offered Assets free and clear of certain liens, claims, encumbrances, and

other interests (collectively, "Liens").  The sale of the Offered Assets pursuant to the Bidding Procedures will have satisfied at least one of the prongs of Section 363(f).

36.     Further, the Debtors believe that Section 363(f)(5) is satisfied because (i) any entity holding a Lien on the Offered Assets could be compelled to accept a monetary satisfaction of its Liens, and (ii) the Debtors propose that any Lien on the Offered Assets sold pursuant to the Bidding Procedures shall attach to the net proceeds of the sale of the Assets, subject to any claims and defenses the Debtors may possess with respect thereto.  As such, the sale of the Offered Assets free and clear of all Liens satisfies Section 363(f)(5) of the Bankruptcy Code.

37.     In addition, the Debtors submit that the Assets may be sold free and clear of all successor liability claims.  Notwithstanding reference to the conveyance free and clear of "any interest" in Section 363(f) of the Bankruptcy Code, that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well.  *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) of the Bankruptcy Code barred successor liability claims for employment discrimination and rights under travel voucher program); *Am. Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986), *aff'd*, 805 F.2d 1515 (11th Cir. 1986) (sale pursuant to section 363(1) barred successor liability for products defect claim).

38.     Unless the amount received from the Successful Bidder is sufficient to exercise satisfy the Purchase Option to RACC in full at closing or RACC consents in writing, no sale of the Raytheon Aircraft shall be included as part of the sale.

39.     Unless the amount received from the Successful Bidder is sufficient to satisfy the outstanding DIP Indebtedness to Victory Park in full at closing, Victory Park consents in writing,

to allow the sale of the assets subject to its DIP Facility Liens, or Victory Park bids its DIP Loan

Claim, the Debtors will not proceed with the sale of its assets as contemplated herein.

## XI.    The Successful Bidder Should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser

40.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest

in property purchased from the debtor notwithstanding that the sale conducted under section

363(b) was later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] ... does not affect the validity of a sale ... to an
> entity that purchased ... such property in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and such sale ... were stayed pending appeal

11 U.S.C. § 363(m).  *See Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994)

("Section 363(m) . . . provides that good faith transfers of property will not be affected by the

reversal or modification on appeal of an unstayed order, whether or not the transferee knew of

the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990)

("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale

on appeal unless there is a stay pending appeal").

41.    Although the Bankruptcy Code does not define "good faith," one court has held

that:

> the good faith of a purchaser is shown by the integrity of his
> conduct during the course of the sale proceedings; where there is a
> lack of such integrity, a good faith finding may not be made. A
> purchaser's good faith is lost by 'fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

126 F.3d at 390 (quoting *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th

Cir. 1978)); *see also In re Andy Frain Services, Inc.,* 798 F.2d 1113, 1125 (7th Cir. 1986).

42.     Here, the selection of the Successful Bidder will be the result of a marketing process and extended arm's-length, good-faith negotiations.  The Debtors will be advised by its legal and financial advisors throughout the process.  The Successful Bidder will be selected by the Debtors after the Debtors' review of indications of interest by all potential purchasers, negotiations, and the Debtors' determination that the offer of the Successful Bidder is the most favorable offer submitted for the Offered Assets.  Accordingly, the Debtors request that the Court make a finding that the Successful Bidder is entitled to the protections of section 363(m) of the Bankruptcy Code.

### XII.  The Court Should Waive or Reduce the Periods Required By Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure

43.     Pursuant to Rule 6004(h) (formerly Rule 6004(g)) of the Bankruptcy Rules), all orders authorizing the sale of property pursuant to Section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order, unless the court orders otherwise.  Fed. R. Bankr. P. 6004(h).  Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before the order is implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).

44.     Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately if there is a showing of a sufficient need to close the sale within the 14-day period.  10 Collier on Bankruptcy § 6004.10 (15th ed. 2007).

45.     In light of the Debtors' severe liquidity restraints, the strict deadline for exercise of the Purchase Option and to limit the costs of administering the Debtors' estates, it is critical that the Debtors close the sale of the Offered Assets as soon as possible and before the Purchase Option expires.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

### XIII. Assumption And Assignment of Executory Contracts and Unexpired Leases

46.     The assumption and assignment of the Debtors' executory contracts and unexpired leases is an integral part of the proposed sale and should be approved by the Court. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a).  By enacting section 365(a) of the Bankruptcy Code, Congress intended to allow a debtor to assume those leases/contracts that benefit the estate, and to reject those that are of no value or are burdensome to the estate.  *See Cinicloa v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *Leland v. Gardinier, Inc. (In re Gardinier, Inc.)*, 831 F.2d 974, 976 n.2 (11th Cir. 1987); *In re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983); *Chira v. Saal (In re Chira)*, 367 B.R. 888, 898 (S.D. Fla. 2007); *In re Sandman Assocs.*, LLC, 251 B.R. 473, 481 (W.D. Va. 2000) (noting that "[t]he authority granted by section 365 allows the trustee or debtor in possession to pick and choose among contracts, assuming those that are favorable and rejecting those that are not").

47.     It is well established that decisions to assume or reject executory contracts or unexpired leases are matters within the "business judgment" of the debtor.  *See Gardinier, Inc.*, 831 F.2d at 976 n.2; *Chira*, 367 B.R. at 898; *In re G. Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) (noting that "[i]n determining whether a debtor may be permitted to

reject an executory contract, courts usually apply the business judgment test. Generally, absent a showing of bad faith, or an abuse of discretion, the debtor's business judgment will not be altered") (citations omitted); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Sharon Steel Corp. v. National Fuel Gas Dist Corp.*, 872 F.2d 36, 40 (3d Cir. 1989). Accordingly, courts approve the assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject was "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *In re Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986).

48.    Adequate business justification exists to merit judicial approval of the proposed assumption and assignment of the Debtors' executory contracts and unexpired leases. The Debtors' contracts and leases are valuable assets of the Debtors' estates and represent an integral part of any proposed transaction for the sale of the Offered Assets. To the extent that the Debtors can sell them as part of the sale, the sales will generate cash which the estates can use to satisfy claims and reduce potential claims against the estates.

49.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign an executory contract if the Debtor:

> (A)    cures, or provides adequate assurance that [it] will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an expired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in

accordance with the provisions of this paragraph;

(B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)     provides adequate assurance of future performance under such contract or lease. . . .

(f)(2)   The trustee may assign an executory contract or unexpired lease of the debtor only if —

(A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

*See* 11 U.S.C. §§ 365(a), (b)(1), (f)(2).  Accordingly, section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments of executory contracts and unexpired leases, provided that the defaults under such contracts are cured and adequate assurance of future performance is provided.

50.     It is well settled that the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but that a contract counterparty is not required to receive an absolute guarantee of future performance.  *See, e.g., In re Glycogensys, Inc.*, 352 B.R. 568, 578 (Bankr. D. Mass. 2006) ("[I]t is appropriate to evaluate the financial condition of the assignee and the likelihood that the non-debtor party will receive the benefit of its bargain from the assignee"); *Carlisle Homes, Inc. v. Arrari (In re Carlisle  Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1989) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Natco  Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (same).  As set forth above, any bid that is conditioned upon the assumption and assignment of executory contracts and unexpired leases must (a) be submitted

with Adequate Assurance Packages containing the identity of such contracts and leases and (b) provide evidence of such bidder's ability to provide adequate assurance of future performance. The Debtors will provide all parties to executory contracts and unexpired leases to be assumed and assigned pursuant to the Motion with such Adequate Assurance Packages and an opportunity to be heard, and in connection with the Sale Hearing, the Debtors will provide evidence that all requirements for the assumption and assignment of the executory contracts and unexpired leases proposed to be assigned to the purchaser(s) of the assets will be satisfied.  Thus, the Debtors respectfully submit that, by the conclusion of the Sale Hearing, assumption and assignment of the executory contracts and unexpired leases should be approved.

### XIV.  Procedures Regarding Cure Amounts

51.    To facilitate the sale and the assumption and assignment of the Debtors' executory contracts and unexpired leases, the Debtors propose to serve a notice of assumption and assignment and of the proposed cure amounts relating to such assumed agreements ("Assumed Agreements") no later than five (5) days after the entry of an Order approving this Motion and request that the Court approve the following procedure for fixing any cure amounts owed on all Assumed Agreements.

52.    The Debtors will attach to the Assumption Notice their calculation of the undisputed cure amounts that the Debtors believe must be paid to cure all prepetition defaults under all Assumed Agreements (the "Prepetition Cure Amount").  The Debtors request that if a non-debtor party to any Assumed Agreements disputes the Prepetition Cure Amount or objects to the assumption and/or assignment of an Assumed Agreements that such party be required to file an objection (the "Cure Amount Objection") on or before 4:00 p.m. (prevailing Eastern Time) three (3) days prior to the Sale Hearing (the "Cure Objection Deadline") and serve a copy of the

Cure Amount Objection so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon (i) the Debtors, Gulfstream International Group, Inc., 3201 Griffin Road, 4th Floor, Fort Lauderdale, FL  33312 (Attn: Dave Hackett); (ii) attorneys for the Debtors, Berger Singerman P.A., 350 East Las Olas Blvd., Suite 1000, Fort Lauderdale, Florida 33301 (Attn: Brian K. Gart); (iii) counsel for Shelter Island, Greenberg Traurig, P.A., 1221 Brickell Ave, Miami, Florida 33131 (Attn: Paul J. Keenan); (v) counsel for Taglich, Bast Amron LLP, 1 SE 3rd Ave, Suite 1440, Miami, Florida 33131 (Attn: Jeffrey Bast); (vi) counsel for SVSP, Bilzin Sumberg Baena Price & Axelrod, LLP, 1450 Brickell Ave, Suite 2300, Miami, Florida 33131 (Attn: Scott Baena); and (vii) counsel for the Committee of Creditors Holding Unsecured Claims (the "Committee"), if appointed in these cases.

53.    In the event any such party fails to timely file and serve a Cure Amount Objection by the Cure Objection Deadline, such party shall (i) be forever barred from objecting to the Prepetition Cure Amount and from asserting any additional cure or other amounts with respect to such Assumed Contracts and Assumed Leases and the Debtors shall be entitled to rely solely upon the Prepetition Cure Amount; and (ii) be deemed to have consented to the assumption and assignment of such Assumed Agreements and shall be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder or any other assignee of the relevant Assumed Agreements that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied under such Assumed Agreements.

54.    In the event that a Cure Amount Objection is timely filed, the Cure Amount Objection must set forth (i) the basis for the objection, and (ii) the amount the party asserts as the Prepetition Cure Amount.  After receipt of the Cure Amount Objection, the Debtors will attempt to reconcile any differences in the Prepetition Cure Amount believed by the non-debtor party to

exist.   In the event, however, that the Debtors and the non-debtor party are unable to consensually resolve the Cure Amount Objection, the Debtors will segregate any disputed Prepetition Cure Amount pending the resolution of any such disputes by this Court or mutual agreement of the parties.

55.     Based on the foregoing, the Debtors respectfully request that the Bankruptcy Court approve the assumption and assignment of the Assumed Agreements.

### XV.   Alternative Relief Regarding Assumption and Assignment of the Lease Agreements

56.     In the event that the Court is not inclined to grant the relief requested above, the Debtors seek the authority of this Court to assume the Lease Agreements[5] so that the Lease Agreements can be assigned to an entity ready, willing and able to exercise the Purchase Option.

57.     The authority for the requested assumption and assignment is detailed above.  It is the Debtors' business judgment that the value of the Lease Agreements should not be lost, especially considering the value attached to the Purchase Option.  As the Debtors continue the process of establishing potential purchasers, it is possible that the Debtors will encounter parties who would consider an assignment of the rights under the Lease Agreements, in the absence of a bankruptcy sale.  The Debtors do not want the estates to lose the potential value associated with such an assumption and assignment.

58.     Of course, the Debtors understand that in order to complete such an assumption and assignment the adequate assurance provisions of Section 365 will have to be met.  Thus, any potential assignee of the Lease Agreements will have to provide assurances of its ability to perform under the Lease Agreements.

---

[5] For the purposes of the alternative relief sought herein, the definition of the Lease Agreements should be expanded to included the RACC Forbearance Agreement (defined above herein) and that certain Letter Agreement Regarding Possible Purchaser of Aircraft dated May 14, 2010 (the "Side Letter Agreement").

## XVI.   <u>NOTICE</u>

59.     On an expedited basis, notice of this Motion has been given to (a) respective counsel for the Junior Lenders, (b) counsel for the Department of Transportation, (c) the Office of the United States Trustee, (d) all other parties known to be asserting a lien in the Debtors' assets, (e) the 20 largest unsecured creditors of the Debtors, (f) all counterparties to executory contracts and leases that may be assumed and assigned, (g) all state attorney generals in states where the Debtors conduct business, (h) various federal and state tax and environmental authorities, including the Internal Revenue Service and the Environmental Protection Agency, and (i) the Federal Aviation Administration and Department of Transportation.  Based on the exigent circumstances described above, the Debtors respectfully submit that such notice is sufficient and request that this Court find that no further notice of the relief requested herein is required.  When the Debtors are advised that a Committee has been appointed and that the Committee has selected counsel, the Debtors will immediately serve the Sale Motion and related documents on counsel to the Committee.

60.     In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## XVII.  <u>NO PRIOR REQUEST</u>

61.     No previous motion for the relief sought herein has been made to this or to any other court.

## XVIII. <u>CONCLUSION</u>

For all the foregoing reasons, the Debtors respectfully request the Court grant the relief requested in this Motion in all respects, and grant such other and further relief as is just and proper.

Dated:   November 19, 2010                    Respectfully submitted,

                                              BERGER SINGERMAN, P.A.
                                              *Counsel for Debtors*
                                              350 E. Las Olas Boulevard, Suite 1000
                                              Fort Lauderdale, FL 33301
                                              Tel. (954) 525-9900
                                              Fax (954) 523-2872


                                              By:  */s/   Brian K. Gart*
                                                    Brian K. Gart
                                                    Florida Bar No.  381152
                                                    bgart@bergersingerman.com
                                                    Douglas A. Bates
                                                    Florida Bar No. 791431
                                                    dbates@bergersingerman.com

**EXHIBIT A**

**To Bidding Procedures Order**

**BIDDING PROCEDURES**

By motion dated November 19, 2010 (the "Sale Motion"),[1] Gulfstream International Group, Inc., Gulfstream International Airlines, Inc., Gulfstream Training Academy, Inc., GIA Holdings Corp., Inc., and Gulfstream Connection, Inc. (collectively, the "Debtors"), as debtors and debtors in possession, sought, among other things, approval of the procedures by which the Debtors will seek proposals for a transaction or transactions that alone or in combination will allow the Debtors to maximize the value of their estates. On November __, 2010, the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") entered its order (the "Bidding Procedures Order"), which, among other things, authorized and directed the Debtors to market their assets to persons that may be interested in acquiring a portion of or substantially all of their assets including, without limitation, the Raytheon Aircraft (pursuant to the Purchase Option), the equity security interests of GIA, all rights associated with the Debtors' operations and the operations of the airline, all assets and rights necessary to operate the airline now and in the future, that certain Services Agreement (the "Services Agreement") with Gulfstream Air Charter, Inc. ("GAC"), which Agreement was subsequently amended on March 14, 2006 through the First Amendment to Services Agreement (the "Services Agreement Amendment") and any assets related thereto, that certain agreement with CSC Applied Technologies, LLC (the "CSC Agreement" or the "Autec Agreement") and any assets related thereto, spare parts and equipment, the operating assets the Debtors use in connection therewith, with each of such assets being offered in tandem with others or separately (the "Offered Assets"), pursuant these Bidding Procedures (the "Bidding Procedures").

**Important Dates**

The Debtors shall, with the consent of Raytheon Aircraft Credit Corporation ("RACC") if required in connection with a transaction involving the Raytheon Aircraft and after consultation with the Junior Lenders, and the Committee of Creditors Holding Unsecured Claims appointed in these cases (the "Committee"):

- Assist prospective Potential Bidders (as defined herein) qualifying as Qualified Bidders (as defined herein) until 12:00 noon (Prevailing Eastern Time) on November __, 2010;

- Assist Qualified Bidders in submitting their Qualified Bid (as defined herein) and conducting their respective due diligence investigations until 12:00 noon (Prevailing Eastern Time) on December 1, 2010;

- Negotiate first with Potential Bidders and then with Qualified Bidders in preparation for an auction (the "Auction") to be held on December 5, 2010, commencing at 10:00 a.m.; and

---

[1] Capitalized terms not otherwise defined here shall have the same definition ascribed to them in the Sale Motion.

- Select the Successful Bidder(s) (as defined herein), with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft and after consultation with the Junior Lenders and the Committee, at the conclusion of the Auction and seek authority to sell Offered Assets to such Successful Bidder(s) at a hearing (the "<u>Sale Hearing</u>") to be held by the Bankruptcy Court on December 5, 2010, at __ p.m.

- Close and consummate the transaction with the Successful Bidder by the close of business on December __, 2010.

### **Participation Requirements**

<u>Qualified Bidder Materials; Qualification as Potential Bidder and Qualified Bidder</u>.  Any prospective party wishing to bid on some or all of the Offered Assets must deliver (unless previously delivered) to the Debtors (at Gulfstream International (Attn: David Hackett; and to attorneys for the Debtors, Berger Singerman P.A., 350 East Las Olas Boulevard, 10th Floor, Fort Lauderdale, Florida 33301 (Attn: Brian K. Gart, Esq.),  by 12:00 noon (prevailing Eastern Time) on November ___, 2010: (a) an executed confidentiality agreement in form and substance satisfactory to the Debtors and (b) a statement demonstrating to the Debtors' satisfaction a *bona fide* interest in purchasing some or all of the Offered Assets and describing the Potential Bidder's proposed transaction, and (c) a statement demonstrating the Potential Bidder's ability to close a transaction within the significantly shortened time period required by virtue of the Purchase Option (collectively, the "<u>Qualified Bidder Materials</u>").  "Potential Bidder" shall mean a party expressing an interest in the Offered Assets.  "Qualified Bidder" means a Potential Bidder that submits the Qualified Bidder Materials as provided herein.

<u>Binding Agreement, Deposit and Adequate Assurance Package</u>. Any Qualified Bidder that desires to participate at the Auction must deliver (unless previously delivered) to the Debtors by 12 noon (prevailing Eastern Time) on December 1, 2010 the documents, funds and materials described below in "Bid Requirements."  A party that has delivered such a Statement of Interest, confidentiality agreement, and such funds and materials that are acceptable to the Debtors with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft and after consultation with the Junior Lenders and the Committee, shall be known as a Qualified Bidder as defined under the conditions above.

## Due Diligence

The Debtors will afford any Qualified Bidder such due diligence access or additional information as may be reasonably requested by such Qualified Bidder that the Debtors, in their business judgment, determines to be reasonable and appropriate. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. Unless otherwise determined by the Debtors, in their reasonable discretion with the consent of RACC if required in connection with a transaction relating to Offered Assets subject to the Lease Agreements and after consultation with the Committee if and when such Committee is appointed, the availability of additional due diligence to a Qualified Bidder will cease on the Bid Deadline (as such term is defined below). Interested investors requesting information about the qualification process, and Qualified Bidders requesting information in connection with their due diligence, should contact Stuart A. Klaskin by email at saklaskin@Jetstreamavcap.com.

## Bid Requirements

Delivery of Bids. **No later than 12:00 noon (Prevailing Eastern Time) on** December 1, 2010 ("Bid Deadline"), each Qualified Bidder interested in maintaining its participation in the bidding process must deliver copies of the Bid (as defined herein) and supporting materials described herein to: (i) Gulfstream International (Attn: David Hackett; (ii) attorneys for the Debtors, Berger Singerman P.A., 350 East Las Olas Boulevard, 10th Floor, Fort Lauderdale, Florida 33301 (Attn: Brian K. Gart, Esq.); (iii) financial advisors for the Debtors, JetStream Aviation Management, LLC, 2601 South Bayshore Drive, Suite 630, Miami, Florida 33133 (Attn: Stuart A. Klaskin); (iv) counsel for Shelter Island, Mr. Paul J. Keenan, Jr. Greenberg Traurig, P.A., 1221 Brickell Ave, Miami, Florida 33131; (v) counsel for Taglich, Mr. Jeffrey Bast, Bast Amron LLP, 1 SE 3rd Ave, Suite 1440, Miami, Florida 33131; (vi) counsel for SVSP, Mr. Scott Baena, Bilzin Sumberg Baena Price & Axelrod, LLP, 1450 Brickell Ave, Suite 2300, Miami, Florida 33131; and (vii) counsel for the Committee, if appointed in these cases.

Form and Content of Bid. A "Bid" is a signed agreement from a Qualified Bidder stating that:

    a.    The Qualified Bidder offers to purchase all or any portion of the Offered Assets; and

    b.    The Qualified Bidder's offer is irrevocable until two business days after the earlier of: (i) the closing of the sale of the applicable Offered Assets (including the Raytheon Aircraft pursuant to the Purchase Option by December 6, 2010), whether or not to such Qualified Bidder; or (ii) 30 days after the Sale Hearing provided the Purchase Option has been otherwise timely performed.

<u>Required Supporting Materials</u>.  A Qualified Bidder shall accompany (or precede) its Bid with:

a.   An executed asset purchase agreement, in a form to be delivered to and reviewed by the Debtors prior to the Bid Deadline, detailing all of the terms and conditions of the proposed transaction;[2]

b.   Written evidence of available cash, a commitment for financing or ability to obtain a satisfactory commitment if selected as the Successful Bidder (as defined below), and such other evidence of ability to consummate the transaction as the Debtors may reasonably request (including the ability to close the Purchase Option with RACC no later than December 6, 2010, before the Termination Date, unless such date is extended);

c.   A copy of a board resolution or similar document demonstrating the authority of the Qualified Bidder to make a binding and irrevocable Bid on the terms proposed;

d.   Any pertinent factual information regarding the Qualified Bidder's operations that would assist the Debtors in their analysis of any regulatory or other issues that may effect or delay consummation of a transaction with the Qualified Bidder; and

e.   To the extent that the Qualified Bidder proposes to include in its Bid the assumption and assignment of executory contracts or unexpired leases, a schedule showing such contracts and/or leases to be assumed and assigned together with evidence of the Qualified Bidder's ability to provide adequate assurance of future performance of such contracts and/or leases, such as audited financial statements of the Qualified Bidder, information regarding the capitalization of the Qualified Bidder, information allowing the Debtors to evaluate the value of any guaranties being provided by affiliates of a Qualified Bidder of its obligations under any assumed and assigned executory contracts or leases, and the Qualified Bidder's intentions with respect to the assumption of the collective bargaining agreement between the Debtors and the Air Line Pilots Association, International ("ALPA") (an "<u>Adequate Assurance Package</u>") provided, however, Debtors shall make a good faith effort to cause the Successful Bidder (as defined below) to assume the obligations of the Debtors under the current collective bargaining agreement with ALPA in connection with the sale of the Offered Assets and otherwise comply with the requirements of Section 1113 of the Bankruptcy Code.

<u>Required Good Faith Deposit</u>.  By the Bid Deadline, a Qualified Bidder must provide a good faith deposit (the "<u>Good Faith Deposit</u>") equal to 10% of such Qualified Bidder's proposed purchase price in the form of a wire transfer or cashier's check payable to the trust account for the attorneys for the Debtors and provide evidence of an immediate ability to fund the closing of the Purchase Option before the Termination Date, unless such date is extended.

---

[2]   All asset purchase agreements that provide for the purchase of the Debtors' books and records must contain provisions allowing the Debtors reasonable access to these books records for purpose of administering their bankruptcy cases.

Qualified Bid.  A Bid received from a Potential Bidder that meets the requirements above (as determined by the Debtors with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee) is considered a "Qualified Bid."  The Debtors reserve the right, in their discretion with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee, to waive noncompliance with any one or more of these requirements and deem an otherwise not qualified bid to be a Qualified Bid.  The Debtors will advise all Qualified Bidders of any such waiver and the basis for which it was granted at the Auction.

### Stalking Horse Bidder, Break Up Fee and Expense Reimbursement

Prior to or after the submission of bids, the Debtors, with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee, may enter into an agreement ("Stalking Horse Bid"), subject to higher and better offers at the Auction (as defined below), providing for a breakup fee up to 3% of the proposed purchase price (the "Breakup Fee") and/or reimbursement of documented out-of-pocket expenses incurred in connection with the negotiation of the Stalking Horse Bid up to $150,000 (the "Expense Reimbursement").  The Debtors' agreement to the Stalking Horse Bid will be contingent on the Stalking Horse providing, as part of the agreement, sufficient financing to allow the Debtors to continue operations pending a closing on the sale of the offered Assets or a closing of the Purchase Option on a timely basis.

### Conduct and Termination of Bidding Process

The Debtors will, in their reasonable discretion, with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee, if an when a Committee is appointed (a) determine whether any Potential Bidder satisfies the requirements specified above to become a Qualified Bidder; (b) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Offered Assets; (c) determine whether to remove any of the Offered Assets from the sale process under these Bidding Procedures; (d) evaluate bids from Qualified Bidders and determine whether any such bid is a Qualified Bid; (e) negotiate any bid made to purchase some or all of the Offered Assets, and negotiate any related transaction issues; and (f) make such other determinations as are provided in these Bidding Procedures.

### Auction Participation – Qualified Participants and Baseline Bid

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction.  Unless there is a Stalking Horse Bid, at least one business day prior to the Auction, the Debtors will select, with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft and after consultation with the Junior Lenders and the Committee, the best bid ("Baseline Bid") to serve as the starting point for the Auction.  Unless there is a Stalking Horse Bid, the Baseline Bid will be the qualified bid which proposes the highest and best economic consideration to the Debtors in the Debtors' sole business judgment.  At least one business day prior to the Auction, the Debtors will provide all Qualified Bidders with a copy of the Stalking Horse Bid or the Baseline Bid, as is applicable.

## The Auction

Time and Place.  If more than one Qualified Bid is received by the Bid Deadline, the Debtors will conduct the Auction.  The Auction shall take place at 10:00 a.m. (Prevailing Eastern Time) on December 5, 2010, at Berger Singerman, 350 East Las Olas Blvd., Suite 1000, Fort Lauderdale, Florida 33301.  Only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Auction.

Competitive Bidding.  The minimum bidding increment at the auction shall be $10,000 or such other amount as the Debtors determine is appropriate, plus the amount of any Breakup Fee and/or Expense Reimbursement if the Debtors have entered into a Stalking Horse Bid, provided, however, that the Debtors reserve the right to change the bidding increments at the Auction.  The Debtors also retain discretion, with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee, with respect to how to conduct the Auction if bids are received on differing packages of Offered Assets.

Evaluation of Qualified Bids.  For the purpose of determining the Baseline Bid and whether a Qualified Bid submitted at the Auction is higher or otherwise better, the Qualified Bid will be valued based upon factors such as: (a) the purported amount of the Qualified Bid; (b) the fair value to be provided to the Debtors under the Qualified Bid; (c) the ability to consummate any proposed sale transaction; and (d) any other factors that the Debtors, with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee, may deem relevant.  Upon the submission of any bid at the Auction, the Debtors, with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Committee, shall announce to all participants whether the bid submitted is higher or otherwise better than the previously submitted bid.

Adoption of Auction Rules.  The Debtors may adopt rules for the bidding process at the Auction that, in their discretion with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee, will best promote the goals of the bidding process and are not inconsistent with any of the provisions of the Bidding Procedures described herein.  Nothing herein will prevent the Debtors, with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee, from having separate negotiations with bidders during the Auction provided that the announcement of any bids actually made will be made in one room, on an open basis.

## Acceptance of Qualified Bids

The Debtors presently intend to consummate the sale with the successful bidder who the Debtors determine to have made the highest and best offer (the "Successful Bidder") for all or a part of the Debtors' assets.  However, the Debtors' presentation to the Bankruptcy Court for approval of the bid made by the Successful Bidder does not constitute the Debtors' acceptance of the bid.  The Debtors will be deemed to have accepted such Bid only when such bid has been approved by order of the Bankruptcy Court.

## Return of Good Faith Deposit

The Good Faith Deposit of a Qualified Bidder shall be returned within three business days of the earlier of (a) the closing of a sale transaction on all or a portion of the Offered Assets on which the Qualified Bidder made a bid or (b) 30 days after the Sale Hearing.

## Reservation of Rights and Modifications

The Debtors, with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee: (i) may determine which qualified bid, if any, is the highest or otherwise best offer; (ii) may reject at any time, any bid that the Debtors determine in their sole discretion to be: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the sale transaction; or (c) contrary to the best interests of the Debtors, their estates and creditors; (iii) may modify these Bidding Procedures to allow the Debtors to maximize the value of their assets; and (iv) may adjourn the Auction or the Sale Hearing or remove any assets from the sale if the Debtors determine.

## The Sale Hearing

The Sale Hearing is scheduled to be conducted following the Auction on December 5, 2010, at 10:00 a.m. (Prevailing Eastern Time) at Berger Singerman, P.A., 350 East Las Olas Blvd., Suite 1000, Fort Lauderdale, Florida 33301.  If any Successful Bidder is selected by the Debtors, with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee, the Debtors will seek the entry of an order from the Bankruptcy Court at the Sale Hearing approving and authorizing the proposed sale to the Successful Bidder(s) on the terms and conditions of the Successful Bid.

## Miscellaneous

**Only the Junior Lenders (only to the extent of their secured claims and only to the extent the Junior Lenders bid to purchase their collateral) and Victory Park (only to the extent of the DIP Loan Indebtedness) may exercise their right to credit bid their indebtedness under Section 365(k) of the Bankruptcy Code, provided that in the event of a credit bid by the Junior Lenders, Victory Park may, in its discretion, elect to have its indebtedness paid in full as a condition to the making of a credit bid by the Junior Lenders. Notwithstanding anything contained to the contrary in the Bidding Procedures, the Junior Lenders and Victory Park shall be deemed Qualified Bidders and neither the Junior Lenders nor Victory Park shall be required to provide a deposit or an Adequate Assurance Package if the Junior Lenders or Victory Park submits a credit bid.**

The Debtors, with the consent of RACC if required in connection with a transaction involving the Raytheon Aircraft, and after consultation with the Junior Lenders and the Committee, reserves the right to make changes in these Bidding Procedures to promote the realization of the highest and best offers for the Offered Assets.