UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                          Chapter 11 Cases

GULFSTREAM INTERNATIONAL                        Case No. 10-44131-BKC-JKO
GROUP, INC., *et al.*,[1]                       Jointly Administered

                    Debtors.
_____/

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
(A) SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105,
361, 362, 364(c)(1), (c)(2),(c)(3), AND (d); (B) GRANTING SECURITY INTERESTS,
SUPERPRIORITY LIENS AND CLAIMS AND ADEQUATE PROTECTION; AND
(C) USE OF CASH COLLATERAL AND (II) SCHEDULING A FINAL HEARING
PURSUANT TO BANKRUPTCY RULE 4001(C)**

**(EMERGENCY HEARING REQUESTED ON DECEMBER 17, 2010 AT 2:00 P.M.)**

**Statement of Exigent Circumstances**

The Debtors submit that a hearing on this Motion is necessary on an emergency basis.  The Debtors are engaged in a extremely compressed sale process as has been presented to the Court in conjunction with the Bid Procedures Motion [D.E. # 98].  In the absence of the financing sought herein, the Debtors will not have sufficient liquidity to continue operations during the sale process.  The Debtors can not operate during the sale process with use of cash collateral alone.  Therefore, it is critical that the Debtors obtain immediate approval to obtain post-petition financing for $1,700,000 million under the DIP Facility on an interim basis pending a final hearing.  Without approval of the post-petition financing, the Debtors will be severely limited in their ability to continue operations throughout the sale process and thus the value of the Debtors' assets will decline and creditors and parties in interest will be severely prejudiced.  In contrast, approval of the post-petition financing on an interim basis will preserve the value of the Debtors' assets and enable the Debtors to continue their operations and allow for an orderly sale process.

_____

[1] The address of each of the Debtors is 3201 Griffin Road, 4th Floor, Fort Lauderdale, FL 33312; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis:  (i) Gulfstream International Group, Inc. (3956); (ii) Gulfstream International Airlines, Inc. (1720); (iii) Gulfstream Training Academy, Inc. (5843); (iv) GIA Holdings Corp., Inc. (9548); and (v) Gulfstream Connection, Inc. (1208).

Gulfstream International Group, Inc. ("GIG"), Gulfstream International Airlines, Inc. ("GIA"), Gulfstream Training Academy, Inc. ("GTA"), GIA Holdings Corp., Inc. ("GIA Holdings") and Gulfstream Connection, Inc. ("GCI") (collectively, the "Debtors"), by and through undersigned counsel, pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), (2), (3) and 364(d), Fed. R. Bankr. P. 4001(d) and 9014, and Local Rule 4001-3, file this motion (the "Motion") seeking entry of an order (the "Interim Order") in the form attached as **Exhibit "A**:"[2] (I) authorizing the Debtors to obtain secured post-petition financing; (II) granting Shelter Island Opportunity Fund, LLC ("SIOF" or "Lender") a perfected first priority senior priming lien on all of the DIP Facility Collateral pursuant to 11 U.S.C. § 364(d)(1); (III) granting Lender a first priority pledge of the capital stock and/or equity interest held directly or indirectly by each of the Debtors;[3] (IV) authorizing the Debtors to use cash collateral; (V) granting adequate protection; and (VI) scheduling a final hearing to consider entry of a final order approving the post-petition financing under the DIP Financing Agreement.  In support of this motion (the "Motion"), the Debtors rely upon the record in these cases, and in part upon the *Declaration in Support of First Day Pleadings* (the "First Day Declaration"), and respectfully represent as follows:

<div align="center">

**STATEMENT OF RELIEF REQUESTED**
**PURSUANT TO BANKRUPTCY RULE 4001(d)(1)(B)**

</div>

1.      The Debtors seek the entry of the proposed *Interim Order (I) Authorizing (A) Secured Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(c)(1), (2), and (3) and 364(d); (B) Granting Security Interests, Superpriority Claims And Adequate Protection; and*

---

[2] Capitalized terms ascribed in this motion and not otherwise defined herein shall have the meaning's ascribed to them in the Interim Order.

[3] Such pledge shall not include a pledge of capital stock/equity interest held by shareholders/investors in Gulfstream International Group, Inc.

*(C) Use Of Cash Collateral and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)* (the "Interim Order") in the form attached hereto as Exhibit A, as well as a Final Order authorizing the Debtors to:

a. Refinance the principal obligation[4] created under the original interim post-petition financing which was memorialized in the *Interim Order (I) Authorizing (A) Secured Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364(c) and (d); (B) Granting Security Interests, Superpriority Liens and Claims and Adequate Protection; and (C) Use of Cash Collateral and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(C)* (the "Victory Park Interim DIP Order") (D.E. # 75). To accomplish the refinancing, the Debtors seek approval of post-petition financing from Lender pursuant to the terms of that certain Letter Agreement and the Approved Budget,[5] under the DIP Facility not to exceed approximately $1,700,000 to be provided in order to facilitate an orderly sale process;

b. Grant to Lender, in accordance with Bankruptcy Code § 364(c)(1), a lien with claims holding a priority over all administrative expenses of the kind specified in Bankruptcy Code § 503(b) or § 507(b). In addition, the security interests and liens in the Collateral securing the Loan shall be authorized and approved by the Court pursuant to Bankruptcy Code § 364(c)(2), (3), and 364(d) to constitute a lien on and in the Collateral ranking prior to all other claims and liens of the Debtors, except for the Carve-Out as defined below (the "***Priming Lien***"). The Priming Lien will be senior in priority to all security interests and liens securing the indebtedness and other obligations owing under any of the Debtors' prepetition loan and security agreements. The Priming Lien shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the Agent or the Lender upon entry of the Interim Order.

2.     In addition, the Debtors request that the Court schedule an interim hearing and a final hearing to consider this Motion.

---

[4] Any and all objections to obligations relating to interest, fees and expenses arising from the Victory Park DIP Loan and/or Victory Park Interim Order shall be fully reserved and prosecuted by the Committee and/or the Junior Lenders in their discretion.

[5] From and after the Final Hearing approving the financing sought herein, the Approved Budget shall be subject to modification and/or amendment with the approval of Lender and Agent.

## SUMMARY OF TERMS OF FINANCING

3.      Pursuant to Bankruptcy Rule 4001, Local Rule 4001-2, 4001-3 and the *Guidelines for Motions Seeking to Authority to Use Cash Collateral and Motions Seeking Approval of Postpetition Financing* (the "Guidelines") [CG-7], the Debtors highlight in bold as well as summarize, in bullet point form, the essential terms of the proposed use of cash collateral and post-petition financing as follows:[6]

| Material Terms of Proposed Financing | Location in Proposed Interim Order |
|---|---|
| • The lender shall be Shelter Island Opportunity Fund, LLC ("SIOF") (the "Lender") or its affiliated designees or affiliates. | Preamble |
| • The principal amount of the DIP Term Loan shall be $1,700,000 million ("DIP Term Loan Principal Amount").  On an interim basis, the Debtors are seeking the full amount of the DIP Term Loan Principal Amount in order to facilitate an orderly sale process. | Paragraph K Paragraph 2 |
| • Interest payable monthly in arrears at rate of 15% per annum (based on a 360 day year and for the actual number of days elapsed).  Debtors shall prepay one (1) interest payments under the Loan on the Initial Closing Date.  In the event of a default of Event of Default, the DIP Term Loan shall bear interest at 20% per annum on any outstanding advances.<br><br>• The DIP Term Loan Fee:  payment of 1.5% fee, payable in cash to the Lender on the Initial Closing Date.<br><br>• The DIP Term Loan includes a maintenance fee of | Paragraph 4 Paragraph 5 |

---

[6] For purposes of completeness, parties should refer to the terms and conditions contained within the executed Letter Agreement, a true and correct copy of which is attached hereto as **Exhibit "B."**  The terms and conditions of the Letter Agreement are substantially similar to the terms and conditions of the Letter Agreement with Victory Park Capital, LLC ("Victory Park") which was the basis for the Victory Park Interim DIP Order.

3294856-5

| | |
|---|---|
| $4,000 per month.<br><br>• The DIP Term Loan does not include a success fee. | |
| • The proceeds of the Loan nor the Carve-Out (as defined below) may not be utilized to prosecute any action against the Lender or the Agent, whatsoever. | Paragraph 19(c) |
| • The Loan Obligations shall become due and payable in full in cash upon the earlier of (the "Due Date"): (i) termination of the stay period specified in Bankruptcy Code § 1110, or the Debtors' failure to reach arrangements (including arrangements with the Aircraft Lessor) reasonably satisfactory to Agent, Lender and Debtors regarding the Debtors' assets that are subject to Section 1110); (ii) ninety (90) days after the commencement of the Bankruptcy Cases; (iii) the substantial consummation of a confirmed plan of reorganization; (iv) conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code; (v) appointment of a trustee for the Debtors; (vi) dismissal of any of the Bankruptcy Cases; (vii) thirty (30) days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such thirty (30) day period; (viii) the date on which the Court enters a final order approving a post-petition financing between the Debtors and another lender(s) or investor(s) (as the case may be) (other than Lender); (ix) repayment in full in cash of the Loan Obligations; (x) three (3) business days after the Agent or the Lender notifies the Debtors in writing of an Event of Default which is not subsequently cured or waived by the end of such notice period; and (xi) January 6, 2011. | Paragraph 6 |
| • Debtors shall continue for cooperate with Lender regarding a Lender Sponsored Transaction, including, without limitation, using their best efforts to meet or cause others to meet the following milestones:   (a) obtaining a binding commitment letter from a buyer of the Debtors' option to purchase the Raytheon Aircraft before 12/21/10; (b) obtaining agreement of Raytheon to proposed purchase price no later than 12/23/10; (c) obtaining a financing commitment letter of at least $4,000,000 before 12/23/10, which shall provide for payment in full of | N/A |

5

| | |
|---|---|
| the Loan Obligations, administrative fees and working capital; (d) obtaining agreement of the Junior Lenders before 12/24/10 to any conditions in clause (a) or (b) regarding any debt conversions; and (e) developing by 12/30/10 a standalone plan for (i) the Autec contract and (ii) the Cuba contract. | |
| • Events of Default are summarized as follows:<br><br>a) Debtors shall fail to pay any Loan Obligation as due;<br><br>b) Any report, certificate or other document delivered to the Agent or the Lender;<br><br>c) Debtors shall fail to perform or comply with any covenant or agreement;<br><br>d) The failure of Debtors to comply in all material respects with each and all of the terms and conditions of the Interim Order, the Final Order and the Letter Agreement;<br><br>e) Any of the Debtors is enjoined, restrained or in any way prevented by the order of any court or any governmental authority from conducting all or any material part of its business for more than three (3) consecutive days;<br><br>f) Any material damage to, or loss, theft or destruction of, any Collateral, as more fully explained in the Letter Agreement;<br><br>g) The entry of an order in the Bankruptcy Cases which stays, modifies (in any manner adverse to the Agent or the Lender), or reverses the Interim Order or Final Order or which otherwise materially adversely affects, as determined by the Agent in its reasonable discretion, the effectiveness of the Interim Order or Final Order without the express written consent of the Agent;<br><br>h) The conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code; | Paragraph 22 |

i)  Removal of any of the senior management who must remain in the employ of the Debtors;

j)  The appointment of a trustee for the Debtors;

k)  The dismissal of any of the Bankruptcy Cases without Agent or Lender consent;

l)  Relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 with effects as defined in the Letter Agreement;

m) Subject to conditions in the Letter Agreement, the filing of any application by Debtors without the express written consent of the Agent for the approval of a super-priority claim in the Bankruptcy Cases which is pari passu with or senior to the priority of the claims of the Agent or the Lender if proceeds are not to be used to pay the Loan;

n)  The payment or other discharge by Debtors of any prepetition indebtedness without the written consent of the Agent or Lender;

o)  Subject to the terms of the Letter Agreement, the filing of any motion by Debtors seeking, or the entry of any order in the Bankruptcy Cases: (a) permitting working capital or other financing; (b) granting a lien on, or security interest in, any of the Collateral; (c) except as permitted by this Letter Agreement, the Interim Order or the Final Order, permitting the use of any of the Collateral pursuant to Bankruptcy Code § 363(c) without the prior written consent of the Agent, permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Bankruptcy Code § 506(c); or (d) dismissing the Bankruptcy Cases, unless the Agent has sought or consented in writing to such relief by the Court;

p)  The Debtors filing of a motion or other

| | |
|---|---|
| pleading seeking the entry of an order confirming a plan of reorganization that does not contemplate paying the Lender in full; or<br><br>q) A challenge to the validity, priority, perfection or enforceability of the DIP Facility. | |
| • As more fully described in the Letter Agreement, the Loan shall be secured by: (i) a perfected first priority lien on all assets, excluding recoveries pursuant to Chapter 5 of the Bankruptcy Code (and also expressly excluding any equipment or other assets as described in Bankruptcy Code § 1110); (ii) a first priority pledge of the capital stock and/or equity interest held directly or indirectly by each of the Debtors; and (iii) constructive control over the Debtors' bank accounts in similar form and substance of lockbox and/or control accounts customary for transactions of this nature exercisable upon an Event of Default and stay relief from the Court (collectively the "Collateral"). | Paragraph 7 |
| • The Debtor shall comply with all covenants contained in and more fully described in the Letter Agreement. | Paragraph 21 |
| • Not to be duplicative of the Carve-Out given by Victory Park under the prior DIP Loan, the fees and expenses incurred by the Debtors' retained professionals in the Bankruptcy Cases and the quarterly fees of the US Trustee under 28 U.S.C. § 1930 may be paid by the Debtors from the Collateral, subject to and in accordance with the Budget, including an agreed professional fees budget, and subject to entry of any required orders of the Court (the "***Carve-Out***"), which Carve-Out is subject to the Lender's review and approval in its sole discretion. The Lender's and Agent's liens on the Collateral and the Lender's and Agent's administrative expense claims provided for herein shall be subject and subordinate only to the Carve-Out. | Paragraph 17 |
| • The Debtors shall reimburse the Agent and the Lender for all costs incurred in connection with the Loan and/or, the Loan Obligations and/or any Lender | N/A |

| | |
|---|---|
| Sponsored Transaction. | |
| • Upon three (3) business days' written notice of an Event of Default which is not subsequently cured or waived during such notice period, the Agent and the Lender shall have the right to, among other things, without Court approval, commence an orderly wind down of the Debtors' business serviced by the Raytheon Aircraft, which shall include, without limitation, (a) selling any excess inventory; (b) taking all actions necessary to mitigate any offsets or damages from other carriers, including, without limitation, ceasing booking any customers for flights after 1/5/11, selling off tickets to other carriers by 1/2/11 and taking any actions necessary to return the aircraft to Raytheon; (c) closing a sale of the Debtors' assets by credit bid by 1/6/11; and (d) taking all actions to preserve the Autec and Cuba contracts and maximize the value of the Debtors' other assets. | N/A |

## I.    <u>Jurisdiction and Background</u>

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory bases for the relief requested herein are sections 105 and 507 of title 11 of the United States Code (the "Bankruptcy Code").

7.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11, title 11 of the Bankruptcy Code.

8.      The Debtors are operating their businesses and managing their affairs as debtors in possession.  11 U.S.C. §§ 1107(a) and 1108.

9.      For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the First Day Declaration.

## II.    Requested Relief and Basis Therefor[7]

### *Approval of Financing Under Section 364(c) and (d) of the Bankruptcy Code*

10.    The Debtors seek approval of secured, post-petition loan from the Lender pursuant to the terms of the Letter Agreement, in an amount sufficient to fund a refinancing of the principal amount of the Victory Park DIP Loan and to provide limited working capital to allow the Debtors to continue business operations and to facilitate an orderly sale of their assets. A refinancing is necessary because Victory Park is not willing to waive the existing defaults under the Victory Park DIP Loan.  The amount of the DIP financing being sought through this Motion is not to exceed $1,700,000.  The Debtors seek approval of the entire amount on an interim basis, which will be used in accordance with the Approved Budget.[8]

11.    Similar to the protections found in the Victory Park Interim Order, as security and adequate protection for the DIP Facility, the Debtors propose to grant the Lender the following: (1) as security for the DIP Indebtedness, security interests and liens (the "DIP Facility Liens") in all currently owned or hereafter acquired assets including, without limitation, accounts, accounts receivable, inventory, customer lists, intellectual property, minerals, mineral rights, plan and equipment patents, trade secrets, property and/or leasehold rights, all other tangible and intangible assets, and any causes of action under the Bankruptcy Code or applicable

---

[7] For the sake of brevity, the Debtors refer the Court and all interested parties to the *Debtors' Motion For Interim And Final Orders (I) Authorizing (A) Secured Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(c)(1), (c)(2),(c)(3), And (d); (B) Granting Security Interests, Superpriority Liens And Claims And Adequate Protection; And (C) Use Of Cash Collateral And (II) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001(C)* (the "Victory Park DIP Motion") [D.E. 8].  The Victory Park DIP Motion provides, among other things, detailed information regarding the Debtors' capital structure as well as a chart summarizing that structure.  To the extent necessary and applicable, the Victory Park DIP Motion is incorporated herein by reference.

[8] A true and correct copy of the Approved Budget is attached hereto as **Exhibit "E".**

nonbankruptcy law, expressly excluding: a) recoveries pursuant to Chapter 5 of the Bankruptcy Code "Avoidance Actions," and b) any aircraft or equipment or other assets as described in Bankruptcy Code §1110; (2) a first priority pledge of the capital stock and/or equity interest held directly or indirectly by each of the Debtors (excluding a pledge of the capital stock/equity interest held by shareholders/investors in GIG); and (3) constructive control over the Debtors' bank accounts in similar form and substance of a lockbox and/or control accounts customary for transactions of this nature exercisable upon an event of default (all of the foregoing, the "DIP Facility Collateral.").  The Debtors propose to grant:

(a)      pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority senior priming lien (the "Priming Liens") on all of the DIP Facility Collateral, which shall be senior to all other security interests and liens in property of the Debtors' estates in this or any subsequent or superseding cases (including, without limitation, any conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto); and

(b)      except to the extent otherwise expressly set forth in the Interim Order, or in a written instrument, agreement or other document executed by Lender and subject to the Order, the DIP Facility Liens shall not be subject to subordination to any other liens, security interests or claims under Section 510 of the Bankruptcy Code, or otherwise.  Any security interest or lien upon the DIP Facility Collateral which is avoided or otherwise preserved for the benefit of the Debtors' estates under Section 551 or any other provision of the Bankruptcy Code shall be subordinate to the DIP Facility Liens and the Adequate Protection Liens (as defined below).

**For the avoidance of doubt, the Debtors do not seek to include Avoidance Actions, or any the proceeds thereof, or any equipment or other assets as described in Bankruptcy Code §1110, as part of the DIP Facility Collateral.**

12.     Subject to the Carve-Out described herein, the Debtors propose that all of the DIP Indebtedness shall have the highest administrative priority under § 364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in the Chapter 11 Case or any successor case), and shall at all times be senior to the rights of the Debtors, any successor trustee or estate representative in the Chapter 11 Cases or any successor case (the "Superpriority Claims").  The Lender has not consented, through the Budget or otherwise, to the imposition of any costs or expense of administration or other charge, fees, liens, assessment or claim (including, without limitation, any amounts set forth in the Approved Budgets) against Lender, its claims or collateral (including the DIP Facility Collateral) under § 506(c) of the Bankruptcy Code or otherwise, all of which rights the Debtors shall waive pursuant to the terms of an interim order granting this Motion and approving the Interim Financing.

13.     Through this Motion, the Debtors propose that the DIP Facility Liens shall be deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of § 362 of the Bankruptcy Code, (i) Lender may, at its sole option, file or record or cause the Debtors to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or

record, at the Debtors' expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as Lender may require, and (ii) Lender may require the Debtors to deliver to Lender any chattel paper, instruments or securities evidencing or constituting any DIP Facility Collateral, and the Debtors are directed to cooperate and comply therewith.  If Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Facility Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in these Chapter 11 Cases as of the commencement of these Chapter 11 Cases but with the priorities as set forth herein.  Lender or Junior Lenders may (each in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtors have real or personal property.

14.     The super-priority administrative expense claims and the liens granted to the Lender pursuant to the Interim Order and the Loan Agreement shall be junior and subordinate to the Carve-Out, as defined in the Interim Order, to the fees due to the Clerk of the Court and fees due to the United States Trustee.

### *Approval of the Use of Junior Lenders' Cash Collateral*

15.     Through this Motion, the Debtors seek this Court's authorization to use the Junior Lenders' cash collateral within the meaning of Bankruptcy Code § 363(a) (the "Cash

3294856-5

Collateral"), pursuant to Bankruptcy Code § 363(c) and to provide adequate protection, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d).  The Junior Lenders have not consented to such use as of the date of the filing of this Motion.

16.    The Debtors require the use of cash collateral, in conjunction with the financing sought herein, as the use of the requested cash collateral will allow for the flow of supplies and services to the Debtors necessary to sustain the Debtors' business operations and enhance the Debtors' prospects for an orderly and successful sale of the Debtors' assets.  In addition, the Debtors seek, to the extent necessary, use of Cash Collateral to pay down the principal amount of the existing Victory Park DIP Loan in conjunction with the re-financing made possible through the DIP Facility subject of this Motion.

17.    As adequate protection of Junior Lenders' interests in the DIP Facility Collateral, including use of the Cash Collateral, pursuant to §§ 361, 363 and 552(b) of the Bankruptcy Code, the Debtors submit that the Junior Lenders be granted valid, binding, enforceable and perfected additional and replacement liens (the "Adequate Protection Liens") in all property of the Debtors' estates, including the DIP Facility Collateral, to the extent of any decrease in the value of Junior Lenders' interests in the DIP Facility Collateral occurring subsequent to the Petition Date, with such decrease in value to include decreases resulting from the Debtors' use (if any) of Cash Collateral, the depreciation, use, sale, loss, decline in market price of the DIP Facility Collateral, or otherwise.  The Debtors' further propose that the Adequate Protection Liens enjoy the same validity and extent as the liens the Junior Lenders held on the Petition Date, but subject and junior to the Lender's super priority Priming Liens and the Carve-Out.

18.    The Debtors' use of cash collateral will be subject to the Approved Budgets, and solely in compliance therewith and subject further to the terms and conditions of this Interim

Order and the DIP Loan Documents. The Debtors submit that by virtue of the replacement liens discussed above, the Junior Lenders will be adequately protected with respect to the Debtors' limited use of Cash Collateral. The Lender consents to the Debtors' requested use of such cash collateral.

19.     With respect to SVSP, the Debtors propose that the adequate protection provided to SVSP as part of the Victory Park Interim Order be left in place and submit that the adequate protection provided to SVSP in the Victory Park Interim Order is appropriate under the circumstances.

20.     With respect to Victory Park, the Debtors will use the proceeds of the DIP Facility to pay off the principal amount of the indebtedness arising from the Victory Park DIP Loan. Therefore, Victory Park will not be prejudiced by the relief sought herein.

### III.     Authority for Relief

#### *Approval of the Proposed Financing is Warranted Under the Circumstances*

21.     The Bankruptcy Code authorizes this Court to approve the DIP Facility as requested herein and in the manner proposed in the Interim Order for the specific purposes of refinancing the Victory Park DIP Loan and to provide the limited additional working capital necessary for the Debtors to complete an orderly sale process.

22.     Specifically, section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Court may authorize the debtor to obtain credit or incur debt (1) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (2) secured by a lien on property of the estate that is not otherwise subject to a lien, (3) secured by a junior lien on property of the estate that is subject to a lien, *see* 11 U.S.C. § 364(c), or (4) secured by a

senior or equal lien on property of the debtor's estate that is subject to a lien if the debtor is unable to obtain such credit otherwise and there is adequate protection of the interest of the lien holder whose lien is being primed.  *See* 11 U.S.C. § 364(d)(1).

23.     Because the Debtors propose to obtain financing under the DIP Facility with priority over all administrative expense and that is secured by first priority priming liens on property of the estate that is subject to the liens of the Junior Lenders, approval of the DIP Facility is governed by both sections 364(c) and 364(d) of the Bankruptcy Code.

24.     The Debtors submit that ample justification exists for approval of the DIP Facility.  The first requirement for approval of post-petition financing under both sections 364(c) and 364(d) is that the debtors in possession are unable to obtain such credit otherwise.  In the circumstances of this case, the Debtors are unable to obtain a working capital facility of the type and magnitude needed to refinance the principal amount of the Victory Park DIP Loan and finance their operations and the other administrative expenses of this case on an unsecured basis, or secured solely by junior liens on property of the estate.  Indeed, given the nature of the Debtors' borrowing needs, potential alternative sources of financing, obtainable on an expedited basis and on reasonable terms are not available.  *See Bray v. Shenandoah Federal  Say. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c)); *Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.)*, 300 B.R. 861, 863 (Bankr. W.D. Pa. 2003); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing"); *see also 495 Cent. Park*, *Ave Corp.*, 136 B.R., 630-31 (Bankr.

16

S.D.N.Y. 1992) (holding that debtor must make an effort to obtain credit without the requirement of a priming lien but is not required to seek credit from every possible lender); *In re Dunes Casino Hotel*, 69 B.R. 784, 796 (Bankr. D. N.J. 1986) (holding that the debtor had made required efforts under section 364(d)(1) based on evidence that the debtor had attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but that at least three such lenders were willing to advance funds secured by a superpriority lien); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that the fact that two national banks had refused to grant unsecured loans was sufficient to support conclusion that the requirement under section 364(d)(1) was met).

25.     The second statutory requirement for obtaining postpetition credit under section 364(d)(1) is that the secured creditors whose liens are being "primed" by the Lender must be provided with adequate protection of their interests in their collateral.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (*en banc*) (noting that adequate protection is required under section 364(d)(1)(B) of the Bankruptcy Code to insure that the creditor receives the value for which it bargained prebankruptcy); *Dunes Casino*, 69 B.R. at 793 (holding that "[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy").

26.     Under section 361 of the Bankruptcy Code, adequate protection may be provided by, among other things, requiring a debtor in possession to make a cash payment or payments or by providing a replacement lien to the extent that post-petition liens result in a decrease in the value of a pre-petition lender's interest in the property of the estate.  Any proposal for post-petition financing should "provide the pre-petition secured creditor with the

same level of protection it would have it there had not been post-petition superpriority financing."   *Id.*; *Swedeland*, 16 F.3d at 564.

27.     The Victory Park DIP Motion contains substantial discussion of adequate protection and decisional law regarding same.  For brevity, some of that discussion has been removed from this Motion.  However, to the extent necessary and applicable, that discussion is incorporated herein by reference.

28.     No other postpetition credit is available to the Debtors.  In addition, with respect to adequate protection, the Junior Lenders will be granted additional and replacement liens in all property of the Debtors' estates subject only to (i) the Lender's super priority priming liens, (ii) existing liens and unavoidable encumbrances that are valid, binding and enforceable and perfected liens existing in the DIP Facility Collateral on the Petition Date, and (iii) the Carve-Out.  The additional and replacement liens will ensure that the Junior Lenders will retain the full benefit of subordinated liens on all available collateral to the extent such liens and encumbrances are not subsequently subordinated or set aside.  *See In re Delaware & Hudson Ry, Co.*, 124 B.R., 169, 177-78 (D. Del. 1991) (priming lien under section 364(d) of the Bankruptcy Code may serve as adequate protection where, absent financing, value of collateral may be impaired); *In re JKJ Chevrolet, Inc.*, 190 B.R. 542, 548 (Bankr. E.D. Va. 1995) (rejecting creditor's adequate protection challenge where it was granted replacement liens by debtor); *In re Craddock-Terry Shoe Corp.,* 98 B.R. 250, 256 (Bankr. W.D. Va. 1988) (holding that replacement liens provided adequate protection sufficient to deny motion to lift automatic stay).

29.     Absent the financing sought herein, the Debtors would not be able to adequately fund ongoing business operations and thus would lose the benefit of an orderly sale process.  As a result, the Junior Lenders' collateral would be significantly impaired.  In addition to the

obvious deterioration in going concern and goodwill value, the Debtors derive significant revenue pursuant to a services agreement (the aforementioned "Cuba Business") between GIA and Gulfstream Air Charters ("GAC") dated August 9, 2003, and amended on March 14, 2006 (the "Services Agreement").   Pursuant to the Services Agreement, GIA provides use of its aircraft, flight crews, the Gulfstream name, insurance, service personnel, ground handling, security, and administrative support and the Debtors receive 75% of the operating profit of GAC. Without the proposed financing, and continued operations, the revenues derived under the Services Agreement would cease almost immediately and thus impair the collateral value of any secured creditor claiming a lien against such revenues.

30.     Additionally, the appropriate method of valuation to gauge whether a creditor is adequately protected in a reorganization case is the going concern or fair market value of the property.  *In re Automatic Voting Mach. Corp.*, 26 B.R. 970, 972 (Bankr. W.D.N.Y.1983).  Here, the Debtors are working toward the reorganization or sale of their businesses as going concerns, and thus propose, for purposes of establishing adequate protection, that the assets subject to the security interests of the Junior Lenders be valued accordingly.  *See In re Beker Industries Corp.*, 58 B.R. 725, 738-39 (Bankr. S.D.N.Y. 1986) (for purposes of determining adequate protection for debentureholders, who objected to grant of superpriority status to lenders who would provide additional financing to debtor-in-possession, use of going concern value, rather than liquidation value, of debtor-in-possession's facilities was appropriate); *see also In re Pelham Enterprises, Inc.*, 376 B.R. 684, 692 (Bankr. N.D. Ill. 2007) (valuing property for purposes of section 506(a)(1) with respect to its actual use in the operation of the debtor's business as a going concern); *cf. Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997) (the proposed disposition or use of the collateral is of paramount importance to the valuation question); *GECC*

*v. QPL Components, Inc. (In re QPL Components, Inc.)*, 20 B.R. 342, 345 (Bankr. E.D.N.Y. 1982) (the judicial test for determining where to assess collateral's value requires court to make an informed projection as to the amount recoverable upon conversion of the collateral into cash in a commercially reasonable manner, in other words, fair market value).

31.     Even if the Court were to determine that the appropriate standard for valuation for adequate protection in this case is not full fair market or going concern value, but rather some lesser amount, that amount should be a figure closer to full going concern value than liquidation value. The Supreme Court has weighed in on valuation and determined that, at least for confirmation and cramdown purposes, collateral that a debtor proposes to retain and use should be valued at replacement value rather than either the foreclosure value or the average of foreclosure value and replacement values. *Id.; Rash*, 520 U.S. 953 (1997) (noting that replacement value is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain property of a like age and condition from a willing seller"). Similarly, the Eleventh Circuit has evaluated valuation for purposes of adequate protection under §363(e) and determined that, at least for inventory, the appropriate standard is "wholesale value". *In re George Ruggiere Chrysler*, 727 F.2d. 1017 (11th Cir. 1984) (noting that wholesale value is the amount which the creditor would receive by the collateral's customary or reasonable means of disposition).

32.     Within the §364(d) context the courts that have not employed full fair market value or full going concern value, have employed a variety of standards, based upon the facts and circumstances of each case. *See In re Campbell Sod, Inc.*, 378 B.R. 647 (Bankr. D.Kan. 2007) (employing a "holistic" approach weighing the likelihood of collateral depreciation or appreciation, the prospects of a successful reorganization, and the existence or non-existence of

equity); *In re Phoenix Steel Corp.*, 39 B.R. 218 (D.Del. 1984) (using an "interim value" – a mean between liquidation and going-concern value – an approach that appears to have been rejected by the Supreme Court in *Rash*). The Debtors operate an airline passenger service, have significant receivables (including the Cuba receivables, from a non-debtor entity generated as a result of the Debtors ongoing operations), and the existence of the DIP facility enables the Debtor to preserve the status quo until such time as a reorganization or a sale of the business as a going concern can be formulated.    The "replacement value", "wholesale value", and "holistic" approaches employed by the courts that do not apply the full going concern standard, all envision the Court taking into account the full nature of the Debtor's business and the value of all of its assets as an operating entity.    For all of the foregoing reasons, if this Court should find that full going-concern value is not appropriate, some value on the continuum closer to going-concern than liquidation is appropriate.

33.    The Debtors intend to introduce evidence that even if the appropriate value for adequate protection purposes is determined to be less than full fair market or going concern value, sufficient equity exists in the assets utilized by the Debtors to operate which adequately protect pre-petition secured creditors' interests even in the event of a subsequent liquidation. The Debtors intend to also introduce evidence that secured creditors' interests are not harmed by, and that their pre-petition protections are not reduced by, this DIP Facility, and that in fact the existence of the DIP Facility will increase the value of the Collateral.    With the DIP Facility, the Debtors will continue to have an operating airline as well as revenue sources that will be preserved pending a going-concern sale, and the DIP financing enables all of this to continue and likely result in the post-petition enhancement of the value of the assets securing all the pre-petition secured claims in connection with a going-concern sale.    The Debtors are confident that

21

the valuation evidence presented to the Court at the hearing on this Motion will support the Debtors' argument that the proposed financing can be approved by this Court on a priming basis.

34.    Because of the Debtors' need for the liquidity provided by the DIP Facility, coupled with the need to complete an orderly sale process within an extremely compressed time frame, the Debtors, in the exercise of reasoned business judgment, and in consultation with their professional advisors, has concluded that the Lender is the only lender able to offer a post-petition credit facility sufficient to meet the Debtors' working capital and case funding needs on the terms, and within the time frame, required by the Debtors.  Indeed, without immediate access to liquidity sufficient to sustain normal course business operations while running the sale process, the value of the Debtors' assets will be severely, if not irreparably, harmed to the extreme detriment of the Debtors' creditors, employees and estates.

35.    Moreover, the Debtors have exercised sound business judgment in negotiating and agreeing to the proposed DIP Facility, and believe that the terms of the DIP Facility are fair and reasonable, and are in the best interests of its estate.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decision, including decisions to borrow money.  *See In re Snowshoe Co.*, 789 F.2d at 1088; *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).  Among other things, the Debtors believe that the funding to be provided pursuant to the DIP Facility (in accordance with the Budget) will be sufficient to fund all operating and case administration expenses through the conclusion of the Debtors' sale process.  The pricing and other terms on which the DIP Facility is based are eminently fair and reasonable under the circumstances and, indeed, are an improvement over the terms of the Victory Park DIP Loan which was approved by the Victory Park Interim DIP Order.

The cost and expense of alternative financing (to the extent available) would be detrimental to the Debtors' estates.

36.     In addition, and as noted above, without the DIP Facility, the Debtors would be unable to continue to obtain necessary goods and services, pay their employees and preserve the going concern value of their enterprises through the conclusion of the sale process.  The DIP Facility also should provide comfort to the Debtors' vendors, suppliers and customers throughout the sale process.

37.     Thus, for all of the foregoing reasons, the Debtors submit that the DIP Facility should be approved pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code.

### *Approval of the Use of Cash Collateral Is Warranted Under the Circumstances*

38.     Subject to certain conditions, a bankruptcy court may authorize the use of cash collateral by a debtor with such use being generally governed by 11 U.S.C. § 363.  If a debtor does not obtain consent to use cash collateral, 11 U.S.C. § 363(c)(2) provides that a debtor must obtain court approval for the requested use of cash.  *In re Sharon Steel Corp.*, 159 B.R. 165, 168 (Bankr. W.D. Pa. 1993) (noting further that "11 U.S.C. § 363(e) provides that the court shall prohibit or condition such use [of cash collateral] as is necessary to provide adequate protection of [the secured lender's] interest.").  The *Sharon Steel* Court summed up the purpose of adequate protection as follows:

> The purpose of providing "adequate protection" is to insure that a secured creditor receives in value essentially what he bargained for. *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir.1987); H.R.Rep. No. 595, 95th Cong., 1st Sess. 339 (1977), reprinted in 1978 U.S. Code Cong. & Admin. News, pp. 5787, 6295. The means of adequate protection provided by § 361 are not exclusive. *In re O'Connor*, 808 F.2d at 1397; *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir.1984). Exactly what constitutes adequate protection must be decided on a case by case basis. *In re O'Connor,* 808 F.2d at 1396-97.

*Id.* at 169.

39.     Once a court makes a determination that the interests in cash collateral will be adequately protected under a debtor's proposed usage, authorization of such usage is appropriate. *In re Markim, Inc.*, 15 B.R. 56 (Bankr. E.D. Pa. 1981) (stating "[s]ince we conclude that the debtor's application proposes a method by which the creditors who have a security interest in the cash collateral will be adequately protected under the debtor's proposal, we will authorize the debtor to use the cash collateral").

40.     In this case, Debtors' requested use of cash collateral will not adversely impact the Junior Lenders, or any other party with an alleged interest in cash collateral, and thus no harm will result from the granting of the relief requested herein.  Specifically, the use of cash collateral requested in this Motion will benefit all parties as it will allow for the continuation of the Debtors' operations during the sale process and the avoidance of immediate and irreparable harm.

## IV.  Interim Approval of Post-Petition Financing

41.     Fed. R. Bankr. P. 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code § 364 may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.  The Debtors are seeking such interim relief through this Motion.

42.     The Debtors request that the Court conduct an expedited preliminary hearing on the Motion no later than December 17, 2010 and authorize the Debtors to obtain the financing

requested herein on an interim basis until a final hearing to avoid immediate and irreparable harm to Debtors' estates.

**WHEREFORE**, the Debtors respectfully request the entry of an order (i) granting this Motion, (ii) authorizing the Debtors to obtain post-petition financing pursuant to the DIP Financing Agreements on an interim basis, (iii) authorizing the use of cash collateral sought herein, (iv) scheduling a hearing to consider final approval of the financing sought herein; and (v) granting such other and further relief as is just and proper.

Dated:   December 16, 2010          Respectfully submitted,

                                    BERGER SINGERMAN, P.A.
                                    *Counsel for Debtors*
                                    350 E. Las Olas Boulevard, Suite 1000
                                    Fort Lauderdale, FL 33301
                                    Tel. (954) 525-9900
                                    Fax (954) 523-2872

                                    By:   /s/  *Brian K. Gart*
                                          Brian K. Gart
                                          Florida Bar No.  381152
                                          bgart@bergersingerman.com
                                          Douglas A. Bates
                                          Florida Bar No. 791431
                                          dbates@bergersingerman.com

        .

## <u>EXHIBIT "A"</u>

**(Proposed Order)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                          Chapter 11 Cases

GULFSTREAM INTERNATIONAL                        Case No. 10-44131-BKC-JKO
GROUP, INC., *et al.*,[1]                       Jointly Administered

          Debtors.

_____/

**INTERIM ORDER (I) AUTHORIZING (A) SECURED
POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105,
361, 362, AND 364(c) AND (d); (B) GRANTING SECURITY INTERESTS,
SUPERPRIORITY LIENS AND CLAIMS AND ADEQUATE PROTECTION; AND (C)
USE OF CASH COLLATERAL AND (D) SCHEDULING A FINAL HEARING
PURSUANT TO BANKRUPTCY RULE 4001(C)**

     **THIS MATTER** came before the Court for an interim hearing on the 17th day of

December, 2010 at 2:00 p.m. (the "SIOF Interim Hearing"), in Fort Lauderdale, Florida, upon

---

[1]  The address of each of the Debtors is 3201 Griffin Road, 4th Floor, Fort Lauderdale, FL 33312; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis: (i) Gulfstream International Group, Inc. (3956); (ii) Gulfstream International Airlines, Inc. ("**GIA**") (1720); (iii) Gulfstream Training Academy, Inc. (5843); (iv) GIA Holdings Corp., Inc. (9548); and (v) Gulfstream Connection, Inc. (1208).

the motion (the "Motion")[2] dated November 4, 2010 of debtors and debtors-in-possession, Gulfstream International Group Inc. ("Gulfstream"), and its co-debtors, Gulfstream International Group, Inc., Gulfstream International Airlines, Inc. ("GIA"), Gulfstream Training Academy, Inc., GIA Holdings Corp., Inc., and Gulfstream Connection, Inc. (collectively the "Debtors"), (a) requesting entry of an order authorizing the Debtors pursuant to Sections 363(c), 364(c) and 364(d) of Title 11 of the United States Code, 11 U.S.C. §§.101, et seq. (as amended, the "Bankruptcy Code") and Rules 2002, 4001(c) and (d) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 4001-2, 4001-3, 9013-(G) and 9013-(H), inter alia, (i) to obtain post-petition financing (the "Post-Petition Financing") pursuant to the terms of the DIP Documents (as defined below) from Victory Park, (ii) to grant Victory Park, pursuant to Bankruptcy Code §§ 364(c) and 364(d), first priority and priming security interests in all of the Debtors' currently owned and after-acquired assets and property to secure the Debtors' obligations under the Post-Petition Financing; (iii) to grant DIP Lender priority in payment with respect to the obligations incurred in connection with the Post-Petition Financing over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below; and (iv) to provide adequate protection to Junior Lenders (as defined below), (b) seeking this Court's authorization to use Junior Lenders' cash collateral within the meaning of Bankruptcy Code § 363(a) (the "Cash Collateral"), pursuant to Bankruptcy Code § 363(e) and to provide adequate protection, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d); (c) seeking a preliminary hearing (the "Preliminary Hearing") on the Motion to consider entry of an Interim Order pursuant to Bankruptcy Rule 4001 (the "VP Interim

---

[2] In addition, on December 16, 2010, the Debtors filed that certain motion entitled *Debtors' Motion For Interim And Final Orders (I) Authorizing (A) Secured Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(c)(1), (c)(2),(c)(3), And (d); (B) Granting Security Interests, Superpriority Liens And Claims And Adequate Protection; And (C) Use Of Cash Collateral And (II) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001(C)* [D.E. 8].

2

Order") authorizing the Debtors to borrow under the Post-Petition Financing in the amounts set forth in and limited by the Approved Budget (as defined below), upon the terms and conditions set forth in the Interim Order pending the Final Hearing referred to below; and (d) requesting that a final hearing (the "Final Hearing") be scheduled by this Court to consider entry of a final order (the "Final Order") authorizing on a final basis, inter alia, the Post-Petition Financing and use of the Cash Collateral; and the Preliminary Hearing on the Motion having been held before this Court on November 5, 2010 at 2:00 p.m.; and the Court having entered the VP Interim Order on November 10, 2010; and Shelter Island Opportunity Fund, LLC ("Shelter Island" or the "DIP Lender") having agreed with the Debtors on December 16, 2010 to refinance the existing Post-Petition Financing; and upon the record made at the SIOF Interim Hearing,  this Court having found good and sufficient cause appearing therefor,

IT IS HEREBY FOUND:

A.     Unless otherwise indicated herein, all capitalized terms used but not defined herein shall have the meanings given in the DIP Documents (as hereafter defined).

B.     On November 4, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief with this Court under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are authorized to continue in possession of their property, and operate and manage their businesses, as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

C.     This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

D.     On November 3, 2010, Victory Park and Debtors entered into that certain Debtor-In-Possession Term Loan/Potential Bankruptcy Emergence Transaction Letter Agreement (the

"DIP Loan Letter").  On December 16, 2010, Shelter Island and the Debtors entered into that certain Amended DIP Loan Letter, a copy of which is attached as **Exhibit "A"** hereto (the "Amended DIP Loan Letter").

      E.     The Debtors' presently outstanding obligations to creditors that claim pre-petition security interests in the DIP Facility Collateral include (a) indebtedness due Shelter Island ("Shelter Island Debt") pursuant to a securities purchase agreement and a secured original issue discount debenture, including warrants which the Debtors agreed to purchase following the retirement of the balance of such debt; (b) indebtedness due Taglich Brothers, Inc. ("TBI Debt"), and (c) indebtedness due SAH-VUL Strategic Partners I, LLC ("SAH-VUL Debt") (Shelter Island as holder of such pre-petition secured debt, together with Taglich Brothers, Inc. and SAH-VUL Strategic Partners I, LLC being called, collectively, the "Junior Lenders").

      F.     Given the Debtors' current financial condition, the Debtors are unable to operate solely with use of Cash Collateral.  Moreover, the Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(I) as an administrative expense. Debtors assert that financing on a post-petition basis is not otherwise available without the Debtors granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in §§ 503(b) and 507(b) of the Bankruptcy Code, other than as described below, and securing such indebtedness and obligations with the first priority priming liens and security interests in and the liens upon the property described below pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code.

      G.     Notice of the SIOF Interim Hearing has been filed on the docket.

      H.     Based on the proffers and argument presented at the SIOF Interim Hearing, it appears that the Post-Petition Financing and use of Cash Collateral have been negotiated in good

faith and at arm's-length between the Debtors and DIP Lender, and any credit extended and loans made to the Debtors pursuant to this Interim Order shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of, Section 364(e) of the Bankruptcy Code and the DIP Lender shall have all of the protections thereunder, without limitation, to the extent of the New Funding (as defined below).

I.      Based on the record before this Court, it appears that the terms of this Interim Order, including, without limitation, the terms of the Post-Petition Financing (to the extent of the New Funding) and use of Cash Collateral, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

J.      The Debtors had requested approval of the Motion at the Preliminary Hearing, so that Victory Park would immediately advance the initial $1.7 million funding (the "Initial Funding") as contemplated by the DIP Loan Letter, as modified and supplemented by the VP Interim Order, pursuant to the First Approved Budget (as defined below).  The Court approved the Motion pursuant to the VP Interim Order, and Victory Park advanced $1.7 million pursuant to the First Approved Budget.

K.      On December 16, 2010, Shelter Island agreed with the Debtors to refinance the Initial Funding (the "New Funding"), subject to the terms and conditions of the Amended DIP Loan Letter and this Interim Order.

L.      At the SIOF Interim Hearing, the Debtors seek permission to use Cash Collateral which is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates and

5

creditors as its implementation will, among other things, allow time for an orderly liquidation of the Debtors' estates and sustain the Debtors' efforts in these Chapter 11 Cases.

Based upon the foregoing conclusions, and upon the record made before this Court at the SIOF Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED DETERMINED AND DECREED** that:

1.      <u>Motion Granted</u>. The Motion is granted, subject to the terms and conditions set forth in this Interim Order.

2.      <u>Authorization</u>. The Debtors are expressly authorized and empowered to (i) use the Cash Collateral, and perform their obligations strictly pursuant to the provisions of this  Interim Order; and (ii) enter into such other agreements, instruments and documents as may be necessary or required or requested by DIP Lender in its sole discretion to evidence the obligations to DIP Lender to consummate the terms and provisions of the Motion and this Interim Order and to evidence perfection of the liens and security interests to be given to DIP Lender (any and all such other agreements, instruments and documents, as may be necessary to be considered at the Final Hearing (as defined below) and the Amended DIP Loan Letter shall hereinafter be referred to as the "<u>DIP Loan Documents</u>").  DIP Lender may advance the Post-Petition Financing (to the extent of the New Funding) pursuant to the same terms as the Amended DIP Loan Letter, as modified and supplemented by this Interim Order, without the need for execution of further documentation.  The borrowing(s) made under the credit facility maintained under the DIP Loan Documents (the "<u>DIP Facility</u>") and all other indebtedness and obligations incurred on or after the Petition Date with respect to loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to this Interim Order and the DIP Loan which may now or from time to time hereafter be owing by the Debtors to DIP Lender (including principal, accrued and

6

unpaid interest, fees, costs and expenses, including without limitation, reasonable attorneys' fees and expenses, reasonable fees and expenses of the DIP Lender's financial advisor and any other amounts owed under this Order or the DIP Loan Documents) are referred to herein as the "DIP Indebtedness." The Debtors and DIP Lender may enter into any nonmaterial amendments of, or modification to, the DIP Loan Documents without the need of further notice and hearing or order of this Court.

3.    Borrowing; Use of Cash Collateral. Subject to the Approved Budgets (as defined in paragraph 19 below) and solely in compliance therewith and subject further to the terms and conditions of this Interim Order and the DIP Loan Documents, (a) the Debtors may use Cash Collateral (subject to the SAH-VUL Carveout (as defined below)), (b) the Court determines that the Junior Lenders (other than SAH-VUL) are adequately protected to the extent of the New Funding pending the Final Hearing with respect to the Debtors' limited use of Cash Collateral, (c) DIP Lender will provide the Post-Petition Financing in accordance with the terms of the Amended DIP Loan Documents and this Interim Order, and (d) SAH-VUL has agreed that it is adequately protected solely to the extent of the New Funding by the provisions of paragraphs 8 and 31 of this Interim Order.

4.    Interest, Fees, Costs and Expenses; Escrow. The DIP Indebtedness shall bear interest at the applicable rates (including default and non-default interest rates) set forth in the DIP Loan Documents. Victory Park shall pay to the Debtors any unearned funds promptly upon entry of this Interim Order. The Debtors shall prepay to Shelter Island one-month's interest on the Initial Closing Date. Notwithstanding the foregoing, nothing in this Interim Order shall be construed to limit or otherwise impair the joint and several liability of the Debtors for all of the DIP Indebtedness under the DIP Loan Documents. DIP Lender shall be paid all of its reasonable

7

Costs and Expenses (as defined and set forth in the Amended DIP Loan Letter), subject to review and approval by the Court as to reasonableness if there is an objection to same. To the extent the Court determines that all or a portion of the Costs and Expenses paid to Victory Park and/or the DIP Lender were not reasonable, Victory Park and/or the DIP Lender shall be obligated to disgorge any such amounts to the Debtors. To the extent the VP Interim Order or the Budget provides for payment of any Costs and Expenses, interest or fees to Victory Park, such amounts shall be escrowed by the Debtors pending approval of same by the Court.

5.    Refinancing; DIP Fee; Maintenance Fee; Interest. The Debtors are authorized and directed to pay down the principal amount of the Initial Funding within three (3) business days after entry of this Interim Order. The DIP Fee, Interest (one month, prepaid) and the Maintenance Fee are hereby approved, allowed and earned in their entirety pursuant to the Amended DIP Loan Letter.

6.    Termination of the DIP Facility and Use of Cash Collateral. From and after the New Funding, the DIP Lender's obligation to provide the DIP Facility in accordance with the DIP Loan Documents and DIP Lender's consent to the use of the Cash Collateral shall immediately and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole discretion), and all DIP Indebtedness shall be immediately due and payable in cash upon the earliest to occur of the following (the "Termination Date"):

   (i)    One Business Day following the Final Hearing Date (as defined below) if a Final Order (as defined below) has not been entered by January 3, 2010;

   (ii)    termination of the stay period specified in § 1110 of the Bankruptcy Code, or the Debtors' failure to reach arrangements (including arrangements with Raytheon Aircraft Credit Corporation, hereinafter "RACC") reasonably satisfactory to DIP Lender, RACC and the Debtors regarding the Debtors' assets that are subject to § 1110 of Bankruptcy Code;

8

(iii)    ninety (90) days after the commencement of the Chapter 11 Cases;

(iv)    the date of final indefeasible payment and satisfaction in full in cash of the DIP Indebtedness;

(v)     the effective date of any confirmed plan of reorganization in the Chapter 11 Cases;

(vi)    the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors;

(vii)   the occurrence of any breach by the Debtors of this Interim Order (including, but not limited to, the Debtors' failure to adhere to the Approved Budgets as set forth in ordering paragraph 19 of this Interim Order or violation of any of the covenants provided for in ordering paragraph 21 of this Order) or the Final Order, or under any of the DIP Loan Documents;

(ix)    the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code;

(x)     upon and following the entry of an order authorizing the appointment in any of the Debtors' Chapter 11 Cases of a trustee or an examiner without the prior written consent of DIP Lender (which consent may be withheld, or, if given revoked, by DIP Lender in its sole discretion), or if any Debtor applies for, consents to, or acquiesces in, any such appointment without the prior written consent of DIP Lender (which consent may be withheld in its sole discretion);

(xi)    this Interim Order or the Final Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of DIP Lender (which consent may be withheld in its sole discretion);

(xii)   the Court enters an order granting a party relief from the automatic stay with respect to any portion of the DIP Facility Collateral provided that the value of the relevant collateral is more than $50,000;

(xiii)  this or any other Court enters an order or judgment in any of the Chapter 11 Cases modifying, limiting, subordinating or avoiding the priority of the DIP Indebtedness, or the perfection, priority or validity of DIP Lender's DIP Facility Liens or imposing, surcharging or assessing against DIP Lender or its claims, DIP Facility Collateral or any fees, costs or expenses, whether pursuant to § 506(c) of the Bankruptcy Code or otherwise; or

*MIA 181,594,409v2 12-16-10*

(xiv)   three (3) business days after the DIP Lender notifies the Debtors in writing of an Event of Default (as defined and set forth in the Amended DIP Loan Letter) which is not subsequently cured or waived by the end of such notice period.

7.      Liens to Secure the DIP Indebtedness. As security for all or any portion of the DIP Indebtedness, the DIP Lender is hereby irrevocably granted the following security and priming liens (the "DIP Facility Liens") in all currently owned or hereafter acquired property and assets of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, all cash, goods, accounts, accounts receivable, instruments, documents, chattel paper, inventory, cash in advance deposits, general intangibles, payment intangibles, goodwill, investment property (including, without limitation, ownership interests in corporations, partnerships, and limited liability companies), financial assets, security accounts, deposit accounts, real estate, real estate leases, executory contracts and unexpired leases, intellectual property, software, machinery, leasehold interests, equipment, fixtures, vehicles, trademarks, trade names, licenses, causes of action (excluding, however, actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under §§ 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (collectively, "Avoidance Actions")) and actions and recoveries thereon against third parties, tax refund claims, commercial tort claims and insurance proceeds (including, without limitation, any director & officer insurance proceeds), and the proceeds, products, rents and profits of all of the foregoing; provided, however, any equipment or other assets as described in § 1110 of the Bankruptcy Code, including without limitation, all leased aircraft and engines (including those leased from RACC), as well as the aircraft leases with RACC, shall be expressly excluded by this Interim Order (all of the foregoing, the "DIP Facility Collateral"):

10

(a)      pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority senior priming lien (the "Priming Liens") on all of the DIP Facility Collateral, which shall be senior to all other security interests and liens in property of the Debtors' estates in this or any subsequent or superseding cases (including, without limitation, any conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto); and

(b)      except to the extent otherwise expressly set forth in this Interim Order, or in a written instrument, agreement or other document executed by DIP Lender and subject to paragraph 10 of this Order, the DIP Facility Liens shall not be subject to subordination to any other liens, security interests or claims under Section 510 of the Bankruptcy Code, or otherwise. Any security interest or lien upon the DIP Facility Collateral which is avoided or otherwise preserved for the benefit of the Debtors' estates under Section 551 or any other provision of the Bankruptcy Code shall be subordinate to the DIP Facility Liens and the Adequate Protection Liens (as defined below); and

(c)      a first priority pledge of the capital stock and/or equity interest held directly or indirectly by each of the Debtors (for the avoidance of doubt, such pledge shall not include a pledge of the capital stock and/or equity interests held by any shareholders or investors in Gulfstream International Group, Inc.)

8.      Adequate Protection Liens. As adequate protection of Junior Lenders' interests in the DIP Facility Collateral, including use of the Cash Collateral pursuant to §§ 361, 363 and 552(b) of the Bankruptcy Code, Junior Lenders are hereby granted valid, binding, enforceable and perfected additional and replacement liens (the "Adequate Protection Liens") in all property of the Debtors' estates, including the DIP Facility Collateral, to the extent of any

11

decrease in the value of Junior Lenders' interests in the DIP Facility Collateral occurring subsequent to the Petition Date, with such decrease in value to include decreases resulting from the Debtors' use (if any) of the Cash Collateral, the depreciation, use, sale, loss, decline in market price of the DIP Facility Collateral, or otherwise. The Adequate Protection Liens shall enjoy the same validity and extent as the liens the Junior Lenders held on the Petition Date, but subject and junior to the DIP Lender's superpriority Priming Liens and the Carve-Out (as defined in paragraph 17). Under no circumstances shall any of the Junior Lenders (other than Shelter Island) have a lien on any of the Debtors' assets or property, including the DIP Facility Collateral, which it did not have a right to prepetition. Further, (in addition to the Debtors' waiver and release set forth in paragraph 31 below), as based on the agreement of the Debtors, Victory Park and SAH-VUL announced on the record at the Preliminary Hearing, SAH-VUL shall receive additional adequate protection of its pre-petition claim and security by the Debtors' agreement to segregate and not use, pending the Final Hearing, the first $200,000 of proceeds actually received by Debtor GIA from ongoing performance of the Services Agreement with Gulfstream Air Charter, Inc. (the "SAH-VUL Carveout"). Pending a determination at or after the Final Hearing with respect to future use or other disposition, the "SAH-VUL Carveout" shall not become or constitute a part of the DIP Facility Collateral.

9.    Superpriority Claims.  Subject to the Carve-Out described in paragraph 17 below,

all or any portion of the DIP Indebtedness shall irrevocably have the highest administrative priority under § 364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in the Chapter 11 Case or any successor

*MIA 181,594,409v2 12-16-10*

case), and shall at all times be senior to the rights of the Debtors, any successor trustee or estate representative in these Chapter 11 Cases, any successor Chapter 11 cases, or any Chapter 7 cases upon any conversion of these cases (the "Superpriority Claims"). Subject to the Carve-Out described in paragraph 17 below, nothing in this Interim Order or the Approved Budgets (as defined below) shall constitute the consent by DIP Lender to the imposition of any costs or expense of administration or other charge, fees, liens, assessment or claim (including, without limitation, any amounts set forth in the Approved Budgets) against DIP Lender, its claims or collateral (including the DIP Facility Collateral) under § 506(c) of the Bankruptcy Code or otherwise, all of which rights have been waived pursuant to the terms of this Interim Order and the Amended DIP Loan Letter.

10.    Perfection of DIP Facility Liens and Adequate Protection Liens. The DIP Facility Liens and the Adequate Protection Liens shall be, and they hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of § 362 of the Bankruptcy Code, (i) DIP Lender may, at its sole option, file or record or cause the Debtors to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the Debtors' expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender may require the Debtors to deliver to DIP Lender any chattel paper, instruments or securities evidencing or constituting any DIP Facility Collateral, and the Debtors are directed to cooperate and comply therewith. If DIP Lender, in its sole discretion, shall elect for any reason to cause to

be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Facility Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in these Chapter 11 Cases as of the commencement of these Chapter 11 Cases but with the priorities as set forth herein. DIP Lender or Junior Lenders may (each in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtors have real or personal property.

11.    <u>Waiver</u>. The Debtors and their estates (and any party in interest acting on behalf of the Debtors) hereby irrevocably waive, and are barred from asserting or exercising any right (a) without DIP Lender's prior written consent (which may be withheld in their sole discretion) or (b) without prior indefeasible payment and satisfaction in full in cash of the DIP Indebtedness: (i) to grant or impose, or request that the Court grant or impose, under § 364 of the Bankruptcy Code or otherwise, liens on or security interests in any DIP Facility Collateral, which are <u>pari passu</u> with or senior to the DIP Facility Liens or the Adequate Protection Liens; (ii) to return goods pursuant to § 546(h) of the Bankruptcy Code to any creditor of the Debtors or to consent to any creditor taking any setoff against any of such creditor's pre-petition indebtedness based upon any such return pursuant to § 553(b)(1) of the Bankruptcy Code or otherwise (with the exception of the relief afforded the Debtors in this Court's *Order Authorizing Gulfstream International Airlines, Inc. to Honor Obligations Related to Code Share Agreements, Interline Agreements, Clearinghouse Agreements, Alliance Agreements, Computer Reservation Systems*

*MIA 181,594,409v2 12-16-10*

*Agreements, ATPCO Agreement and Various Other Operating Agreements in the Ordinary Course of Business*, Docket Entry No. 66); (iii) to seek a surcharge of the DIP Facility Collateral under § 506(c) of the Bankruptcy Code; (iv) to modify or affect any of the rights of the DIP Lender or the Junior Lenders under this Interim Order or any DIP Loan Documents by any order entered in any of the Chapter 11 Cases or any successor cases; or (v) propose a plan of reorganization or liquidation, or seek an extension of the exclusive right to file a plan or solicit acceptances with respect to any plan of reorganization or liquidation without the written consent of the DIP Lender that does not provide for and require payment in full in cash of the DIP Indebtedness on the Effective Date.

12.    <u>Sale Out of the Ordinary Course of Business</u>.

(a)    The Debtors may not seek approval of a sale of their assets outside the ordinary course of business (whether under a plan of reorganization or otherwise) if such sale does not provide for the payment in full in cash of the DIP Indebtedness on the closing date of such sale, unless (i) the DIP Lender consents to such sale, (ii) all proceeds realized from any Court-approved sale are transferred to DIP Lender for immediate application in reduction of the DIP Indebtedness and, upon payment in full in cash of all amounts owed to DIP Lender, the obligations owed to the Junior Lenders, in the manner set forth in this Interim Order and in the priority provided by their agreements with the Debtors and by law, and (iii) the approved bid procedures expressly provide that DIP Lender and the Junior Lenders may exercise their right to credit bid their indebtedness under 363(k) of the Bankruptcy Code, provided that in the event of a credit bid by any Junior Lender, DIP Lender may, in its sole discretion, elect to have the DIP Indebtedness paid in full in cash as a condition to the effectiveness of any such credit bid.

15

(b)    The Debtors shall adhere to the following milestones with respect to a sale of their assets outside the ordinary course of business:  (i) immediately upon  entry of this Order Debtors will coordinate with DIP Lender's financial advisors to market and sell the Debtors' assets, and (ii) Debtors will comply with the terms of the bid procedures order that was entered by the Court on December 16, 2010 (D.E. # 213), which provides for qualified bids to be due on January 3, 2011, an auction to occur on January 4, 2011, and a hearing on approval of the sale and winning bidder on January 5, 2011.

13.    <u>Books and Records</u>. The Debtors shall permit and shall not impede the efforts of DIP Lender and any authorized representatives designated by DIP Lender (including, without limitation, its auditors, appraisers and financial advisors) to visit and inspect any of the properties of any Debtors, including the Debtors' respective financial and accounting records, and to make copies and take extracts therefrom, and to discuss any Debtor's affairs, finances and business with such Debtors' officers, advisors (including, without limitation, Jetstream Aviation Capital) and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Without limiting the generality of the foregoing, the Debtors shall promptly provide to DIP Lender and DIP Lender's designated representatives any information or data reasonably requested to monitor the Debtors' compliance with the covenants and the provisions of the DIP Loan Documents and this Order and to perform appraisals or other valuation analyses of the property of the Debtors.

14.    <u>Certain Rights of Shelter Island</u>.

(a)    <u>Credit Bid Plan.</u>  As contemplated by the Amended DIP Loan Letter, DIP Lender shall have the right under § 363(k) of the Bankruptcy Code to credit bid up to the full amount or

any portion of the DIP Indebtedness in connection with any sale of the Debtors' assets under a plan of reorganization or otherwise.

(b)    Plan.  If the Debtors have not received a Court order approving the Section 1110 Stipulation (as defined in the DIP Loan Letter) before the termination of the stay period specified in § 1110 of the Bankruptcy Code, then, notwithstanding § 1121 of the Bankruptcy Code, the DIP Lender and the Committee shall have the right to file a plan and disclosure statement and the Debtors' exclusivity shall be terminated only as to the DIP Lender's and Committee's rights in this paragraph 14.

(c)    CRO/CFO.  DIP Lender shall have the right to require that the Debtors appoint a Chief Restructuring Officer or interim Chief Financial Officer for the Debtors, who shall be acceptable to Shelter Island in its sole discretion.

(d)    Financial Advisor.  The Debtors shall be responsible for paying all fees and expenses of the financial advisor hired by the DIP Lender from December 18, 2010 through entry of a final decree in these Chapter 11 Cases.

15.    Reserved.

16.    Modification of Automatic Stay; Other Remedies.

(a)    Except as set forth in subparagraph (b) of this paragraph, which governs any action of DIP Lender to foreclose on their liens on any DIP Facility Collateral or to exercise any other default-related remedies (other than those specifically referenced in the next sentence), the automatic stay pursuant to § 362 of the Bankruptcy Code is hereby vacated as to DIP Lender to permit it to perform in accordance with, and exercise, enjoy and enforce their respective rights, benefits, privileges and remedies pursuant to this Interim Order and the DIP Loan Documents without further application or motion to, or

order from, the Court, and regardless of any change in circumstances (whether or not foreseeable), and neither Section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code, or any other law, shall be utilized to prohibit DIP Lender from the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies. DIP Lender is hereby granted leave to receive and apply payments to the DIP Indebtedness from collections on and proceeds of the DIP Facility Collateral in the manner specified in this Interim Order and the DIP Loan Documents.  In addition, DIP Lender is hereby granted leave to, among other things, to (a) file or record any financing statements, mortgages or other instruments or other documents to evidence the Adequate Protection Liens or the DIP Facility Liens, (b) charge and collect any interest, fees, costs, and expenses and other amounts accruing at any time under the DIP Loan Documents or this Interim Order as provided therein, (c) give the Debtors any notice provided for in any of the DIP Loan Documents or this Interim Order, and (d) upon the occurrence of the Termination Date, and without application or motion to, or order from this Court or any other court, (i) terminate the DIP Facility and the DIP Loan Documents, (ii) declare all DIP Indebtedness immediately due and payable, and (iii) revoke the Debtors' right, if any, under this Interim Order and/or the other DIP Loan Documents to use the Cash Collateral.

(b)    Upon the occurrence of the Termination Date, the DIP Lender may file a motion to terminate the automatic stay which shall be served electronically, by hand delivery, facsimile or overnight mail on counsel to the Debtors, the Committee, the Junior Lenders, RACC and the Office of the United States Trustee, and, subject to the Court's calendar, the Court shall conduct a hearing on an expedited or emergency basis (but in no

event later than three (3) business days after service of such notice) to consider terminating the automatic stay under § 362 of the Bankruptcy Code in favor of the DIP Lender for the purpose of allowing the DIP Lender to exercise all of its rights and remedies under the DIP Loan Documents, this Interim Order or applicable law, including, without limitation, causing the Debtors to engage in a process to liquidate their assets pursuant to § 363 of the Bankruptcy Code, foreclosing or otherwise enforcing their liens on any or all of the DIP Facility Collateral. The only issue that may be raised or addressed by the Debtors at such hearing is whether the Termination Date has occurred. Subject to the Debtors' right to contest whether the Termination Date has occurred, the Debtors shall cooperate with DIP Lender in connection with any enforcement action by, among other things, (1) providing access to its premises to representatives of DIP Lender, (ii) providing DIP Lender or its designees access to the Debtors' books and records, (iii) performing all other obligations set forth in this Interim Order and/or the other DIP Loan Documents, and (iv) taking reasonable steps to safeguard and protect the DIP Facility Collateral until DIP Lender can make adequate provision to protect and safeguard the DIP Facility Collateral, and the Debtors shall not otherwise interfere or encourage others to interfere with enforcement of the rights of DIP Lender.

17.    <u>Carve-Out</u>.

    (a)    Subject to the remaining provisions of this paragraph, the Adequate Protection Liens, the DIP Facility Liens, the Superpriority Claims, any 507(b) Claim and all liens and claims of Junior Lenders referenced or defined herein shall be subject to (i) the payment of any unpaid fees payable pursuant to 28 U.S.C. § 1930 (including, without limitation, fees under 28 U.S.C. § 1930(a)(6)); (ii) the fees due to the Clerk of the Court;

and (iii) the actual fees and expenses incurred by professionals retained by an order of the Court entered pursuant to Sections 327, 328, 363 or 1103(b) of the Bankruptcy Code (the "Retained Professionals"), provided they are within the amounts set forth in the Approved Budget and an agreed professional fees budget and are subsequently allowed by the Bankruptcy Court under Sections 330, 331 or 363 of the Bankruptcy Code (the "Carve-Out"), which is subject to DIP Lender's review and approval in its sole discretion. DIP Lender and Junior Lenders shall retain their rights as a party in interest to object to any fee applications or other claims of any entity, including but not limited to the Retained Professionals.

      (b)    Notwithstanding anything to the contrary in this Interim Order or the DIP Loan Documents, no proceeds of the DIP Indebtedness or Cash Collateral pursuant to the DIP Loan Documents, nor any DIP Facility Collateral (or proceeds thereof) may be used to pay any claims for services rendered by any of the Retained Professionals or any other entity in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief (i) invalidating, setting aside, avoiding, disallowing or subordinating, in whole or in part, the DIP Indebtedness or the liens and security interests of DIP Lender in the DIP Facility Collateral; or (ii) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by DIP Lender of any of its rights and remedies under this Interim Order and/or the DIP Loan Documents or DIP Lender's enforcement or realization upon any of the liens on or security interests in any DIP Facility Collateral.

(c)    The Debtors are authorized to use proceeds of the DIP Facility in accordance with the Approved Budget to pay U.S. Trustee quarterly fees and such compensation and expense reimbursements of Retained Professionals as may be awarded by the Court pursuant to Section 328, 330 or 331 of the Bankruptcy Code (the "Professional Expenses").  The Retained Professionals shall be permitted to submit to the Debtors, with copies to counsel for the DIP Lender, periodic statements (but no more frequently than on a monthly basis) for services rendered and reimbursable expenses incurred by them (the "Conditional Professional Expenses").  So long as the Termination Date has not occurred, the DIP Lender shall advance the amounts set forth in the Approved Budget, and allocated for such fees and expenses; said funds shall be advanced to and segregated and escrowed in an escrow account maintained by counsel for the Debtors for payment to the Retained Professionals, in accordance with the procedures which may be approved by the Court for the payment of professionals (the "Professional Expense Escrow"). Funds deposited in the Professional Expense Escrow shall be available and may be used by the Debtors solely for the payment of the Conditional Professional Expenses and the Professional Expenses (to the extent not previously paid). Neither the Debtors nor any creditor of any of the Debtors (except for the DIP Lender) shall have a claim or interest in the funds on deposit in the Professional Expense Escrow, other than the entitlement of the Debtors or a successor trustee to receive (i) any balance remaining in the Professional Expense Escrow after payment in full of the Professional Expenses that have accrued and that are allowed by final order of the Court; and (ii) any amounts paid from the Professional Expense Escrow but subsequently disallowed by final order of the Court that are not otherwise payable to the DIP Lender. Nothing in this

*MIA 181,594,409v2 12-16-10*

paragraph 17 shall prejudice or impair the rights of any of the Retained Professionals to request an award of compensation in excess of the amounts set forth in the Approved Budget (the "Unbudgeted Professional Expenses") or the rights of the DIP Lender to object to the amount or reasonableness of the Conditional Professional Expenses, the Professional Expenses or the Unbudgeted Professional Expenses.

18.     Cash Collection Procedures. Except as provided in paragraph 8 above, from and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Facility Collateral or services provided by the Debtors and all other cash or cash equivalents which shall at any time come into the possession or control of the Debtors, or to which the Debtors shall become entitled at any time shall be deposited in accounts as are designated by DIP Lender from time to time, and such collections and proceeds upon such deposit shall remain and be part of the DIP Facility Collateral, and be released to Debtors as provided for in the Approved Budget. In the event the Debtors intend to open any new bank accounts that would affect the right and ability of DIP Lender to receive any proceeds as contemplated by this Order, the Debtors shall first obtain a "lock box agreement" or other written confirmation to the satisfaction of DIP Lender from the relevant banking institution recognizing the rights of the DIP Lender as provided for in this Order. Except as it relates to the segregated account used solely to maintain the SAH-VUL Carveout, all financial institutions in which any lockboxes, blocked accounts or other accounts of the Debtors are located are hereby authorized and directed to comply with any request of DIP Lender to turnover to DIP Lender all funds therein without offset or deduction of any kind.

MIA 181,594,409v2 12-16-10

19.     Budget, Use of Cash Collateral and DIP Facility Proceeds.

(a)     Attached as **Exhibit "B"** hereto and incorporated herein by reference is a budget (which has been approved by the DIP Lender solely as to the period pending the Final Hearing) setting forth by line item all projected cash receipts, sales and cash disbursements for the time period from November 29, 2010 through February 4, 2011 (the "Initial Approved Budget").[3]  The Debtor and DIP Lender shall promptly after entry of this Interim Order negotiate any changes to the Initial Approved Budget requested by the DIP Lender with respect to the period pending the Final Hearing.  If DIP Lender does not approve the Budget in its sole discretion as to any period subsequent to the Final Hearing (which approval shall not be unreasonably withheld), such failure shall constitute an Event of Default.  The Initial Approved Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) to which DIP Lender agrees in its sole discretion (each such additional budget, a "Supplemental Approved Budget").  The aggregate of all items approved by DIP Lender in the First Approved Budget, the Initial Approved Budget, and any and all Supplemental Approved Budgets (acceptable to DIP Lender in its sole discretion) shall constitute an "Approved Budget." The Junior Lenders shall be provided notice of any changes to the Approved Budget and shall have the right to object to such changes at or prior to the Final Hearing.

(b)     Except as it relates to the SAH-VUL Carveout, Debtors may use Cash Collateral and the proceeds of the DIP Facility exclusively to pay for the operating expenses and costs of administration incurred by Debtors as provided for in the Approved Budget. Debtors represent and warrant that (i) the expenditures set forth in the Approved

---

[3] The budget approved in connection with the VP Interim DIP Order is defined as the "First Approved Budget."

Budget constitute all of Debtors' projected costs and expenses during the period of the Approved Budget, and (ii) the Cash Collateral and the sums to be advanced by DIP Lender pursuant to the DIP Facility are sufficient to pay all of the expenses set forth in the Approved Budget. Debtors' sales and cash receipts shall not be less than as set forth in the Approved Budget and Debtors' expenses shall not exceed those set forth in the Approved Budget, in all cases subject to the Approved Sales Variance, the Approved Cash Receipts Variance, and the Approved Disbursements Variance (all as defined below, and collectively, the "Approved Variances"). Notwithstanding the foregoing, DIP Lender shall have no obligation to provide the DIP Facility if the Debtors exceed the overadvance limits provided in the Approved Budgets. As used herein, the Approved Variances include, and are defined and calculated as follows:

> (i)     "Approved Sales Variance" means a negative variance of less than 5%, between Debtors' actual sales and Debtors' projected sales measured commencing as of the end of the first week covered by the Approved Budget and each week thereafter for both (i) the one-week period concluding with the week during which the variance is being calculated, and (ii) cumulatively from the commencement of the Chapter 11 Cases concluding with the week during which the variance is being calculated;

> (ii)    "Approved Cash Receipts Variance" means a negative variance of less than 5%, between Debtors' actual cash receipts and Debtors' projected cash receipts measured commencing as of the end of the first week covered by the Approved Budget and each week thereafter for both (i) the one-week period concluding with the week during which the variance is being calculated, and (ii) cumulatively from the commencement of the Chapter 11 Cases concluding with the week during which the variance is being calculated;

> (iii)   "Approved Disbursements Variance" means a positive variance of (A) less than 5%, between Debtors' actual disbursements and Debtors' projected disbursements, on a line item basis, and (B) less than 5% of the Debtors' actual disbursements and Debtors' projected disbursements, on a cumulative basis, each measured commencing as of the end of the first week covered by the

Approved Budget and each week thereafter for both (i) the one-week period concluding with the week during which the variance is being calculated, and (ii) cumulatively from the commencement of the Chapter 11 Cases concluding with the week during which the variance is being calculated.

(c)     Neither the proceeds of the DIP Facility nor the Carve-Out shall be utilized (i) to attack the validity, priority or enforceability of any of the post-petition liens or security interests of the DIP Lender, (ii) to research, review, analyze or investigate with respect to or in connection with any litigation, claim, objection or cause of action of any kind or nature whatsoever against the DIP Lender (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other conduct), or (iii) to file, prosecute or otherwise pursue any litigation, claim, objection or cause of action of any kind or nature whatsoever against the DIP Lender (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other conduct).

20.     <u>Financial Reporting</u>. The Debtors shall provide the following reports to DIP Lender and Junior Lenders:  (i) no later than 5:00 p.m. (Eastern Time) each business day, a log of each of the daily disbursements and collections; (ii) no later than 5:00 p.m. (Eastern time) each Wednesday, (A) a comparison of the items in the Approved Budget for the preceding week to the Debtors' actual performance that includes a narrative summary of any material variances from the Approved Budget for the preceding week, (B) an accounts receivable aging report by customer, (C) a detailed inventory listing report, (D) a detailed fixed asset listing report, and (E) a report of headcount and salaries by division; and (iii) no later than the [20th] day of each month, beginning [December 20], 2010, the Debtors' financial statements (including detail by operating division and consolidated balance sheets, income statements and cash flow statements) for the immediately preceding month.

*MIA 181,594,409v2 12-16-10*

21.    <u>Covenants</u>. The Debtors shall timely comply with all of the covenants set forth in the Amended DIP Loan Letter, as modified and supplemented by this Interim Order.

22.    <u>Events of Default</u>. The Events of Default set forth in the Amended DIP Loan Letter are hereby approved and incorporated herein in their entirety.

23.    <u>Release</u>. The Debtors and their respective estates hereby release and discharge the DIP Lender, and each of its existing and former general partners, shareholders, directors, officers, fiduciaries, principals, managers, investment managers, members, employees, investors, representatives, agents, subsidiaries, predecessors, successors, assigns, affiliates, affiliated funds and managed accounts, portfolio companies, and related entities (collectively, the "<u>Releasees</u>"), of and from any and all claims, actions, charges, suits, liabilities, damages, contracts, agreements and promises, of any kind or nature whatsoever, known or unknown, foreseen or, unforeseen, suspected or unsuspected, latent or patent, fixed or contingent, existing or hereafter arising, in law, equity, or otherwise, which the Debtors would have been legally entitled to assert in their own right or on behalf of any other person or entity against any of the Releasees, whether or not any of the facts or legal bases therefore were known or existed on or before the date of this Order, based upon or related to, in whole or in part, any funding of the DIP Indebtedness, DIP Loan Documents, DIP Facility or any transaction contemplated thereby, or any other acts, omissions or aspect of the pre-petition relationship between any of the Releasees and the Debtors, including, without limitation, the Shelter Island Debt. This waiver and release shall be binding on the Committee or any successor to the Debtors, including but not limited to any subsequently appointed Chapter 11 trustee, Chapter 7 trustee and any liquidating trustee.

24.    <u>DIP Lender Reservation of Rights; No Waiver</u>. DIP Lender does not waive, and expressly reserves, any and all claims, defenses, rights and remedies it may have pursuant to any

or all of the DIP Loan Documents, this Interim Order, the Bankruptcy Code and/or other applicable law against the Debtors and any officer, director, employee, agent or other representative of the Debtors. Notwithstanding anything to the contrary contained in the VP Interim Order or this Order, DIP Lender reserves the right to seek additional relief from the Court on any issue that may arise in connection with the Chapter 11 Cases.

25. <u>Effect of Dismissal, Conversion or Substantive Consolidation</u>. If any Chapter 11 Case is dismissed, converted, otherwise superseded or substantively consolidated, DIP Lender's rights and remedies under this Order and the DIP Loan Documents shall be and remain in full force and effect as if such Chapter 11 Case had not been dismissed, converted, superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, supersession or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

26. <u>Order Binding on Successors</u>. Except as provided in paragraph 31 below, the provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender and the Debtors and their respective successors and assigns (including any trustee or other estate representative appointed as a representative of the Debtors' estate or of any estate in any successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

27. <u>No Liability to Third Parties</u>. DIP Lender shall not (i) have liability to any third party nor shall it be deemed to be in control of the operations of the Debtors or to be acting as a "controlling person", "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the Internal

27

Revenue Code, the Unites States Comprehensive, Environmental Response, Compensation and Liability Act as amended, or any similar Federal or state statute), or owe any fiduciary duty to the Debtors, their creditors or their estate, and (ii) DIP Lender's relationship with the Debtors shall not constitute nor be deemed to constitute a joint venture or partnership with the Debtors.

28.     <u>Order Binding Upon Parties in Interest</u>. Except as provided in paragraph 31 below, all of the provisions of this Interim Order shall be final and binding on the Debtors (including, without limitation, their successors and assigns), the Debtors' shareholders, and all creditors and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed.

29.     <u>Effect of Modification of Interim Order</u>. The Debtors shall not, without DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents. If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without DIP Lender's prior written consent, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

*MIA 181,594,409v2 12-16-10*

30.  <u>Safe Harbor</u>. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtors to obtain credit on the terms and conditions upon which the Debtors and DIP Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under § 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in § 364(e) of the Bankruptcy Code.

31.  <u>SAH-VUL Waiver and Release</u>. In consideration of SAH-VUL's agreement (as announced on the record at the Preliminary Hearing) to consent to the Priming Liens granted by the VP Interim Order to the extent of the Initial Funding and to the extent of the New Funding under this Order, the Debtors have agreed to waive, release and forgo any challenge to the validity, priority, or extent of the SAH-VUL Debt (and the pre-petition liens securing same), including any causes of action for equitable subordination or recharacterization. Such waiver shall only be binding upon the Debtors and shall not be binding upon the Debtors' estates or on any creditors, the Committee, or any subsequently appointed Chapter 11 or Chapter 7 trustee.

32.  <u>Subsequent Hearing; Procedure for Objections and Entry of Final Order</u>. The Motion is set for a final hearing ("<u>Final Hearing</u>") before this Court at [__] p.m. on _____ __, 201_ (such date or such later date to which the Final Hearing is adjourned or continued with DIP Lender's consent, the "<u>Final Hearing Date</u>"), at which time any party in interest may present any timely filed objections to the entry of a final order and the remaining Post-Petition Financing in form and substance reasonably acceptable to DIP Lender in its sole discretion (the "<u>Final Order</u>"). After entry of this Order, the Debtors shall promptly serve a copy of it upon (i) the Junior Lenders, RACC, and their respective counsel; (ii) appropriate state and federal taxing authorities; and (iii) any other party which theretofore has filed in the Chapter 11 Cases an

29

appearance and request for notice with this Court and served such request upon Debtors' counsel. Any objections to the entry of a Final Order on the Motion shall be in writing and shall be filed with the Court and served so that they not later than three (3) business days before the date scheduled for the Final Hearing and served so that they are received on or before 4:00 p.m. (Eastern Time) of such date by (i) Berger Singerman, P.A., counsel for the Debtors, 350 E. Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301, Attn: Brian K. Gart, Esq.; (ii) Greenberg Traurig LLP, counsel for DIP Lender and Shelter Island as a secured pre-petition lender, 401 Las Olas Boulevard, Fort Lauderdale, FL, Attn: Scott M. Grossman, Esq.; (iii) Bilzin Sumberg Baena Price & Axelrod LLP, counsel for SAH-VUL Strategic Partners I, LLC, 1450 Brickell Avenue, 23rd Floor, Miami, FL 33131-3456, Attn: Scott I. Baena, Esq. and Matthew I. Kramer, Esq., (iv) [Bast info]; (v) the Office of the United States Trustee, 51 Southwest First Avenue, Room 1204, Miami, FL 33130, and (vi) Gray Robinson, P.A., counsel for the Committee, 1221 Brickell Avenue #1600, Miami, FL 33131 attn: Robert A. Schatzman, Esq. and Steven Solomon, Esq.  Any objections by creditors or other parties in interest to any of the provisions of this Interim Order being included in the Final Order shall be deemed waived unless filed and served in accordance with this paragraph.

33.    <u>Objections Overruled or Withdrawn</u>. All objections to the entry of this Interim Order have been withdrawn, resolved by agreement as embodied herein, or are hereby overruled.

34.    <u>Controlling Effect of Order</u>. To the extent any provisions of this Interim Order

*MIA 181,594,409v2 12-16-10*

conflict with any provisions of the Motion, the VP Interim Order, or any DIP Loan Document,

the provisions of this Interim Order shall control.

<div align="center"># # #</div>

Submitted by:
Brian K. Gart, Esq.
Douglas A. Bates, Esq.
Berger Singerman, P.A.
350 E. Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL 33301
Tel. (954) 525-9900
Fax (954) 523-2872
bgart@bergersingerman.com

Copy furnished to:
Brian K. Gart, Esq.
*(Attorney Gart is directed to serve a conformed copy of this Order upon all interested parties and to file a Certificate of Service).*

*MIA 181,594,409v2 12-16-10*

## EXHIBIT "B"

**(Letter Agreement)**

**Debtor-in-Possession Term Loan/Potential Bankruptcy Emergence Transaction**

**Letter Agreement**

**December 15, 2010**

---

| | |
|---|---|
| **Debtors:** | Gulfstream International Group Inc. and any and all current and future affiliates and subsidiaries (whether or not wholly owned) as joint and several borrowers (collectively. the "*Debtors*"). |
| **Lender/Sponsor:** | Shelter Island Opportunity Fund, LLC, on behalf of one or more entities for which it acts as investment manager, ("*SIOF*") and any other lender(s) acceptable to SIOF (collectively with SIOF, the "*Lender*" or "*Sponsor*"). |
| **Agent:** | SIOF shall act as administrative and collateral agent (the "*Agent*"). |
| **Type:** | Debtor-in-Possession Term Loan (the "*Loan*" or "*DIP Facility*"), and potential emergence transaction. |
| **Commitment:** | $1,700,000 (the "*Commitment*"). |
| **Initial Disbursement:** | Upon entry of an interim financing order (the "*Interim Order*") by the applicable United States Bankruptcy Court in Florida (the "*Court*") presiding over the Chapter 11 proceedings of the Debtors (the "*Bankruptcy Cases*") under Bankruptcy Code § 384(c) and (d) (in form and substance agreeable to the Debtors, Lender and Agent), $1,700,000 of the Commitment shall be funded by the Lender (the "*Initial Disbursement*"). |
| **Final Disbursement:** | Upon entry of a final financing order (the "*Final Order*") by the Court presiding over the Bankruptcy Cases under Bankruptcy Code § 364(c) and (d) (in form and substance agreeable to the Debtors, Lender and Agent), $0 of the Commitment shall be funded by the Lender (the "*Final Disbursement*"). |
| **Closing Date:** | Closing of the Loan with respect to the Initial Disbursement anticipated to being promptly upon entry of the Interim Order, but no later than two (2) days after entry of such order (the "*Initial Closing Date*"). |
| | Closing of the Loan with respect to the Final Disbursement anticipated to being promptly upon entry of the Final Order, but no later than three (3) days after entry of such order. |

*Error! Unknown document property name.*

**Use of Proceeds:** Proceeds of the Loan shall be utilized as follows: (i) payoff existing DIP Loan and costs, expenses, closing payments, and all other payment amounts contemplated herein; (ii) general working capital and operational expenses (in accordance with a weekly cash flow budget prepared by the Debtors, in form and substance acceptable to the Lender and Agent on a line-by-line basis, subject to a five percent (5%) variance on a cumulative basis for each such line item of expense (the "***Budget***")); and (iii) scheduled aircraft lease and other payments due to Raytheon Aircraft Credit Corporation ("***RACC***") before the scheduled expiration of the term of the Debtors' agreements with RACC, on January 6, 2011, or if such term is extended by RACC, during the period contemplated by Bankruptcy Code § 1110(a)(2), or as may be extended pursuant to a Stipulation in form and substance acceptable to the Debtors, Agent, Lender and RACC under Bankruptcy Code § 1110(b) (the "***Section 1110 Stipulation***"); with all such payments to be Included and approved as part of the Budget.

For the avoidance of doubt, neither the proceeds of the Loan nor the Carve-Out (as defined below) shall be utilized (i) to attack the validity, priority or enforceability of any of the post-petition liens or security interests of the Lender or the Agent, (ii) to research, review, analyze or investigate with respect to or in connection with any litigation, claim, objection or cause of action of any kind or nature whatsoever against the Lender or the Agent (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other. conduct), or (iii) to file, prosecute or otherwise pursue any litigation, claim, objection or cause of action of any kind or nature whatsoever against the Lender or the Agent (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other conduct).

**Interest:** Fifteen percent (15.0%) per annum (the "***Interest***") interest shall be payable monthly in cash in arrears; provided however that the Debtors shall prepay one (1) interest payments under the Loan on the initial Closing Date.

**Default interest:** Upon the occurrence of an Event of Default (as defined below) and during the continuation of such default, interest shaft accrue on any outstanding advances at twenty percent (20%) per annum (the "***Default Interest***").

*Error! Unknown document property name.*

**DIP Fee:**     One and one half percent (1.5%) of the Commitment, which amount shall be fully earned and payable in cash to Lender on the Initial Closing Date in the form of a closing payment payable from the proceeds of the Loan.

**Maintenance Fee:**     $4,000 per month, which amount shell be payable in cash to Agent on the Initial Closing Date and every thirty (30) days thereafter from the proceeds of the Loan pursuant to the Budget.

**Costs/Expenses:**     The Debtors shall reimburse the Agent and the Lender for all costs incurred in connection with the Loan, the Loan Obligations as defined below) and/or any Lender Sponsored Transaction (as defined below), including, without limitation, legal fees, advisor fees, consultant fees, costs and expenses, collateral valuations, appraisals, surveys, field examinations, third party diligence, lien searches, filing fees, and all other out-of-pocket costs and expenses in any way related to the Loan and/or Loan Obligations and the enforcement thereof and any Lender Sponsored Transaction (collectively, the "***Costs and Expenses***"). In the event that the Loan is not consummated, the Lender and the Agent shall have the right to seek reimbursement of all reasonable Costs and Expenses incurred with respect thereto as an administrative expense of the Debtors' estates pursuant to Bankruptcy Code § 503(b).

**Term:**     Any and all then current outstanding principal amount of the Loan (the "***Loan Principal***") <u>plus</u> any unpaid accrued interest or Default Interest (as the case may be) <u>plus</u> any Costs and Expenses or other amounts due under the Loan, this Letter Agreement, the Interim Order and the Final Order (each, a "***Loan Obligation***" and collectively, the "***Loan Obligations***") shall become due and payable in full in cash upon the earlier of (the "***Due Date***"): (i) termination of the stay period specified in Bankruptcy Code § 1110, or the Debtors' failure to reach arrangements (including arrangements with RACC) reasonably satisfactory to Agent, Lender and Debtors regarding the Debtors' assets that are Subject to Section 1110); (ii) ninety (90) days after the commencement of the Bankruptcy Cases; (iii) the substantial consummation (as defined in Bankruptcy Code § 1101 and which for purposes hereof shall be no later than the effective date) of a confirmed plan of reorganization; (iv) conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code; (v) appointment of a trustee for the Debtors; (vi) dismissal of any of the Bankruptcy Cases; (vii) thirty (30) days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such thirty (30) day period; (viii) the date on which the Court enters a final order approving a post-petition financing

*Error! Unknown document property name.*

between the Debtors and another lender(s) or investor(s) (as the case may be) (other than Lender); (ix) repayment in full in cash of the Loan Obligations; (x) three (3) business days after the Agent or the Lender notifies the Debtors in writing of an Event of Default which is not subsequently cured or waived by the end of such notice period and (xi) January 6, 2011. The Agent and the Lender may extend the Due Date in their sole discretion. In the event that the parties consummate a Lender Sponsored Transaction, as referred to below, the Loan Obligations will be treated in accordance with the terms of such Lender Sponsored Transaction.

---

### Governing Terms

**Lender Sponsored Transaction:**

The Debtors and Lender will continue to cooperate to develop an agreement for a sale of the Debtors' assets free and clear of liens and claims (under which Lender would provide the "stalking horse" purchase transaction), or a Plan of Reorganization, under which Lender and Debtors would be co-sponsors (a "***Lender Sponsored Transaction***"), which would require, involve and is expressly subject to and conditioned upon: (a) the completion of Lender's due diligence satisfactory to Lender in its sole discretion, (b) negotiating an agreement with RACC acceptable to the Lender, Debtors and RACC, (c) reaching term: for applying the Loan Obligations within the capital structure of the Reorganized Debtor or consideration for the purchase of the Debtors' assets in a § 363 sale satisfactory to Lender in its sole discretion; and (d) negotiating and executing definitive documents acceptable to the Lender and the Debtors as required for the transaction. For the avoidance of doubt, the Lender and Debtors specifically acknowledge and agree that they have not reached any binding agreement or understanding regarding any Lender Sponsored Transaction.

**Collateral:**

The Loan shall be secured by: (i) a perfected first priority lien on any and all current and future assets of the Debtors of any nature or type whatsoever including, without limitation, accounts, accounts receivable, inventory, customer lists, intellectual property, minerals, mineral rights, plant and equipment patents, trade secrets, property and/or leasehold rights, all other tangible and intangible assets, and any causes of action under the Bankruptcy Code or applicable non- bankruptcy law, excluding recoveries pursuant to Chapter 6 of the Bankruptcy Code (and also expressly excluding any equipment or other assets as described in Bankruptcy Code § 1110); (ii) a first priority pledge of the capital stock and/or equity interest held directly or indirectly by each of the Debtors (for the avoidance of doubt,

*Error! Unknown document property name.*

such pledge shall not include a pledge of the capital stock/ equity interest held by shareholders/investors in Gulfstream International Group, Inc.); and (iii) constructive control over the Debtors' bank accounts in similar form and substance of lockbox and/or control accounts customary for transactions of this nature exercisable upon an Event of Default end stay relief from the Court, or as may be provided in the interim Order and final Order (collectively the "*Collateral*"). The Debtors shall take any steps requested by the Agent, including the execution of Control Agreements and Pledge Agreements to assure that the Agent's interest in the Collateral is perfected.

**Priority:**

The Loan shall be authorized and approved by the Court pursuant to Bankruptcy Code § 364(c)(1) to be incurred as, and shall constitute, claims with a priority over all administrative, expenses of the kind specified in Bankruptcy Code § 503(b) or 507(b). The security interests and liens in the Collateral securing the Loan shall be authorized and approved by the Court pursuant to Bankruptcy Code § 364(0)(2), (3), and 364(d) to constitute a lien on and in the Collateral ranking prior to all other claims and liens of the Debtors, except for the Carve-Out as defined below (the "*Priming Lien*"). The Priming Lien will be senior in priority to security interests and liens securing the indebtedness and other obligations owing under any of the Debtors' pre-petition loan and security agreements. The Priming Lien shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the Agent or the Lender.

**Carve-Out:**

Not to be duplicative of the Carve-Out given by Victory Park under the prior DIP Loan, the fees and expenses incurred by the Debtors' retained professionals in the Bankruptcy Cases and the quarterly fees of the US Trustee under 28 U.S.C. § 1930 may be paid by the Debtors from the Collateral, subject to and in accordance with the Budget, including an agreed professional fees budget, and subject to entry of any required orders of the Court (the "*Carve-Out*"), which Carve-Out is subject to the Lender's review and approval in its sole discretion. The Lender's and Agent's liens on the Collateral and the Lender's and Agent's administrative expense claims provided for herein shall be subject and subordinate only to the Carve-Out.

5

| | |
|---|---|
| **Representations and Warranties:** | The Debtors shall make usual and customary representations and warranties for transactions of this nature, including, without limitation, good standing of each of the Debtors; no consent or approval is required other than the interim Order and Final Order, due authorization, execution and delivery of loan documents; no violation of material agreements entered into after the commencement of the Bankruptcy Cases; no violation of law as a result of the execution of the Loan documents; no liens on the assets of the Debtors except for certain liens permitted by the Agent and the Lender; compliance with applicable laws and regulations; no material change in business; no unstayed litigation that is reasonably likely to have a material adverse effect on the operations of the Debtors taken as a whole; no information, furnished by Debtors to the Agent or Lender or the Court contains any material misstatement of fact or omitted to state a material fact necessary to make the statements therein not materially misleading; taxes paid to the extent required by law; and material returns filed. |

**Covenants:**

The Debtors shall comply with all of the following covenants:

1.  The Debtors shall promptly provide the Agent with updates of any material developments in connection with the Debtors' reorganization efforts under the Bankruptcy Cases, whether in connection with an asset sale, plan of reorganization or otherwise;

2.  The Debtors shall deliver the Budget as updated on a weekly basis to the Agent (in form and substance reasonably acceptable to the Agent), including, without limitation, forecasts, sales pipeline, accounts receivable and cash flow;

3.  The Debtors shall deliver a bi-monthly payroll report to the Agent (in form and substance reasonably acceptable to the Agent);

4.  The Debtors shall operate their businesses in accordance with the Budget, and the requirements of the Bankruptcy Code and orders of the Bankruptcy Court;

5.  The Debtors shall not provide maintenance service, aircraft parts, fuel or any other resources or services: (a) to any aircraft that is not actively in service and generating revenue for the Debtors' business (for the avoidance of doubt, permitted aircraft shall include those certain: twenty-one (21) Beech 1900D aircraft leased from RACC, two (2)

*Error! Unknown document property name.*

Beech 1900D aircraft leased from Computer Sciences Corporation, Inc. ("**CSC**"), two (2) Piper PA-31 Navajo Chieftain aircraft leased from Thomas L. Cooper ("**Cooper**"), and one (1) Piper PA-31 Navajo Chieftain aircraft leased from Thomas A. McFall ("**McFall**") ); (b) in connection with any maintenance event that may be considered unnecessary by industry standards; or (c) any maintenance event that does not fall within the scope of the Debtors' existing agreements with RACC, CSC, Cooper or McFall;

6.      Without the prior written consent of the Agent or the Lender, the Debtors shall not seek, consent to, or permit to occur any of the following:

     a.      Any order which authorizes the rejection of any leases of any of the Debtors without the Agent's prior written consent;

     b.      Any modification, stay, vacation or amendment to the Final Order to which the Agent has not consented in writing;

     c.      A priority claim or administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including without limitation, any administrative expense of the kind specified in Bankruptcy Code § 105, 326, 327, 330, 331, 364(c) 503(a), 503(b), 506(e), 507(a), 507(b), 546(b), 546(d), 726 or 1114) equal or superior to the priority claim of the Agent and the Lender in respect of the obligations hereunder, except with respect to the Carve- Out;

     d.      Any lien on any Collateral having a priority equal or superior to the lien securing the obligations hereunder, other than with respect to the Carve-Out;

     e.      Any order which authorizes the payment of any indebtedness incurred prior to the petition date without the Agent's prior written consent;

     f.      Any order seeking authority to take any action that is prohibited by the terms of this Letter Agreement, the Interim Order or the Final Order or refrain from taking any action that is required to be taken by the

*Error! Unknown document property name.*

terms of this Letter Agreement, the Interim Order or the Final Order; or

g.      Any other action that would materially adversely affect the Agent or the Lender in any way without the prior written consent of the Agent or the Lender.

7.      Debtors shall continue for cooperate with Lender regarding a Lender Sponsored Transaction, including, without limitation, using their best efforts to meet or cause others to meet the following milestones:  (a) obtaining a binding commitment letter from a buyer of the Debtors' option to purchase the Raytheon aircraft before 12/21/10; (b) obtaining agreement of Raytheon to proposed purchase price no later than 12/23/10; (c) obtaining a financing commitment letter of at least $4,000,000 before 12/23/10, which shall provide for payment in full of the Loan Obligations, administrative fees and working capital; (d) obtaining agreement of the Junior Lenders before 12/24/10 to any conditions in clause (a) or (b) regarding any debt conversions; and (e) developing by 12/30/10 a standalone plan for (i) the Autec contract and (ii) the Cuba contract.

**Event(s) of Default:**      Each of the following shall constitute an "***Event of Default***", unless otherwise waived by the Agent in its sole discretion:

1.      Debtors shall fall to pay any Loan Obligation after such payment has become due;

2.      Any report, certificate or other document delivered to the Agent or the Lender pursuant to this Letter Agreement, the Interim Order or the Final Order shall have been incorrect in any material respect when made or deemed made;

3.      Debtors shall fail to perform or comply with any covenant or agreement contained in this Letter Agreement, the Interim Order or the Final Order;

4.      The failure of Debtors to comply in all material respects with each and all of the terms and conditions of the interim Order, the Final Order and this Letter Agreement;

5.      Any of the Debtors is enjoined, restrained or in any way prevented by the order of any court or any governmental authority from conducting all or any material part of its business for more than three (3) consecutive days;

*Error! Unknown document property name.*

6.    Any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty (whether or not insured) which causes, for more than three (3) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Debtors, if any such event or circumstance could reasonably be expected to have a material adverse effect;

7.    The entry of an order in the Bankruptcy Cases which stays, modifies (in any manner adverse to the Agent or the Lender), or reverses the interim Order or Final Order or which otherwise materially adversely affects, as determined by the Agent in its reasonable discretion, the effectiveness of the Interim Order or Final Order without the express written consent of the Agent;

8.    The conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code;

9.    Any of the following employees of the Debtors is removed, terminated or replaced, or otherwise ceases to participate actively in management of the Debtors, in each case without the written consent of the Agent or Lender; (a) Dave Hackett (President & CEO), (b) Leo Krupllis (Sr. VP Maintenance), (c) Phil LeFevre (VP Director of Operations), (d) Roy Canter (Sr. VP Customer Service), (e) Pete Taggart (VP of SOCC), (f) Eddie Panetta (Director of Financial Reporting), or (g) Donna Bascombe (Revenue Accounting Manager);

10.    The appointment of a trustee for the Debtors;

11.    The dismissal of any of the Bankruptcy Cases, provided that the Agent and the Lender have not consented in writing to such dismissal;

12.    The entry of any order which provides relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 that permits any creditor to (a) realize upon, or to exercise any right or remedy with respect to, any material portion of the Collateral, or (b) terminate any license, franchise or similar agreement, wherein either case the exercise of such right or remedy or such realization or termination would be reasonably likely to have a material

9

adverse effect;

13. Subject to the allowance and payment of any amounts due under the Carve-Out, the filing of any application by Debtors without the express written consent of the Agent for the approval of a super-priority claim in the Bankruptcy Cases which is *pari passu* with or senior to the priority of the claims of the Agent or the Lender, or there shall arise any such super-priority claim under the Bankruptcy Code, provided that the filing of any such application shall not be deemed an Event of Default if the proceeds of the funding supporting such claim will be used to pay the Loan;

14. The payment or other discharge by Debtors of any prepetition indebtedness without the written consent of the Agent or Lender;

15. The filing of any motion by Debtors seeking, or the entry of any order in the Bankruptcy Cases: (a) permitting working capital or other financing (other than ordinary course trade debt or unsecured debt) for any of the Debtors from any person other than the Agent (unless the proceeds of such financing are to be used to pay in full all obligation; arising under this Letter Agreement, the Interim Order and the Final Order); (b) granting a lien on, or security interest in, any of the Collateral, other than with respect to this Letter Agreement (unless such liens are granted in connection with a financing, the proceeds of which are to be applied to the payment in full of all obligations arising under this Letter Agreement, the Interim Order and the Final Order, and other than liens granted as adequate protection for pre-petition claims on the Debtors' assets, which adequate protection liens are junior in priority to the Lenders super priority priming liens); (c) except as permitted by this Letter Agreement, the Interim Order or the Final Order, permitting the use of any of the Collateral pursuant to Bankruptcy Code § 363(c) without the prior written consent of the Agent, permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Bankruptcy Code § 506(c); or (d) dismissing the Bankruptcy Cases, unless the Agent has sought or consented in writing to such relief by the Court;

16. The filing of a motion or other pleading seeking the entry of an order confirming a plan of reorganization (and/or approving a disclosure statement related thereto) that does not require payment in full in cash of all obligations under

10

this Letter Agreement, the Interim Order and the Final Order and the consummation date of such plan of reorganization, and as to which Lender has not consented in writing; or

17. The filing of any pleading by any of the Debtors challenging the validity, priority, perfection or enforceability of this Letter Agreement or the obligations hereunder, or any lien granted pursuant to this Letter Agreement, the Interim Order or the Final Order is determined to be null and void, invalid or unenforceable by the Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Bankruptcy Cases.

**Default Remedies:**    Upon three (3) business days' written notice of an Event of Default which is not subsequently cured or waived during such notice period:

1. The Loan shall mature and any and all Loan Obligations shall become due and payable in full in cash;

2. The Agent and the Lender shall have the right to seek an emergency hearing requesting relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 that allows the Agent and the Lender to realize upon, or to exercise any right or remedy with respect to, any portion of the Collateral.

3. Without the need for court approval, the Agent and the Lender shall have the right to commence an orderly winddown of the Debtors' business serviced by the Raytheon Aircraft, which shall include, without limitation, (a) selling any excess inventory; (b) taking all actions necessary to mitigate any offsets or damages from other carriers, including, without limitation, ceasing booking any customers for flights after 1/5/11, selling off tickets to other carriers by 1/2/11 and taking any actions necessary to return the aircraft to Raytheon; (c) closing a sale of the Debtors' assets by credit bid by 1/6/11; and (d) taking all actions to preserve the Autec and Cuba contracts and maximize the value of the Debtors' other assets.

**Prepayment(s):**    The Debtors shall have the right (but not the obligation) to prepay the Loan Obligations (in cash) in whole or in part.

**Reservation of Rights:**    Nothing in this Letter Agreement is intended or shall be construed

11

to waive any of the Agent's or the Lender's rights to object to or otherwise contest the reasonableness of the fees and expenses of the Debtors' retained professionals. Such rights are hereby reserved in their entirety.

If the Debtors have not received a Court order approving the Section 1110 Stipulation before the termination of the stay period specified in Bankruptcy Code § 1110, then, notwithstanding Bankruptcy Code § 1121, the Agent and the Lender shall have the right to file a plan and disclosure statement (the "*Plan Right*"). The Plan Right shall be approved by the Court pursuant to the Interim Order and Final Order, and shall be a condition to consummating the Loan.

The Agent and the Lender shall have the right under Bankruptcy Code § 363(k) to credit bid up to the full amount of the Loan Obligations in connection with any sale of the Debtors' assets under a plan of reorganization or Otherwise (the "***Credit Bid Right***"). The Credit Bid Right shall be approved by the Court pursuant to the Interim Order and Final Order, and shall be a condition to consummating the Loan.

| | |
|---|---|
| **Retainer:** | None |
| **Closing Conditions:** | This Letter Agreement is subject to, amongst other items, the following: |

1.    Completion of business and legal due diligence satisfactory to the Agent and Lender in their sole discretion;

2.    Execution of definitive legal documentation acceptable to the Agent and Lender in their sole discretion;

3.    Payment in full in cash of the Initial Retainer and the Additional Retainer; and

4.    Entry of the Interim Order and Final Order by the Court, authorizing borrowing pursuant to this Letter Agreement.

This Letter Agreement does not set forth all the terms and conditions of the Loan described herein. Rather, it is only an outline, in summary formal, of major points of understanding, which will form the basis of the definitive documentation. The definitive documentation will be prepared by the Agent and the Lender.

This Letter Agreement is not, and shall not be deemed to be, a binding agreement by the Agent or the Lender to provide the Loan described herein. Such agreement will arise only upon the

*Error! Unknown document property name.*

execution and delivery by the Debtors of definitive documentation satisfactory in form and substance to the Agent and the Lender and the fulfillment, to the satisfaction of the Agent and the Lender, of the conditions precedent required by the Agent and the Lender and set forth herein and therein. Notwithstanding the foregoing, the rights of the Agent and the Lender and the corresponding obligations of the Debtors under "Costs/Expenses" and "Retainer" shall be binding on the parties hereto upon the execution of this Letter Agreement.

In the event that the Debtors elect not to consummate the transaction contemplated herein or the Debtors are unable, for any reason, to obtain the interim Order from the Court on or before December 17, 2010 (or as soon thereafter as the Court's calendar shall permit), this Letter Agreement shall automatically terminate (unless extended in writing by the Agent and the Lender). Any disputes arising in connection with this letter, or the definitive documents referred to herein, shall be determined by the Florida Bankruptcy Court having Jurisdiction and Venue over the Debtors cases.

This Letter Agreement and the terms set forth herein are confidential, and the Debtors shall not disclose the terms of this Letter Agreement, or the tact that negotiations between the Agent, the Lender and the Debtors are ongoing, to any third party other than RACC, including any other source of potential financing for the Debtors; provided, however, that the Debtors shall disclose the terms of this Letter Agreement for purposes of seeking approval of the Loan by the Court.

*Error! Unknown document property name.*

# EXHIBIT "C"

## (Budget)

| GULFSTREAM INTERNATIONAL AIRLINES<br>December | 29-Nov | 30-Nov | 1-Dec | 2-Dec | 3-Dec | WEEK TOTAL 3-Dec | 6-Dec | Actual Thru 7-Dec | 8-Dec | 9-Dec | 10-Dec | WEEK TOTAL 10-Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BEGINNING BALANCE** | 1,602 | 1,749 | 1,712 | 1,623 | 1,379 | 1,602 | 1,209 | 771 | 680 | 530 | 1,044 | 1,209 |
| | | | | | | | | | | | | |
| **SOURCES-OPERATING** | | | | | | - | | | | | | - |
| Continental Weekly Revenue Advance | - | - | - | 504 | - | 504 | | | | 518 | | 518 |
| Airline Clearing House - Revenue | - | - | - | - | - | - | | | | | | - |
| Airline Clearing House - Expense | - | - | - | - | - | - | | | | | | - |
| Essential Air Service - DOT | - | - | - | - | - | - | | | | | | - |
| Airline Clearing House - IATA | - | - | - | - | - | - | | | | | | - |
| Cuba Charter | 175 | 12 | - | - | 100 | 287 | | | 7 | | | 7 |
| Charter | - | - | - | - | - | - | | | | | | - |
| Sunpac & Other | 5 | 3 | 6 | 10 | 7 | 31 | 7 | | 3 | 1 | 12 | 23 |
| Ministry of Tourism - Bahamas | - | - | - | - | - | - | | | | | | - |
| Autec Contract | - | - | - | - | - | - | | | | | 249 | 249 |
| Other | - | - | 2 | - | - | 2 | | | | | | - |
| Other | - | - | - | - | - | - | | | | | | - |
| **TOTAL RECEIPTS** | 180 | 15 | 8 | 514 | 107 | 824 | 7 | - | 10 | 519 | 261 | 797 |
| | | | | | | | | | | | | |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | |
| **Payroll** | | | | | | | | | | | | |
| Net | - | - | 39 | 367 | - | 406 | | | | | | - |
| Taxes | - | - | - | 133 | - | 133 | | | | | | - |
| Headcount Reductions | - | - | - | - | - | - | | | | | | - |
| Salary Reductions | - | - | - | - | - | - | | | | | | - |
| Union Contract Savings | - | - | - | - | - | - | | | | | | - |
| | - | - | - | - | - | - | | | | | | - |
| **Flight Operations** | - | - | - | - | - | - | | | | | | - |
| Fuel & Oil | - | 45 | 3 | 1 | 83 | 132 | | 1 | 74 | | 50 | 125 |
| Food & Lodging | 1 | 1 | - | - | - | 2 | | | | | | - |
| Aircraft Rental | - | - | - | - | - | - | 441 | | | | | 441 |
| All Other ( Flight Safety incl.) | 1 | - | - | - | 11 | 12 | | 1 | 1 | | | 2 |
| **Aircraft Maintenance** | - | - | - | - | - | - | | | | | | - |
| Vendor O'hauls | 12 | - | - | 20 | - | 32 | | | 18 | | 20 | 38 |
| Rotable Parts-1900 | - | - | 24 | - | 2 | 26 | | 36 | | 1 | | 37 |
| Consumable Parts-1900 | 3 | - | 10 | 17 | 3 | 33 | | 2 | 6 | | 15 | 23 |
| Engine Reserve | - | - | - | - | 144 | 144 | | | | | 144 | 144 |
| All Other | - | - | 2 | 21 | - | 23 | | 2 | 18 | | | 20 |
| Critical Vendor Payments | - | - | - | 5 | - | 5 | | | | | 12 | 12 |
| **Stations** | - | - | - | - | - | - | | | | | | - |
| Landing Fees | - | - | - | - | - | - | | | | | - | - |
| Other Airport Fees | - | - | - | - | - | - | | | | | 25 | 25 |
| Ground Handling | - | - | - | 20 | 2 | 22 | | | 20 | | - | 20 |
| All Other (TSA incl.) | - | 4 | - | 15 | 3 | 22 | | 8 | 13 | | | 21 |
| **Sales and Reservations** | - | - | - | - | - | - | | | | | | - |
| All Other | - | - | 5 | 49 | 25 | 79 | | 11 | | | 6 | 17 |
| **General & Administrative / Other** | - | - | - | - | - | - | | | | | | - |
| Insurance (Hull & Pax Liab) | - | - | - | 108 | - | 108 | | | | | 17 | 17 |
| Insurance - Other(W/C,Health,etc…) | 13 | - | - | - | - | 13 | | | | | | - |
| ACH / IATA | - | - | - | - | | - | 4 | | | | | 4 |
| Excise taxes | - | - | - | - | - | - | | | | | | - |
| Other | 1 | 2 | 14 | 2 | 4 | 23 | | 25 | 10 | 4 | 15 | 54 |
| Legal & Acctg | 2 | - | - | - | - | 2 | | 5 | | | 4 | 9 |
| Critical Vendors | - | - | - | - | - | - | | | | | 3 | 3 |
| Utilities, Rent & Other | - | - | - | - | - | - | | | | | | - |
| Cassell - Salpeter Retention | | | | | | | | | | | | - |
| DIP Payments | - | - | - | - | - | - | | | | | | - |
| Payments to Professionals | - | - | - | - | - | - | | | | | 200 | 200 |
| **TOTAL DISBURSEMENTS** | 33 | 52 | 97 | 758 | 277 | 1,217 | 445 | 91 | 160 | 5 | 511 | 1,212 |
| **CONSOLIDATED CASH** | 1,749 | 1,712 | 1,623 | 1,379 | 1,209 | 1,209 | 771 | 680 | 530 | 1,044 | 794 | 794 |

| GULFSTREAM INTERNATIONAL AIRLINES<br>December | 13-Dec | 14-Dec | 15-Dec | 16-Dec | 17-Dec | WEEK TOTAL 17-Dec | 20-Dec | 21-Dec | 22-Dec | 23-Dec | 24-Dec | WEEK TOTAL 24-Dec | 27-Dec | 28-Dec | 29-Dec | 30-Dec | 31-Dec | WEEK TOTAL 31-Dec | MONTH TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BEGINNING BALANCE** | 794 | 694 | 726 | 477 | 959 | 794 | 597 | 506 | 441 | 332 | 978 | 597 | 905 | 900 | 695 | 684 | 777 | 905 | 1,712 |
| | | | | | | | | | | | | | | | | | | | |
| **SOURCES-OPERATING** | | | | | | - | | | | | | - | | | | | | | |
| Continental Weekly Revenue Advance | | | | 553 | | 553 | | | | 500 | | 500 | | | | 500 | | 500 | 2,575 |
| Airline Clearing House - Revenue | | 1,943 | | | | 1,943 | | | | | | - | | | | | | - | 1,943 |
| Airline Clearing House - Expense | | (1,398) | | | | (1,398) | | | | | | - | | | | | | - | (1,398) |
| Essential Air Service - DOT | | | | 650 | | 650 | | | | | | - | | | | | | - | 650 |
| Airline Clearing House - IATA | | | | 55 | | 55 | | | | | | - | | | | | | - | 55 |
| Cuba Charter | 100 | | | 150 | | 250 | | | | 150 | | 150 | | | | 150 | | 150 | 657 |
| Charter | - | | | - | | - | | | | | | - | | | | | | - | - |
| Sunpac & Other | 5 | 5 | 5 | 5 | 5 | 25 | | | | | | - | | | | | | - | 71 |
| Ministry of Tourism - Bahamas | | | | | | - | | | | | | - | | | | | | - | - |
| Autec Contract | | | | | | - | | | | | 240 | 240 | | | | | | - | 489 |
| Other | | | | | | - | | 10 | | | | 10 | | | | | | - | 12 |
| Other | | | | | | - | | | | | - | - | | | | | | - | - |
| **TOTAL RECEIPTS** | 105 | 550 | 5 | 1,413 | 5 | 2,078 | - | 10 | - | 650 | 240 | 900 | - | - | - | 650 | - | 650 | 6,452 |
| | | | | | | | | | | | | | | | | | | | |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | |
| **Payroll** | | | | | | | | | | | | | | | | | | | |
| Net | | 196 | | 400 | | 596 | | | | | | - | | | | 519 | 30 | 549 | 1,551 |
| Taxes | | 80 | | 124 | | 204 | | | | | | - | | | | 171 | | 171 | 508 |
| Headcount Reductions | | | | (20) | | (20) | | | | | | - | | | | (65) | (5) | (70) | (90) |
| Salary Reductions | | | | | | - | | | | | | - | | | | (50) | (5) | (55) | (55) |
| Union Contract Savings | | | | | | - | | | | | | - | | | | (25) | | (25) | (25) |
| | | | | | | - | | | | | | - | | | | | | - | - |
| **Flight Operations** | | | | | | - | | | | | | - | | | | | | - | - |
| Fuel & Oil | 75 | 60 | 105 | 75 | 60 | 375 | 50 | 60 | | | 60 | 170 | | 60 | | | 60 | 120 | 877 |
| Food & Lodging | | | | | | - | | | | | 10 | 10 | | | | | | - | 10 |
| Aircraft Rental | | | | | | - | | | | | | - | | | | | | - | 441 |
| All Other ( Flight Safety incl.) | 5 | | | | | 5 | 5 | 10 | | | 5 | 20 | 5 | | | | | 5 | 43 |
| **Aircraft Maintenance** | | | | | | - | | | | | | - | | | | | | - | - |
| Vendor O'hauls | 20 | | | | 20 | 40 | | | | | 40 | 40 | | | | | 40 | 40 | 178 |
| Rotable Parts-1900 | | 40 | | | | 40 | | | | | | - | | | | | | - | 103 |
| Consumable Parts-1900 | | 25 | | | 20 | 45 | | | | | 10 | 10 | | | | | 5 | 5 | 113 |
| Engine Reserve | | | | | 144 | 144 | | | | | 144 | 144 | | | | | 144 | 144 | 720 |
| All Other | 5 | 30 | 8 | | 20 | 63 | | 5 | | | 10 | 15 | | | | | 20 | 20 | 141 |
| Critical Vendor Payments | 10 | | | | | 10 | | | | | | - | | | | | | - | 27 |
| **Stations** | | | | | | - | | | | | | - | | | | | | - | - |
| Landing Fees | | | 85 | | | 85 | | | | | | - | | | | | | - | 85 |
| Other Airport Fees | | 25 | | 50 | | 75 | | | 75 | | | 75 | | 50 | | | | 50 | 225 |
| Ground Handling | | | | | | - | | | | | | - | | | | | | - | 42 |
| All Other (TSA incl.) | | | 25 | | 62 | 87 | 36 | | 25 | | | 61 | | 25 | | | | 25 | 212 |
| **Sales and Reservations** | | | | | | - | | | | | | - | | | | | | - | - |
| All Other | 2 | 50 | 2 | | 3 | 57 | | | | | | - | | | | | | - | 153 |
| **General & Administrative / Other** | | | | | | - | | | | | | - | | | | | | - | - |
| Insurance (Hull & Pax Liab) | | | | | | - | | | | | | - | | | | | | - | 125 |
| Insurance - Other(W/C,Health,etc…) | 73 | | | 176 | | 249 | | | | | 7 | 7 | | | | | | - | 256 |
| ACH / IATA | | | | | 22 | 22 | | | | | | - | | | | | 22 | 22 | 48 |
| Excise taxes | 11 | | 20 | 87 | | 118 | | | | | | - | | 70 | | | | 70 | 188 |
| Other | 4 | 12 | 3 | 6 | 16 | 41 | | | 3 | | 6 | 9 | | | 3 | 3 | 6 | 12 | 136 |
| Legal & Acctg | | | | 4 | | 4 | | | | 4 | | 4 | | | | 4 | | 4 | 21 |
| Critical Vendors | | | | | | - | | | | | | - | | | | | | - | 3 |
| Utilities, Rent & Other | | | 6 | 29 | | 35 | | | 6 | | 21 | 27 | | | 8 | | | 8 | 70 |
| Cassell - Salpeter Retention | | | | | | - | | | | | | - | | | | | | - | - |
| DIP Payments | | | | | | - | | | | | | - | | | | | | - | - |
| Payments to Professionals | | | | | | - | | | | | | - | | | | | | - | 200 |
| **TOTAL DISBURSEMENTS** | 205 | 518 | 254 | 931 | 367 | 2,275 | 91 | 75 | 109 | 4 | 313 | 592 | 5 | 205 | 11 | 557 | 317 | 1,095 | 7,704 |
| **CONSOLIDATED CASH** | 694 | 726 | 477 | 959 | 597 | 597 | 506 | 441 | 332 | 978 | 905 | 905 | 900 | 695 | 684 | 777 | 460 | 460 | 460 |

Case 10-44131-JKO Doc 217 Filed 12/16/10 Page 73 of 74

**GULFSTREAM INTERNATIONAL AIRLINES**

January

**BEGINNING BALANCE**

**SOURCES-OPERATING**
- Continental Weekly Revenue Advance
- Airline Clearing House - Revenue
- Airline Clearing House - Expense
- Essential Air Service - DOT
- Airline Clearing House - IATA
- Cuba Charter
- Charter
- Cruise & Other
- Ministry of Tourism - Bahamas
- Iberia Contract
- Other

**OPERATING DISBURSEMENTS**
- Fuel
  - Net
  - Taxes
- Aircraft Maintenance
  - Vendor Checks
  - Rotable Parts-1900
  - Consumable Parts-1900
  - Engine Reserve
  - All Other
  - Critical Vendor Payments
- Stations
  - Landing Fees
  - Other Airport Fees
  - Ground Handling
  - All Other (TSA incl.)
- Sales and Reservations
- General & Administrative / Other
  - Insurance - Hull & Fleet Liab'l
  - Insurance - Other (W/C, Health, etc...)
  - ACH / JATA
  - Estate taxes
  - Other
  - Legal & Acctg
  - Critical Vendors
  - Utilities, Rent & Other
  - DIP Payments
- Payments to Professionals

**CONSOLIDATED CASH**

Wind Down Cash Projection 12-16.xls
JAN 2011