**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| In re: | Chapter  11 |
| GULFSTREAM INTERNATIONAL GROUP, INC., | Case No. 10-44131-JKO |
| GULFSTREAM INTERNATIONAL AIRLINES, INC., | Case No. 10-44133-JKO |
| GULFSTREAM TRAINING ACADEMY, INC., | Case No. 10-44134-JKO |
| GULFSTREAM CONNECTION, INC., | Case No. 10-44137-JKO |
| GIA HOLDINGS CORP., INC, | Case No. 10-44139-JKO |
| Debtors. | *Jointly Administered* |
| _____/ | *Case No.* 10-44131-JKO |

**AMENDED COMBINED JOINT DISCLOSURE STATEMENT**
**AND PLAN OF LIQUIDATION FOR DEBTORS PROPOSED BY**
**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**GRAYROBINSON, P.A.**

Robert A. Schatzman, Esq.
Steven J. Solomon, Esq.
Ji Hun Kim, Esq.
1221 Brickell Avenue, Suite 1650
Miami, FL 33131

***Counsel for the Official Committee of Unsecured Creditors***

1

> THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT OR THE PLAN OF LIQUIDATION.

The Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases (the "Committee") hereby file the Amended Combined Disclosure Statement (the "Disclosure Statement") and Plan of Liquidation (the "Plan") for Gulfstream International Group, Inc., Gulfstream International Airlines, Inc., Gulfstream Training Academy, Inc., Gulfstream Connection, Inc., and GIA Holdings Corp., Inc. (collectively, the "Debtors").

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ITS ACCEPTANCE.

ALL CREDITORS AND INTEREST HOLDERS ARE HEREBY ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS HERETO AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE COURT PRIOR TO OR CONCURRENT WITH THE FILING OF THIS DISCLOSURE STATEMENT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE MADE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN ARE MATERIALLY ACCURATE OR (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN. NOTHING CONTAINED HEREIN WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE LIQUIDATION OF THE DEBTORS ON HOLDERS OF CLAIMS OR INTERESTS. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CLAIMS AND CAUSES OF ACTIONS OR THREATENED ACTIONS AGAINST THIRD PARTIES, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE COMMITTEE AND HAS NOT BEEN SUBJECT TO INDEPENDENT REVIEW OR TO CERTIFIED AUDIT. THE COMMITTEE HAS MADE EVERY EFFORT TO ENSURE THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE AND ACCURATE; HOWEVER, THE COMMITTEE IS UNABLE TO WARRANT OR REPRESENT THAT THIS INFORMATION IS WITHOUT ANY INACCURACY.

## TABLE OF CONTENTS

INTRODUCTION AND REPRESENTATIONS ..................................................................4

    A.    Introduction and Summary of Plan...........................................................4

    B.    Substantive Consolidation of Debtors' Estates ........................................4

    C.    Representations...........................................................................................5

    D.    Defined Terms ............................................................................................6

    E.    Holders of Claims Entitled to Vote ........................................................12

    F.    Cramdown .................................................................................................13

ARTICLE I BACKGROUND INFORMATION ...............................................................13

    A.    Background of Debtors.............................................................................13

    B.    Events Leading to Debtors' Chapter 11 Filings .....................................14

ARTICLE II THE DEBTORS' CHAPTER 11 CASES ....................................................15

    A.    Procedural Matters....................................................................................15

    B.    Payment of Pre-Petition Employee Obligations.....................................15

    C.    Adequate Assurance as to Utility Companies .........................................15

    D.    Retention of Professionals........................................................................16

    E.    Creditors' Committee ...............................................................................16

    F.    Pre-Petition Claims Bar Date ...................................................................16

    G.    Use of Cash Collateral .............................................................................16

    H.    DIP Loans .................................................................................................17

    I.    DIP Reports ..............................................................................................17

    J.    Section 363 Asset Sale .............................................................................18

    K.    Assumption and Assignment of Certain Executory Contracts and Unexpired Leases of Nonresidential Real Property ..................................20

    L.    Rejection of Executory Contracts and Unexpired Leases of Nonresidential Real Property ................................................................20

    M.    Settlement with SAH-VUL Strategic Partners I, LLC .........................20

    N.    Bona Fide Dispute as to Claim Asserted by Taglich Brothers, Inc. ......21

    O.    Rejection of Executory Contracts and Unexpired Leases; Exceptions ...............21

    P.    Approval of Rejection; Rejection Damages Claims Bar Date .............21

    Q.    Treatment Under the Plan of Executory Contract Rejection Claims .................22

    R.    Causes of Action.......................................................................................22

ARTICLE III CHAPTER 11 PLAN....................................................................................25

    A.    Treatment of Unclassified, Unimpaired Claims.....................................25

    B.    Treatment of Classified Claims and Interests.........................................25

ARTICLE IV MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN........27

    A.    General Overview of the Plan ...........................................................27

    B.    Effective Date Transactions.............................................................28

    C.    Liquidating Trust ............................................................................28

    D.    Prosecution and Settlement of Claims and Causes of Action..............30

    E.    Effectuating Documents; Further Transactions ....................................30

ARTICLE V DISTRIBUTIONS ......................................................................31

    A.    General..........................................................................................31

    B.    Delivery of Distributions ...............................................................31

    C.    Distributions to Allowed Creditors ..................................................31

    D.    Cash Payments...............................................................................31

    E.    Interest on Claims ..........................................................................31

    F.    Failure to Negotiate Checks ............................................................31

    G.    Unclaimed or Returned Property......................................................32

    H.    Limitation on Distribution Rights ....................................................32

    I.    Fractional Dollars ..........................................................................32

    J.    De Minimis Distributions ...............................................................32

    K.    Setoffs..........................................................................................32

    L.    Disputed Claims Reserve ................................................................33

ARTICLE VI CONDITIONS PRECEDENT TO EFFECTIVE DATE .....................33

    A.    Conditions to Effective Date ...........................................................33

    B.    Waiver of Conditions to Consummation ..........................................34

    C.    Notice of Effective Date .................................................................34

ARTICLE VII TAX CONSIDERATIONS..........................................................34

    A.    General..........................................................................................34

    B.    Federal Income Tax Consequences to the Debtors .............................35

    C.    Federal Income Tax Consequences to Creditors and Interestholders.................35

    D.    Holders of Allowed Equity Interests ...............................................36

    E.    Holders of Disputed Claims ............................................................37

    F.    Information Reporting and Backup Withholding.................................37

    G.    Importance of Obtaining Professional Tax Assistance ........................37

ARTICLE VIII ALTERNATIVES TO PLAN AND BEST INTERESTS OF CREDITORS.....37

    A.    Dismissal ......................................................................................38

    B.    Chapter 7 Liquidation.....................................................................38

    C.    Alternative Plan .............................................................................39

ARTICLE IX ACCEPTANCE AND CONFIRMATION OF THE PLAN ...............................39

    A.     General Confirmation Requirements.........................................................39

    B.     Best Interest of Creditors Test..................................................................40

    C.     Classification of Claims and Interests ......................................................40

    D.     Combined Disclosure Approval and Confirmation Hearing ......................40

    E.     Voting .......................................................................................................41

    F.     Financial Feasibility .................................................................................41

ARTICLE X RISK FACTORS .................................................................................41

    A.     Failure to Confirm or Consummate the Plan.............................................41

    B.     Allowed Claims Estimates May Be Incorrect ...........................................42

ARTICLE XI EFFECT OF THE PLAN ON CLAIMS AND INTERESTS..............................42

    A.     Causes of Action ......................................................................................42

    B.     Binding Effect ..........................................................................................42

    C.     Exculpation from Liability .......................................................................42

    D.     Effect on Securities and Exchange Commission .......................................43

    E.     Term of Certain Injunctions and Automatic Stay .....................................43

    F.     No Liability for Tax Claims......................................................................43

ARTICLE XII FINAL REPORT ................................................................................43

ARTICLE XIII ABANDONMENT ..............................................................................43

ARTICLE XIV RETENTION OF JURISDICTION...........................................................44

    A.     Retained Jurisdiction of Bankruptcy Court ..............................................44

ARTICLE XV MISCELLANEOUS PROVISIONS...........................................................46

    A.     Substantial Consummation of the Plan......................................................46

    B.     No Admissions .........................................................................................46

    C.     Controlling Documents .............................................................................46

    D.     Withdrawal of the Plan .............................................................................46

    E.     Modification of the Plan ...........................................................................47

    F.     Business Days ...........................................................................................47

    G.     Governing Law .........................................................................................47

    H.     Notices .....................................................................................................47

**EXHIBIT A: Liquidating Trust Agreement**
**EXHIBIT B: Potential Litigation Targets**

## INTRODUCTION AND REPRESENTATIONS

### A.    Introduction and Summary of Plan

The Committee has prepared and is disseminating this Disclosure Statement to creditors for the purpose of soliciting acceptances of their chapter 11 plan of liquidation. The Committee believes this Disclosure Statement contains the information that is material, important and necessary for creditors to reach an informed decision in exercising their rights to vote for the Plan.  For a class of creditors to accept the Plan, acceptances must be filed by at least 66 2/3% in amount and more than 50% in number of the eligible creditors that actually vote on the Plan. A failure to vote on the Plan does not constitute either an acceptance or rejection of the Plan.

In summary, but subject to more specific details provided herein, the Plan provides for the distribution in the total amount of $625,000, which includes the purchase price allocation of substantially all of the $600,000 received by the Estate from the pre-confirmation sale of substantially all of the Debtors' Assets pursuant to section 363 of the Bankruptcy Code, to the Holders of Allowed Claims.  In addition, the Plan contemplates that the Purchaser will assume certain liabilities of the Debtors, including but not limited to, satisfying the Claims of certain secured creditors and the assumption of certain executory contracts and unexpired leases, all of which will render a benefit to the Estates.  Causes of Action may also be pursued for the benefit of creditors as further described herein, thereby increasing the funds available for distribution.

Distributions may be made in accordance with the substantive consolidation of the Estates.  The Plan also provides for the creation of a Liquidating Trust to make distributions to creditors and to administer the Debtors' Assets, including the sale proceeds and Causes of Action described herein for the benefit of Holders of Allowed Claims under the Plan.

### B.    Substantive Consolidation of Debtors' Estates

As part of this Plan, the Committee is requesting that the Court substantively consolidate the Debtors' Estates.  This Plan constitutes a motion for substantive consolidation of the assets and liabilities of all Debtors.

For the reasons set forth below, the Committee has concluded that the time and cost involved in the reconstruction of each individual Debtor's assets and liabilities are such that substantive consolidation of the Debtors is in the best interests of all creditors.  The Committee believes that the following facts are sufficient to warrant the substantive consolidation of the Debtors:

1)    Each of the Debtors has been headquartered in and operated their business from a common corporate location at 3201 Griffin Road, 4th Floor, Fort Lauderdale, FL 33312

2)    Prior to the Petition Date, the Debtors shared common officers and directors.

3)    For a substantial period of time leading to the Petition Date, the Debtors maintained  centralized administrative operations including (i) centralized books and records (including consolidated financial statements); (ii) centralized administrative staff; (iii)

centralized payroll accounting; and (iv) centralized policies and procedures affecting all employees in connection with, inter alia, travel, entertainment, personnel and employee benefits.

4)      In addition, the Debtors' cash management system is centrally managed by the Debtors' financial personnel in corporate headquarters located in Fort Lauderdale, Florida. Through the utilization of the centralized cash management system, the Debtors facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of the various bank accounts required to effect the collection, disbursement, and movement of cash for all of the Debtors.  The centralized cash management system was set up to allow the Debtors to (a) control corporate funds centrally and (b) reduce administrative expenses.  In essence, the centralized cash management system was structured to treat the Debtors as one enterprise.

5)      The parent Debtor, Gulfstream International Group, Inc. ("GIG") owns one hundred percent (100%) of the equity interests in the affiliate Debtors, Gulfstream International Airlines, Inc.("GIA"), Gulfstream Training Academy, Inc. ("GTA"), Gulfstream Connection, Inc. ("GCI"), and GIA Holdings Corp ("GIA Holdings").

6)      The Debtors also made intercorporate guarantees on certain loans.  Various Debtors guaranteed debts of other Debtors, without regard to which entity received the consideration.  Specifically, GIG entered into certain loans with Shelter Island Opportunity Fund, LLC ("Shelter Island"), Taglich Brothers, Inc. ("Taglich"), and SAH-VUL (collectively, the "Lenders").  In each of these instances, the Lenders received a security interest in and to all of the assets and properties of all of the Debtors.[1]  For all intents and purposes, each of the Debtors was liable on the loans with the Lenders.

7)      The Committee believes that segregating and ascertaining individual liabilities of the Debtors, including accurately reflecting the amount of intercompany receivables, would be very difficult and time consuming.  Due to the commingling of funds, it would be difficult to determine the extent to which each of the Debtors would have an interest in causes of action or be subject of fraudulent transfer claims by another Debtor.  The cost to the Debtors' Estates would be substantial and could delay prosecution of the Debtors' Causes of Action, as well as distribution for the Debtors' creditors.

8)      Therefore, the Committee believes substantive consolidation of the Debtors is necessary and appropriate under the Plan to recognize the pre-petition relationship between the Debtors.  The Committee proposes that the Confirmation Order provide for, among other things, the substantive consolidation of the Debtors' Estates as of the Effective Date.

## C.      Representations

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH HEREIN.  ANY REPRESENTATIONS OR INDUCEMENTS TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU.  THE INFORMATION

---

[1] As addressed *infra* in the Plan, it is important to note that certain of these secured claims against the Debtors are subject to bona fide dispute or have been resolved via a settlement.

CONTAINED HEREIN HAS NOT BEEN REVIEWED OR PASSED UPON BY AN ACCOUNTANT AND THE COMMITTEE IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE ALTHOUGH ALL SUCH INFORMATION IS ACCURATE TO THE COMMITTEE'S BEST KNOWLEDGE, INFORMATION AND BELIEF.  THE COURT HAS NOT VERIFIED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN, AND THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE COURT ENDORSES OR APPROVES THE PLAN, BUT ONLY THAT IF THE INFORMATION IS ACCURATE IT IS SUFFICIENT TO PROVIDE AN ADEQUATE BASIS FOR CREDITORS AND INTERESTHOLDERS TO MAKE INFORMED DECISIONS ON WHETHER TO APPROVE OR REJECT THE PLAN.

**D.     Defined Terms**

The following terms shall have the following meanings:

**a.**     "**Administrative Claim**" shall mean a Claim for payment of costs or expenses of administrative priority specified in sections 503(b) and 507(a)(1) of the Bankruptcy Code, incurred after the Petition Date through the Confirmation Date, including without limitation: (i) the actual, necessary costs and expenses of preserving the Debtors' Estates; (ii) compensation for legal and other services and reimbursement of expenses awarded pursuant to sections 330(a) or 331 of the Bankruptcy Code; and (iii) all fees and charges assessed against the Debtors' Estates pursuant to 28 U.S.C. § 1930.

**b.**     "**Affiliate**" shall have the meaning as defined in section 101(2) of the Bankruptcy Code.

**c.**     "**Allow**", "**Allowed**" **or** "**Allowance**" shall mean with respect to a Claim against the Estates: (i) that no objection has been filed within the applicable period of limitation fixed by this Plan or by the Bankruptcy Court and that such period of limitation has expired; or (ii) that the Claim has been allowed for purposes of payment by a Final Order of the Bankruptcy Court.

**d.**     "**Allowance Date**" shall mean the date on which the particular Claim at issue becomes an Allowed Claim.

**e.**     "**Allowed Holders**" shall mean Holders of Allowed Claims and Equity Interests.

**f.**     "**APA**" **or** "**Asset Purchase Agreement**" shall mean the Asset Purchase Agreement executed and closed on May 6, 2011, which sold substantially all of the Debtors' assets to the Purchaser.

**g.**     "**Assets**" shall mean any and all assets and property of the Debtors under section 541 of the Bankruptcy Code.

**h.**      "**Available Cash**" shall mean Cash available to make payments to Holders of Allowed Claims pursuant to this Plan.

      **i.**    **"Avoidance Actions"** shall mean any and all causes of action which a trustee, debtor-in-possession, the estate or other legal representative or appropriate party-in-interest, including the Liquidating Trustee, may assert, including those causes of action under chapter 5 of the Bankruptcy Code, including the Debtors' rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity in connection herewith (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted.

      **j.**    "**Ballot**" shall mean, as applicable, the form or forms distributed to each Holder of an impaired Claim entitled to vote on this Plan on which acceptance or rejection of this Plan shall be indicated.

      **k.**    "**Bankruptcy Code**" shall mean title 11 of the United States Code.

      **l.**    "**Bankruptcy Court**" or "**Court**" shall mean the United States Bankruptcy Court for the Southern District of Florida, Miami Division, or any other court exercising competent jurisdiction over the Chapter 11 Cases or any proceeding arising in or related to the Chapter 11 Cases.

      **m.**    "**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court (including any applicable local rules of the United States District Court for the Southern District of Florida), as now in effect or hereafter amended.

      **n.**    "**Cash**" shall mean money, currency and coins, negotiable checks, balances in bank accounts and other lawful currency of the United States of America and its equivalents.

      **o.**    "**Causes of Action**" shall mean any and all actions, claims, rights, defenses, impleader claims, damages, executions, demands, crossclaims, counterclaims, suits, causes of action, choses in action, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly, indirectly or derivatively, at law, in equity or otherwise, accruing to the Debtors, including the Avoidance Actions.

      **p.**    "**Chapter 11 Cases**" shall mean the Debtors' bankruptcy cases jointly administered under Case No. 10-44131-BKC-JKO.

      **q.**    "**Claim**" shall have the meaning provided for such term in Section 101(5) of the Bankruptcy Code.

      **r.**    "**Claimant**" or "**Creditor**" shall mean the Holder of a Claim against the Debtors.

      **s.**    "**Claims Bar Date**" shall mean March 16, 2011 the last date for Creditors and Interestholders to have filed proofs of Claims or Interests in the Chapter 11 Cases, provided however that the Claims Bar Date shall be 180 days after the Petition Date with respect to Governmental Units.

**t.** **"Claim Objection Deadline"** means the deadline for objecting to Claims against the Estates, which shall be 120 days after the Effective Date unless extended by order of the Bankruptcy Court for cause.

**u.** **"Class"** shall mean a group of Claims or Interests which are substantially similar to each other as classified pursuant to the Plan in accordance with section 1122 of the Bankruptcy Code.

**v.** **"Committee Counsel"** shall mean the attorneys for the Committee, GrayRobinson, P.A.

**w.** "**Confirmation**" shall mean confirmation of the Plan under section 1129 of the Bankruptcy Code.

**x.** **"Confirmation Date"** shall mean the date on which the Bankruptcy Court conducts a hearing on confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

**y.** **"Confirmation Order"** shall mean the Court's order confirming the Plan.

**z.** **"Contested Claim"** shall mean a Claim which is not an Allowed Claim and not subject to a pending objection.

**aa.** **"Debtors"** shall mean Gulfstream International Group, Inc., Gulfstream International Airlines, Inc., Gulfstream Training Academy, Inc., Gulfstream Connection, Inc., and GIA Holdings Corp., Inc., collectively.

**bb.** **"Disallowed Claim"** shall mean a Contested Claim which is disallowed by Final Order of the Bankruptcy Court.

**cc.** **"Disclosure Statement"** shall mean this Disclosure Statement in its entirety, together with all addenda, exhibits, schedules and other attachments hereto, in its present form or as it may be modified, amended or supplemented from time to time.

**dd.** **"Disputed Claim"** shall mean any Claim that is the subject of a pending objection, motion, complaint, counterclaim, setoff, Avoidance Action or other defense, or any other proceeding seeking to disallow, subordinate or estimate any such Claim in whole or in part.

**ee.** **"Disputed Claims Reserve"** shall mean the Cash in the Liquidating Trust set aside by the Liquidating Trustee in a separate interest-bearing account in an amount sufficient to cover the scheduled or asserted amount of Disputed Claims and Pending Claims not disallowed, released or discharged pursuant to this Plan or otherwise and any related costs and expenses that may be incurred by the Liquidating Trustee, as such reserve amount may be increased or reduced by the Liquidating Trustee.  However, if any dispute arises regarding any increase or reduction of the Disputed Claims Reserve, the Liquidating Trustee shall obtain approval of the Bankruptcy Court.  Any unused amounts from the Disputed Claims Reserve shall become Cash available for distribution to Holders of Allowed Claims in accordance with the terms of this Plan.

8

ff.    **"D&O Claims"** shall mean the claims or causes of action against certain of the Debtors' former officers and directors.

gg.    **"D&O Parties"** shall mean any of the Debtors' pre-petition officers and directors with the exception of David Hackett, Philip LeFevre, Timothy Murphy, Leon Knight, Craig Attel and Christopher Eason.

hh.    "**Effective Date**" shall mean a date designated by the Committee that is not later than 30 days after the date of the Court's entry of the Confirmation Order, unless otherwise modified by the Court.

ii.    **"Equity Security"** shall have the meaning set forth in section 101(16) of the Bankruptcy Code.

jj.    **"Estates"** shall mean the estates of the Debtors created under section 541 of the Bankruptcy Code on the Petition Date.

kk.    **"Executory Contracts"** shall mean executory contracts and unexpired leases as such terms are used in section 365 of the Bankruptcy Code, including all operating leases, capital leases, and contracts to which a Debtor is a party or beneficiary as of the Confirmation Date.

ll.    **"Final Distribution Date"** means the date upon which the final distribution is made to Allowed Holders pursuant to the Plan.  The Final Distribution Date shall be determined by the Liquidating Trustee, and shall be the date on or after which (a) all Liquidating Trust Assets are liquidated to Cash and the proceeds thereof distributed in accordance with the Plan and Liquidating Trust Agreement, (b) any Net Proceeds of Causes of Action are distributed to Holders of Allowed General Unsecured Claims, (c) any and all remaining Cash in the Liquidating Trust Reserve has been paid or distributed in accordance with the Plan and Liquidating Trust Agreement, and (d) any and all other Liquidating Trust Assets have been liquidated and distributed.

mm.    **"Final Order"** shall mean an order or judgment of the Bankruptcy Court which has not been reversed, stayed, modified or amended and: (i) as to which the time to appeal or seek reconsideration or rehearing thereof has expired; (ii) in the event that a motion for reconsideration or rehearing is filed, such motion shall have been denied by an order or judgment of the Bankruptcy Court; or (iii) in the event that an appeal is filed and pending, a stay pending appeal has not been entered, provided however that with respect to an order or judgment of the Bankruptcy Court allowing or disallowing a Claim, such order or judgment shall have become final and non-appealable, and provided further that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or analogous rule under the Bankruptcy Rules, or Section 502(j) of the Bankruptcy Code or Bankruptcy Rule 3008, may be filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order.

nn.    **"Final Report"** means the Final Report on Distributions and Request for Entry of Final Decree Closing Case to be filed by the Liquidating Trustee, pursuant to section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, after the Estates and Liquidating Trust are fully administered.

oo.    **"General Unsecured Claim"** shall mean a Claim that is not a Secured Claim, Administrative Claim or Priority Claim.

pp.    **"Governmental Unit"** shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

qq.    **"Holder"** shall mean the beneficial holder of a Claim or Interest and, when used in conjunction with a Class or type of Claim or Interest, means a holder of a Claim or Interest in such Class or of such type.

rr.    **"Interest" or "Equity Interest"** shall mean any "equity security" interest in the Debtors, as the term is defined in section 101(16) of the Bankruptcy Code, exclusive of any such interests held in treasury by the Debtors, which Interests are identified in the Lists of Equity Security Holders filed by the Debtors in the Chapter 11 Cases and/or registered in the stock registers maintained by or on behalf of the Debtors.

ss.    **"Interestholder"** shall mean the Holder of an Interest in any of the Debtors.

tt.    **"Liquidating Trust"** shall mean the grantor trust created upon the Effective Date, for the benefit of Allowed Creditors under the Plan, pursuant to the terms of the Plan and Liquidating Trust Agreement.

uu.    **"Liquidating Trust Agreement"** shall mean the agreement between and among the Debtors, Committee and Liquidating Trustee, effective as of the Effective Date and governing the terms of the Liquidating Trust, the form of which is attached hereto as **Exhibit A**.

vv.    **"Liquidating Trust Assets"** shall mean the Debtors' Assets transferred to the Liquidating Trust as of the Effective Date, including Cash, remaining accounts receivable and Causes of Action.

ww.    **"Liquidating Trustee"** means Kenneth A. Welt, whose appointment shall become effective on the Effective Date.

xx.    **"Net Proceeds"** means an amount equal to the gross proceeds actually collected by the Debtors or Liquidating Trustee from the liquidation of any Assets, including any judgment or settlement or other disposition of any Causes of Action, less any and all fees and expenses incurred in the liquidation of such Assets or prosecution of such Causes of Action, including, without limitation, those of attorneys, accountants, brokers and experts.

yy.    **"Pending Claim"** means a Claim which is not an Allowed Claim but not a Disputed Claim (for example, any Claim as to which the Debtors or Liquidating Trustee have not agreed to allow prior to the expiration of the Claims Objection Deadline).

zz.    "**Person**" shall mean any natural person, firm, partnership, association, corporation, company, trust, business trust, government authority or other entity.

aaa.    **"Petition Date"** shall mean November 4, 2010 the date on which the Debtors filed their voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code.

**bbb.**    **"Plan"** shall mean this Chapter 11 Plan of Liquidation in its entirety, together with all addenda, exhibits, schedules and other attachments hereto, in its present form or as it may be modified, amended or supplemented from time to time.

**ccc.**    **"Plan Documents"** means any contracts, instruments, securities, releases, indentures, and any other agreements or documents delivered pursuant to, related to or implementing this Plan or such other documents, including without limitation those documents attached as exhibits to this Plan and the Liquidating Trust Agreement.

**ddd.**    **"Priority Claims"** means Priority Tax Claims and Priority Non-Tax Claims, collectively.

**eee.**    **"Priority Non-Tax Claim"** means any Claim given priority in payment pursuant to section 507 of the Bankruptcy Code, but not including Priority Tax Claims and Administrative Claims.

**fff.**    **"Priority Tax Claim"** means any Claim given priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

**ggg.**    **"Professional**" means a Person (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 328 and/or 1103 of the Bankruptcy Code and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code, including professionals employed by the Liquidating Trustee on and after the Effective Date; or (b) for which compensation and reimbursement have been allowed by the Bankruptcy Court pursuant to section 503(b)(3)(A) or (b)(4) of the Bankruptcy Code.

**hhh.**    **"Professional Fees"** or **"Professional Claims"** means Claims by Professionals retained by the Debtors or Committee for compensation and reimbursement of expenses relating to services rendered from and after the Petition Date through and including the Confirmation Date pursuant to sections 330 and 331 of the Bankruptcy Code.

**iii.**    **"Pro Rata"** means, at any time, the same proportion that the amount of an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in such Class.

**jjj.**    **"Purchaser"** means VPAA Co., the buyer of substantially all of the Debtors' Assets.

**kkk.**    **"Rejection Claim"** shall mean any Claim arising out of the Debtors' rejection of an Executory Contract.

**lll.**    **"Sale"** shall mean the May 6, 2011 sale of substantially all of the Debtors' assets to the Purchaser.

**mmm.**    **"SAH-VUL"** shall mean SAH-VUL Strategic Partners I, LLC.

11

**nnn.** **"Schedules"** shall mean the Schedules and Statements of Financial Affairs filed by the Debtors in the Chapter 11 Cases, as have or may be amended, modified or supplemented.

**ooo.** **"Secured Claim"** shall mean a Claim secured by property of the Debtors.

**ppp.** **"Secured Tax Claim"** shall mean a Secured Claim asserted by or on behalf of a Governmental Unit arising from tax obligations of the Debtors.

**qqq.** **"Unclaimed Property"** shall mean any distribution of Cash or other property made to the Holder of an Allowed Claim pursuant to this Plan that (a) is returned to the Debtors or Liquidating Trustee as undeliverable and no appropriate forwarding address is received within the later of (i) 90 days after the Effective Date and (ii) 90 days after such distribution is made to such Holder, or (b) in the case of a Distribution made in the form of a check, is not negotiated within 90 days and no request for re-issuance is made. Unclaimed Property shall become Cash available for distribution to Holders of Allowed Claims in accordance with the terms of this Plan.

**rrr.** **"United States Trustee"** shall mean the United States Trustee for the Southern District of Florida.

**sss.** **"Unliquidated Claims"** shall include all Claims scheduled as such by the Debtors and any Claims filed with the amount listed as "unknown" or "disputed" or a similar non-specific description of the amount.

**ttt.** **"Unsecured Claims"** shall mean Priority Claims and General Unsecured Claims.

**uuu.** **"Voting Deadline"** means the deadline established by the Bankruptcy Court for submitting a Ballot to accept or reject the Plan.

Most words or phrases used in the Disclosure Statement and Plan shall have their usual and customary meanings. Unless otherwise defined, the terms used herein shall have the same meaning as in the Bankruptcy Code or Rules.

## E.    Holders of Claims Entitled to Vote

Pursuant to the Bankruptcy Code, only holders of Allowed Claims or Equity Interests in Classes of Claims or Interests that are impaired under the Plan and that will receive distributions under the Plan are entitled to vote to accept or reject the Plan. Under applicable bankruptcy law, any proof of claim filed by an alleged creditor is presumed to be an Allowed Claim until such time as the Debtors or Committee (or another party in interest) objects to such a claim. In the event an objection is filed to a Claim (filed or scheduled) claim, then the Holder of the Disputed Claim **is not permitted to vote on the Plan until such time as the Claim is temporarily allowed by the Bankruptcy Court for voting purposes. In this regard, the burden is on the claimant to seek the allowance for voting purposes and the Committee strongly recommends that parties with claims subject to an objection seek legal counsel to discuss their eligibility to vote.** Classes of Claims or Interests in which the Holders of Claims or Interests will not receive or retain any property under the Plan are deemed to have rejected the

12

Plan and are not entitled to vote on the Plan; Classes of Claims or Interests in which the Holders of Claims or Interests are unimpaired under the Plan are deemed to have accepted the Plan and are not entitled to vote on the Plan. Under the Plan, Classes 4 and 5 are impaired. Only Holders of Allowed Claims under Classes 4 and 5 are entitled to vote on the Plan.

### F.    Cramdown

If the applicable requirements of section 1129(a) of the Bankruptcy Code, other than subparagraph 8 thereof, are determined by the Bankruptcy Court to have been satisfied with respect to the Plan, then the Committee may seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. For purposes of seeking confirmation of the Plan under section 1129(b), the Committee reserves the right to modify or vary the terms of the Plan or the treatment of the Claims or interests so as to comply with the requirements of section 1129(b).

### ARTICLE I
### BACKGROUND INFORMATION

### A.    Background of Debtors

Gulfstream Acquisition Group, Inc. was incorporated in Delaware in December 2005 and changed its name to GIG in June 2007. GIG was formed for the purpose of acquiring Gulfstream GTA. GIA was a wholly-owned subsidiary of GIA Holdings. Prior to the Sale, GIA served the public as a regional air carrier based in Fort Lauderdale, Florida. GIA operated a fleet of turboprop Beechcraft 1900D aircraft, and specialized in providing travelers with access to niche locations not typically covered by major carriers. Specifically, GIA operated approximately 150 scheduled flights per day, serving nine destinations in Florida, ten destinations in the Bahamas, five destinations from Continental Airline's hub under the Department of Transportation's Essential Air Service Program and support charter service to Cuba through a services agreement with Gulfstream Air Charter, Inc. ("GAC"), an entity otherwise unrelated to the Debtor. GIA operated as a Continental Connection carrier, as well as for United Airlines and Copa Airlines, through respective code share agreements.

Prior to the Sale, GAC, a non debtor company owned by GIA's founder, Thomas L. Cooper, operated charter flights between Miami, Florida and Havana Cuba. GAC was licensed by the Office of Foreign Assets Control of the U.S. Department of the Treasury as a carrier and travel service provider for charter air transportation between designated U.S. and Cuban airports. Pursuant to a service agreement between GIA and GAC dated August 8, 2003, as amended on March 14, 2006 (the "Amended Agreement"), GIA provided use of its aircraft, flight crews, the Gulfstream name, insurance, and service personnel, including passengers, ground handling, security, and administrative functions. GIG also maintained the financial records for GAC. Pursuant to the Amended Agreement, GIA received 75% of the operating profit generated by GAC, after paying operating expenses on behalf of GAC.

Prior to the Sale, GTA was in the business of flight training. GTA employed 6 teaching staff and provided recurrent 441 training for the GIA pilots. GTA housed the flight training operations at Flight Safety Orlando, and maintained a simulator to aid and assist in the delivery of its training curriculum. The training program for enrolled students consisted of approximately

522 hours of training including a 318 hours of Turboprop training, and 250 hours of Flying Line as a Part-121 paid First Officer at GIA.

GCI was an FAA certified part 135 air carrier located at the Ft. Lauderdale, Hollywood International Airport. GCI provided private charter service to the Islands of the Bahamas, the Caribbean, and Florida. GCI employed 8 persons and operated four twin engine aircraft with seating for 9 passengers and an executive configuration for 6 passengers.

GIA Holdings was a non-operating holding company which owns one hundred percent (100%) of the capital stock of GIA.

## B.    Events Leading to Debtors' Chapter 11 Filings

From 2003 until 2007, the Debtors experienced strong growth and consistent profitability. GIG completed an initial public offering in December 2007, raising approximately $5.5 million to pay off debt and provide additional working capital.

Starting in late 2007, spiking oil prices and high maintenance expenses associated with the airline's fleet of EMB-120 aircraft contributed to operating losses through the first nine months of 2008, which created the need for additional working capital to sustain operations. In an effort to improve profitability, management implemented a series of significant actions, including a sale of the EMB-120 fleet, exiting unprofitable markets, and completing a number of reductions in the Debtors' cost structure. By the fourth quarter of 2008, the profitability improvement plans had taken hold and the Debtors experienced improved financial performance.

In September of 2008, the Debtors raised approximately $6.5 million in debt capital, which met near term capital needs, allowed it to meet other scheduled obligations, and allowed the airline to implement its planned business changes to improve profitability. During late 2008 and the first half of 2009, the Debtors posted excellent financial results. GIG also began to pay down significant amounts of its principal indebtedness to its senior secured lender, Shelter Island, its aircraft lessor, Raytheon Company ("Raytheon"), and its engine service provider, Pratt and Whitney Canada Corp. While these payments were necessary, the repayments absorbed a majority of the positive cash flow generated from improved operations.

During the second half of 2009 and the first half of 2010, results from operations declined as fuel prices climbed once again, and more significantly, GIG experienced a decline in revenues due to weak passenger demand in light of the recession and new competition in several key markets. Management again structured a plan to shift capacity to markets offering better profitability prospects, and undertook a series of financings to improve working capital and fund the capacity reallocations. In addition, GIG engaged in extensive negotiations with Raytheon and, on May 14, 2010, entered into a lease amendment and forbearance agreement.

The process of completing necessary working capital financings was delayed by the abrupt closure of GIG's placement agent, Jesup & Lamont. GIG continuously sought to complete the financing efforts, and as a result of the GIG's efforts, obtained an investment of $1.5 million from SAH-VUL. As part of the SAH-VUL investment, SAH-VUL was granted an option, exercisable during the 90 day period beginning on September 8, 2010 through December 8, 2010, to lend an additional $1 million to GIG in exchange for an additional $1,000,000

secured convertible promissory note, and an additional warrant to purchase up to 500,000 shares of common stock at an exercise price of $0.70 per share.

After September 8, 2010, as GIG made decisions relating to potential investment and capital raising opportunities being pursued to complete an acquisition of the Raytheon aircrafts, GIG anticipated that SAH-VUL would exercise its option and fund the additional $1.0 million investment at the end of October 2010. Unfortunately, SAH-VUL elected not to provide the remaining $1.0 million, leaving GIG in an extraordinarily difficult cash flow position at the end of October 2010.

The Debtors then filed for Chapter 11 relief in hopes of attracting financing through the assistance of a court-supervised financial restructuring.

## ARTICLE II
## THE DEBTORS' CHAPTER 11 CASES

### A.    Procedural Matters

On November 4, 2010, each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code, designated as Case Numbers 10-44131-BKC-JKO, 10-44133-BKC-JKO, 10-44134-BKC-JKO, 10-44137-BKC-JKO, 10-44139-BKC-JKO.  The Debtors remain in possession of their properties and continue to manage their assets as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On November 4, 2010, the Bankruptcy Court entered an order directing the joint administration of the Chapter 11 Cases for procedural purposes only. Pursuant to the terms of that order, the Chapter 11 case of 10-44131-BKC-JKO is the lead case.  Set forth below is a brief summary of significant matters or events which have occurred to date in the Chapter 11 Cases.

### B.    Payment of Pre-Petition Employee Obligations

On November 8, 2010, the Bankruptcy Court entered an order authorizing the Debtors to pay (i) pre-petition accrued, unpaid employee wages and related taxes, benefits and business expenses; (ii) all pre-petition premiums and contributions on policies and plans of insurance for the benefit of their employees, including, without limitation, policies and plans pertaining to health, medical, dental, disability and accidental death and dismemberment claims, together with all costs and expenses incurred in connection with the servicing and processing of such claims and such other amounts as may be required to keep such policies and plans in full force and effect; and (iii) all pre-petition payments, premiums or benefits due to or for the benefit of employees pursuant to worker's compensation laws and policies (excluding any retroactive adjustments under any existing policies).  Pursuant to the terms of that order, the Debtors have made all such payments.

### C.    Adequate Assurance as to Utility Companies

As of the Petition Date, the Debtors used electricity, water, telephone, and other utility services provided by numerous utility companies.  It was necessary for the Debtors to seek an immediate order from the Bankruptcy Court which prohibited any such utility company from

altering, refusing, terminating or discontinuing utility services on account of a pre-petition amount owed to such utility company or the Debtors' failure to furnish a post-petition deposit to such utility company.   On December 7, 2010, the Bankruptcy Court entered an order (i) prohibiting any such utility company from altering, refusing, terminating or discontinuing utility services to the Debtors on account of the filing of the Chapter 11 Cases or a pre-petition amount owed to such utility company, and (ii) finding that all utility companies were adequately assured of future performance due to the Debtors' agreement to provide a cash deposit equal to two week's worth of utility services based on the Debtors' anticipated post-petition usage, coupled with the Debtors' ability to pay for post-petition utility services.

**D.      Retention of Professionals**

The Debtors have retained the law firm of Berger Singerman, P.A. ("Berger Singerman") as their general bankruptcy counsel in the Chapter 11 Cases.   On December 3, 2010, the Bankruptcy Court entered final orders approving the applications to employ Berger Singerman as their general bankruptcy counsel in the Chapter 11 Cases.   The Debtors also retained the firm of Jetstream Aviation Capital, LLC and Jetstream Aviation Management, LLC to perform services on behalf of the Debtors in connection with the sale of their assets.   The Bankruptcy Court entered an order authorizing the retention of all such Professionals retained by the Debtors.

**E.      Creditors' Committee**

On November 19, 2010, the United States Trustee appointed a committee of creditors holding unsecured claims in the Chapter 11 Cases.   The initial members of the Committee were Pratt & Whitney Canada Corp., Gulfstream Funding II, LLC, G. Richard Hicks, Flight Safety International, Inc., Monroe County Board of County Commissioners, Jeffrey William Mays, and R. Kenneth Lindell (Gregory McDaniel SEP IRA).   The Bankruptcy Court entered an order approving the retention of GrayRobinson, P.A. as counsel to the Committee.

**F.      Pre-Petition Claims Bar Date**

On November 15, 2010, the Bankruptcy Court entered an order fixing March 16, 2011 as the deadline for filing proofs of claim against the Debtors by all Creditors.

**G.      Use of Cash Collateral**

On November 10, 2010, the Bankruptcy Court entered its first interim order authorizing the Debtors' use of cash collateral in accordance with an approved budget for the Debtors [Docket No. 75].   The Court has entered numerous orders permitting the Debtors' further use of cash collateral over interim periods [Docket Nos. 197, 208, 237, 283, and 288].   Each time the Court entered orders further authorizing the use of cash collateral, determined that the use of cash collateral was fair and reasonable, an exercise of prudent business judgment, and supported by fair consideration.   The Court further determined that the use of cash collateral was necessary to avoid irreparable harm and damage to the Debtors, is in the best interests of the Debtors, necessary to sustain business operations, and preserve valuable contractual rights.

## H.    DIP Loans

Through the efforts of the Debtors and their financial advisors, the Debtors were able to secure up to $5.0 million in debtor-in-possession financing (the "DIP Loan") from Victory Park Capital Advisors, LLC ("Victory Park").

On November 4, 2010, the Debtors filed the Debtors' Motion for Interim and Final Orders (I) Authorizing (A) Secured Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364 (c)(1), (c)(2), (c)(3), and (d); (B) Granting Security Interests, Superpriority Liens and Claims and Adequate Protections; And (C) Use of Cash Collateral and Scheduling A Final Hearing Pursuant to Bankruptcy Rule 4001 (c) (the "DIP Motion") [Docket No. 8].[2]  Pursuant to agreements reached prior to the hearing on the DIP Motion, the interim financing made available pursuant to the Interim Order (I) Authorizing (A) Secured Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364 (c) and (d); (B) Granting Security Interests, Superpriority Liens and Claims and Adequate Protection; and (C) Use of Cash Collateral; and (II) Scheduling a Final Hearing (the "Interim DIP Order") [Docket No. 75] was increased from $1,500,000 to $1,700,000.

On December 6, 2010, Victory Park, pursuant to the DIP Loan, sent a notice of default (the "Default Notice") to the Debtors.  Since Victory Park was initially unwilling to waive existing defaults under the DIP Loan, the Debtors, on December 16, 2010,  filed its Motion for Interim and Final Orders (I) Authorizing (A) Secured Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), (c)(2), (c)(3), and (d); And (B) Granting Security Interests, Superpriority Liens and Claims and Adequate Protection; and (C) Use of Cash Collateral and (II) Scheduling a Final Hearing [Docket No. 217] (the "Second DIP Motion").  The Second DIP Motion sought approval of secured, post-petition loan from Shelter Island, in the amount of $1,700,000 to fund a refinancing of the principal amount of the DIP Loan from Victory Park and to provide limited working capital to allow the Debtors to continue business operations and to facilitate an orderly sale of the Debtors' assets.

However, after negotiations and discussions among the Debtors, Victory Park, and Shelter Island, Victory Park agreed to reserve any further action until after a sales process was properly completed.  As a result, there was no need for the Court to rule on the Second DIP Motion and the financing provided by Shelter Island as Victory Park had agreed to a moratorium on its rights to enforce the Default Notice.

## I.    DIP Reports

As required under the Bankruptcy Code, the Debtors have filed monthly debtor-in-possession operating reports (the "DIP Reports") or will have filed all outstanding DIP Reports by the Confirmation Date.  As evidenced by the DIP Reports, the Debtors are current on all post-petition obligations. For more detailed information regarding the Debtors' post-petition financial performance, the DIP Reports are available for review by parties in interest.

---

[2] Pursuant to the DIP Motion, the Debtors were originally seeking $1,500,000 in interim DIP financing.

**J.      Section 363 Asset Sale**

On May 6, 2011, the Debtors and the Purchaser executed and closed on the APA, which provided for the sale by the Debtors of substantially all of their assets to the Purchaser [Docket No. 494].

On December 16, 2010, the Court entered an Amended Order (I) Establishing Competitive Sale and Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (II) Approving Form and Manner of Notices; (III) Scheduling Hearing Dates to Conduct Auction and to Consider Final Approval of Sale Including Treatment of Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief [Docket No. 213] (the "Bid Procedures Order"). Pursuant to the Bid Procedures Order, the Court established procedures and deadlines for the submission of any competing bids for the assets, and scheduled an auction for January 5, 2011, and sale hearing (the "Sale Hearing") for January 7, 2011, to determine the highest and best offer for the sale of the Debtors' assets.

At the Sale Hearing, the Court determined that the highest and best offer for the Debtors' assets was the bid from the Purchaser. Gulfstream International Acquisition Co., LLC's final bid at the auction was deemed the back-up bid in accordance with the Bid Procedures Order.

On January 20, 2011, the Court entered its Order Approving the Sale of Substantially All of the Assets of the Debtors Free and Clear of All Liens, Claims, Encumbrances, and Interests; (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief [Docket No. 307] (the "Sale Order"), approving the Sale of the Debtors' assets to the Purchaser.

The closing of the sale occurred on May 6, 2011 (the "Closing"). Pursuant to the APA and at the Closing, the Purchaser performed certain actions and assumed certain liabilities of the Debtors.

First, the Purchaser satisfied the DIP Loan provided by Victory Park, on behalf of one or more entities for which it acts as investment manager, including all the principal, interests, costs, expenses, and fees that were due.

Second, the Purchaser also assumed all unpaid and allowed administrative expense claims pursuant to 11 U.S.C. §503 arising prior to the date of closing, with the exception of fees and costs sought by professionals retained by the Estates pursuant to 11 U.S.C. §§ 327, 328, 330 and 1103.

Third, the Purchaser satisfied Shelter Island's claim in full and final satisfaction, released and discharged any and all claims Shelter Island has or may have against the Debtors, the Estates, DIP Lender, Purchaser, or any of their respective affiliates[3].

---

[3] As part of the APA, the Purchaser entered into a transaction of an undisclosed nature with Shelter Island, under which the Purchaser is satisfying Shelter Island's claim.

Fourth, any and all claims of the Debtors, the Estates, the Committee, and Debtors' creditors and Interestholders against DIP Lender, and their respective affiliates were released and discharged.

Fifth, the Purchaser also paid $600,000 to the Estates, which will be used as part of the total amount of $625,000 for the distribution to the Allowed General Unsecured Claim Holders.[4] From the amount due to it under the DIP Loan, the Victory Park allocated $100,000 for fees and expenses for Committee Counsel to draft, prepare, and confirm a liquidating plan of reorganization and also for the Liquidating Trustee to prosecute Claims assigned to the Liquidating Trust. Victory Park was further required to fund up to $300,000 per calendar month under the DIP Loan for the purpose of paying allowed going-forward administrative expenses.

Sixth, the Purchaser also purchased the aircraft leased to the Debtors from Raytheon Aircraft Credit Corporation for a purchase price of $18,700,000.00.

Lastly, the Purchaser agreed to assume, and pay, perform and discharge when due, all liabilities and obligations related to or arising from the ownership or operation of the assets arising after date of Closing.

As part of the APA and the Sale Order, the Debtors, the Estates, the Committee, or any subsequent Chapter 11 or Chapter 7 Trustee (the "Estate Parties"), are prohibited from bringing any avoidance actions, investigation, or litigation of any kind against the Purchaser, Victory Park, Shelter Island, RACC, David Hackett, Philip LeFevre, Timothy Murphy, Leon Knight, Craig Attel, and Christopher Eason.

In accordance with the Sale Order, the Debtors provided the Purchaser with a schedule of transfers (as such term is defined by section 101(54) of the Bankruptcy Code) to (i) insiders (as such term is defined by section 101(31) of the Bankruptcy Code) within the one year period to the Petition Date and to (ii) non-insiders within the ninety day period prior to the Petition Date (collectively, the "Transfer Schedules"). The APA further detailed that, on or before the one hundred fiftieth (150th) day subsequent to the Closing, the Purchaser agreed to send a written confirmation to the Debtors, the Committee, or any successor, identifying which of the transfers on the Transfer Schedules may not be subject of an avoidance action because the Purchaser maintains an active business relationship with such transferee (the "Confirmation Notice"). Upon receipt of the Confirmation Notice from the Purchaser, the Debtors, the Committee, or any successor, will be authorized but not obligated to commence any avoidance actions possessed by the Estates against any transferee not identified in the Confirmation Notice. The Debtors, the Committee, or successor will be allowed to pursue any avoidance actions solely against transferees listed on the Transfer Schedules that are not identified by the Purchaser in the Confirmation Notice.

The total proceeds from the Sale and any Estate Causes of Action not excepted will be transferred into the Liquidating Trust upon the Effective Date as Available Cash for distribution to Holder of Allowed Claims under the Plan.

---

[4] The remaining $25,000 is derived from the $25,000 remaining balance of the SAH-VUL Carveout that was released to the Estates as part of the Settlement with SAH-VUL.

**K.      Assumption and Assignment of Certain Executory Contracts and Unexpired Leases of Nonresidential Real Property**

Pursuant to the Purchase Agreement, and the Sale Order, the Purchaser, and Victory Park, filed the attached schedule of contracts designated for assumption and assignment (the "Designated Contracts").

**L.      Rejection of Executory Contracts and Unexpired Leases of Nonresidential Real Property**

During the course of the Chapter 11 Cases, the Debtors filed three motions with the Bankruptcy Court seeking authority to reject Executory Contracts and unexpired leases of nonresidential real property.

However, only one of these motions has been granted by an order of the Bankruptcy Court[5]. On May 10, 2011, the Debtors filed their Omnibus Motion to Reject Executory Contracts and Unexpired Leases of Non-Residential Real Property Effective as of May 6, 2011 ("Omnibus Motion"). On May 20, 2011, the Court entered an order granting the Omnibus Motion.

**M.      Settlement with SAH-VUL Strategic Partners I, LLC**

SAH-VUL is a creditor of the Debtors by virtue of a $1,500,000 debt financing. As collateral security for the repayment of the financing, SAH-VUL asserted that the Debtors granted to SAH-VUL a lien and security interest in, and an assignment of certain assets and rights, along with the proceeds and products thereof. As a result of this asserted security interest, SAH-VUL was given the right to the first $200,000 (the "SAH-VUL Carveout") of certain designated post-petition proceeds as adequate protection.

At the Sale Hearing, the Court overruled SAH-VUL's objection to the Sale and authorized the Sale free and clear of SAH-VUL's lien rights based on the Court's finding of a *bona fide* dispute as to the SAH-VUL debt. The Committee indicated at the Sale Hearing that they would pursue avoidance, subordination and/or recharacterization of the SAH-VUL claims. SAH-VUL subsequently filed a Notice of Appeal of the Sale Order [Docket No. 308].

In resolution of the aforementioned claims, on March 22, 2011, SAH-VUL, the Debtors, and the Committee filed a Joint Motion for Entry of an Order Pursuant to Federal Rule of

---

[5]      On December 31, 2010, the Debtors filed its Conditional Motion to Reject Collective Bargaining Agreement with the Airline Division of the International Brotherhood of Teamsters ("CBA Conditional Motion"). On February 17, 2011, the Court entered the Agreed Order Continuing Deadlines Pursuant to 11 U.S.C. §1113 and Authorizing Interim Relief Pursuant to Debtor's Motion to Reject Collective Bargaining Agreement (the "Agreed Order").

On April 29, 2011, GIA filed its Motion to Reject Unexpired Lease of Non-Residential Real Property. On May 16, 2011, an Agreed Motion for Continuance of Hearing Scheduled for May 18, 2011 on Debtor, GIA's Motion to Reject Unexpired Lease of Non-Residential Real Property.

Bankruptcy Procedure 9019 Approving Settlement and Compromise (the "Settlement") [Docket No. 411].

Pursuant to the Settlement, the Debtors have paid the sum of $175,000 to SAH-VUL from the SAH-VUL Carveout. The remaining balance of $25,000 from the SAH-VUL Carveout has been released to the Debtors' Estates. Additionally, SAH-VUL is entitled to one-third of any recoveries (net of attorneys' fees and costs) from any source in respect of any claim asserted on behalf of the Estates or its successor against any of the Debtors' current or former directors or officers.

In turn, SAH-VUL dismissed its appeal of the Sale Order with prejudice on June 27, 2011 [Docket No. 519].

Finally, the Debtors, the Estates, the Committee, any subsequent Chapter 11 or Chapter 7 trustee, and any of their respective counsel, advisors, agents, professionals and representatives (collectively, the "Estate Parties") granted general releases in favor of SAH-VUL, William J. Caragol, Scott Silverman, and any of SAH-VUL's other officers, directors, managers, members, affiliates, associates, employees, equity holders, agents, representatives, advisors, and professionals (the "SAH-VUL Parties"), relating in any manner whatsoever, to the Debtors, their businesses and operations. The SAH-VUL Parties granted the Estate Parties a reciprocal general release in their favor.

## N.    Bona Fide Dispute as to Claim Asserted by Taglich Brothers, Inc.

The Court, in its Sales Order, found that a bona fide dispute exists as to the secured claim asserted against the Estates by Taglich (on behalf of itself and/or the lenders and other parties for which it acts as agent) in that such claim is subject to, without limitation, the potential of avoidance, subordination, recharacterization, disallowance or reclassification. The Committee does not believe that Taglich holds a valid secured claim and may seek to invalidate any secured claim or seek to equitably subordinate under Section 510 of the Bankruptcy Code any claim asserted by Taglich.

## O.    Rejection of Executory Contracts and Unexpired Leases; Exceptions

EXCEPT FOR THOSE EXECUTORY CONTRACTS EXPRESSLY ASSUMED BY THE DEBTORS IN THE CHAPTER 11 CASES, ALL OTHER EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS WILL BE REJECTED PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE BY THE CONFIRMATION ORDER.

## P.    Approval of Rejection; Rejection Damages Claims Bar Date

Any Claim for damages arising from any Executory Contract rejection not already approved by the Court must be filed within 30 days after the earlier of the date of entry of the Confirmation Order or such Rejection Claim or shall be forever barred, shall not be enforceable against the Debtors, the Estates, or any of their respective properties and shall receive no distribution under the Plan or otherwise on account of such Rejection Claim. TO REITERATE, THE FAILURE TO TIMELY FILE REJECTION CLAIMS SHALL BAR SUCH CLAIMS

AND THE HOLDERS THEREOF SHALL NOT BE ENTITLED TO ANY DISTRIBUTIONS UNDER THE PLAN.

**Q.      Treatment Under the Plan of Executory Contract Rejection Claims**

Unless otherwise ordered by the Bankruptcy Court, an Allowed Rejection Claim shall be treated as an Allowed General Unsecured Claim (against the applicable Debtor and treated accordingly) under the Plan.

**R.      Causes of Action**

The Debtors' Schedules identify creditors whose Claims are disputed, and the Debtors' Statements of Financial Affairs identify the parties who received payments and transfers from the Debtors, which payments and transfers may be avoidable under the Bankruptcy Code. Moreover, the Committee continues to investigate Causes of Action that the Estates may have against third parties. The Committee has not completed their investigation of potential Causes of Action and objections to Claims; therefore, the Committee is unable to provide any meaningful estimate of amounts that could be recovered for the benefit of the Liquidating Trust beneficiaries under the Plan and Liquidating Trust Agreement and/or the amount of claims that will be allowed by the Bankruptcy Court. **THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY SUCH CAUSES OF ACTION OR OBJECTIONS TO CLAIMS. ALL SUCH RIGHTS ARE SPECIFICALLY PRESERVED IN FAVOR OF THE DEBTORS AND LIQUIDATING TRUST.**

Creditors and Interest holders should understand that legal rights, claims and Causes of Action that the Debtors may have against them, if any exist, are retained under the Plan and will be transferred into the Liquidating Trust for prosecution by the Liquidating Trustee unless a specific order of the Court authorizes the Debtors to release such claims. As such, Creditors and Interestholders are cautioned not to rely on (i) the absence of the listing of any legal right, claim or Cause of Action against a particular Creditor in the Disclosure Statement, Plan, Schedules or Statement of Financial Affairs, or (ii) the absence of litigation or demand prior to the Effective Date as any indication that the Debtors or Liquidating Trustee do not possess or do not intend to prosecute a particular right, claim or Cause of Action if a particular Creditor or Interestholder votes to accept the Plan. It is the expressed intention of the Plan to preserve the Debtors' rights, claims and Causes of Action, whether now known or unknown, for the benefit of the Debtors' Estates, Creditors and Interestholders.

**1.      Causes of Action; Subordination**

Under the Plan, all of the Debtors' Causes of Action (i.e., Claims against third parties including Avoidance Actions) will be transferred to the Liquidating Trust for prosecution by the Liquidating Trustee. The Claims that may be pursued post-Confirmation include Avoidance Actions (described below) and Claims against certain of the Debtors' insiders and their related or affiliated entities.

D&O Claims include the claims or causes of action against the D&O Parties which may be asserted by the Liquidating Trustee. These potential Claims include, without limitation,

breach of fiduciary duty, corporate waste and deepening insolvency relating to certain pre-petition conduct, transactions and actions by the Debtors' former officers and directors

Specifically, D&O Claims include, but are not limited to, alleged breaches of fiduciary duty of the Debtors' former officers and directors for (i) allowing the Debtors to incur or continue to incur additional debt, without regard to the Debtors' ability to pay such debt, causing the Debtors to become insolvent or enter the zone of insolvency, (ii) failing to cause the Debtors to file Chapter 11 bankruptcy petitions sooner than the Petition Date in an attempt to preserve enterprise value and/or maximize the value of the Debtors' assets, and (iii) other breaches that may be determined through discovery. The Liquidating Trustee may also pursue Claims against any professionals, advisors, consultants or other Persons who may have assisted such former officers in the misconduct that gives rise to such claims, as either principal tortfeasors or under an aiding and abetting theory. Because the D&O Claims have not been asserted, the estimated recoveries are currently unknown.

However, no Causes of Action (including Avoidance Actions) can be brought or instigated by the Liquidating Trustee against the Purchaser, Victory Park, any of their respective affiliates, Shelter Island, RACC, David Hackett, Philip Lefvre, Timothy Murphy, Leon Knight, Craig Attel, or Christopher Eason.

The Committee believes and the Court recognized (in its Sale Order) that a bona fide dispute exists as to the secured claim asserted against the Estates by Taglich Brothers, Inc. ("Taglich Claim") (on behalf of itself and/or the lenders and other parties for which it acts as agent). As a result, the Committee asserts that grounds exist to subordinate the claim filed by Taglich under section 510(b) of the Bankruptcy Code. Because this claim may be converted to equity, the Committee believes that the Taglich Claim is subordinate to holders of General Unsecured Claims. Pursuant to 11 U.S.C. 510(b), the Committee not stipulating to the allowance of the Taglich Claim; rather, disclosing their position that, even if the Taglich Claim is allowed, it shall be subordinated to the General Unsecured Claims.

In addition to any state law or federal common law claims outlined above, the Liquidating Trustee may pursue preferential and/or fraudulent transfer claims against the aforementioned insiders and other third parties for avoidance and recovery of certain pre-petition transfers made to such Persons by the Debtors, as discussed in more detail below, and such claims shall be preserved for the benefit of the Estates and Liquidating Trust.

The Committee and Liquidating Trustee reserve their rights to prosecute any available Causes of Action and objection to Claims, and such rights shall be preserved for the benefit of the Estates and Liquidating Trust except as described herein.

### 2.    Avoidance Actions

During the 90-day period immediately preceding the Petition Date, while insolvent, the Debtors made various payments and other transfers to Creditors on account of antecedent debts. In addition, during the one-year period before the Petition Date, the Debtors made certain transfers to, or for the benefit of, certain "insider" creditors. Some of those payments may be subject to avoidance and recovery by the Estates as preferential and/or fraudulent transfers

pursuant to Bankruptcy Code sections 544, 547, 548 and 550. All claims, Causes of Action, and other legal and equitable rights that the Debtors had (or had power to assert) immediately prior to Confirmation of the Plan, including actions for the avoidance and recovery of estate property under Bankruptcy Code sections 329 and 550, or transfers avoidable under Bankruptcy Code sections 544, 545, 547, 548, 549 or 553(b), will be transferred into the Liquidating Trust as of the Effective Date, and the Liquidating Trustee may commence or continue, in any appropriate court or tribunal, any suit or other proceeding for the enforcement of such actions for the benefit of the Liquidating Trust beneficiaries.

However, as stated, no Avoidance Actions can be brought or instigated by the Liquidating Trustee against the Purchaser, Victory Park, any of their respective affiliates, Shelter Island, RACC, David Hackett, Philip Lefvre, Timothy Murphy, Leon Knight, Craig Attel, or Christopher Eason.

In addition, no Avoidance Actions can be brought or instigated by the Liquidating Trustee against any creditors with whom the Purchaser wishes to maintain or establish going forward business relationships without the prior written consent of the Purchaser.

Attached hereto as **Exhibit B** is a list which, among other things, identifies recipients of payments made by the Debtors (i) within the 90-day pre-petition period which may be subject to avoidance and recovery as preferential transfers pursuant to sections 547 and 550 of the Bankruptcy Code; (ii) within two and four years pre-petition, which may be subject to avoidance and recovery as fraudulent transfers pursuant to sections 544 and/or 548 and 550 of the Bankruptcy Code; and (iii) certain claims, without limitation, against officers, directors, their affiliates and advisors for actionable conduct relating to their fiduciary duties, business judgment, self dealing and/or conversion or similar causes of action, and other avoidance actions under chapter 5 of the Bankruptcy Code. The Committee and Liquidating Trustee reserve their rights to prosecute actions against the Persons identified on Exhibit B, and any other available claims learned through discovery or otherwise (which may also uncover the identity of other litigation targets), and all such claims and Causes of Action shall be preserved for the benefit of the Estates and Liquidating Trust.

In accordance with the Sale Order, the Debtors provided the Purchaser with the Transfer Schedules.[6] The APA further detailed that, on or before the one hundred fiftieth (150th) day subsequent to the Closing, the Purchaser agreed to send the Confirmation Notice, a written confirmation to the Debtors, the Committee, or any successor, identifying which of the transfers on the Transfer Schedules may not be subject of an avoidance action because the Purchaser maintains an active business relationship with such transferee  Upon receipt of the Confirmation Notice from the Purchaser, the Debtors, the Committee, or any successor, will be authorized but not obligated to commence any avoidance actions possessed by the Debtors' Estates against any transferee not identified in the Confirmation Notice. The Debtors, the Committee, or successor

---

[6] As already described herein, the Transfer Schedules refer to a schedule of transfers (as such term is defined by section 101(54) of the Bankruptcy Code) to (i) insiders (as such term is defined by section 101(31) of the Bankruptcy Code) within the one year period to the Petition Date and to (ii) non-insiders within the ninety day period prior to the Petition Date (collectively, the "Transfer Schedules").

will be allowed to pursue any avoidance actions solely against transferees listed on the Transfer Schedules that are not identified by the Purchaser in the Confirmation Notice.

## ARTICLE III
## CHAPTER 11 PLAN

**A.    Treatment of Unclassified, Unimpaired Claims**

    **1.    Administrative Claims**

        **a.    Approval of Administrative Claims**: All Administrative Claims are subject to allowance by the Bankruptcy Court and its determination of the reasonableness of the amounts; and any party in interest can object to any claims for administrative fees and expenses.

        **b.    Payment of Allowed Administrative Claims**:  Pursuant to the APA, Holders of Allowed Administrative Claims, have already received or shall receive, on account of such Claims, Cash in the amount of such Claims on or as soon as reasonably practicable after the later of the Effective Date or the Allowance Date.  Professionals retained in these Chapter 11 Cases and entities that may be entitled to reimbursement for the allowance of fees and expenses from the Estates pursuant to section 503 of the Bankruptcy Code shall receive Cash in the amount awarded to such Professionals and entities and in accordance with any Final Orders entered pursuant to sections 330 or 503 of the Bankruptcy Code.

    **2.    United States Trustee Fees**

    The Debtors shall pay the U.S. Trustee the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6) within 10 days after the Effective Date for pre-Confirmation periods and simultaneously provide to the U.S. Trustee an appropriate affidavit indicating the cash disbursements for the relevant periods.  The Liquidating Trust shall pay all U.S. Trustee fees owed for post-Confirmation periods.

    **3.    Allowed Priority Tax Claims**

    No Claim reconciliation analysis regarding the validity and the amount of each Allowed Priority Tax Claim has yet been performed.  To the effect that Allowed Priority Non-Tax Claims are determined to exist, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, each Allowed Priority Tax Claim (against any Debtor) will be paid in full on or as soon as reasonably practicable after the later of the Effective Date or the Allowance Date.

**B.    Treatment of Classified Claims and Interests**

    The following comprises the Plan's treatment of all Allowed Claims against the Estates. Any Allowed Claims will be paid pursuant to the terms of the Plan.

    **1.    Allowed Priority Non-Tax Claims (Class 1):**

    Class 1 consists of all Priority Non-Tax Claims against all Debtors.  No Claim reconciliation analysis regarding the validity and the amount of Each Allowed Priority Non-Tax

Claim has yet been performed. To the effect that Allowed Priority Non-Tax Claims are determined to exist, each Allowed Priority Non-Tax Claim shall be paid in full on or as soon as reasonably practicable after the later of the Effective Date or the Allowance Date in accordance with § 1129(a)(9)(B) of the Bankruptcy Code. Class 1 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**HOLDERS OF PRIORITY NON-TAX CLAIMS ARE UNIMPAIRED AND THEREFORE NOT ENTITLED TO VOTE ON THE PLAN**

      **2.**    **Allowed Secured Tax Claims (Class 2)**

Class 2 consists of all Secured Tax Claims. Each Allowed Secured Tax Claim shall be paid in full on or as soon as reasonably practicable after the later of the Effective Date or the Allowance Date. Class 2 is Unimpaired by the Plan. Each Holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan. **The Committee is not aware of any Allowed Secured Tax Claims.**

**HOLDERS OF SECURED TAX CLAIMS ARE UNIMPAIRED AND THEREFORE NOT ENTITLED TO VOTE ON THE PLAN**

      **3.**    **Allowed Other Secured Claims (Class 3)**

Class 3 consists of all Allowed Other Secured Claims. Each Allowed Secured Claim shall either be paid or satisfied in full and final satisfaction as reasonably practicable after the later of the Effective Date or the Allowance Date. Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**HOLDERS OF ALLOWED SECURED CLAIMS IN THIS CLASS ARE UNIMPAIRED AND THEREFORE NOT ENTITLED TO VOTE ON THIS PLAN.**

      **4.**    **Allowed General Unsecured Claims (Class 4)**

Class 4 consists of Allowed General Unsecured Claims (against any of the Debtors, the Estates of which will either be substantively consolidated as of the Effective Date or treated separately on the Effective Date). Each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata distribution from Available Cash and the Net Proceeds of the Liquidating Trust Cash after payment in full satisfaction of Allowed Administrative Claims, Allowed Priority Claims, and Allowed Secured Claims in accordance with the terms of this Plan. Class 4 is Impaired by the Plan. Each Holder of a General Unsecured Claim in Class 4 is entitled to vote to accept or reject the Plan. **Although the Claims reconciliation process is ongoing, the Committee estimates that approximately $19,976,902.61 in general unsecured claims were scheduled by the Debtors. The Committee was advised by the Debtors, through the course of this Case, that the Debtors approximate there will be $10,000,000.00 in Allowed General Unsecured Claims with approximately $625,000 in cash available for distribution in respect of such Allowed Claims subject to potential recoveries from Claims assigned to the Liquidating Trust. IF THE DEBTORS' CHAPTER 11 CASES ARE NOT**

**SUBSTANTIVELY CONSOLIDATED, AN ALLOCATION OF THE ASSETS AND LIABILITIES AMONG THE DEBTORS' CHAPTER 11 CASES WOULD BE REQUIRED, WITH EACH DEBTOR'S ASSETS BEING DISTRIBUTED PRO RATA TO THE GENERAL UNSECURED CREDITORS OF THAT PARTICULAR DEBTOR.**

**HOLDERS OF GENERAL UNSECURED CLAIMS ARE IMPAIRED AND THEREFORE ENTITLED TO VOTE ON THE PLAN**

      **5.**      **Intercompany Claims (Class 5)**

Class 5 consists of all Intercompany Claims.  On the Effective Date, and consistent with the substantive consolidation of the Debtors' Estates under the Plan, all Intercompany Claims shall be deemed cancelled, annulled and extinguished without further action by any party and shall be of no further force and effect. The Holders of Class 5 Intercompany Claims will not receive or retain any property under the Plan on account of such Intercompany Claims. Accordingly, the Debtors will not make any distribution or establish any reserve under the Plan for the Intercompany Claims.  Class 5 is impaired by the Plan.  Pursuant to section 1126(g) of the Bankruptcy Code, Class 5 is deemed to have rejected the Plan and, thus, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

      **6.**      **Equity Interests (Class 6)**

Class 6 consists of Interests in Debtor, GIG.  The Interests in Class 6 shall be cancelled and extinguished on the Effective Date and will not receive a distribution except in the extreme unlikely circumstances that Holders of Allowed General Unsecured Claims (Class 4) are paid in full. Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, Class 6 is deemed to have rejected the Plan and, thus are not entitled to vote to accept or reject the Plan.

**ARTICLE IV**
**MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN**

**A.**      **General Overview of the Plan**

On the Effective Date, a Liquidating Trustee will be appointed to manage the Estates and implement the terms of the Plan, including making distributions to Creditors.

The Plan provides for payments to be made by the Debtors or Liquidating Trustee to certain Holders of Allowed Claims out of Available Cash.  On the Effective Date, all holders of unpaid Claims shall become beneficial interest holders of the Liquidating Trust in an amount equal to their Allowed Claim and shall be treated in accordance with the Plan and the Liquidating Trust Agreement. The Plan provides that all Allowed Claims other than Class 4 General Unsecured Claims will be paid in full, and that each Holder of an Allowed General Unsecured Claim will receive such Holder's Pro Rata share of the Liquidating Trust Assets.  If the Court does not approve substantive consolidation of the Debtors' Estates and except for Intercompany transfers that are required to pay administrative, secured claims and priority tax claims, the Intercompany Claims and Equity Interests will automatically be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and will be of no further

force and effect. The Holders of the Intercompany Claims and Equity Interests will not be entitled to receive any distribution under the Plan and will retain no property or interest in the Debtors.

The Committee believes that the Available Cash from the proceeds of the pre-Confirmation sale of the Debtors' Assets, the continued collection of all of the Claims assigned to the Liquidating Trust will be sufficient in amount to fund in full, in Cash, the payments proposed under the Plan to Holders of Allowed Administrative Claims, Allowed Priority Claims, and Allowed Secured Claims.

## B.    Effective Date Transactions

Subject to the approval of the Bankruptcy Court, and the satisfaction and waiver of the conditions precedent to the occurrence of the Effective Date under the Plan on (or as soon as practicable following) the Effective Date, the Plan shall be implemented and the following actions shall occur:

### 1.    Vesting of Assets in the Liquidating Trust

On the Effective Date, and except as otherwise expressly provided in the Plan, all of the Debtors' Assets shall vest in the Liquidating Trust free and clear of any and all liens, debts, obligations, Claims, liabilities, Interests, and all other interests of every kind and nature, and the Confirmation Order shall so provide. All privileges with respect to the Assets, including the attorney/client privilege, to which the Debtors are entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Liquidating Trust and Liquidating Trustee.

### 2.    Corporate Action

All matters provided for under the Plan involving the corporate structure of the Debtors or the Liquidating Trust, and any corporate action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the Debtors or Liquidating Trustee.

## C.    Liquidating Trust

The Committee has selected Kenneth Welt to serve as the Liquidating Trustee. The Liquidating Trust Agreement, the form of which is attached hereto as **Exhibit B**, shall be effective as of the Effective Date. The Liquidating Trust Agreement shall establish the Liquidating Trust, which shall be a distinct legal entity from the Debtors and is intended to (i) qualify as a trust governed and construed in all respects as a liquidating trust pursuant to Treas. Reg. §301.7701-4(d) of the United States Treasury Regulations and as a grantor trust in favor of the Liquidating Trust beneficiaries pursuant to Treas. Reg. §1.671-4(a); and (ii) comply with the requirements of a liquidating trust, which is a grantor trust, as set forth in Revenue Procedure 94-45, 1994-2 C.B. 684.

By way of their execution of the Liquidating Trust Agreement, the Debtors shall transfer, assign and deliver all of their rights, title and interests in and to the Assets, including Causes of

Action, to the Liquidating Trust as of the Effective Date. Upon the request of the Liquidating Trustee, the Debtors shall also execute and deliver such other documentation deemed reasonably necessary by the Liquidating Trustee or his counsel to assure the proper transfer, assignment and delivery of title to the Assets to the Liquidating Trust. The Confirmation Order shall also contain appropriate language transferring, assigning and delivering title to the Assets to the Liquidating Trust and shall further provide that such transfer, assignment and delivery shall be effective without further action by any party. Except as expressly provided herein, the Debtors shall not have any obligation to contribute any funds or Assets to the Liquidating Trust or Liquidating Trustee.

Any and all Assets in the Liquidating Trust shall be held in an irrevocable trust for distribution to the Holders of Allowed Claims in accordance with the provisions of this Plan. Such distributions shall be made in accordance with the procedures set forth herein, and the terms of the Liquidating Trust Agreement and the Confirmation Order shall contain appropriate language to that effect. Once funds or Assets are deposited into the Liquidating Trust, and thereby become Liquidating Trust Assets, they shall no longer be property of the Debtors or any other Person or entity and none of the Debtors or any other Person or entity shall have any claim to said funds or Assets. The Confirmation Order shall declare and provide that all funds or Liquidating Trust Assets shall (a) be held in trust as set forth above, (b) not be property of the Estates in this or any subsequent proceeding in which any of the Debtors or their successors or assigns may be a debtor under the Bankruptcy Code, and (c) be protected from, and not subject to, the Claims of any Creditors of, or Holders of Interests in, the Debtors.

On the Effective Date, all holders of unpaid Claims shall become beneficial interest holders of the Liquidating Trust in an amount equal to their Allowed Claim and shall be treated in accordance with the Plan and the Liquidating Trust Agreement.

The Liquidating Trustee shall have the following duties under the Liquidating Trust Agreement:

a.  resolve any pending objections to Claims, and file or otherwise assert any objections necessary or appropriate to resolve all Disputed Claims;

b.  make any required distribution from the Liquidating Trust to the Holders of Allowed Claims, in accordance with the terms and provisions of the Plan and the Liquidating Trust Agreement;

c.  pursue, investigate, prosecute, compromise and otherwise resolve the Causes of Action;

d.  collect and liquidate or otherwise dispose of the Debtors' remaining accounts receivable; and

e.  such other duties as may be set forth in the Liquidating Asset Trust Agreement or elsewhere in the Plan.

In performing the duties described above, the Liquidating Trustee may act through legal counsel of his choice. The Liquidating Trust Agreement shall also provide for the Liquidating

29

Trustee to perform duties commonly performed by, and have the powers commonly provided to, such bankruptcy trustees, as more specifically set forth in the Liquidating Trust Agreement, including, among other things, obtaining tax identification number(s) for the Liquidating Trust, preparing and filing appropriate federal and state tax returns for the Liquidating Trust, opening bank accounts to maintain the Liquidating Trust Reserve and the Available Cash in the Liquidating Trust, maintaining records pertaining to the Pro Rata interests of the Holders of Allowed Class 4 General Unsecured Claims, and retaining Professionals to represent the interests of the Liquidating Trust and Liquidating Trustee.  For purposes of performing the foregoing duties, the Liquidating Trustee shall have the status of a representative of the Estates under 11 U.S.C. § 1123(b)(3)(B).  Until the Chapter 11 Cases are closed, the Liquidating Trustee shall submit any proposed action or compromises to the Bankruptcy Court as required by the terms of the Liquidating Trust Agreement.  The United States Trustee shall not be required to supervise the Liquidating Trustee, but shall have standing to seek removal of the Liquidating Trustee for cause.

The Liquidating Trustee shall invest the funds in the Liquidating Trust; provided, however, that any investments shall only be in United States government securities with a maturity date of 90 days or less, money market funds or other similar short-term liquid investments. Any and all interest earned on such funds shall be added to the principal amount of the funds in the Liquidating Trust and shall be available, together with the principal amount, for distribution in accordance with the provisions of this Plan.

The Liquidating Trustee shall be compensated at the hourly rate of $300.00, plus the reimbursement of his actual and necessary out-of-pocket expenses.  Any administrative or staff members the Liquidating Trustee employs will be compensated in the range of an hourly rate of $100.00 to $175.00.  The Liquidating Trust shall terminate as provided in the Liquidating Trust Agreement.

**D.      Prosecution and Settlement of Claims and Causes of Action**

The Liquidating Trustee may (a) commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Cause of Action which the Debtors had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Cause of Action subject to Bankruptcy Court approval as necessary or appropriate in accordance with the terms of the Liquidating Trust Agreement.

**E.      Effectuating Documents; Further Transactions**

Each officer of the Debtors, on and prior to the Effective Date (and the Liquidating Trustee from and after the Effective Date), shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, mortgages and other agreements or documents, and take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan or to otherwise comply with applicable law.

# ARTICLE V
# DISTRIBUTIONS

**A.      General**

The Liquidating Trustee may employ or contract with other Persons to make or assist in making the distributions required under this Plan without further Court order.  Distributions made by the Liquidating Trustee under the Plan shall be made only to Allowed Holders.  Until a Disputed Claim or Pending Claim becomes an Allowed Claim, the holder of that Disputed Claim or Pending Claim shall not receive the consideration otherwise provided under the Plan.

**B.      Delivery of Distributions**

Distributions to each Allowed Holder shall be made: (a) at the address set forth in the proof of claim filed by each such Holder with the Bankruptcy Court; (b) at the address set forth in any written notice of address change delivered to the Debtors or Liquidating Trustee after the date that the related proof of claim or interest was filed; or (c) at the address reflected in the Debtors' Schedules relating to the Allowed Claim or Interest if no proof of claim or interest was filed and the Debtors or Liquidating Trustee, as applicable, have not received written notice of a change of address.

**C.      Distributions to Allowed Creditors**

Except as otherwise provided in the Plan, on the applicable distribution date, or such other date as provided in the Plan, Holders of Allowed Claims shall be paid the amounts provided for under the Plan by the Liquidating Trustee in Cash.

**D.      Cash Payments**

Cash payments to be made pursuant to this Plan shall be made by checks drawn on a U.S. financial institution.

**E.      Interest on Claims**

Unless otherwise specifically provided for in this Plan, the Confirmation Order, a Final Order of the Bankruptcy Court or other court of competent jurisdiction, or required by applicable bankruptcy law, interest shall not accrue or be paid on Claims on a post-petition basis, nor will the Holder of an Allowed Claim be entitled to post-petition interest on such Claim.

**F.      Failure to Negotiate Checks**

Checks issued in respect of distributions under the Plan, or in payment of post-petition expenses and other Administrative Claims incurred from the Petition Date through the Confirmation Date, shall be null and void if not negotiated within sixty (60) days after the date of issuance. Any amounts returned to the Debtors or Liquidating Trustee in respect of such non-negotiated checks shall be held by the Liquidating Trustee.  Requests for reissuance of any such check shall be made in writing by the Allowed Holder directly to the Liquidating Trustee with respect to which such check originally was issued.  All amounts represented by any voided

31

check will be held until 60 days after the later of (a) the Effective Date, (b) the Allowance Date, or (c) the date that such check was issued, and all requests for reissuance by the Allowed Holder in respect of a voided check are required to be made before such date. Thereafter, all such amounts shall be deemed Unclaimed Property (as described below) and all Claims in respect of void checks and the underlying distributions shall be forever barred, estopped and enjoined from assertion in any manner against the Estates, property of the Estates, the Debtors, the Liquidating Trust and the Liquidating Trustee.

## G.    Unclaimed or Returned Property

All Cash distributed on account of Allowed Claims must be claimed within the later of (a) 90 days after the Effective Date or (b) 90 days after the date that such distribution is made to the Holder of such Allowed Claim which are not negotiated within the 90-day period set forth above, or returned by the United States Post Office (or other delivery service) as undeliverable, shall constitute Unclaimed Property and shall vest in and become an Asset of the Liquidating Trust free and clear of any Claims, liens, interests or encumbrances, except as otherwise provided in the Plan. No further distribution shall be made to any such Holder and the Holder shall not be entitled to a claim for such Unclaimed Property. Nothing in this Plan shall require the Liquidating Trustee to attempt to locate the Allowed Holders other than by reviewing the proofs of claim filed with the Bankruptcy Court, the Debtors' Schedules and any written communication from the Allowed Holder relating to address information.

## H.    Limitation on Distribution Rights

If an Allowed Holder holds more than one Allowed Claim in any one Class, all Allowed Claims of the Holder in that Class may be aggregated into one Claim and one distribution may be made with respect to the aggregated Allowed Claim.

## I.    Fractional Dollars

Notwithstanding any other provision of the Plan, Cash distributions of fractions of dollars will not be made; rather, whenever any payment of a fraction of a dollar would be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash remains undistributed as a result of the rounding of such fraction to the nearest whole dollar, such Cash shall be treated as Unclaimed Property hereunder.

## J.    De Minimis Distributions

No Cash payment of less than twenty-five dollars ($25.00) shall be made to any Allowed Holder on account of its Allowed Claim unless it is a final distribution.

## K.    Setoffs

The Liquidating Trustee may, but shall not be required to, set off against any Claim, and the payments or distributions to be made in respect of such Claim, any and all debts, liabilities and claims of every type and nature whatsoever which the Estates, Debtors or Liquidating Trustee may have against the Holder of such Claim, but neither the failure to do so nor the

allowance of any such Claim, whether pursuant to the Plan or otherwise, shall constitute a waiver or release by the Estates, Debtors or Liquidating Trustee of any such claims that the Estates, Debtors or Liquidating Trustee may have against such Holder, and all such claims shall be reserved and retained by the Liquidating Trustee.

**L.      Disputed Claims Reserve**

Prior to making any distributions, the Liquidating Trustee shall deposit distributions of Cash reserved for the Holders of Disputed Claims and Pending Claims in a segregated, non-interest bearing account called the Disputed Claims Reserve.  The Liquidating Trustee shall hold the Disputed Claims Reserve for the benefit of (a) Allowed Holders whose Cash distributions are unclaimed subject to the provisions above, and (b) the Holders of Disputed Claims and Pending Claims pending allowance or disallowance of their Claims.  When a Disputed Claim or Pending Claim becomes an Allowed Claim, the Liquidating Trustee shall release and deliver the Cash distribution reserved for the Holder of such Allowed Claim from the Disputed Claims Reserve. If the Bankruptcy Court disallows a Disputed Claim or Pending Claim, such Cash distribution shall be deemed property of the Liquidating Trust and become a Liquidating Trust Asset free and clear of any Claims, liens, interests or encumbrances, except as otherwise provided in the Plan.

## ARTICLE VI
## CONDITIONS PRECEDENT TO EFFECTIVE DATE

**A.      Conditions to Effective Date**

This Plan shall not become effective and the Effective Date shall not occur unless and until the following conditions have occurred or have been duly waived (if waivable) in accordance herewith:

**a.**      The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Committee, and such order shall have become a Final Order.

**b.**      The Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate pursuant to section 1125 of the Bankruptcy Code.

**c.**      All documents, instruments and agreements, in form and substance satisfactory to the Committee, provided for under this Plan or necessary to implement this Plan shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby.

**d.**      All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

**e.**      No order of a court shall have been entered and shall remain in effect restraining the Committee from consummating this Plan.

**B.      Waiver of Conditions to Consummation**

The conditions set forth above may be waived at any time only by a writing signed by an authorized representative of the Committee without notice or order of the Bankruptcy Court, or any further action other than proceeding to consummation of the Plan.

**C.      Notice of Effective Date**

On the Effective Date or as soon thereafter as is practicable, the Liquidating Trustee shall file with the Bankruptcy Court a notice of occurrence of the Effective Date which notice shall constitute appropriate and adequate notice that this Plan has become effective.  A copy of the notice of Effective Date may be sent by first class mail, postage prepaid, to those Persons who have filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002 and any other Persons deemed appropriate by the Liquidating Trustee.

**ARTICLE VII**
**TAX CONSIDERATIONS**

**A.      General**

A summary description of certain U.S. federal income tax consequences of the Plan is provided below.  The description of tax consequences below is for informational purposes only and is subject to significant uncertainties.  Only the principal consequences of the Plan for the Debtors and for the holders of Allowed Claims and Equity Interests who are entitled to vote to accept or reject the Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan, and no tax opinion is being given in this Disclosure Statement.  No rulings or determinations of the IRS or any other taxing authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other authorities.

The following discussion of U.S. federal income tax consequences is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), regulations promulgated and proposed thereunder, and judicial decisions and administrative rulings and pronouncements of the IRS as in effect on the date hereof.  Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to Holders.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

This discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the U.S. federal tax consequences of the Plan to special classes of taxpayers (such as foreign entities, nonresident alien individuals, Pass-through entities such as partnerships and holders through such pass-through entities, S corporations, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, certain securities traders, broker-dealers and tax-exempt organizations).

34

Furthermore, estate and gift tax issues are not addressed herein and tax consequences relating to the alternative minimum tax are generally not discussed herein.

No representations are made regarding the particular tax consequences of the Plan to any Holder of a Claim or Equity Interest. Each Holder of a Claim or Equity Interest is strongly urged to consult its own tax advisor regarding the federal, state, local and foreign tax consequences of the transactions described herein and in the Plan.

## B.    Federal Income Tax Consequences to the Debtors

Generally, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) gives rise to cancellation of debt ("COD") income, which must be included in the debtor's income. The Debtors should have COD income as a result of the Plan; the Debtors should, however, be able to utilize a special tax provision which excludes from taxable income debts discharged in a chapter 11 case. If debts are discharged in a chapter 11 case, however, certain tax attributes otherwise available may be reduced by the amount of COD income that is excludable from income. Tax attributes subject to reduction generally include net operating losses and net operating loss carryovers (collectively, "NOLs"). Any NOLs would be reduced (assuming the Debtors do not make an election pursuant to section 108(b)(5) of the Internal Revenue Code (title 26 of the United States Code) to first reduce the tax basis of depreciable property) to the extent of the COD income exclusion.

Federal income taxes generally must be satisfied before most other claims may be paid. To the extent the Debtors have taxable income after the Effective Date, the Debtors may have NOLs to offset such income.

## C.    Federal Income Tax Consequences to Creditors and Interestholders

Creditors should generally recognize gain (or loss) to the extent the amount realized under the Plan (generally the amount of cash received) in respect of their Claims exceeds (or is exceeded by) their respective tax bases in their Claims. The tax treatment of holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan will depend upon, among other things, (i) the nature and origin of the Claim, (ii) the manner in which a Creditor acquired a Claim, (iii) the length of time a Claim has been held, (iv) whether the Claim was acquired at a discount, (v) whether the Creditor has taken a bad debt deduction in the current or prior years, (vi) whether the Creditor has previously included in income accrued but unpaid interest with respect to a Claim, (vii) the method of tax accounting of a Creditor; and (viii) whether a Claim is an installment obligation for U.S. federal income tax purposes. Therefore, Creditors should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequence to such Creditors as a result thereof.

The tax treatment of a Creditor that receives distributions in different taxable years is uncertain. If such a Creditor treats the transaction as closed in the taxable year that it first receives (or is deemed to have received) a distribution of cash and/or other property, it should recognize gain or loss for such tax year in an amount equal to the cash and the value of other

property actually (and deemed) received in such tax year (other than that received in respect of accrued interest) with respect to its Claim (other than any portion of the Claim that is attributable to accrued interest) plus the estimated value of future distributions (if any) less its tax basis in its Claim (except to the extent its Claim is for accrued interest).   A Creditor should then subsequently recognize additional income or loss when additional property distributions are actually received in an amount equal to the cash and/or value of such other property (other than that received in respect of accrued interest) less the Creditor's allocable tax basis in its Claim with respect to such subsequent distribution.  A Creditor may have to treat a portion of any such subsequent distribution as imputed interest recognizable as ordinary income in accordance with the Creditor's method of tax accounting.  If instead the open transaction doctrine applies as a result of the value of the subsequent distributions that a Creditor may receive not being ascertainable on the Effective Date, such Creditor should not recognize gain (except to the extent that the value of the cash and/or other property already received exceeds such Creditor's adjusted tax basis in its Claim (other than any Claim for accrued interest)) or loss with respect to its Claim until it receives the final distribution thereon (which may not be until the final distribution date).  It is the position of the IRS that the open transaction doctrine only applies in rare and extraordinary cases.  Creditors are urged to consult their own tax advisors regarding the application of the open transaction doctrine and how it may apply to their particular situations, whether any gain recognition may be deferred under the installment method, whether any loss may be disallowed or deferred under the related party rules and the tax treatment of amounts that certain Creditors may be treated as paying to other Creditors.

Holders of Allowed Claims will be treated as receiving a payment of interest (in addition to any imputed interest as discussed in the preceding paragraph) includible in income in accordance with the Holder's method of accounting for tax purposes, to the extent that any Cash and/or other property received pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims.  The extent to which the receipt of Cash and/or other property should be attributable to accrued but unpaid interest is unclear.  The Plan provides that such Cash and/or other property distributed pursuant to the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon.  Each Creditor should consult its own tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any) and whether any such interest may be considered to be foreign source income.  A Creditor generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

**D.**     **Holders of Allowed Equity Interests**

The Holders of Allowed Equity Interests in the Debtors are urged to consult with their tax advisors with respect to the tax consequences under the Plan.  The Holders of Allowed Equity Interests and their advisors may wish to consider, among any other relevant considerations, the extent to which the Holder of an Allowed Equity Interest may be entitled to a bad debt deduction or a worthless security loss in respect of the cancellation of its shares of the common stock under the Plan.

E.    **Holders of Disputed Claims**

Though not beyond doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that Cash is transferred to the Disputed Claims Reserve, but should recognize gain or loss in an amount equal to: (i) the amount of Cash and the fair market value of any other property actually distributed to such claimants (other than any amounts attributable to accrued and unpaid interest) less (ii) the adjusted tax basis of their Claims (other than for accrued and unpaid interest).  Holders of Disputed Claims are urged to consult their own tax advisors regarding the taxation of their Disputed Claims and the timing and amount of income or loss recognized relating to the Disputed Claims Reserve.

F.    **Information Reporting and Backup Withholding**

Certain payments, including payments of Allowed Claims pursuant to the Plan, are generally subject to information reporting by the payor to the IRS.  Moreover, such reportable payments are subject to backup withholding under certain circumstances.  Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding at the applicable tax rate with respect to distributions or payments made pursuant to the Plan, unless the Holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury as to the correctness of its taxpayer identification number and certain other tax matters.  Backup withholding is not an additional tax.  Rather, the federal income tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld.  If withholding results in an overpayment of federal income taxes, a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS.

G.    **Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CREDITOR'S INDIVIDUAL CIRCUMSTANCES.  ACCORDINGLY, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## ARTICLE VIII
## ALTERNATIVES TO PLAN AND BEST INTERESTS OF CREDITORS

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Chapter 11 Cases, (b) the Chapter 11 Cases could be converted to cases under chapter 7 of the Bankruptcy Code, or (c) the

Bankruptcy Court could consider an alternative plan of reorganization proposed by another party.

## A.    Dismissal

If the Chapter 11 Cases were to be dismissed, the Debtors would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. Dismissal would force a race among creditors to take over and dispose of the Debtors' available assets. Even the most diligent unsecured creditors would likely fail to realize any significant recovery on their claims.

## B.    Chapter 7 Liquidation

A straight liquidation bankruptcy, or chapter 7 case, requires liquidation of the bankruptcy debtor's assets by an impartial trustee. In a chapter 7 case, the amount that unsecured creditors would receive depends on the net estate available after all assets of the debtor have been reduced to Cash. The cash realized from liquidation of the Debtors' assets would be distributed in accordance with the priority and distribution scheme prescribed in Bankruptcy Code sections 507 and 726.

If the Plan is not confirmed, it is likely that the Chapter 11 Cases will be converted to cases under chapter 7 of the Bankruptcy Code, in which case several trustees would be appointed to liquidate the Debtors' assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. Whether a bankruptcy case is a case under chapter 7 or chapter 11, Secured Claims, Administrative Claims and Priority Claims are entitled to be paid in full before any distribution becomes available for payment of Allowed General Unsecured Claims.

If the Chapter 11 Cases were converted to chapter 7, the present Administrative Claims may have a priority lower than administrative priority claims generated by the chapter 7 case, such as the chapter 7 trustee's fees or the fees of attorneys, accountants and other professionals engaged by the chapter 7 trustee. Nevertheless, because the Debtors are not administratively insolvent, the Professionals would argue their entitlement to be paid in full prior to any conversion.

If the Chapter 11 Cases were so converted, the Bankruptcy Court would appoint several trustees to liquidate the Debtors' property and assets and distribute the proceeds to creditors in accordance with the Bankruptcy Code's priority scheme. It is likely that the chapter 7 trustees would have little or no experience or knowledge of the Debtors' businesses or their records or assets. A substantial period of education would be required in order for any chapter 7 trustee to wind the case up effectively.

The chapter 7 trustee would be entitled to receive the compensation allowed under section 326 of the Bankruptcy Code. The trustee's compensation is based on 25% of the first $5,000 or less; 10% of any amount in excess of $5,000 but not in excess of $50,000; 5% of any amount in excess of $50,000 but not in excess of $1 million; and reasonable compensation not to exceed 3% of any amount in excess of $1 million, on all funds disbursed or turned over in the bankruptcy case by the trustee to parties in interest (excluding the Debtors, but including the

38

holders of Secured Claims).    The trustee's compensation would be paid as a cost of administration of the chapter 7 estate, and may have priority over the costs and expenses incurred in the chapter 11 case and any payment to unsecured creditors.  Under the Plan, a Liquidating Trustee will be placed in charge of monetizing all remaining non-cash assets (primarily litigation claims) and making distributions.  For his services, the Liquidating Trustee will be paid at the rate of $265 per hour, plus the reimbursement of actual and necessary out of pocket expenses. Because the majority of the Assets are in the form of Available Cash, the Committee believes the statutory fee payable to a Trustee under section 326 of the Bankruptcy Code will exceed the hourly rate charged by the Liquidating Trustee.

It is also likely that each chapter 7 trustee would retain his own professionals (including attorneys and financial advisors) whose fees would also constitute administrative priority claims in the chapter 7 case, with a priority that may be higher than those claims arising as part of the administration of the chapter 11 case.  While the Liquidating Trustee will also retain counsel, he will most likely retain one of the lawyers already familiar with the Debtors' bankruptcy case.  As a result, the fees should be lower.

Finally, the Claims Bar Date would be reopened in the converted chapter 7 cases, creating the possibility that additional allowable Claims would be filed against the Debtors' Estates and thereby reduce the aggregate distribution available to Holders of Allowed Claims and Equity Interests in the Chapter 11 Cases.

The Committee believes that liquidation under chapter 7 would result in a smaller distribution in respect of Allowed General Unsecured Claims.  As previously noted, conversion to chapter 7 would give rise to, among other things, (a) additional administrative expenses involved in the appointment of trustees, attorneys and other professionals to assist such trustee, and (b) the risk of additional allowable claims due to the reopening of the Claims Bar Date.

Accordingly, the Committee believes that the Plan is in the best interests of creditors for purposes of section 1129(a)(7) of the Bankruptcy Code.

## C.    Alternative Plan

The Committee does not believe that there are any other or different plans of reorganization which could be proposed which would yield a better result to the Estates' creditors.

## ARTICLE IX
## ACCEPTANCE AND CONFIRMATION OF THE PLAN

The Committee believes that the Plan satisfies all of the requirements for confirmation.

## A.    General Confirmation Requirements.

Section 1129(a) of the Bankruptcy Code requires, among other things, that a plan be proposed in good faith, that certain information regarding payments made or promised to be made to insiders be disclosed, that the plan comply with the applicable provisions of chapter 11, and that confirmation of the plan will likely not be followed by the need for further financial

reorganization or liquidation of the Debtors unless proposed in the plan.  Section 1129(b) of the Bankruptcy Code also requires that at least one impaired class accept the plan.  The Committee believes that they have complied with these provisions.

Classes 4 and 5 are the impaired classes entitled to vote under the Plan.  The Committee believes that each such class will vote to accept the Plan and, if not, "cramdown" confirmation under section 1129(b) of the Bankruptcy Code will be successful because at least one impaired class will vote to accept the Plan.

**B.     Best Interest of Creditors Test.**

Each Holder of a Claim or Interest in an impaired Class must either: (i) accept the Plan or (ii) receive or retain under the Plan cash or property of a value, as of the Effective Date of the Plan, that is not less than the value that the holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the Cash paid under the Plan to each Class equals or exceeds the value that would be allocated to Creditors in liquidation under chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Best Interest Test requires the Bankruptcy Court to find the Plan provides each member of each impaired Class a recovery having a value at least equal to that which each such Class member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  The Committee believes that the Plan meets the Best Interest Test for the reasons explained above.

**C.     Classification of Claims and Interests**

The Bankruptcy Code requires that a plan of reorganization place each creditor's claim and each equity security holder's interest in a class with other claims and interests that are "substantially similar."   The Committee believes that the Plan meets the classification requirements of the Bankruptcy Code.

**D.     Combined Disclosure Approval and Confirmation Hearing**

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing on approval of the Disclosure Statement and confirmation of the Plan.  The Committee will file a motion requesting that the Court initially approve the Disclosure Statement, and then schedule a consolidated hearing at which time the Court will consider the final approval of the Disclosure Statement and Confirmation of the Plan.  Any objection to approval of the Disclosure Statement and/or confirmation of the Plan must be made timely (in accordance with the Court's scheduling order to be provided) in writing, filed with the Bankruptcy Court and served upon the following parties:

Robert A. Schatzman, Esq.
Steven J. Solomon, Esq.
GrayRobinson, P.A.
1221 Brickell Avenue – Suite 1650
Miami, FL  33131

**E.      Voting**

Except as otherwise provided herein, each class of Claims or Interests that is impaired under the Plan shall be entitled to vote separately to accept or reject the Plan.  A Class of Claims shall have accepted the Plan if at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class that have filed ballots accepting or rejecting the Plan vote in favor of the Plan.  A Class of Interests shall have accepted the Plan if at least two-thirds in amount of the Allowed Interests in such Class that have filed ballots accepting or rejecting the Plan vote in favor of the Plan.

**F.      Financial Feasibility**

The Bankruptcy Code requires that, in order to confirm a plan, the Court must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors unless such further liquidation or reorganization is proposed by the Plan (the "Feasibility Test").  For a Plan to meet the Feasibility Test, the Court must find that the Debtors' Estates will possess the capital and other resources necessary to meet their obligations under the Plan.  The distributions contemplated to Holders of Allowed Claims will be paid from the Debtors' Cash on hand on the Effective Date and the proceeds of the Liquidating Trust Assets including any Cash generated from the prosecution of Causes of Action and collection of accounts receivable.

The Committee believes that the Feasibility Test has been satisfied because the Plan already contemplates the Debtors' complete liquidation.

**ARTICLE X**
**RISK FACTORS**

Creditors and Interestholders should carefully consider the following factors, as well as the other information contained in this Disclosure Statement (and the documents delivered herewith or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

The principal purpose of the Chapter 11 Cases is the formulation of the Plan, which provides for the complete liquidation of the Debtors' Assets and establishes how Claims against and Equity Interests in the Debtors will be satisfied.

**A.      Failure to Confirm or Consummate the Plan**

If the Plan is not confirmed and consummated, it is possible that an alternative plan can be negotiated and presented to the Bankruptcy Court for approval, however there is no assurance

that the alternative plan will be confirmed, that the Chapter 11 Cases will not be converted to liquidation cases under chapter 7 of the Bankruptcy Code, or that any alternative chapter 11 plan could or would be formulated on terms as favorable to the Creditors as the terms of the Plan. Unlike under the Plan, in a chapter 7 liquidation the Available Cash for distribution to Holders of Allowed General Unsecured Claims would be reduced by the additional administrative expense of a chapter 7 trustee and his/her professionals as well as the potential for additional claims filed as a result of reopening of the Claims Bar Date.

**B.**     **Allowed Claims Estimates May Be Incorrect**

There can be no assurance that the estimated Allowed Claim amounts set forth herein are correct; the actual amounts may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions, and if one or more of such risks or uncertainties materialize, or if underlying assumptions prove incorrect, the actual Allowed amounts may vary from those estimated herein.

## ARTICLE XI
## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**A.**     **Causes of Action**

This Plan does not operate or intend to resolve the Causes of Action, related defenses or other rights that the Debtors, Committee, Estates, Liquidating Trust or Liquidating Trustee may have against any other Person except as expressly provided for hereunder.

**B.**     **Binding Effect**

Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date the provisions of this Plan shall bind any Holder of a Claim against or Interest in the Debtor and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under this Plan and whether or not such Holder has accepted this Plan.

**C.**     **Exculpation from Liability**

The Professionals for the Debtors (acting in such capacity), the Committee (with respect to their service as members of the Committee, not as Creditors) and the Professionals for the Committee (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, implementation, or confirmation of the Plan, Disclosure Statement, Plan Documents or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Chapter 11 Cases, for the period from and after the Petition Date through the Confirmation Date; provided, however, that this exculpation provision shall not be applicable to any liability found by a court of competent jurisdiction, pursuant to a final order not subject to stay or appeal, to have resulted from the fraud, willful misconduct or gross negligence of any such party.  The rights granted hereunder are cumulative with (and not restrictive of) any

42

and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law.  Notwithstanding the foregoing, and without limitation, nothing contained in this Plan shall be considered a release, injunction or exculpation from any Claim the Estates may have against any officer, director, affiliate or Interest Holder of the Debtors except as already described herein.

**D.      Effect on Securities and Exchange Commission**

Nothing in this Plan or the Confirmation Order is intended to, or shall be construed as restricting or otherwise limiting the ability of the United States Securities and Exchange Commission to perform its statutory duties with respect to any person or Entity in any nonbankruptcy forum, pursuant to otherwise applicable law.

**E.      Term of Certain Injunctions and Automatic Stay**

All injunctions or automatic stays provided for in the Chapter 11 Cases pursuant to section 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect following the Confirmation Date and until the final decree is entered by the Bankruptcy Court, unless otherwise ordered by the Court.

**F.      No Liability for Tax Claims**

Unless a taxing Governmental Unit has asserted a Claim against the Debtors before the Claims Bar Date, no Claim of such Governmental Unit shall be Allowed against the Debtors or their respective directors, trustees, officers or agents, or the Liquidating Trustee, for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtors or any other Person to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

**ARTICLE XII**
**FINAL REPORT**

At such time as all distributions provided for under the Plan and Liquidating Trust Agreement have been made, the Liquidating Trustee shall file a final accounting with the Bankruptcy Court, together with the Final Report, and shall seek entry of a final decree closing the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

**ARTICLE XIII**
**ABANDONMENT**

The Debtors or Liquidating Trustee may abandon any property deemed burdensome or of inconsequential value to the Estates by filing a notice of abandonment with the Bankruptcy Court and serving it on the U.S. Trustee and affected parties. No property shall be deemed abandoned unless the Debtor or Liquidating Trustee files and serves a notice of abandonment, and such

abandonment shall be effective 10 days after the notice of abandonment is filed and served if no objection is timely filed and served. Any party in interest may oppose such abandonment by filing a written objection or response thereto with the Bankruptcy Court and serving the objection or response upon the Debtors or Liquidating Trustee so as to be received by the Debtors or Liquidating Trustee prior to the expiration of such 10-day period. The Bankruptcy Court retains jurisdiction to hear and determined any dispute regarding any proposed abandonment.

## ARTICLE XIV
## RETENTION OF JURISDICTION

### A.    Retained Jurisdiction of Bankruptcy Court

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, from and after the Effective Date the Bankruptcy Court shall retain subject matter jurisdiction of all matters arising out of, arising in or related to the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

    **1.**    interpret and enforce the provisions of the Plan;

    **2.**    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether filed before or after the Effective Date and whether or not contingent, disputed or unliquidated), including the compromise, settlement and resolution of any request for payment of any Administrative Claim or Priority Tax Claim, the resolution of any objections to the allowance or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to reinstate a Claim or Interest pursuant to the Plan, and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any objection to such Claim or Interest (to the extent permitted under applicable law);

    **3.**    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or Plan, for periods ending before, on or after the Effective Date;

    **4.**    determine and resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is a party or with respect to which a Debtor may be liable, and to hear, determine and, if necessary, liquidate any claims arising therefrom;

    **5.**    ensure that all payments and performance due under the Plan and the Plan Documents are accomplished as provided herein, and resolve any issues relating to distributions to Holders of Allowed Claims pursuant to the provisions of the Plan and the Plan Documents;

    **6.**    construe, take any action and issue such orders consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all Plan Documents, contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, including, without

limitation, the Disclosure Statement, Liquidating Trust Agreement and Confirmation Order, for the maintenance of the integrity of the Plan and the Plan Documents;

7.       determine and resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan, Plan Documents, Liquidating Trust Agreement or Confirmation Order, including the release and injunction provisions set forth in and contemplated by the Plan, Plan Documents, Liquidating Trust Agreement or Confirmation Order, or any Person's rights arising under or obligations incurred in connection therewith;

8.       entertain, approve and confirm modifications of the Plan before, on or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, or modify any Plan Document, contract, instrument, release, indenture or other agreement or document created in connection therewith, or remedy any defect or omission, or reconcile any inconsistency in any Plan Document, contract, instrument, release, indenture or other agreement or document created in connection therewith, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code, and the Plan;

9.       issue injunctions, enter, implement and enforce orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan, Confirmation Order, Liquidating Trust Agreement and/or Plan Documents;

10.       enter, implement and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

11.       determine any other matters that may arise in connection with or relating to the Plan, Confirmation Order, Liquidating Trust Agreement and/or Plan Documents, or any contract, instrument, release, indenture or other agreement or document created in connection therewith, except as otherwise provided in the Plan;

12.       hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

13.       continue to enforce the automatic stay, and any other applicable stays or injunctions, through the date of entry of the final decree closing the Chapter 11 Cases;

14.       hear and determine (A) disputes arising in connection with the interpretation, implementation or enforcement of the Plan, Confirmation Order, Liquidating Trust Agreement and/or Plan Documents; or (B) issues presented or arising under the Plan, Confirmation Order, Liquidating Trust Agreement and/or Plan Documents, including disputes among Holders of Claims and arising under agreements, documents or instruments executed in connection with the Plan, Confirmation Order, Liquidating Trust Agreement and/or Plan Documents;

15.       shorten or extend, for cause, the time fixed for performance of any act or event under the Plan, Confirmation Order, Liquidating Trust Agreement and/or the Plan Documents, on notice or *ex parte*, as the Bankruptcy Court shall determine to be appropriate;

16.    enter any order, including injunctions, necessary to enforce the title, rights and powers of the Debtors or Liquidating Trust, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary;

17.    adjudicate any settlements pursuant to Bankruptcy Rule 9019, if required under the Plan or Liquidating Trust Agreement, and all other matters contained herein; and

18.    enter a final decree closing the Chapter 11 Cases or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtors, the Estates, the Liquidating Trust, or the Chapter 11 Cases, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

## ARTICLE XV
## MISCELLANEOUS PROVISIONS

**A.    Substantial Consummation of the Plan**

For purposes of any future analysis regarding appellate issues (including the mootness of any appeal of the Confirmation Order which has not been stayed), modification of the Plan, administration of the Plan and jurisdiction of the Bankruptcy Court, the Plan shall be deemed to have been substantially consummated upon the Effective Date.  Nothing herein, however, shall limit or affect the Bankruptcy Court's retention of jurisdiction under this Plan.

**B.    No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtors, Committee or Liquidating Trustee with respect to any matter set forth herein, including without limitation liability on any Claim or Interest or the propriety of any classification of any Claim or Interest.

**C.    Controlling Documents**

To the extent that the Plan or Disclosure Statement is inconsistent with the Confirmation Order, the Confirmation Order shall control.  To the extent that the Plan or Disclosure Statement is inconsistent with the Liquidating Trust Agreement, the Liquidating Trust Agreement shall control.

**D.    Withdrawal of the Plan**

The Committee reserves the right, at any time prior to the substantial consummation (as that term is defined in section 1101(2) of the Bankruptcy Code) of the Plan, to revoke or withdraw the Plan. If the Plan is revoked or withdrawn or if the Confirmation Date does not occur, the Plan shall be null and void and have no force and effect. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims or interests by or against the Debtors or any other Person, constitute an admission of any fact or legal conclusion

46

by the Committee, Debtors, or any other Person, or to prejudice in any manner the rights of the Committee or any other Person in any further proceedings involving the Debtors.

**E.      Modification of the Plan**

The Committee may alter, amend or modify the Plan in accordance with section 1127(a) of the Bankruptcy Code or as otherwise permitted at any time before the Confirmation Date. After the Confirmation Date and before substantial consummation of the Plan, and in accordance with the provisions of section 1127(b) of the Bankruptcy Code and the applicable Bankruptcy Rules, the Committee or any other party in interest may, so long as the treatment of Holders of Claims and Interests under the Plan is not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Plan Documents or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan and the Plan documents. However, prior notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002.

**F.      Business Days**

If any payment or act under the Plan is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date.

**G.      Governing Law**

EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE OR BANKRUPTCY RULES OR OTHER FEDERAL LAWS ARE APPLICABLE, AND SUBJECT TO THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, INDENTURE OR OTHER AGREEMENT OR DOCUMENT ENTERED INTO IN CONNECTION WITH THE PLAN, INCLUDING WITHOUT LIMITATION THE PLAN DOCUMENTS, THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THE PLAN AND ALL RIGHTS AND OBLIGATIONS ARISING UNDER THE PLAN SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF FLORIDA, WITHOUT GIVING EFFECT TO CONFLICTS OF LAW PRINCIPLES THAT WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF FLORIDA OR THE UNITED STATES OF AMERICA.

**H.      Notices**

Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) first class U.S. mail, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

Robert A. Schatzman, Esq.
Steven J. Solomon, Esq.
GrayRobinson, P.A.
1221 Brickell Avenue – Suite 1650
Miami, FL  33131

The Committee recommends that Creditors carefully consider and review this Disclosure Statement and Plan. The Committee believes that the Plan provides Creditors with the greatest possible value that could be realized on their Claims. There are several alternatives to confirmation of the Plan including liquidation of the Debtors under chapter 7 of the Bankruptcy Code, in which event the Committee believes that Holders of Allowed General Unsecured Claims would receive less than they will under the Plan.

For the reasons set forth above, the Committee believes that the distribution to each impaired Class under the Plan will be greater than distributions that might be received under chapter 7 liquidation. The Committee recommends that each eligible Creditor vote to accept the Plan.

**[SIGNATURE PAGE FOLLOWS]**

Dated: July 20, 2011

**GRAYROBINSON, P.A.**

By: /s/  Robert A. Schatzman
Robert A. Schatzman
Florida Bar No. 139008
Steven J. Solomon
Florida Bar No. 931969
Ji Hun Kim
Florida Bar No. 87430
1221 Brickell Avenue, Suite 1650
Miami, Florida  33131
Phone:  (305) 416-6880
Fax:  (305) 416-6887
E-Mail:  robert.schatzman@gray-robinson.com
E-Mail:  steven.solomon@gray-robinson.com
E-Mail:  ji.kim@gray-robinson.com

*Attorneys for the Official Committee of Unsecured Creditors*

\350039\1 - # 475434 v1
7/20/11